Attorney for Plaintiff

Reed Zars
Utah State Bar No. 16351
Attorney at Law
910 Kearney Street
Laramie, WY  82070
(307) 760-6268
reed@zarslaw.com

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH
CENTRAL DISTRICT**

| | | |
|---|---|---|
| Utah Physicians for a Healthy Environment, Inc., | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| Diesel Power Gear LLC, 4X4 Anything LLC, | ) | Case No. 2:17-cv-32-RJS-DBP |
| B&W Auto LLC d/b/a Sparks Motors LLC, | ) | |
| David W. Sparks, David Kiley, Joshua Stuart, | ) | |
| and Keaton Hoskins, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**PLAINTIFF'S COMBINED MOTION AND MEMORANDUM FOR
PARTIAL SUMMARY JUDGMENT TO ESTABLISH
PLAINTIFF'S STANDING**

Plaintiff Utah Physicians for a Healthy Environment ("Physicians") respectfully move for partial summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, and Rule 56-1 of the Local Rules, to establish Physicians' standing to bring this Clean Air Act citizen enforcement action.

## I.  Introduction

This memorandum addresses, and answers in the affirmative, the following question: do Physicians have standing to obtain the relief they seek, assuming Defendants have violated the Clean Air Act ("CAA") as alleged in Physicians' Complaint?  Reworded in the parlance of standing, assuming the truth of Physicians' allegations that Defendants have

violated the CAA by causing the removal of pollution control devices from motor vehicles, are the injuries to Physicians fairly traceable to the harms caused by Defendants' violations and can those injuries be redressed, at least in part, by the relief Physicians seek?

As demonstrated below, there is no genuine dispute that Physicians are harmed by air pollution, that the types of air pollution harming Physicians are fairly traceable to Defendants' alleged violations of the CAA, and that Physicians' injuries can be redressed by injunctive and civil penalty relief.  First, Physicians' members have been, and continue to be, injured by harmful pollutants present in the air along the Wasatch Front.  Second, Defendants' alleged removal of pollution control devices in vehicles, their alleged operation of such vehicles, and their alleged installation and sale of aftermarket pollution control defeat parts adds pollution into the air that contributes to Physicians' injuries.  Finally, the injunctive and civil penalty relief requested by Physicians will redress, at least in part, Physicians' injuries.  Because there is no genuine dispute as to any material fact regarding these elements of standing, partial summary judgment finding Physicians have standing to prosecute the claims in their Complaint is warranted as a matter of law.

## II.  Statement of the Elements of Standing and the Undisputed Material Facts that Meet Each Element

The federal courts have jurisdiction under Section 304 of the Clean Air Act to hear an enforcement action brought by a citizen against "any person who is alleged to have violated (if there is evidence that alleged violation has been repeated) or to be in violation of . . . an emission standard or limitation under this chapter."  42 U.S.C § 7604(a).  The standing of a citizen-plaintiff under Article III of the Constitution to bring a CAA citizen action is established by proof that "(1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180 (2000).  *See*

*also, Catron Cnty. Bd. of Comm'ns v. U. S. Fish and Wildlife Serv.*, 75 F.3d 1429, 1432 (10th Cir. 1996) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 559 (1992)), and *Mount Evans Co. v. Madigan*, 14 F.3d 1444, 1450 (10th Cir. 1994.  Further, according to *Sierra Club v. Morton*, 405 U.S. 727 (1972), "all persons or associations of persons have an interest sufficient to confer standing if they allege that they have been or will be harmed by the challenged action."

## A.  THE ELEMENT OF ORGANIZATIONAL STANDING.

As an initial matter, organizations such as Physicians have "standing to bring suit on behalf of [their] members when [their] members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization[s'] purpose[s], and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."  *Laidlaw*, 528 U.S. at 181 (citing *Hunt v. Washington State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977)).

Statement of Undisputed Material Facts that Demonstrate
Physicians have Organizational Standing.

1.  The purpose of Physicians, a Utah non-profit organization comprised of health care professionals and concerned citizens, is "to educate the public about and to advocate for clean air, healthy land and clean water."  Catherine Cawley Decl., ¶ 4, Exhibit A.

2.  Physicians incorporated in 2007, have an office and staff based in Salt Lake City, and have approximately 3,000 newsletter subscribers.  Cawley Decl. ¶ 2.

3.  Physicians are concerned about air pollution in Utah, including ambient levels of particulate matter smaller than 2.5 microns ("PM$_{2.5}$") and ozone that exceed federal, health-based standards.  Diesel exhaust contributes to the concentration of both of these pollutants in the ambient air.  Cawley Decl., ¶ 5.

4.  This matter is germane to Physicians' purpose because the organization seeks to reduce harmful levels of PM$_{2.5}$ and ozone in the air of the Wasatch Front by reducing the emission of these (and other precursor) pollutants in diesel exhaust

from illegally modified diesel vehicles.  Cawley Decl., ¶ 6.

       5.    Physicians' members have standing to sue in their own right with respect to the violations alleged in Physicians' complaint as set forth below.

       6.    Neither Physicians nor any of its members assert claims for monetary damages or particularized relief for a specific member or group of members.

**B.  THE ELEMENT OF INJURY-IN-FACT FOR STANDING.**

The element of injury for the purposes of standing is established by proof from the plaintiff that "it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical."  *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180 (2000).  Actual or potential harm to health, aesthetic or recreational interests is sufficient to demonstrate injury-in-fact.  *Texans United for a Safe Econ. Educ. Fund v. Crown Cent. Petroleum Corp.*, 207 F.3d 789, 792 (5th Cir. 2000) (citing *NRDC v. EPA*, 507 F.2d 905, 910 (9th Cir. 1974)).

<u>Statement of Undisputed Material Facts that Demonstrate
Physicians' Injuries-in-Fact.</u>

       1.    Physicians' members live in the Wasatch Front airshed, and breathe the unhealthy pollution that is present in the ambient air.  Garber Decl., ¶¶ 1-2, 3-7; C. Jones Decl., ¶¶ 1, 3-11; K. Jones Decl., ¶¶  1, 3-12; Evans Decl., ¶¶ 1, 4-10, Exhibits B-E.

       2.    The ambient air in at least seven Utah counties along the Wasatch Front fails to meet the federal, health-based standard for $PM_{2.5}$.  The Utah counties that do not meet the 24-hour, 35 micrograms per cubic meter $PM_{2.5}$ standard are shown in the map below, acquired from the Utah Department of Environmental Quality ("UDEQ") website at:

*https://deq.utah.gov/Pollutants/P/pm/pm25/areas.htm*

**Utah Nonattainment Map**
Including nonattainment area boundaries and the townships and ranges of the legal descriptions.



3.      According to a PM₂.₅ overview published by UDEQ,

PM$_{2.5}$ particulates are fine, inhalable particles or droplets with a diameter of 2.5 microns or smaller. These fine particulates, which are about 30 times smaller than the width of a human hair, can travel deeply into the lungs and cause both short-term and long-term health effects. While larger PM$_{10}$ particulates can compromise respiratory and cardiac health, smaller particulate matter (PM$_{2.5}$) poses the greatest risk because it can penetrate deeply into the lungs where it can cause inflammation and damage to the lung tissue.

See, https://deq.utah.gov/Pollutants/P/pm/pm25/

4.      The ambient air in parts or all of at least seven Utah counties along the Wasatch Front also fails to meet the federal, health-based limit for ozone.  The Utah counties that do not meet the 8-hour, 0.070 parts per million ozone standard are shown in the map below.  *See*, Governor Herbert's September 29, 2016 letter to EPA, p.2, available from the UDEQ website at: *http://deq.utah.gov/Pollutants/O/ozone/docs/2016-10-Utah-Governor-Ozone-Area-Recommendation.pdf.*



5.      According to a health advisory issued by UDEQ, "Ozone affects the lungs and respiratory system in many ways. Exposure can lead to increased school or work absences, visits to doctors and emergency rooms, and hospital admissions. Research also indicates that ozone exposure can increase the risk of premature death from heart or lung disease." *See*, *http://www.deq.utah.gov/Pollutants/O/ozone/ozonehealth.htm.*

6.      The physical endurance of Physicians Board Member and Salt Lake County resident Howie Garber, M.D., is impaired by elevated levels of air pollution in the Wasatch Front.  During bad air pollution days in the winter, Dr. Garber discovered,

> I could only climb about 80% of the vertical that I would normally climb
> when the air is good.  After a few days of exposure to particulate air pollution
> I could actually measure a 15-20% diminution of peak expiratory flow rate.  I
> have also noticed at the health club that maximal heart rate is markedly
> reduced on days when particulate pollution is high.  I am discouraged that
> my physical output is significantly harmed by air pollution.

Garber Decl., ¶ 6, Exhibit B.

7.      Due to the adverse health effects associated with breathing fine

particulate matter, when ambient outside levels of $PM_{2.5}$ exceed 30 ug/m$^3$, Dr. Garber states

he is "forced to avoid all outdoor activities, including riding my road bike."  Garber Decl.,

¶ 7.  Because all indoor air derives from outside air, Dr. Garber also operates an air filtering

system during these periods to reduce indoor $PM_{2.5}$ pollution that has infiltrated into his

home from outside.  *Id.*

8.      Physicians member and Salt Lake County resident Christopher Jones,

M.D., also restricts his outdoor activities during air pollution alerts.  According to Dr. Jones,

> Because of concerns for my health, during air pollution alerts when air
> quality is unhealthy for "sensitive people" or worse, I run a portable air
> filtering device in my bedroom where I read or sleep.  On such days I also
> avoid outdoor exercise and run a portable air filter in my garage where my
> exercise machines are located.  If the air was cleaner I would not have to
> spend money on these devices, but I am forced to in order to protect my
> health.

C. Jones Decl., ¶ 10, Exhibit C.

9.      Dr. Jones also likes to exercise on the Bonneville Shoreline Trail, but

on high pollution days he is "denied this pleasure."  C. Jones Decl., ¶ 11.  In his words, "I am

discouraged that I have to avoid these activities because of air pollution."  *Id.*

10.     Dr. Jones is a four-season bicycle commuter in Salt Lake County.

According to Dr. Jones, "During my commute, I'm sometimes forced to breathe the smell

and visible smoke from one or more diesel pickup trucks.  I don't like breathing this

exhaust, and I hold my breath for as long as I can to avoid it."  C. Jones Decl., ¶ 6.

11.     During the winter months on his bicycle commute, Dr. Jones wears a "sub-micron particle filter mask" to defend himself against harmful particulate matter pollution.  C. Jones Decl., ¶ 8.  During the summer months, however, Dr. Jones says "it is too hot to wear a mask.  When I'm passed by a diesel pickup truck laying down a black cloud of diesel smoke in the warmer months I try to hold my breath but usually I have no choice but to breathe it. I do not like breathing heavy plumes of diesel exhaust."  C. Jones Decl., ¶ 9.

12.     The eyesight of Physicians Board Member and Salt Lake County resident Janice Evans is harmed by elevated levels of air pollution in the Wasatch Front.  Ms. Evans has a genetic eye disease called Keratoconus that requires her to use a gas-permeable contact lens.  According to Ms. Evans, "[w]hen the air is fouled with particulate pollution, my eye is literally sore, and on really bad air days, I cannot tolerate wearing the contact lens at all.  Can't drive, can't read, can't work."  Evans Decl., ¶ 5, Exhibit D.

13.     Even when she is able to see with her contact lens, pollution levels in the Wasatch Front, particularly during the winter, prevent her from seeing the view.  As Ms. Evans explains, "I live in one of the most beautiful places on the planet.  I become depressed when I can't see these places because of high levels of fine particulate matter and ozone."  She "deeply regret[s] the days when I can't see the mountains and feel the peace and restoration that the natural world would otherwise bring to my heart and soul."  Evans Decl., ¶¶ 8 & 9.

14.     Ms. Evans adds,

> My health, safety and comfort are not just compromised by the general levels of air pollution in Salt Lake County. My health, safety and comfort are specifically injured by dense plumes of diesel exhaust. Visible diesel exhaust coming from vehicles smells terrible, makes me choke, and adversely affects

my eyes. If I see a diesel truck belching black smoke I change lanes, slow
down or get off the road as soon as I can because the smoke will immediately
affect my eyes. I must avoid campfires and barbeque smoke as it also affects
my eyes. Diesel smoke and fumes are much worse.

Evans Decl., ¶ 7.

15.     Physicians Board Member and Salt Lake County resident Kirtly Jones,

M.D., is harmed by elevated levels of PM$_{2.5}$ and ozone in the Wasatch Front.  According to

Dr. Jones, "Because of air pollution's threat to my health, I am forced to limit my time

outdoors particularly when levels of PM$_{2.5}$ and ozone exceed federal health standards.  In

other words, my freedom to travel and enjoy our beautiful state is being infringed upon

when air quality is poor."  K. Jones Decl., ¶ 9, Exhibit E.

16.     As a professional endocrinologist and educator at the University of

Utah, the efforts of Dr. Jones to improve reproductive health and in utero development in

the state are also harmed by high levels of air pollution.  According to Dr. Jones,

> We have shown that the sperm quality of men in the Wasatch Front
> decreases after an episode of high levels of particulate pollution.  We also
> know that poor air quality is associated with increased rates of miscarriage.
> Even short term exposure in utero has an adverse effect on the developing
> child.  This has been proven in laboratory animals as well as humans.  My
> efforts to improve the chances of women to have children, and for those
> children to be healthy, are being harmed by high levels of air pollution in the
> Wasatch Front.

K. Jones Decl., ¶ 12.

17.     Dr. Jones has a reactive airways response and corneal irritation -

burning eyes - when exposed to diesel exhaust.  According to Dr. Jones, "It is well

established that air pollution increases tear production and causes eye inflammation.

When exposed to a visible cloud of diesel exhaust while driving, I cough, tear, and become

distracted.  I am adversely affected by this kind of diesel exhaust on a monthly basis in the

Wasatch Front."  K. Jones Decl., ¶ 3.

18.    Dr. Jones further relates, "Recently, while driving north on I-15 through Utah County, a diesel pickup truck in the lane next to me accelerated and emitted a black cloud of smoke from its tail pipe.  Immediately, I coughed and teared up, while driving 70 miles per hour.  I tried to change lanes to move away from the offending vehicle, but felt it wasn't safe for me or other drivers for me to change lanes suddenly.  These kinds of emissions are not just a hazard to my health, but also a hazard to my immediate safety and the safety of those around me."  K. Jones Decl., ¶ 4.

19.    At her deposition, defendant Diesel Power Gear's employee Heather Pledger made the following observations regarding air quality in the Wasatch Front:

> Q.    Are you familiar with the air quality in Salt Lake
>        City, in this area?
> A.    I know it's bad.
> Q.    And by "bad" — what do you mean by "bad"?
> A.    It's not good air to breathe.  There's a lot of gunk
>        in it.

Pledger depo. excerpts, pp. 25-26, Exhibit F.

## C.  THE ELEMENT OF CAUSATION FOR STANDING.

Citizen plaintiffs must also show that their injuries are "fairly traceable" to the defendant's alleged violations.  *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180 (2000).  To meet the "fairly traceable" element, a plaintiff alleging pollution-related injuries "must merely show that a defendant discharges a pollutant that causes or contributes to the kinds of injuries alleged."  *Piney Run Pres. Ass'n v. Cnty. Comm'rs of Carroll Cnty.*, 268 F.3d 255, 263–64 (4th Cir. 2001).

<u>Statement of Undisputed Material Facts that Demonstrate
Physicians' Injuries are Fairly Traceable to Defendants' Actions.</u>

1.      Defendant B&W Auto's Shop Foreman, Hans Peterson, made the

following observation in his deposition regarding the effect of removing air pollution

devices from vehicles:

```
Q.   . . . Do you understand why it's illegal to
     remove [a vehicle's pollution control] equipment?
A.   Yes.
Q.   Why is that?
A.   Because we're adding more pollution to the air.
```

Peterson depo. excerpts, pp. 49-50, Exhibit G.

2.      The aftermarket defeat parts alleged in the Complaint to have been

sold and installed by the applicable Defendants are acknowledged by Defendant Diesel

Power Gear's employee, Heather Pledger, to increase the amount of pollution in the air .

```
Q.   On the first page -- I realize the print's
     awfully small --
A.   Uh-huh (Affirmative).
Q.   -- about three-quarters of the way down, there's
     a reference under Thunder Diesel for a Flo-Pro
     DSL Ford DPF delete pipe. Do you see that
     reference?
A.   I think so. The 11 to 12 5-inch?
Q.   Yes.
A.   Yes.
Q.   What's your understanding of that part? What is
     it?
A.   It's an exhaust pipe that's taking out the DPF
     and it's 5 inches, for a Ford.
Q.   And what does "DPF" stand for?
A.   I can't think of the words right now.
Q.   Is it "diesel particulate filter"?
A.   Yes.
Q.   What do you understand the function of that
     part to be?
A.   It's taking out one of the filters that is coming
     back from the engine exhaust, so -- I would think
     taking that part out would give you better air
     flow in the truck.
```

```
Q.    Does it remove a pollution control device?
A.    Yes.
Q.    What is your understanding of its effect on the
      emissions from the vehicle once the delete pipe
      is used to replace the DPF?
A.    Lets more exhaust go through it, so it would be
      putting more into the air.
```

Pledger depo. excerpts, pp. 10-11.

3.     The vehicles alleged in the Complaint to have been "deleted" by the

applicable Defendants cause the same type of diesel smoke-related injuries suffered by

Physicians.  In Defendants' video titled "2012 Cummins Giveaway Truck Smokes Out Prius

Paul," a dark plume of diesel exhaust from Defendants' modified 2012 Dodge pickup truck

engulfs the driver to his medical detriment.  Complaint Exhibit F.  The location of

Defendants' diesel pollution exemplar is East Capitol Street in downtown Salt Lake City.

Soltysiak Decl., Attachments 1 and 2, video #1, Exhibit H.

4.     Defendant B&W Auto admits that, in the last five years, it has

purchased diesel vehicles with missing pollution control devices, removed pollution

control devices on diesel vehicles, and sold diesel vehicles that have had pollution control

devices removed.  Resp. to Request for Production, ¶ 8, Exhibit I.

5.     One such vehicle was a 2013 Ford F250 diesel pickup truck, Vehicle

Identification ("VIN") 1FT7W2BT2DEA61696 (Exhibit I, ¶ 8, No. 12).  Defendant Sparks

advertised this vehicle with a "full DPF delete and H&S Tune" ("Sparks Deleted Truck"), and

published a video on Facebook showing its ability to emit pollution.  Complaint, ¶ 151;

Soltysiak Decl., Attachments 1 and 2, video # 5.

6.     In 2016, Physicians obtained the Sparks Deleted Truck and

commissioned Dr. Michael St. Denis of Revecorp, Inc. to have its particulate matter ("PM")

and nitrogen oxides ("$NO_x$") emissions tested pursuant to the Federal Test Procedure ("FTP").  The FTP is the testing protocol that Ford Motor Company ("Ford") was required to follow to prove diesel exhaust levels from the 2013 Ford F250 were below federal emission standards before Ford could sell the truck in the United States.  St. Denis Decl., ¶¶ 6-7, Exhibit J.

7.     Ford installed at least three emission control devices in its 2013 diesel F250 to meet federal standards: a Diesel Oxidation Catalyst ("DOC"), a Diesel Particulate Filter ("DPF"), and a Selective Catalytic Reduction system ("SCR").  In the Sparks Deleted Truck, these three devices had been removed and replaced by a hollow "straight pipe."  St. Denis Decl., ¶¶ 8 and 12.

8.     Emissions from the Sparks Deleted Truck were tested pursuant to the FTP at the accredited SGS Environmental Testing Center in Aurora, Colorado.  The FTP results showed that $NO_x$ emissions from the Sparks Deleted Truck exceeded the vehicle's federal emission standards by 2,160 percent, and PM emissions by 429 percent.  St. Denis Decl., ¶¶ 14-15.

9.     The 2016 FTP test results of the Sparks Deleted Truck also showed that its pollutant emissions exceeded the vehicle's actual or "certified" 2013 emission rates by 3,600 percent for NOx, and 2,145 percent for PM.  St. Denis Decl., ¶¶ 16-17.  According to Dr. St. Denis, this means "[t]he excess emissions of $NO_x$ from this single truck are equivalent to the emissions from 36 certified and properly operating stock trucks of the same type. The excess emissions of PM from this single truck are equivalent to the emissions from 21 certified and properly operating stock trucks of the same type."  St. Denis Decl., ¶ 19.

10.     Defendants alleged in the Complaint as having operated "deleted" diesel vehicles have operated them in Utah, and those vehicles have discharged their excess emissions into the airshed of the Wasatch Front.  According to the Declaration of Ashley Soltysiak, Defendants' promotional videos show the vehicles identified in Exhibit I being driven in both metropolitan and rural areas of the state.  Soltysiak Decl., ¶¶4-5, and Attachments 1 and 2, Exhibit H.

11.     According to Defendant B&W Auto's Shop Foreman Hans Peterson, the vehicles identified in Exhibit I continue to be operated in Utah.

```
Q.     When is the last time you recall any of these
       vehicles on the list being operated in Utah?
A.     Define "operated."
Q.     Running, with engine running.
A.     The Bro-Dozer engine runs right now. Hercules —
Q.     I mean — I'm sorry — is on, I mean, combustion is
       occurring.
A.     Megaram, Bro-Dozer, Hercules. And those are the
       only ones I know of. I don't — I don't know
       where the Reaper is.
Q.     And does that mean this year, in 2017?
A.     That's, like, right now.
```

Peterson Depo., August 4, 2017, Exhibit G, pp. 35-36.

12.     "Diesel engines emit nitrous oxides ("$NO_x$"), non-methane hydrocarbons, and particulate matter ("PM"), all of which are harmful to the environment and human health."  *Nat'l Petrochemical & Refiners Ass'n v. E.P.A.*, 287 F.3d 1130, 1134 (D.C. Cir. 2002).

13.     How $NO_x$ is formed, and how it is transformed into other pollutants, is explained by the Utah Division of Air Quality ("UDAQ") in its 2016 Annual Report,

During high temperature combustion, nitrogen in the air reacts with oxygen to produce various oxides of nitrogen, or $NO_x$, a reddish-brown gas. One of the oxides of nitrogen, $NO_2$, is a criteria pollutant.  Oxides of nitrogen react

with other air contaminants to form other criteria pollutants.  In the summer along the Wasatch Front, and in the winter in the Uinta Basin, photochemical reactions between $NO_2$ and VOCs lead to the formation of ground-level ozone.  In the winter, $NO_2$ reacts with ammonia to form fine particulate matter ($PM_{2.5}$).  Both of these seasonal scenarios can result in increased pollution.

UDAQ 2016 Annual Report, https://documents.deq.utah.gov/air-quality/annual-reports/DAQ-2017-001541.pdf; *See also*, St. Denis Decl., ¶ 19.

14.    The U.S. EPA has also found that "[m]any of the organic compounds present on the particle and in the gases [of diesel exhaust] are individually known to have mutagenic and carcinogenic properties."  U.S. EPA, Health Assessment Document for Diesel Engine Exhaust, 2002, p. 1-2, *https://cfpub.epa.gov/si/si_public_record_report.cfm?dirEntryId=29060&simple Search=1&searchAll=diesel.*

15.    An August 2013 study conducted by the University of Utah and Davis County showed that an increase in opacity of emissions (density of smoke) from diesel vehicles is directly correlated to a significant increase in fine particulate matter.  For diesel vehicles that failed the Davis County opacity test, for example, the emission of particulate matter in the 1.0 - 2.0 micron range was *100 times that of the diesel vehicles that passed the test*.  Davis County Summary of Particulate Matter Testing, 2003, Exhibit K.

16.    According to the California Air Resources Board ("CARB"), "[a]lmost all of the diesel particle mass [in diesel exhaust] is in the fine particle range of 10 microns or less in diameter ($PM_{10}$).  Approximately 94 percent of the mass of these particles are less than 2.5 microns in diameter. Because of their small size, these particles can be inhaled and a portion will eventually become trapped within the small airways and alveolar regions of the lung."  CARB Report on Diesel Exhaust, April 22, 1998, *http://www.arb.ca.gov/toxics/dieseltac/de-fnds.htm*

**D.  THE ELEMENT OF REDRESSABILITY FOR STANDING.**

Redressability is sufficiently alleged by a plaintiff as long as there is "a likelihood that the requested relief will redress the alleged injury." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103 (1998).

Statement of Undisputed Material Facts
that Demonstrate Physicians' Injuries are Redressable.

1.      Physicians' First Amended Complaint ("FAC" or "Complaint") requests an injunction to stop Defendants from removing pollution control devices from vehicles, and from selling or conveying as prizes vehicles without fully-functioning pollution control devices including those with defeat parts installed.  FAC, Section VI.F.1.

2.       Physicians' Complaint requests an injunction to stop Defendants from selling, offering to sell or installing aftermarket defeat parts, and vehicles in which such parts are installed, that are used to render inoperative pollution control devices.  FAC, Section VI.F.2.  Physicians also request an injunction to stop Defendants from operating vehicles in which pollution control devices have been removed, bypassed or rendered inoperable.  FAC, Section VI.F.3.

3.      Physicians' Complaint requests a mandatory injunction that requires Defendants to locate, recall and return to original condition all vehicles they have illegally modified, and to locate, recall, repurchase and destroy all aftermarket defeat parts they have sold.  FAC, Section VI.F.5-6.

4.      "[T]o compensate for the excess, illegal pollution caused by Defendants' activities," Physicians request that Defendants "finance supplemental relief designed to reduce air pollution in Davis County and the other non-attainment areas in

Utah," and for each defendant to pay up to $100,000 for "beneficial mitigation projects as provided for by 42 U.S.C. § 7604(g)(2)."  FAC, Section VI.G and J.

5.    Physicians seek the assessment of civil penalties for each vehicle illegally modified by Defendants, each day Defendants have operated an illegally modified vehicle in Utah, and each illegal aftermarket defeat part or component sold and/or installed by Defendants.  FAC, Section VI.G, H and I.

6.    Physicians member Dr. Garber states,

> My enjoyment of Salt Lake County and the Wasatch Front would be enhanced if the defendants were ordered to stop removing pollution control equipment from diesel vehicles, and were ordered to stop operating those vehicles.  The air quality of the Wasatch Front would also be enhanced if the defendants were ordered to stop selling parts designed to remove or defeat diesel vehicle pollution control equipment, and to recover all of the parts they have sold.  If the defendants were also required to pay a substantial penalty that would discourage them from engaging in these activities again, and deter others from following their example.

Garber Decl., ¶ 11, Exhibit B.

7.    Physicians member Dr. C. Jones states,

> If the defendants were required to restore the pollution control equipment they have removed on diesel vehicles, this would be a benefit to me because fewer diesel vehicles would be excessive polluters and the air I am breathing would be less polluted.

C. Jones Decl., ¶ 14, also ¶¶ 13-17, Exhibit C.

8.    Physicians member Janice Evans states,

> If the defendants in this case are found to be breaking the law by removing and defeating pollution control systems on diesel vehicles here in Utah, and selling parts to do the same thing, like Volkswagen they should be required to stop.  They should also be required to undo what they have done by recalling these vehicles and parts.  They should also be required to pay a stiff penalty.  This will make our air cleaner, and deter others from making it dirtier.  Compelling the defendants to obey the law and respect everyone's right to clean air – mine, their own families, neighbors and fellow citizens – wouldn't eliminate all sources of air pollution, but it will make the air

healthier by stopping some of it.

Evans Decl., ¶ 14, Exhibit D.  See also, Dr. C. Jones Decl., ¶ 13, Exhibit C.

>    9.    Ms. Evans states further,

> If the defendants are found to have broken the law they should also be
> required to finance other air pollution control efforts in the Wasatch Front to
> offset the excessive pollution they have caused in the past.

Evans Decl., ¶ 15.

### III.  Argument

The applicable elements of standing, and the undisputed facts recited above that
meet each element, demonstrate that Physicians' motion for partial summary judgment on
the issue of standing should be granted as a matter of law.

### A.  Summary Judgment Standard.

Summary judgment is appropriate when "there is no genuine issue as to any
material fact and . . . the moving party is entitled to a judgment as a matter of law."  Fed. R.
Civ. P. 56(c). *See also Celotex Corp.  v. Catrett*, 477 U.S. 317 (1986); *Reynolds v. School Dist.
No. 1, Denver, Colo.*, 69 F.3d 1523, 1531 (10th Cir. 1995).  A dispute is genuine if 'the
evidence is such that a reasonable jury could return a verdict for the nonmoving party' on
the issue.  *Kerber v. Qwest Group Life Ins. Plan*, 647 F.3d 950, 959 (10th Cir. 2011) (citing
*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)).  Summary judgment is not "a
disfavored procedural shortcut, but an integral part of the Federal Rules as a whole which
are designed 'to secure the just, speedy and inexpensive determination of every action.'"
*Celotex*, 477 U.S. at 327, citing Fed. R. Civ. P. 1.[1]

---

[1]  A plaintiff's standing to bring an environmental enforcement action may properly be
decided at summary judgment.  *Comm. to Save the Rio Hondo v. Lucero*, 102 F.3d 445, 447-
452 (10th Cir. 1996); *St. Bernard Citizens for Envt'l Quality, et al. v. Chalmette Refining, L.L.C.*,
354 F. Supp. 2d 697, 700 (E.D. La. 2005); *Beartooth Alliance v. Crown Butte Mines*, 904 F.
Supp. 1168, 1171 (D. Mont. 1995).

### B. Physicians Have Suffered, And Continue To Suffer, Injuries-In-Fact

It is undisputed that Physicians suffer air pollution-related injuries that are immediate, specific, and palpable.  To demonstrate injury, a plaintiff must show an actual or imminent harm that is concrete and particularized rather than conjectural or hypothetical. *Catron Cnty. Bd. of Comm'ns v. U. S. Fish and Wildlife Serv.*, 75 F.3d 1429, 1433 (10th Cir. 1996).  Actual or potential harm to health, aesthetic or recreational interests will do.  Stated succinctly, "breathing and smelling polluted air is sufficient to demonstrate injury-in-fact and thus confer standing under the CAA." *Texans United for a Safe Econ. Educ. Fund v. Crown Cent. Petroleum Corp.*, 207 F.3d 789, 792 (5th Cir. 2000) (citing *NRDC v. EPA*, 507 F.2d 905, 910 (9th Cir. 1974)).  Neither the magnitude of the injury nor the nature of the injury is important in the determination of standing.  An "identifiable trifle" is sufficient. *Sierra Club v. Cedar Point Oil*, 73 F.3d 546, 557 (5th Cir. 1996).[2]  Physicians have met these requirements.

It is undisputed that Physicians' members are injured by the air pollution that plagues the Wasatch Front.  Unhealthy concentrations of airborne $PM_{2.5}$ in the winter months and ozone in the summer months cause Physicians' members to experience shortness of breath, coughing, tearing, and diminished cardiovascular output.  Air pollution along the Wasatch Front causes Physicians' members to fear for their health and the health of their patients,[3] to limit their activities out-of-doors,[4] and to be deprived of the beauty of

---

[2] *See also*, Si*erra Club v. Tri-State Generation and Transmission Assoc., Inc.*, 173 F.R.D. 275, 280 (D. Colo. 1997) (allegations of air pollutant emissions that "impair the ability of [plaintiff's] members who live, work, and recreate in the Yampa Valley to breathe clean air and view natural scenery and wildlife" sufficient to demonstrate injury if proved); *Concerned Citizens Around Murphy v. Murphy Oil USA, Inc.*, 686 F.Supp.2d 663, 671 (E.D. La., 2010) (citizens "need not show that they suffer adverse 'health effects'" caused by alleged polluter, reasonable health concerns sufficient); *St. Bernard Citizens for Envtl. Quality et al. v. Chalmette Refining*, 354 F. Supp.2d 697, 702 (E.D. La. 2005) ("plaintiffs can demonstrate a cognizable injury by showing that they breathe and smell polluted air").

[3] K. Jones Decl., ¶¶ 5, 10-12; Garber Decl., ¶ 3; C. Jones Decl., ¶ 3.

[4] C. Jones Decl., ¶ 10; Evans Decl., ¶ 5; Garber Decl.; K. Jones Decl., ¶ 9.

their surroundings.[5]

It is also undisputed that Physicians' members are injured by excess emissions from diesel exhaust from diesel vehicles.  Physicians' members who are forced to breathe concentrated plumes of diesel exhaust experience terrible smells and fits of coughing.[6] Physicians' members who experience a cloud of diesel exhaust also complain of dangerous vision loss and are forced to take evasive measures to avoid serious accident.[7]

C.    Physicians' Injuries are Fairly Traceable to Defendants' Alleged Violations.

Physicians' injuries are indisputably traceable to Defendants' alleged violations. According to the Court in *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180 (2000), citizen plaintiffs must show that their injuries are "fairly traceable" to the types of pollution caused by the defendant's alleged violations.  The "fairly traceable" requirement, however, "is not equivalent to a requirement of tort causation."  *Public Int. Research Group, Inc. v. Powell Duffryn Terminals, Inc.*, 913 F.2d 64, 72 (3d Cir. 1990), *cert. denied*, 498 U.S. 1109 (1991).  A plaintiff "must merely show that a defendant discharges a pollutant that causes or contributes to the kinds of injuries alleged."  *Piney Run Pres. Ass'n v. Cnty. Comm'rs of Carroll Cnty.*, 268 F.3d 255, 263–64 (4th Cir. 2001).  Therefore, "[r]ather than pinpointing the origins of particular molecules, a plaintiff must merely show that a defendant discharges a pollutant that causes or contributes to the kinds of injuries alleged in the specific geographic area of concern."  *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 204 F.3d 149, 161 (4th Cir. 2000).[8]

Defendants admit that both the removal of a vehicle's pollution control equipment

---

[5] Evans Decl., ¶ 9; K. Jones Decl., ¶ 9; Garber Decl., ¶ 8; C. Jones Decl., ¶ 7.

[6] Evans Decl., ¶ 7; K. Jones Decl., ¶ 4.

[7] Evans Decl., ¶ 5; C. Jones Decl., ¶ 7.

[8] *See also*, *Sierra Club v. Cedar Point Oil*, 73 F.3d 546, 558 (5th Cir. 1996) ("Given the number of entities discharging chemicals into Galveston Bay, it would be virtually impossible for any of plaintiff's members to trace his injuries to [defendant's] discharge in particular. Rather, it is sufficient for plaintiffs to show that [defendant's] discharge of produced water contributes to the pollution that impairs [plaintiff's] use of the bay.") (Emphasis added.)

and the use of aftermarket defeat devices increase the amount of pollution emitted into the air.[9]  In fact, Defendants not only admit – but appear to glorify the fact – that their tampering practices and defeat parts will result in pollution that causes the very injuries of which Physicians complain.[10]  Physicians' professional emissions testing of one of Defendants' "full delete" trucks further confirms that non-trivial increases in pollution result from Defendants' practices.  $NO_x$ emissions from just one of Defendants' deleted trucks were shown to have increased above the vehicle's certified emission rate by over 3,000 percent, meaning that a single deleted truck is capable of emitting more pollution than 36 unmodified trucks of the same type.[11]

Defendants also admit, and Physicians have confirmed, that Defendants' deleted vehicles have, and continue to be, operated in the same airshed Defendants share with Physicians.[12]  Therefore the excess pollution that these vehicles add to the airshed of the Wasatch Front is fairly traceable to Physicians' injuries.

### D. <u>Physicians' Injuries Can Be Redressed by the Relief Physicians Request.</u>

Physicians' air pollution-related injuries described above can be redressed by the injunctive, civil penalty and curative relief requested by Physicians.  Such relief targets the precise ills that Physicians' experience and that Congress passed the anti-tampering provisions of the Clean Air Act to prevent: unnecessary, unhealthful, visibility impairing air pollution.  Accordingly, due to the absence of any material dispute of fact, Physicians ask the court to find they have established the element of redressability as a matter of law.

Redressability is demonstrated by the plaintiff if there is "a likelihood that the requested relief will redress the alleged injury."  *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103 (1998).  The plaintiff "need not show that a favorable decision will relieve his

---

[9] Pledger depo. excerpts, pp. 10-11; Peterson depo. excerpts pp. 49-50.
[10] Soltysiak Decl., Attachment 1, video #1.
[11] St. Denis Decl., ¶¶ 16-17, 19.
[12] Peterson depo. excerpts, pp. 35-36; Soltysiak Decl., ¶¶ 4-5 and Attachments 1 and 2.

every injury." *Mass. v. EPA*, 549 U.S. 497, 525 (2007).  *See also*, *City of Hugo v. Nichols (Two Cases)*, 656 F.3d 1251, 1264 (10th Cir. 2011); *Nova Health Sys. v. Gandy*, 416 F.3d 1149, 1158 (10th Cir. 2005).

Injunctive relief to stop ongoing violations that are harming the plaintiff plainly provide redress to the plaintiff.  *See Texans United for a Safe Economy v. Crown Cent. Petroleum Corp.*, 207 F.3d 789, 792-94 (5th Cir. 2000) (an injunction to stop excessive emissions of sulfur dioxide causing odor and visibility impairment provides redress).    Injunctive relief to remediate continuing, adverse effects resulting from a  defendant's past violations of law is also an appropriate form of relief and thus redress.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 564 (1992).  For example, where a defendant's past sale of diesel vehicles with pollution control defeat devices is causing present, harmful discharges of pollution, a court can require the recall and remediation of such vehicles to reduce ongoing excess emissions.  In *Re: Volkswagen*, 3:15-md-02672-CRB (N.D. Cal. June 28, 2016, Partial Consent Decree and Appendix A, Recall Program, Doc. No. 1605-1.)[13]

Civil penalties are also an effective form of relief to redress a plaintiff's injuries, as a deterrent to the defendants and those who may be influenced by their example.[14]  According to the Supreme Court in *Friends of the Earth v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167,

---

[13] *See also*, *U.S. v. Tull*, 615 F. Supp. 610, 626-27 (E.D. Va. 1983) (although defendant had stopped his illegal filling of wetlands prior to the filing of plaintiff's complaint, ongoing harm caused by defendant's violation justified injunction requiring fill material removal and wetlands remediation.); *Fallowfield Dev. Corp. v. Strunk*, 1990 WL 52745, *11 (E.D. Penn. 1990) (unpublished) (it would be contrary to Congressional intent for hazardous waste disposer to avoid liability by rendering all violations wholly past "by simply not disposing of any hazardous waste after the commencement of a citizen suit.").

[14] "The Diesel Brothers [as the individual defendants are known to their followers] are diesel truck enthusiasts, apparel manufacturers and online retailers, and masters of social media marketing. The Diesel Brothers are best known for their extremely popular reality Discovery Channel television show called 'Diesel Brothers,' and features diesel trucks being modified primarily for off-road recreational use. Its audience and the Defendant companies' target market are passionate about diesel trucks as a recreational lifestyle." Defendants' Motion to Dismiss, p.1, Doc. 54.

185-86 (2000),

> It can scarcely be doubted that, for a plaintiff who is injured or faces the threat of future injury due to illegal conduct ongoing at the time of suit, a sanction that effectively abates that conduct and prevents its recurrence provides a form of redress.  Civil penalties can fit that description.  To the extent that they encourage defendants to discontinue current violations and deter them from committing future ones, they afford redress to citizen plaintiffs who are injured or threatened with injury as a consequence of ongoing unlawful conduct.

Finally, a request that up to $100,000 in civil penalty relief be applied towards one or more beneficial environmental projects, provided for in the citizen suit provision of the CAA at 42 U.S.C. § 7604(g)(2), can supply sufficient redress to citizens.  *U.S. v. LTV Steel Co., Inc.*, 187 F.R.D. 522, 526 (E.D. Penn. 1998).  The Tenth Circuit agrees that a beneficial environmental project could provide relief to citizen plaintiffs, but nevertheless ruled against the plaintiffs in *WildEarth Guardians v. Public Serv. Co. of Colorado*, 690 F.3d 1174, 1190 (10th Cir. 2012), finding they failed to request such a project or explain how it would redress their injuries.

Physicians' Complaint requests an injunction to stop Defendants from removing pollution control devices in vehicles, from operating vehicles with impaired pollution control devices, and from selling or "giving away" vehicles with aftermarket defeat parts installed.  FAC, Sections VI.F. 1-3.  All of these practices cause an increase in emissions of harmful air pollutants that are injurious to Physicians.  Physicians also request that Defendants be enjoined from selling or installing aftermarket defeat parts that also cause the release of excess emissions.  *Id*.  Physicians further seek a mandatory injunction that requires Defendants to recall and either repair or destroy all of the illegal parts and vehicles they have conveyed to third-parties that continue to pollute.  FAC, Section VI.F.5-6.

Physicians' members testify that their air pollution-related injuries would be redressed by such relief.  As Dr. Christopher Jones aptly observes, "[i]f the Defendants were required to restore the pollution control equipment they have removed on diesel vehicles, this would be a benefit to me because fewer diesel vehicles would be excessive polluters and the air I am breathing would be less polluted."  C. Jones Decl., ¶ 14.

## V.  Conclusion

The following material facts are undisputed: (1) Physicians' members are being injured by health damaging pollution in the airshed of the Wasatch Front, including pollution from high-emitting diesel vehicles, (2) Defendants' alleged violations result in excess emissions that, in turn, contribute to the injuries of which Physicians complain and Physicians' injuries therefore are fairly traceable to such violations, and (3) Physicians' requested injunctive and civil penalty relief will redress, at least in part, Physicians' injuries.  Accordingly, Physicians respectfully ask this Court to grant their motion for partial summary judgment because there are no disputed issues of material fact and thus they have standing as a matter of law under Article III of the Constitution to bring this Clean Air Act citizen suit.

DATED this  26th  day of September, 2017.

Respectfully submitted,

/s Reed Zars
Reed Zars, Esq.
Utah State Bar No. 16351
Attorney at Law
910 Kearney Street
Laramie, WY  82070
(307) 760-6268
reed@zarslaw.com

**LIST OF EXHIBITS**

A.      Catherine Cawley Declaration.

B.      Howie Garber, M.D., Declaration.

C.      Christopher Jones, M.D., Declaration.

D.      Janice Evans Declaration.

E.      Kirtly Jones, M.D., Declaration.

F.      Heather Pledger Deposition, excerpts.

G.      Hans Peterson Deposition, excerpts.

H.      Ashley Soltysiak Declaration.

I.      Defendants' Responses to Production Requests, ¶ 8.

J.      Dr. Michael St. Denis Declaration.

K.      Reed Zars Declaration, attaching Davis County Summary of Particulate Matter Testing, 2003.