Cole S. Cannon (Utah Bar No. 12053)
cole@cannonlawgroup.com
Janet M. Conway (Utah Bar No. 7488)
janet@cannonlawgroup.com
CANNON LAW GROUP
53 South 600 East
Salt Lake City, Utah 84102
Telephone: (801) 363-2999

*Attorneys for Defendants*

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UTAH PHYSICIANS FOR A HEALTHY ENVIRONMENT, INC., <br><br> Plaintiff, <br><br> v. <br><br> DIESEL POWER GEAR, LLC, et al. <br><br> Defendants. | DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT <br><br> Case No.: 2:17-CV-00032 <br><br> Judge Robert J. Shelby <br> Magistrate Dustin Pead |

Defendants, B&W Auto, LLC d/b/a Sparks Motors, LLC, Diesel Power Gear, LLC, Dave Sparks, David Kiley, Keaton Hoskins, and Josh Stuart (collectively "Defendants"), pursuant to Federal Rules of Civil Procedure, 56(c), opposes Plaintiff's Motion for Partial Summary Judgment.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................... ii

I.      Introduction .......................................................................................................... 1

II.     Background Concise Statement Of Facts ............................................................. 3

III.    Response To Statement Of Elements And Undisputed Material Facts ............................ 6

        PLAINTIFF'S 1st ELEMENT -  ORGANIZATIONAL STANDING ............................. 7

                A.    Plaintiff's Statement of Element ..................................................... 7

                B.    Plaintiff's Statement of Material Facts and Defendants' Responses .............. 7

                C.    Defendants' Statement of Additional Elements:............................... 8

                D.    Statement of Material Facts in Support of Additional Elements .................. 9

        PLAINTIFF'S 2nd ELEMENT - INJURY IN FACT FOR STANDING ........................ 10

                A.    Plaintiff's Statement of the Element ........................................... 10

        PLAINTIFF'S 3rd ELEMENT – CAUSATION FOR STANDING.............................. 11

                A.    Plaintiff's Statement of the Element ........................................... 11

                B.    Response to Each Stated Material Fact........................................ 11

                C.    Defendants' Statement of Additional Facts ................................ 19

        PLAINTIFF'S 4th ELEMENT – REDRESSABILITY FOR STANDING ..................... 24

                A.    Plaintiff's Statement of the Element ........................................... 24

                B.    Response to Each Stated Material Fact........................................ 25

                C.    Statement of Additional Elements ............................................. 27

                D.    Statement of Material Facts in Support of Additional Elements ................. 28

IV.     Argument ............................................................................................................ 29

        A.    Standard of Review............................................................................ 29

        B.    Plaintiff fails to satisfy Article III's "fairly traceable" causation element........... 30

        C.    Plaintiff fails to satisfy Article III's redressability element............................... 35

        D.    Plaintiff fails to show it has standing to pursue claims against the individuals.... 38

V.      Conclusion ......................................................................................................... 41

# TABLE OF AUTHORITIES

## Cases

*Anderson v. Farmland Industries, Inc.*, 45 F. Supp. 2d 863 (D. Kansas 1999)........................... 36

*Atlantic States Legal Foundation, Inc. v. Stroh Die Casting Co.*, 116 F.3d 814 (7th Cir.1997) .. 36

*Cambrians v. Didion Mining,* 571 F. Supp. 2d 972 (W.D.Wis. 2008) ........................................ 37

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ........................................................................ 29

*Daimler Chrysler Corp. v. Cuno*, 547 U.S. 332 (2006)........................................................ 6, 29

*Families for Asbestos Compliance Testing and Safety v. City of St. Louis, Missouri*, 638 F. Supp. 2d 1117 (E.D. Mo. 2009)........................................................................................... 28, 37

*Friends of the Earth v. Gaston Copper Recycling Corp*, 204 F.3d 149 (4th Cir. 2000).............. 30

*Friends of the Earth v. Laidlaw Environmental Services*, 528 U.S. 167 (2000) ......................... 37

*Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Foundation, Inc.*, 484 U.S. 49 (1987)............. 36

*Heaps v. Nuriche, Inc.,* 345 P.3d 655 (Utah 2015)............................................................. 38, 39

*Illinois v. Celotex Corp.*, 516 F. Supp. 716 (C.D. Ill. 1981)...................................................... 40

*Illinois v. Commonwealth Edison Co.*, 490 F. Supp. 1145 (N.D. Ill. 1980) ........................... 8, 40

*In re Japanese Electronic Products Antitrust Litigation*, 723 F.2d 238 (3rd Cir. 1983).............. 29

*Lujan v. Defenders of Wildlife,* 504 U.S. 555 (1992) .......................................................... 11, 30

*Lujan v. National Wildlife Federation, 497 U.S. 871 (1990)* .................................................. 7, 29

*Salt Lake City Corp. v. Big Ditch Irr. Co.,* 258 P.3d 539 (Utah 2011)........................................ 38

*Steel Co. v. Citizens for a Better Environment,* 523 U.S. 83 (1998)........................................... 37

*Texas Indep. Producers & Royalty Owners Ass'n v. EPA*, 410 F.3d 964 (7th Cir. 2005) ............ 30

*Utah Physicians for a Healthy Environment v. Holly Refining and Marketing Company -- Wood Cross L,L.C.*, 398 P.3d 1031 (Utah 2017) ....................................................................... 33

*Utah Physicians for a Healthy Environment v. Tesoro Refining and Marketing Company,* 391 P.3d 148 (Utah 2016).................................................................................................. 33

*Washington Environmental Council v. Bellon*, 732 F.3d 1131 (9th Cir. 2013).......... 11, 30, 31, 41

*WildEarth Guardians v. Public Service Co. of Colorado*, 690 F.3d 1174 (10th Cir. 2012).. 28, 35, 37

## Statutes

42 U.S. Code § 7401 ................................................................................................................ 1

42 U.S. Code § 7413(a)(3).................................................................................................... 40

42 U.S. Code § 7413(c)(6).................................................................................................... 40

42 U.S. Code § 7602(e).................................................................................................... 39, 40

42 U.S. Code § 7604 ........................................................................................................ 40

42 U.S. Code § 7604(a) ................................................................................................... 39

Utah Code Ann. § 31A-27a-504(11)(a) ......................................................................... 39

Utah Code Ann. § 32B-4-302(2)(a) ............................................................................... 39

Utah Code Ann. § 48-2c-601 ......................................................................................... 38

Utah Code Ann. § 48-3a-304 ......................................................................................... 38

## **Federal Rules**

Fed. R. Civ. P. 56 .......................................................................................................... 29

Fed. R. Evid. 402 ........................................................................................................... 30

Fed. R. Evid. 602 ........................................................................................................... 30

Fed. R. Evid. 701 ........................................................................................................... 30

Fed. R. Evid. 702 ........................................................................................................... 31

Fed. R. Evid. 703 ........................................................................................................... 31

Fed. R. Evid. 704 ........................................................................................................... 31

## I.    *Introduction*

Defendants readily admit the Wasatch Front's air quality is poor.  Defendants do not dispute that Plaintiff suffer injuries due to air pollution.  However, Plaintiff does not have standing under U.S. Constitution, Article III to maintain this action, as it cannot establish the required traceable causation and redressability elements. Identical pollutants to those found in diesel exhaust are also found in enormous amounts along the Wasatch Front from copper mining, power company coal burning plants, and five major oil refineries, combined with over 3,000,000 vehicles registered in Utah, of which 7,000 were illegally modified VW diesel vehicles. It is impossible to say that 16 vehicles owned by B&W Auto, LLC d/b/a Sparks Motors, LLC[1] ("B&W Auto") in the last five years, that were only briefly operated in Utah, could possibly have caused any traceable injury to Plaintiff.  For the same reason, Plaintiff has failed to establish redressability.  Plaintiff has produced no evidence, nor could it, that the remedies pursued in the Complaint could possibly redress their identified injuries.

In addition, Plaintiff has failed to establish the specific requirements for standing applicable to its claims against Diesel Power Gear, LLC ("DPG") under the Clean Air Act, 42 U.S.C. §§ 7401, et seq. ("CAA"). Plaintiff has asserted a claim against DPG for the sale of vehicles that have had emission control devices defeated, yet Plaintiff has produced no evidence of ownership of one single vehicle by DPG, much less any evidence that DPG has ever sold a single vehicle.  Plaintiff has also asserted a claim against DPG for the sale of products, that are alleged to violate the CAA, on 4x4 Anything's website.[2]  However, Plaintiff vaguely references its Complaint to allege that

---

[1]       Sparks Motors, LLC is a named defendant, but is technically only a d/b/a of B&W Auto.

[2]       4x4 Anything, LLC is a named defendant.  DPG formed this entity to separate out the automotive parts division, but never formally separated the companies.  Therefore, 4x4 Anything, LLC is a d/b/a of DPG.

multiple products were advertised on 4x4 Anything's website, but only produced evidence to identify one single product, known as the diesel particulate filter ("DPF") delete pipe, that was once listed on 4x4 Anything's website.  It is also undisputed that DPG promptly removed all products from its website that were identified in Plaintiff's pre-suit notice letter, months before Plaintiff filed this action.  Plaintiff is not close to meeting its burden of showing it has standing to pursue any claims against DPG.

Nor has Plaintiff offered any evidence to support its claims against the individual defendants, or why it has standing to pursue claims against them, when all of the individuals fall under the protection of Utah's Limited Liability Company Act.  The CAA does not authorize private citizens to pursue personal liability claims against individuals acting in the course of their employment, in direct contravention to the Utah Limited Liability Company Act.  Yet Plaintiff does not address this at all in its motion.

Instead, Plaintiff only sets forth facts that B&W Auto has, in the last five years, owned a handful of vehicles that have had the original stock equipped emissions control systems modified. Plaintiff then broadly claims this Court should grant Plaintiff summary judgment that it has standing to "bring this action," i.e., to assert all claims against all defendants.  Plaintiff blatantly ignores Article III requirements that Plaintiff bears the burden to establish standing for *each* claim asserted and for *each* relief requested.

In sum, Plaintiff's Motion for Partial Summary Judgment generalizes its lawsuit against the Defendants collectively, sets forth a melodramatic characterization of the harm Plaintiff is suffering *allegedly* at the hands of Defendants, and over-reaches its authority granted to citizen suit plaintiffs under the CAA.  Because the Plaintiff did not, and cannot, produce undisputed

material facts to support Article III standing, not only must Plaintiff's Motion for Partial Summary Judgment be denied, but this Court should dismiss this action.

## II.   *Background Concise Statement Of Facts*

In 2009, David Sparks ("Sparks"), in his early 20s, started a side business buying broken down cars, getting them running again, then flipping them for a small profit. Declaration of David Sparks ("Sparks Decl."), attached hereto as Exhibit "A", ¶ 3.   He soon learned that under Utah law, he needed a used car dealership license to continue to operate his quickly building business, so he acquired B&W Auto, a dealership based in Provo, Utah.   *Id.* ¶ *4*. In April, 2011, Sparks moved B&W Auto to Bountiful, Utah and established Sparks Motors as a dba of B&W Auto.   *Id.* Sparks hired his close friend, David Kiley ("Kiley"), to be the tow trucker driver and to help him grow B&W Auto.   *Id.* ¶ *5*.

In developing B&W Auto's business beyond junk cars, Sparks learned he could obtain diesel trucks at local auctions inexpensively, many of which with performance modifications already installed, that only needed simple repairs and/or cosmetic improvements, then re-sell them for a profit.   *Id.* ¶ *6*. By early 2012, B&W Auto expanded its used dealership to include a repair shop, with the idea to evolve the junk car flipping business to a more customized build shop.   *Id.* ¶ *7*.

At around this time, B&W Auto purchased a Dodge Ram 2500 Megacab and Sparks had an idea to do a custom long bed conversion, as well as install a 6" suspension lift and bigger tires. *Id.*¶ *8*. After it was completed, B&W Auto created a Facebook page in summer, 2012, called Diesel Trucks for Sale, to list the truck. *Id.* ¶ *9*. The advertisement went viral, and B&W Auto easily sold

the vehicle for a decent profit. *Id. ¶ 10*. Sparks discovered the world of diesel truck enthusiasts, and a new business model for B&W Auto was born. *Id. ¶ 11*.

Sparks developed an ingenious online marketing strategy, utilizing social media to build B&W Auto and commercialize diesel truck related merchandise. *Id. ¶ 12*. Sparks contracted a website designer to build a website for B&W Auto, and a graphic designer to create a t-shirt design for the company to market. *Id. ¶ 13*. The designer created a t-shirt that read "Rollin Coal" with a pair of smokestacks displayed. *Id. ¶ 14*. T-shirt sale orders were immediately pouring in, and by March, 2013, DPG was formed as a lifestyle brand company, to handle sales of t-shirts, bumper stickers, hats, and other assorted accessories that catered to the diesel truck lifestyle. *Id. ¶¶ 14-15*. At all times since formation of DPG, Sparks has been the manager of DPG. *Id. ¶ 2*. Sparks also transitioned Kiley over to being an employee for DPG, to handle the creation of marketing content for DPG. *Id. ¶ 13;* Declaration of David Kiley ("Kiley Decl."), attached hereto as Exhibit "B", ¶ *3*.

B&W Auto published its first video on www.youtube.com, in March, 2013, showing two trucks playing tug of war with each others' bumpers in the snow.  Sparks Decl. ¶ 16. The video was a huge success, with approximately four million views. *Id.* Using social media to develop marketing ideas, B&W Auto posted pictures of trucks and asked fans what truck was best to custom build.  *Id. ¶ 17*. From there, in April, 2013, Sparks decided to create a sweepstakes giveaway promotion program to build DPG's business, based on responses from social media fans, using one of B&W Auto's custom built trucks as the prize. *Id. ¶ 18*. DPG contracted with a reputable third party sweepstakes promotions company to organize the giveaway, and ensure

compliance with sweepstakes laws. *Id.* ¶ 19. DPG also contracted with B&W Auto to acquire and custom build the truck to be awarded as a gift to the sweepstakes winner. *Id.* ¶ 20.

During this time, Sparks hired Keaton Hoskins ("Hoskins"), who loves custom built diesel trucks, to help build newly formed DieselSellerz.com, an online diesel truck marketplace (who was dismissed from this lawsuit). *Id.* ¶ 21. Sparks also hired Jared Sorenson (not a named party to this lawsuit), to be DPG's marketing manager. *Id.* The companies were very successful at using social media for marketing and business development, and developed Facebook pages and Instagram accounts to develop following within the diesel truck community. *Id.* ¶ 22. *DPG* also created outlandish videos, which were posted on www.youtube.com, generating a lot of publicity. *Id.*

As a result of the popularity of the videos, in November, 2013, Kiley appeared on the Jay Leno Show. Kiley Decl. ¶ 4. B&W Auto and DPG both quickly became established names in the diesel truck community. Sparks Decl. ¶ 24. DPG and DieselSellerz grew at an enormous rate, and Sparks hired Josh Stuart ("Stuart"), in March, 2014, to be the chief financial officer and chief operating officer of those two spin-off companies. *Id.* ¶ 25.

In 2014, DPG formed 4x4 Anything to expand its business to sell automotive parts and accessories for the diesel truck enthusiast on its online store, through drop shipment contractual agreements with third party vendors. *Id.* ¶ 26.

As a result of the smashing success of the businesses' social media marketing videos, on January 4, 2016, the Discovery Channel launched a reality television show, called the "Diesel Brothers." *Id.* ¶ 27. In the show's first season, it averaged over two million viewers per episode.

*Id.* The show is currently starting its fourth season. *Id.* The four individual defendants collectively are the "Diesel Brothers," who are the primary stars of the television show. *Id.*

In July, 2016, Plaintiff sent a notice of intent to "the Diesel Brothers" to commence the instant action, and included a list of parts offered for sale on 4x4 Anything's site that it asserted violated the CAA. *Id.* ¶ 28. All parts listed in that notice letter were immediately and permanently removed from the website, more than five months prior to the date this case was filed. *Id.*  ¶ 29.

### III.    *Response To Statement Of Elements And Undisputed Material Facts*

**Plaintiff's Preliminary Statement:**

The standing of a citizen-plaintiff under Article III of the Constitution to bring a CAA citizen action is established by proof that "(1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant, and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs, Inc.*, 528 U.S. 167, 180 (2000).  Further, according to *Sierra Club v. Morton*, 405 U.S. 727 (1972), "all persons or associations of persons have an interest sufficient to confer standing if they allege that they have been or will be harmed by the challenged action."

**RESPONSE:  Disagree. In the context of bringing "an action" under the CAA, it is an incomplete statement of Article III standing at the summary judgment stage.**

**Defendants' Preliminary Statement:**

Plaintiff must demonstrate standing for each claim he or she seeks to press and for each form of relief sought. *Daimler Chrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006). Plaintiff also bears the burden of proof to establish standing "with the manner and degree of evidence required

at the successive stages of the litigation." *See Lujan v. National Wildlife Federation, 497 U.S. 871, 883-889 (1990).*

**PLAINTIFF'S 1ˢᵗ ELEMENT -  ORGANIZATIONAL STANDING**

### A. *Plaintiff's Statement of Element*

As an initial matter, organizations such as Physicians have "standing to bring suit on behalf of their members when their members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purposes, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Laidlaw,* 528 U.S. at 181 (citation omitted).

**RESPONSE:  Agree.**

### B. *Plaintiff's Statement of Material Facts and Defendants' Responses*

1.      The purpose of Physicians, a Utah non-profit organization comprised of health care professionals and concerned citizens, is "to educate the public about and to advocate for clean air, healthy land and clean water."

**RESPONSE:  Undisputed.**

2.      Physicians incorporated in 2007, have an office and staff based in Salt Lake City, and have approximately 3,000 newsletter subscribers.

**RESPONSE: Undisputed.**

3.      Physicians are concerned about air pollution in Utah, including ambient levels of particulate matter smaller than 2.5 microns ("$PM_{2.5}$") and ozone that exceed federal, health-based standards.  Diesel exhaust contributes to the concentration of both of these pollutants in the ambient air.

**RESPONSE: Undisputed.**

4.    This matter is germane to Physicians' purpose because the organization seeks to reduce harmful levels of $PM_{2.5}$ and ozone in the air of the Wasatch Front by reducing the emission of these (and other precursor) pollutants in diesel exhaust from illegally modified diesel vehicles.

**RESPONSE: Objection.  Calls for a legal conclusion that illegally modified diesel vehicles cause harmful levels of PM2.5 and ozone in the air of the Wasatch Front.**

5.    Physicians' members have standing to sue in their own right with respect to the violations alleged in Physicians' complaint as set forth below.

**RESPONSE:  Objection.  Calls for a legal conclusion that the members of Plaintiff's organization have standing to bring each of the claims that are alleged in its Complaint. Moreover, Plaintiff cites to no evidence to support this "factual" statement.**

6.    Neither Physicians nor any of its members assert claims for monetary damages or particularized relief for a specific member or group of members.

**RESPONSE: Undisputed.**

### C. *Defendants' Statement of Additional Elements:*

The Clean Air Act does not grant standing to citizens to pursue personal liability against individuals, acting in the course of their employment. *Illinois v. Commonwealth Edison Co.*, 490 F. Supp. 1145, 1148 (N.D. Ill. 1980) (the deliberate omission of corporate officers from the definition of person in the CAA section relating to citizen suits, when that language is expressly added to the section relating to EPA enforcement actions, is evidence of the legislature's intent to *not* impose personal liability)

### D. Statement of Material Facts in Support of Additional Elements

1.      Plaintiff has brought CAA claims against Kiley, in his individual capacity, for his alleged modification of B&W Auto owned diesel trucks, which effect defeats or reduces emissions control devices.  At all relevant times, Kiley was acting solely in his capacity as an employee of B&W Auto or DPG.  Kiley Decl. ¶ 8.

2.      Plaintiff has brought CAA claims against Hoskins, in his individual capacity, for his alleged modification of B&W Auto owned diesel trucks, which effect defeats or reduces emissions control devices.  At all relevant times, Hoskins was acting solely in his capacity as an employee of DieselSellerz. Moreover, Hoskins is not a mechanic, has not worked on B&W Autos vehicles, and only had a brief non-managerial role as a sales/marketing employee of DieselSellerz.com. Declaration of Keaton Hoskins ("Hoskins Decl."), attached hereto as Exhibit "C", ¶¶ 2-5.

3.      Plaintiff has brought CAA claims against Sparks, in his individual capacity, for his alleged modification of B&W Auto owned diesel trucks, which effect defeats or reduces emissions control devices, as well as for the sale of those vehicles. At all relevant times, Sparks was acting solely in his capacity as manager of B&W Auto.  Sparks Decl. ¶ 31.

4.      Plaintiff has brought CAA claims against Stuart, in his individual capacity, for DPG's alleged "sale" of sweepstakes trucks.  At all relevant times, Stuart was acting solely in his capacity as an employee of DPG.  Moreover, Stuart is not a mechanic, not an automobile salesperson, nor has any specialized knowledge about diesel trucks performance modifications. Declaration of Joshua Stuart ("Stuart Decl."), attached hereto as Exhibit "D", ¶¶  2-6.

5.      Plaintiff has brought CAA claims against Sparks, in his individual capacity, for DPG's alleged "sale" of sweepstakes trucks. At all relevant times, Sparks was acting solely in his capacity as a manager and employee of DPG. Sparks Decl. ¶¶ 2, 41.

6.      Plaintiff has brought CAA claims against Stuart, in his individual capacity, for DPG's past sales of products on its 4x4 Anything website. At all relevant times, Stuart was acting solely in his capacity as an employee of DPG.  Moreover, Stuart is not a mechanic, not an automobile salesperson, nor has any specialized knowledge about diesel trucks performance modifications. Stuart Decl.¶¶ 2-4, 8.

7.      Plaintiff has brought CAA claims against Sparks, in his individual capacity, for DPG's past sales of products on 4x4 Anything website. At all relevant times, Sparks was acting solely in his capacity as a manager and employee of DPG.  Sparks Decl. ¶¶ 2, 42.

## PLAINTIFF'S 2nd ELEMENT - INJURY IN FACT FOR STANDING

### A.  Plaintiff's Statement of the Element

The element of injury for the purposes of standing is established by proof from the plaintiff that "it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." Actual or potential harm to health, aesthetic or recreational interests is sufficient to demonstrate injury-in-fact.

**RESPONSE:  Agree with Plaintiff's statement of this element.  Agree this element has been met.**

10

## PLAINTIFF'S 3ʳᵈ ELEMENT – CAUSATION FOR STANDING

### A.  *Plaintiff's Statement of the Element*

Citizen plaintiffs must also show that their injuries are "fairly traceable" to the defendant's alleged violations.  To meet the "fairly traceable" element, a plaintiff alleging pollution-related injuries "must merely show that a defendant discharges a pollutant that causes or contributes to the kinds of injuries alleged." *Piney Run Pres. Ass'n v. Cnty Comm'rs of Carroll City*, 268 F.3d 255, 263-64 (4th Cir. 2001).

**RESPONSE:  Disagree.**

**Defendants' Statement of the Element**

Under the Clean Air Act, "[t]to satisfy the causality element for Article III standing, Plaintiffs must show that the injury is causally linked or "fairly traceable" to the [defendants'] alleged misconduct, and not the result of misconduct of some third party not before the court. *Washington Environmental Council v. Bellon*, 732 F.3d 1131, 1141 (9th Cir. 2013), citing, *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560-61 (1992). "The line of causation between the defendant's action and the plaintiff's harm must be more than attenuated." *Id.*, citing *Native Vill. of Kivalina v. Exxon Mobil Corp.,* 696 F.3d 849, 867 (9th Cir.2012) (citations and quotes omitted), *cert denied,* __ U.S. __, 133 S.Ct. 2390, 185 L.Ed.2d 1116 (2013).

### B.  *Response to Each Stated Material Fact*

1.      Defendant B&W Auto's Shop Foreman, Hans Peterson, made the following observation in his deposition regarding the effect of removing air pollution devices from vehicles:

> Q.      . . . Do you understand why it's illegal to remove [a vehicle's pollution control equipment?]
> A.      Yes.

Q.      Why is that?

A.      Because we're adding more pollution to the air.

Hans depo excerpts, pp. 49-50

**RESPONSE:  Disputed.  The bracketed statement is misleading, particularly when the quote is read in context with surrounding testimony.**

**Defendants' Statement of Facts Disputing that Fact:**

Hans Peterson ("Peterson") was hired to be B&W Auto's social media relations manager. Deposition of Hans Peterson ("Peterson Dep."), portions of which are attached as Exhibit "1" to the Declaration of Janet M. Conway ("Conway Decl."), attached hereto as Exhibit "F", 51:13-16. Peterson is not a mechanic or the regular shop foreman for B&W Auto. Peterson Dep., 50:23-51:12. Peterson was asked to step into the shop manager position due to prior manager departing B&W Auto unexpectedly.  *Id.* Peterson has no experience working in a repair shop, and had no idea whatsoever that these modifications violated CAA, as he understood that if modifications cause vehicle to no longer be considered a road vehicle (i.e. off-road performance, race cars), that the CAA did not apply. Peterson Dep., 47:10-48:6. He has only since learned that after the filing of this lawsuit, that the removal of emissions control devices violates the CAA. *Id.*  Regarding the excerpted testimony cited by Plaintiff, Peterson is only discussing a specific vehicle where the customer sent B&W Auto parts for installation that included removing the vehicle's muffler, and he understands that it is illegal to remove a vehicle's muffler.  Peterson Dep., 48:25-50:2. However, Peterson never saw the parts sent by the customer before the shop's mechanic installed them, and only learned afterward that the wrong parts were sent to B&W Auto and that the customer did not intend to ship that part.  *Id.*

12

2.      The aftermarket defeat parts alleged in the Complaint to have sold and installed by

the applicable Defendants are acknowledged by Defendant DPG's employee, Heather Pledger, to

increase the amount of pollution in the air.

Q.      On the first page – I realize the print's awfully small –
A.      Uh-huh (Affirmative).
Q.       – about three quarters of the way down, there's a reference under Thunder
Diesel for a Flo-Pro DSL Ford DPF delete pipe.  Do you see that reference?
A.      I think so.  The 11 to 12 5-inch
Q.      Yes.
A.      Yes.
Q.      What's your understanding of that part?  What is it?
A.      It's an exhaust pipe that's taking out the DPF and it's 5 inches, for a Ford.
Q.      And what does "DPF" stand for?
A.      I can't think of the words right now.
Q.      It is "diesel particulate filter"?
A.      Yes.
Q.      What do you understand the function of that part to be?
A.      It's taking out one of the filters that is coming back from the engine exhaust,
so – I would think taking that part out would give you better air flow in the truck.
Q.      Does it remove a pollution control device?
A.      Yes.
Q.      What is your understanding of its effect on the emissions from the vehicle
once the delete pipe is used to replace the DPF?
A.      Lets more exhaust go through it, so it would be putting more into the air.

Pledger depo pp. 10-11.

**RESPONSE:**

**Objection.   Plaintiff cannot produce evidence for one product, then rely upon**

**allegations in its Complaint as evidence for all other products.**

**Disputed.   Plaintiff claims that Pledger "acknowledged" all aftermarket products**

**alleged in Complaint increase air pollution, but the excerpted testimony only discusses a**

**single product.**

**Defendants' Statement of Facts Disputing that Fact:**

Heather Pledger ("Pledger") only identifies one single product on 4x4 Anything's sales history spreadsheet, known as a DPF delete pipe, which she did not learn until recently that it violated the CAA.  Deposition of Heather Pledger ("Pledger Dep."), portions of which are attached as Exhibit "2" to Conway Decl., 24:5-24.  Pledger is not a mechanic, has no prior experience or training in automotive parts, and has no specific knowledge of the products that Plaintiff is alleging violate the CAA.  Declaration of Heather Pledger ("Pledger Decl."), attached hereto as Exhibit "E", ¶ 2.  Pledger creates website content for 4x4 Anything, which content she receives from DPG's vendors or the product manufacturers. *Id.* ¶ 4. Pledger believed that all products supplied by 4x4 Anything's vendors were legal to sell. *Id.* ¶ 5. She is not an expert on automotive parts or air pollution, and certainly not in any position to opine the effect of removing automotive parts on emissions along the Wasatch Front. *Id.* ¶ 6.

3.      The vehicles alleged in the Complaint to have been "deleted" by the applicable Defendants cause the same type of diesel smoke-related injuries suffered by Physicians.   In Defendants' video titled "2012 Cummins Giveaway Truck Smokes Out Prius Paul," a dark plume of diesel exhaust from Defendants' modified 2012 Dodge pickup truck engulfs the driver to his medical detriment.  The location of Defendants' diesel pollution exemplar is East Capitol Street in downtown Salt Lake City.

**RESPONSE:**

**Objection. Refers to the allegations of the Complaint as if it were evidence, and calls for a legal conclusion that diesel exhaust smoke caused Plaintiff's injuries.  Moreover, it**

misstates the evidence and Plaintiff does not cite any evidentiary support for the "facts" in the first two sentences.

Disputed as to the first two sentences.  Undisputed as to the last sentence.

**Defendants' Statement of Facts Disputing that Fact:**

Defendants had nothing to do with the creation of the Prius Paul video. Sparks Decl. ¶ 23; Deposition of David Sparks ("Sparks Dep."), portions of which are attached as Exhibit "3" to Conway Decl., 125:18-126:15. That video was created by a former marketing manager, Jared Sorenson, who was terminated in part because of the offensive nature of that video. *Id.* Defendants did not participate in the making of that video. *Id.* Defendants removed that video from websites they have any control over, but to the best of Defendants' knowledge, Jared Sorenson still has it available for public viewing on www.youtube.com.  *Id.*

4.      Defendant B&W Auto admits that, in the last five years, it has purchased diesel vehicles with missing pollution control devices, removed pollution control devices on diesel vehicles, and sold diesel vehicles that have had pollution control devices removed.

**RESPONSE:  Undisputed.**

5.      One such vehicle was a 2013 Ford F250 diesel pickup truck, Vehicles Identification ("VIN") 1FT7W2BT2DEA61696. Defendant Sparks advertised this vehicle with a "full DPF delete and H&S Tune" ("Sparks Deleted Truck"), and published a video on Facebook showing its ability to emit pollution.

**RESPONSE:  Disputed.**

**Defendants' Statement of Facts Disputing that Fact:**

Kam Hoskins, a former employee for B&W Auto, is listed as contact person in the advertisement, and would have listed this advertisement as part of his duties as employee for B&W Auto. Sparks Decl. ¶ 38; Sparks Dep. and Exhibit 16 thereto, 62:24-63:24. Further, B&W Auto is listed as the seller in the advertisement. *Id.*

6.     In 2016, Physicians obtained the Sparks Deleted Truck and commissioned Dr. Michael St. Denis of Revecorp, Inc. to have its particulate matter ("PM") and nitrogen oxides ("NOx") emissions tested pursuant to the Federal Test Procedure ("FTP").  The FTP is the testing protocol that Ford Motor Company ("Ford") was required to follow to prove diesel exhaust levels from the 2013 Ford F250 were below federal emission standards before Ford could sell the truck in the United States.

**RESPONSE: Undisputed.**

7.     Ford installed at least three emission control devices in its 2013 diesel F250 to meet federal standards: a Diesel Oxidation Catalyst ("DOC"), a Diesel Particulate Filter ("DPF") and a Selective Catalytic Reduction System ("SCR").  In the Sparks Deleted Truck, these three devices had been removed and replaced by a hollow "straight pipe."

**RESPONSE:  Undisputed.**

8.     Emissions from the Sparks Deleted Truck were tested pursuant to the FTP at the accredited SGS Environmental Testing Center in Aurora, Colorado.  The FTP results showed that NOx emissions from the Sparks Deleted Truck exceeded the vehicle's federal emission standards by 2,160 percent, and PM emissions by 429 percent.

**RESPONSE:  Objection. States an expert's opinion, but Plaintiff has not designated this individual as an expert witness, nor provided any expert reports.**

9.      The 2016 FTP test results of the Sparks Deleted Truck also showed that its pollutant emissions exceeded the vehicle's actual or "certified" 2013 emission rates by 3,600 percent for NOx and 2,145 percent for PM.  According to Dr. St. Denis, this means "the excess emissions of NOx from this single truck are equivalent to the emissions from 36 certified and properly operating stock trucks of the same type.  The excess emissions of PM from this single truck are equivalent to the emissions from 21 certified and properly operating stock trucks of the same type.

**RESPONSE:  Objection. States an expert's opinion, but Plaintiff has not designated this individual as an expert witness, nor has Plaintiff provided any expert reports.**

10.      Defendants alleged in the Complaint as having operated "deleted" diesel vehicles have operated them in Utah, and those vehicles have discharged their excess emissions into the air shed of the Wasatch Front.  According to the Declaration of Ashley Soltysiak, Defendants' promotional videos show the vehicles identified in Exhibit I being driven in both metropolitan and rural areas of the state.

**RESPONSE:**

**Objection.  The first sentence consists of allegations in Plaintiff's Complaint and do not constitute evidence.**

**Undisputed only that the videos attached as Exhibit I to Plaintiff's Motion include B&W Auto vehicles being operated in Utah, by unidentified employees of B&W Auto.**

11.      According to Defendant B&W Auto's Shop Foreman Hans Peterson, the vehicles identified in Exhibit I continue to be operated in Utah.

> Q.      When is the last time you recall any of these vehicles on the list being operated in Utah?
> A.      Define "operated."
> Q.      Running, with engine running.
> A.      The Bro-Dozer engine runs right now.  Hercules –
> Q.      I mean – I'm sorry – is on, I mean, combustion is occurring.
> A.      Megaram, Bro-Dozer, Hercules.  And those are the only ones I know of.  I don't – I don't know where the Reaper is.
> Q.      And does that mean this year, in 2017?
> A.      That's, like, right now.

Peterson depo, pp. 35-36.

**RESPONSE:  Undisputed.**

12.      "Diesel engines emit nitrous oxides ("NOx") non-methane hydrocarbons, and particulate matter ("PM"), all of which are harmful to the environment and human health."  *Nat'l Petrochemical & Refiners Ass'n v. E.P.A.*, 287 F.3d 1130, 1134 (D.C. Cir. 2002).

**RESPONSE:  Undisputed.**

13.      How NOx is formed, and how it is transformed into other pollutants, is explained by the Utah Division of Air Quality ("UDAQ") in its 2016 Annual Report,

> During high temperature combustion, nitrogen in the air reacts with oxygen to produce various oxides of nitrogen, or NOx, a reddish-brown gas.  One of the oxides of nitrogen, NOx is a criteria pollutant.  Oxides of nitrogen react with other air contaminants to form other criteria pollutants.  In the summer along the Wasatch Front, and in the winter in the Uinta Basin, photochemical reactions between NOx and VOCs lead to the formation of ground-level ozone.  In the winter, NOx reacts with ammonia to form fine particulate matter ($PM_{2.5}$).  Both of these seasonal scenarios can result in increased pollution.

**RESPONSE:  Undisputed.**

14.      The U.S. EPA has also found that "many of the organic compounds present on the particle and in the gases [of diesel exhaust] are individually known to have mutagenic and

carcinogenic properties." U.S. EPA, Health Assessment Document for Diesel Engine Exhaust, 2002, p 1-2.

**RESPONSE: Undisputed.**

15.    An August 2013 study conducted by the University of Utah and Davis County showed that an increase in opacity of emissions (density of smoke) from diesel vehicles is directly correlated to a significant increase in fine particulate matter. For diesel vehicles that failed the Davis County opacity test, for example, the emission of particulate matter in the 1.0-2.0 micron range was 100 times that of the diesel vehicles that passed the test. Davis County Summary of Particulate Matter Testing, 2003.

**RESPONSE: Undisputed.**

16.    According to the California Air Resources Board ("CARB"), "almost all of the diesel particulate mass [in diesel exhaust] is in the fine particle range of 10 microns or less in diameter ($PM_{10}$). Approximately 94 percent of the mass of these particles are less than 2.5 microns in diameter. Because of their small size, these particles can be inhaled and a portion will eventually become trapped within the small airways and alveolar regions of the lung." CARB Report on Diesel Exhaust, April 22, 1988.

**RESPONSE: Undisputed.**

**C.  *Defendants' Statement of Additional Facts***

1.    Utah has suffered from poor air quality for a long time, and Utah's Wasatch Front had become non attainment areas for both $PM_{2.5}$ and ozone prior to B&W Auto and DPG coming into existence. Conway Decl., *Utah Division Of Air Quality 2009 Annual Report*, Exhibit "4", at p. 8.

2.　　In 2014, the U.S. Department of Transportation, Federal Motor Carrier Safety Administration reported there were 260,350,938 total registered vehicles in the United States. *Id.*, *2016 Pocket Guide to Large Truck and Bus Statistics*, Exhibit "5", at p. 7.

3.　　The U.S. Department of Transportation, Bureau of Transportation Statistics reported thata s of 2013, there were over 3,000,000 registered vehicles in Utah, and 1,600,000 licensed Utah drivers.  *Id.*, *Table 5.1: Motor-Vehicle Registrations: 2013* and *Table 4.2: Licensed Drivers: 2013*, Exhibit "6".

4.　　In 2016, on-road mobile sources produced about 36% of the annual pollution (NOx, $PM_{2.5}$ exhaust, and VOC) along the Wasatch Front.  *Id., Utah Division of Air Quality 2016 Annual Report*, Exhibit "7", at p. 23-24. More specifically, 35% of NOx is from on-road mobile sources. *Id.* at p. 26.  Only 12% of $PM_{2.5}$, 7% of $PM_{10}$ and 2% of VOC is attributable to on-road mobile sources.  *Id.* at p. 27-28.

5.　　On-road mobile sources include highway vehicles such as cars, light duty trucks, heavy-duty trucks and motorcycles using gasoline and diesel fuels.  *Id.*

6.　　Brock LaBaron, Deputy Director, Utah Department of Environmental Quality has reported that vehicle operation is not a significant source of ozone, and intercontinental transport of ozone and nitrogen oxides (NOx) from Asia contributes up to 20 percent of the West's total ozone concentrations and it has been shown to be growing by 0.5–1 parts per billion (ppb) per year.  *Id.*, *Pollution in Utah: Not Always the Usual Suspects*, Exhibit "8". Another major contributor is wildfires, which are on the rise in the western states.  *Id.*

7.　　Utah's Department of Health, Bureau of Epidemiology has reported that vehicle operation is not a significant source of either $PM_{2.5}$ or $PM_{10}$ pollutants, as over 30% of <u>primary</u>

$PM_{2.5}$ particle emissions in Utah came from dust; fires contributed over 15%, fuel combustion contributed 15%, and mobile sources only emitted 12.5% of the total primary $PM_{2.5}$ particles. In 2014, 67% of the primary $PM_{10}$ particles in Utah came from dust, largely from unpaved roads. The next highest source categories, agriculture and industrial processes, contributed approximately 17% and 5%, respectively, of the total primary $PM_{10}$ particles. *Id.*, *Air Pollution and Public Health in Utah*, Exhibit "9".

8.     The Kennecott Utah Copper Bingham Canyon Mine is a major source contributor of $PM_{10}$, $PM_{2.5}$ and NOx emissions along the Wasatch Front, having moved in excess of 1.5 million tons of material annually, resulting in thousands of tons of emissions, and that amount has increased every year since 2006. *Id.*, *Physicians v. Kennecott.* No. 2:11-CV-01181, United States District Court, D. Utah, Central Division, Memorandum Decision and Order dated June 8, 2016, Exhibit "10".

9.     As of 2014, as posted by the Utah Department of  Environmental Quality, Kennecott had an emissions limit for the Bingham Copper Mine for the combined emissions of $PM_{10}$, SO2, and NOx (7,350 Tons Per Year) and combined emissions of $PM_{2.5}$, SO2 and NOx (6,205 Tons Per Year) encompass facility wide emissions. Conway Decl., *Kennecott Utah Copper, LLC, Public Notice of Intent, dated January 13, 2014*, Exhibit "11".

10.     In 2011, Plaintiff sued Kennecott under the CAA, claiming it was suffering the same exact injuries as it now alleges is being caused by Defendants, and it argued Kennecott was a major source of particulate matter emissions on the Wasatch Front. *Id.*, *Utah Physicians for a Healthy Environment v. Kennecott Utah Copper,* U.S. District Court, District of Utah, Civil Case No. 2:11-cv-01181-SA, Complaint filed December 19, 2011, Exhibit "12"

11.     In 2016, Plaintiff's action against Kennecott was dismissed, and Kennecott continues to be a major source of pollutants. Id, Exhibit 10.

12.     Another major contributor of same emissions also caused by diesel trucks is Pacificorp's four coal burning plants.  In 2016, Plaintiff sent the EPA formal comments, which stated: "PacifiCorp's central Utah fleet of power plants is responsible for a substantial share of the NOx, particulates, and ozone along the Wasatch Front. . . Point sources of NOx emissions in Utah are the state's main source of NOx, and Utah's point sources consist primarily of PacifiCorp's fleet of coal-fired power plants." *Id*, *Comments Of Utah Physicians For A Healthy Environment On The Epa's Co-Proposals For Implementing The Utah State Regional Haze State Implementation Plan*, Exhibit "13".

13.     Plaintiff also intervened in *State of Utah v. E.P.A.*, to force Pacificorp to install NOx emissions control devices, claiming its four coal burning plants are a major source contributor to air pollution along the Wasatch Front, capable of emitting 250 tons of NOx and PM pollutants annually, and further directly impacts the haze in the Wasatch Front and other Utah recreation areas.  *Id., State of Utah v. EPA*, U.S. Court of Appeals for the Tenth Circuit, Docket for Appellate Case No. 16-9541, Exhibit "14".

14.     Utah studied haze levels over a fifteen-year period in correlations with emissions reductions and found that significant reductions in NOx would result in zero visible difference in the haze along the Wasatch Front.  *Id.*, *State of Utah v. EPA*, U.S. Court of Appeals for the Tenth Circuit, Appellate Case No. 16-9541, *Preliminary Brief of Petitioner State of Utah*, filed March 10, 2017, Exhibit "15".

15.     Utah Department of Environmental Quality reported another major source of the same emissions that are found in diesel exhaust are the five major oil refineries along the Wasatch Front, and indeed point sources in 2014, in Salt Lake County alone, accounted for 7,271.81 tons of NOx, 2,560.04 tons of $PM_{10}$, 1,227.34 tons of $PM_{2.5}$ and 1,610.40 tons of VOC., *Id., 2014 Inventory Compiled with Oil Gas Locomotive Aircraft NonRoad Updates*, Exhibit "16".

16.     Tesoro Oil Refinery, located along the Wasatch Front, recently settled a litigation in July, 2016, brought by the EPA, and the Department of Justice, Office of Public Affairs, for, according to its official press release, dated July 18, 2016, emitting illegal levels from its Salt Lake City refinery of the same pollutants found in diesel exhaust. *Id., Oil Refiners to Reduce Air Pollution at Six Refineries Under Settlement with EPA and Department of Justice*, Exhibit "17."

17.     In addition, Tesoro is expanding, which will result in increased emissions, and in 2015, Plaintiff filed an appeal with the Utah Court of Appeals to stop the expansion of Tesoro refinery. *Id., Utah Physicians for a Healthy Environment v. Tesoro Marketing and Refining*, Utah Court of Appeals, Appeal No. 20141132-CA, Opening Brief filed March 18, 2015, Exhibit "18".

18.     In its brief, Plaintiff stated: "At the center of Utah's Wasatch Front are five refineries, including the Tesoro facility. These refineries contribute to our air pollution problem by directly emitting $PM_{2.5}$, as well as the pollutants that form fine particulate matter during our inversions – sulfur oxides (SOX), nitrous oxides (NOx) and volatile organic compounds (VOCs)." *Id.*

19.     Plaintiff further argues: "In 2013, at a time when state and federal law require [Utah's Director of Air Quality] to reduce $PM_{2.5}$, NOx, SO2 and VOC emissions dramatically, he approved increases in the refinery's direct annual emissions of $PM_{2.5}$ by 4 tons and $PM_{10}$ by 6.6

tons, annual emissions of the $PM_{2.5}$ and ozone precursors NOx and VOCs by 27 and 28 tons respectively, annual emission of sulfuric acid by 7 tons and annual emission of CO by 9 tons. *Id.*

20.     Since B&W Auto started its business in April, 2011, it has owned a total of 16 diesel trucks in which emission control devices were removed (often prior to B&W Auto acquiring that truck). Sparks Decl. ¶ 32.  Most of those vehicles were only briefly operated in the State of Utah, before B&W Auto sold, or gave away to DPG sweepstakes winners, most of those vehicles "as is" to out-of-state purchasers or winners. *Id.* ¶ 33.

21.     B&W still currently owns three of those vehicles, which are known as are Bro-Dozer, Hercules and Megaram. *Id.* ¶ 34. These vehicles are not capable of passing safety highway inspections, and are strictly ***not*** for use on Utah roads. *Id.*

22.     Another one of the 16 vehicles is the 2013 F250, referenced by Plaintiff.  *Id.* ¶ 35. B&W purchased that truck from a local Utah auction "as is", with the emissions modifications and H&S tune already on the truck.  *Id.* ¶ *36.* B&W Auto only did cosmetic work to that truck before listing it for sale.  *Id.* ¶ 37. Sparks has no personal interest in this vehicle, and the advertisement clearly shows seller is B&W Auto.  *Id.*  ¶¶ 36-37.

23.     2013 F250 was sold "as is" in 2014 to an out-of-state purchaser, and had 33,231 miles on it at the time of sale.  *Id.* ¶¶ *36, 39.*

## PLAINTIFF'S 4th ELEMENT – REDRESSABILITY FOR STANDING

### A.  *Plaintiff's Statement of the Element*

Redressability is sufficiently alleged by a plaintiff as long as there is "a likelihood that the requested relief will redress the alleged injury."

**RESPONSE:  Agree.**

### B. Response to Each Stated Material Fact

1. Physicians Complaint requests an injunction to stop Defendants from removing pollution control devices from vehicles, and from selling or conveying as prizes vehicles without fully functioning pollution control devices including those with defeat parts installed.

**RESPONSE:  Objection.  Allegations in the Complaint do not constitute evidence.**

2. Physicians' Complaint requests an injunction to stop Defendants from selling, offering to sell or installing aftermarket defeat parts, and vehicles in which such parts are installed, that are used to render inoperative pollution control devices.  Physicians also request an injunction to stop Defendants from operating vehicles in which pollution control devices have been removed, bypassed or rendered inoperative.

**RESPONSE:  Objection.  Allegations in the Complaint do not constitute evidence.**

3. Physicians' Complaint requests a mandatory injunction to requires Defendants to locate, recall and return to original condition all vehicles they have illegally modified, and to locate, recall, repurchase and destroy all aftermarket parts they have sold.

**RESPONSE:  Objection.  Allegations in the Complaint do not constitute evidence.**

4. "To compensate for the excess, illegal pollution caused by Defendants' activities," Physicians request that Defendants "finance supplemental relief designed to reduce air pollution in Davis County and the other non-attainment areas in Utah," and for each defendant to pay up to $100,000 for "beneficial mitigation projects as provided for by 42 U.S.C. 7604(g)(2)."

**RESPONSE: Objection.  Allegations in the Complaint do not constitute evidence.**

5.      Physicians seeks the assessment of civil penalties for each vehicle illegally modified by Defendants, each day Defendants have operated an illegally modified vehicle in Utah, and each illegal aftermarket defeat part or component sod and/or installed by Defendants.

**RESPONSE:  Objection.  Allegations in the Complaint do not constitute evidence.**

6.      Physicians member Dr. Garber states,

My enjoyment of Salt Lake County and the Wasatch Front would be enhanced if the defendants were ordered to stop removing pollution control equipment from diesel vehicles, and were ordered to stop operating those vehicles.  The air quality of the Wasatch Front would also be enhanced if the defendants were ordered to stop selling parts designed to remove or defeat diesel vehicle pollution control equipment, and to recover all of the parts they have sold.  If the defendants were also required to pay a substantial penalty that would discourage them from engaging in these activities again, and deter others from following their example.

**RESPONSE:   Objection.   Calls for a legal conclusion without expert evidence to support statement that Wasatch Front's air quality would be enhanced.**

7.      Physician member Dr. C. Jones states:

If the defendants were required to restore the pollution control equipment they have removed on diesel vehicles, this would be a benefit to me because fewer diesel vehicles would be excessive polluters and the air I am breathing would be less polluted.

**RESPONSE:   Objection.   Calls for a legal conclusion without expert evidence to support statement that Wasatch Front's air quality would be enhanced.**

8.      Physician member Janice Evans states:

If the defendants in this case are found to be breaking the law by removing and defeating pollution control systems on diesel vehicles here in Utah, and selling parts to do the same thing, like Volkswagen they should be required to stop.  They should also be required to undo what they have done by recalling these vehicles and parts.  They should also be required to pay a stiff penalty.  This will make our air cleaner and deter others from making it dirtier.  Compelling the defendants to obey the law and respect everyone's right to clean air – mine, their own families, neighbors and

26

fellow citizens – wouldn't eliminate all sources of air pollution, but it will make the
air healthier by stopping some of it.

**RESPONSE:**

**Objection.  Calls for a legal conclusion without expert evidence to support statement**

**that Wasatch Front's air quality would be enhanced.**

**Disputed.**

**Statement of Facts Disputing this Fact.**

Utah Department of Environmental Quality reported that Volkswagen (VW) has admitted

to secretly installing illegal software on approximately 580,000 vehicles with diesel engines

between 2009-2015. Conway Decl. *VW Settlement*, Exhibit "19".  The software "cheats" engine

certification and emissions testing by producing results that comply with federal law during

testing, but emit up to 40 times the allowable emissions of nitrogen oxides (NOx) under normal

driving conditions. *Id.*  Approximately 7,000 vehicles in Utah were affected by the cheat device

on VW vehicles. *Id.*  Excess emissions of nitrogen oxides (NOx) from the affected vehicles are

estimated to be 230.1 tons-per-year statewide in Utah. *Id.*

9.      Ms. Evans states further:

If the defendants are found to have broken the law they should also be required to
finance other air pollution control efforts in the Wasatch Front to offset the
excessive pollution they have caused in the past.

**RESPONSE: Objection.  Calls for a legal conclusion.**

## C.  *Statement of Additional Elements*

"To establish the redressability element of standing, plaintiff must prove that defendant

was either (1) violating [applicable section] of the Clean Air Act at the time the complaint was

filed or (2) that future violations were imminent." *Families for Asbestos Compliance Testing and*

*Safety v. City of St. Louis, Missouri*, 638 F. Supp. 2d 1117, 1124 (E.D. Mo. 2009).  "The plaintiff bears the burden to establish standing at the time the suit is filed, and if the defendant's offending conduct has ceased by that time, [the court will] dismiss for lack of redressability." *WildEarth Guardians v. Public Service Co. of Colorado*, 690 F.3d 1174, 1185 (10th Cir. 2012), citing *City of Hugo v. Nichols (Two Cases),* 656 F.3d 1251, 1264 (10th Cir. 2011).

### D.  Statement of Material Facts in Support of Additional Elements

1.      Plaintiff has brought CAA claims against DPG for past sales of certain products, alleged to violate the CAA, on 4x4 Anything's website.  Sparks Decl. ¶ 42.

2.      Plaintiff has brought CAA claims against Sparks, for past sales of certain products, alleged to violate the CAA, on 4x4 Anything's website.  *Id.* ¶ 43.

3.      Plaintiff has brought CAA claims against Stuart, for past sales of certain products, alleged to violate the CAA, on 4x4 Anything's website.  Stuart Decl.  ¶ 8.

4.      All parts listed on 4x4 Anything's website, and information about those parts, were obtained from large third party vendor suppliers.  Pledger Decl. ¶¶ 4-5; Sparks Decl.¶ 44.  DPG had no reason to believe that any parts provided by its vendors would violate the CAA.  *Id.*

5.      Immediately upon notice from Plaintiff, DPG permanently removed all parts identified in Plaintiff's letter off 4x4 Anything's site. Sparks Decl. ¶ 45.

6.      More than five months passed between the time DPG ceased selling parts alleged to violate the CAA and the date the instant action was filed.  *Id.* ¶ 46.

### IV.    Argument

#### A.   Standard of Review

Plaintiff bears the burden of proof to establish standing for each claim asserted and for each form of relief sought "with the manner and degree of evidence required at the successive stages of the litigation." *See Daimler Chrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006); *Lujan v. National Wildlife Federation, 497 U.S. 871, 883-889 (1990).* Summary judgment is appropriate only when the court is satisfied "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "If . . . there is any evidence in the record from any source from which a reasonable inference in the [nonmoving party's] favor may be drawn, the moving party simply cannot obtain a summary judgment. . . ." *In re Japanese Electronic Products Antitrust Litigation*, 723 F.2d 238, 258 (3rd Cir. 1983), rev'd on other grounds sub nom. *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U. S. 574 (1986).

Plaintiff's burden of proof for summary judgment has two distinct components: "an initial burden of production, which shifts to the nonmoving party if satisfied by the moving party; and an ultimate burden of persuasion, which always remains on the moving party." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (citations omitted). The burden of production imposed by Rule 56 requires Plaintiff to make a *prima facie* showing that it is entitled to summary judgment, and "must support its motion with credible evidence -- using any of the materials specified in Rule 56(c) -- that would entitle it to a directed verdict if not controverted at trial." *Id.* Plaintiff's burden of persuasion is more stringent, and "summary judgment should not be granted unless it is clear that a trial is unnecessary, *Anderson v. Liberty Lobby, Inc.*, ante at 477 U. S. 255, and any doubt

as to the existence of a genuine issue for trial should be resolved against the moving party, *Adickes v. S. H. Kress & Co.*, 398 U. S. 144, 158-159 (1970)." *Id.*

### B. Plaintiff fails to satisfy Article III's "fairly traceable" causation element.

To satisfy the causality element for Article III standing, Plaintiff must show that the injury is substantially linked to the Defendants alleged misconduct beyond merely showing Defendants contribute to the pollution. *Washington Environmental Council v. Bellon,* 732 F.3d 1131, 1141 (9th Cir. 2013). "[W]here the causal chain involves numerous third parties whose independent decisions collectively have a significant effect on plaintiff's injuries, the causal chain is too weak to support standing." *Id.* at 1142, citing *Native Vill of Kivalina,* 696 F.3d at 867.

Defendants do not dispute that Plaintiff suffered an injury from air pollution along the Wasatch Front. However, Plaintiff's injuries must be fairly traceable to Defendants' alleged conduct. The "fairly traceable" requirement is in large part designed to ensure that the injury complained of is not the result of the actions of a third party. *Friends of the Earth v. Gaston Copper Recycling Corp*, 204 F.3d 149, 161 (4th Cir. 2000), citing *Lujan v. Defenders of Wildlife*, 504 U.S. at 560 (internal quotation marks omitted). Thus, injuries are not fairly traceable when they are the result of "independent action of some third party not before the court." *Texas Indep. Producers & Royalty Owners Ass'n v. EPA*, 410 F.3d 964, 972 (7th Cir. 2005). The "fairly traceable" requirement can only be met, when a plaintiff points to a polluting source as the seed of his injury, and the owner of the polluting source supplies no alternative culprit. *Id.*

Plaintiffs only offer vague, conclusory statements that Defendants' misconduct contributes to increased emissions, which in turn, contributes to reduced air quality that result in Plaintiff's injuries. Plaintiff's evidence in large part does not comply with Fed. R. Evid. 402, 602, 701, and

702-704, it that it relies upon allegations in the Complaint, lacks foundation, renders improper expert opinion, or calls for a legal conclusion not within a declarant's personal knowledge or expertise. In essence, Plaintiffs' causal chain consists of a series of links strung together by conclusory, generalized statements of "contribution," without any other evidentiary basis that the emissions from a handful of B&W Auto's vehicles are the source of their injuries. "The line of causation between the defendant's actions and the plaintiff's harm must be more than attenuated." *Bellon*, 732 F.3d at 1141. Because a multitude of independent third parties are responsible for the changes contributing to Plaintiff's injuries, the causal chain is too tenuous to support standing.

Defendants do not dispute the diesel engines produce NOx and PM, and that pollution caused from vehicle emissions is a problem. It is no wonder, considering how many vehicles and diesel consuming trucks are on the road. In 2014, there were 260,350,938 total registered vehicles in the United States. On a state-wide level, Utahns loves to drive their vehicles, too. As of 2013, there were over 3,000,000 registered vehicles in Utah and 1.6 million licensed Utah drivers.

In 2016, on-road mobile sources produce about 36% of the annual pollution (NOx, $PM_{2.5}$ and VOC) along the Wasatch Front. However, according to Utah's Department of Health, vehicle operation is not a significant source of either $PM_{2.5}$ or $PM_{10}$ pollutants, as over 30% of primary $PM_{2.5}$ particle emissions in Utah also came from dust; fires contributed over 15%, fuel combustion contributed 15%, and mobile sources only emitted 12.5% of the total primary $PM_{2.5}$ particles. In 2014, 67% of the primary $PM_{10}$ particles in Utah came from dust, largely from unpaved roads. The next highest source categories, agriculture and industrial processes, contributed approximately 17% and 5%, respectively, of the total primary $PM_{10}$ particles.

Moreover, according to the Utah Department of Environmental Quality, vehicle operation is not a significant source of ozone, one of the primary pollutants that Plaintiff claims are causing them injury, and intercontinental transport of ozone and nitrogen oxides (NOx) from Asia contributes up to 20 percent of the West's total ozone concentrations and it has been shown to be growing by 0.5–1 parts per billion (ppb) per year.  Another major contributor is wildfires, which are on the rise in the western states.

Kennecott Utah Copper's Bingham Mine is a major source contributor of the same pollutants along the Wasatch Front as caused by diesel truck exhaust.  In 2011, Plaintiff sued Kennecott under the CAA, claiming it was suffering the same injuries as it now alleges is being caused by Defendants, and it argued Kennecott was a major source of particulate matter emissions on the Wasatch Front. Indeed, it was undisputed that Kennecott emitted thousands of tons of emissions annually, and its emissions increased every year.  As of 2014, Kennecott has an emissions limit for the Bingham Mine for the combined emissions of $PM_{10}$, SO2, and NOx (7,350 Tons Per Year) and combined emissions of $PM_{2.5}$, SO2 and NOx (6,205 Tons Per Year) encompass facility wide emissions. In 2016, this lawsuit was dismissed, and the end result is that Kennecott continues to be a major source of pollution.

Another major contributor of the same emissions caused by diesel truck exhaust is Pacificorp's coal burning plants.  In 2016, Plaintiff intervened in the pending action, *State of Utah v. E.P.A.,* to force Pacificorp to install NOx emissions control devices, claiming its coal burning plants are a major source contributor of air pollution along the Wasatch Front, capable of emitting 250 tons of NOx and PM pollutants annually, and further directly impacts the haze in the Wasatch Front and other Utah recreation areas.  This case is still pending.

Finally, at the center of Utah's Wasatch Front are five oil refineries. These refineries contribute to the Wasatch Front's air pollution problem by directly emitting $PM_{2.5}$, NOx and volatile organic compounds (VOCs).   One of the refineries, Tesoro Oil Refinery, was found to be violating the CAA for emitting illegal levels of emissions into the Wasatch Front, and recently settled a litigation in July, 2016.  In addition, Tesoro is expanding its operations, which will result in increased emissions to the Wasatch Front, and in 2013, Plaintiff filed an appeal with the Utah Court of Appeals to stop the expansion of Tesoro refinery.

In the Tesoro appellate brief, Plaintiff argues: "at a time when state and federal law require Utah's Director of Air Quality to reduce $PM_{2.5}$, NOx, SO2 and VOC emissions dramatically, he approved increases in the refinery's direct annual emissions of $PM_{2.5}$ by 4 tons and $PM_{10}$ by 6.6 tons, annual emissions of the $PM_{2.5}$ and ozone precursors NOx and VOCs by 27 and 28 tons respectively, annual emission of sulfuric acid by 7 tons and annual emission of CO by 9 tons."

The court ultimately ruled against Plaintiff and Tesoro is continuing is expansion efforts. *Utah Physicians for a Healthy Environment v. Tesoro Refining and Marketing Company,* 391 P.3d 148, 158 (Utah 2016). Plaintiff also challenged the Holly Frontier Corp's expansion of its refinery in Woods Cross, Utah, where B&W Auto and DPG's businesses are located.  *Utah Physicians for a Healthy Environment v. Holly Refining and Marketing Company -- Wood Cross L,L.C.*, 398 P.3d 1031, 1032  (Utah 2017).  The Utah Supreme Court dismissed Plaintiff's challenge in June, 2017, and Holly is continuing its expansion efforts. *Id.*

 With all the other sources that Plaintiff has personally identified as major sources of enormous amounts of emissions which continue to increase annually, the claims that Plaintiff assert against Defendants are grossly deficient to confer standing.

With regard to Plaintiff's claims against B&W Auto, B&W Auto has owned a total of 16 diesel trucks in which emission control devices were removed (often prior to B&W Auto acquiring that truck) since inception of its business in April, 2011. B&W Auto has sold, or given away to DPG sweepstakes winners, most of those vehicles "as is" to out-of-state purchasers or winners, and were only briefly operated in the State of Utah.  B&W still currently owns three of those vehicles, which are known as are Bro-Dozer, Hercules and Megaram.  These vehicles are not capable of passing safety highway inspections, and are strictly **_not_** for use on Utah roads.

Another one of the 16 vehicles is the 2013 F250, referenced by Plaintiff.  B&W Auto purchased that truck from a local Utah auction "as is", with the emissions modifications and H&S tune already installed on the truck.  B&W Auto only did cosmetic work to that truck before listing it  for sale.  The 2013 F250 was sold "as is" in 2014 to an out-of-state purchaser, and had 33,231 miles on it at that time. There is no evidence that when Plaintiff obtained this vehicles two years later, that it was in the same operating condition as when it left B&W Auto's possession.

Even assuming, for argument's sake, that each of the 16 vehicles results in emissions equivalent to 40 vehicles, which were briefly operated along the Wasatch Front over the last five years, that would only equate to less than .0004% of emissions from the total amount of registered vehicles in Utah, which total includes 7,000 illegally modified VW vehicles that were purchased and registered in Utah.  Given Utah's enormous amount of source pollution from copper mining, power company coal burning plants, and five major oil refineries all located along the Wasatch Front, combined with over 3,000,000 vehicles registered in Utah, of which 7,000 were illegally modified VW vehicles, it is impossible to say that B&W Auto's 16 vehicles, that were only briefly operated in Utah, could possibly have caused any traceable injury to Plaintiff.

Next, with regard to Plaintiff's claims relating to Diesel Power Gear for the sale of products on 4x4 Anything's website, Plaintiff has produced no evidence of sales of any products. Plaintiff generally references its Complaint to allege that products were advertised on 4x4 Anything's website, and identified one single product that was listed on 4x4 Anything's website. Plaintiff has provided no basis to maintain its claims against DPG for violating the CAA for sales of automotive parts.

Finally, with regard to Plaintiff's claims relating to Diesel Power Gear for the sale of vehicles that had emissions control devices defeated, Plaintiff has produced no evidence of ownership of one single vehicle by Diesel Power Gear, much less any evidence that DPG sold a single vehicle.  It is undisputed that without a single factual material fact to advance its claims against DPG, it cannot show it has standing to pursue this action against DPG.

### C.  Plaintiff fails to satisfy Article III's redressability element.

"To demonstrate redressability, a party must show that a favorable court judgment is likely to relieve the party's injury."*WildEarth Guardians v. Public Service Co. of Colorado*, 690 F.3d 1174, 1185 (10th Cir. 2012), citing *City of Hugo v. Nichols (Two Cases),* 656 F.3d 1251, 1264 (10th Cir. 2011). For the very same reasons that Plaintiff cannot show traceability sufficient for causation, Plaintiff fails to show that the requested relief will redress its injuries, as Defendants' possible total emissions contribution to the Wasatch Front air pollution problem is the equivalent to a single drop in the ocean.

Despite producing the 2013 F250 test results, which showed an excessive amount of NOx from one vehicle, that is located outside of Utah, it is undisputed that the total amount of emissions caused by that truck is a microscopic fraction of 1% of the Utah on-road mobile source emissions

and is indiscernible from other third party sources of emissions.  Thus, Plaintiff's injuries are not a consequence of Defendants' actions, are likely to continue, and cannot be redressed by its requested relief.  Moreover, with respect to Plaintiff's claims of injury regarding lack of visibility because of haze, Utah studied haze levels over a fifteen year period in correlations with emissions reductions and found that significant reductions in NOx would result in zero visible difference in the haze along the Wasatch Front.

For the same reasons that Plaintiff cannot establish traceable causation sufficient for Article III standing, the requested relief will not have any impact on the poor air quality along the Wasatch Front.  Thus, Plaintiff has failed to satisfy the redressability element for standing.

Furthermore, there are additional standing requirements to Plaintiff's claims against DPG for its sale of products on 4x4 Anything website that Plaintiff alleges to violate the CAA.  Under the CAA, in citizen-suits, as opposed to suits by States or governmental agencies, the requested relief must not be for wholly past wrongs.

Redressability, in the context of citizen suits under the Clean Air Act, requires a plaintiff to assert allegations of present and ongoing violations at the time the Complaint is filed, and plaintiff has no standing to pursue wholly past violations where the alleged violator ceases the complained of activity upon proper notice.  *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Foundation, Inc.*, 484 U.S. 49, 60 (1987).  "In essence, the purpose of the notice requirement is to give the alleged violator an opportunity to bring itself into compliance with the Act and, thus, render unnecessary the citizen suit."  *Anderson v. Farmland Industries, Inc.*, 45 F. Supp. 2d 863, 866 (D. Kansas 1999), citing *Gwaltney,* 484 U.S. at 60; *accord Atlantic States Legal Foundation, Inc. v. Stroh Die Casting Co.*, 116 F.3d 814, 819 (7th Cir.1997).

Under the Clean Air Act, "[t]he plaintiff bears the burden to establish standing at the time the suit is filed, and if the defendant's offending conduct has ceased by that time, [the court will] dismiss for lack of redressability." *WildEarth Guardians v. Public Service Co. of Colorado*, 690 F.3d 1174, 1185 (10th Cir. 2012); *Steel Co. v. Citizens for a Better Environment,* 523 U.S. 83, 107-09 (1998)(The Supreme Court held that a plaintiff cannot meet the redressability prong of standing where the alleged violations have been resolved or abated before suit is filed.); *Cambrians v. Didion Mining,* 571 F. Supp. 2d 972, 978 (W.D.Wis. 2008) citing *Lujan,* 504 U.S. at 561.  In *Families for Asbestos Compliance Testing and Safety v. City of St. Louis, Missouri*, 638 F. Supp. 2d 1117 (E.D. Mo. 2009), the court discussed the holding in *Gwaltney*, the legislative history behind the 1990 CAA amendments, and two conflicting U.S. Supreme Court decisions post 1990 CAA amendments, *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83 (1998) and *Friends of the Earth v. Laidlaw Environmental Services*, 528 U.S. 167 (2000) and held:  "To establish the redressability element of standing, plaintiff must prove that defendant was either (1) violating [applicable section] of the Clean Air Act at the time the complaint was filed or (2) that future violations were imminent." *Id.* at 1124.

Because Plaintiff has produced no evidence of sales of any products, Plaintiff has provided no basis to maintain its claims against DPG for violating the CAA for sales of automotive parts. Even if Plaintiff showed evidence that DPG sold parts that may violate the CAA, *which it did not*, upon receiving notice, DPG immediately and permanently removed all products identified in Plaintiff's letter from 4x4 Anything's website. Therefore, the challenged activity was no longer present and ongoing as of July, 2016, five months prior to the instant action being filed, and is therefore no longer redressable.

All of the allegations Plaintiff has specifically asserted against DPG relating to parts sold on 4x4 Anything's site are for wholly past alleged violations, and speculating that 4x4 Anything may resume violative conduct at some vague point in the future hardly qualifies as "imminent harm." Therefore, Plaintiff lacks standing to assert claims against DPG for offering to sell automobile parts that are alleged to violate the CAA, because it ceased doing so immediately upon receiving notice by Plaintiff, which is precisely the purpose of a pre-filing notice requirement, i.e., to allow the party to stop committing violations to avert a lawsuit. Since the challenged activity was no longer present and ongoing as of July, 2016, five months prior to the instant action being filed, it is therefore no longer redressable.

### D. Plaintiff fails to show it has standing to pursue claims against the individuals.

Lastly, Plaintiff lacks standing to pursue its claims against the individual defendants. Not only does Plaintiff fail to satisfy Article III standing requirements, in suing the individual defendants, it exceeded the authority granted under the CAA. The authority under citizen suits is limited to pursue actions against only business entities and not the managers or employees thereof where they are otherwise protected by the Utah Limited Liability Act.  See Utah Code § 48-2c-601, in effect during most of the time period of the complained activity, re-codified in 2016 to § 48-3a-304. *See also Heaps v. Nuriche, Inc.,* 345 P.3d 655, 658 (Utah 2015).  Utah's Limited Liability Act specifically provides "no organizer, member, manager, or employee of a company is personally liable . . . for a debt, obligation, or liability of the company or for the acts or omissions of the company or of any other organizer, member, manager, or employee of the company." U.C.A. § 48-2c-601. *See also Salt Lake City Corp. v. Big Ditch Irr. Co.,* 258 P.3d 539, 545-546 (Utah 2011)(and cases cited therein).

Defendants recognize this immunization from personal liability is not absolute. Where suits arise from claims of violations of state or federal law, Utah law provides that a court should look at the governing state or federal statute in which the action is being brought to determine issues of personal liability, which would otherwise be shielded under the Utah Limited Liability Act. *Heaps*, at 658.  Before personal liability can be imposed, the law requires the applicable statute under which the claim is brought to have express language of the legislature's intent to impose personal liability on individuals.  *Id.* at 659.  In *Heaps*, the court distinguished the applicable statute from other statutes that expressly addressed personal liability and noted:

> For example, the Insurer Receivership Act explains that any "person acting on behalf of the insurer who" inappropriately gives preference "is personally liable." Utah Code § 31A-27a-504(11)(a). Similarly, the Alcoholic Beverage Control Act provides that "a manager or member of [a] limited liability company in charge of the premises in which [a violation of the Act] is committed is... personally liable."§ 32B-4-302(2)(a). In each of these contexts, when the Legislature has imposed personal liability on corporate officers and agents, it has done so expressly.

*Id*.

Based on this reasoning, the court refused to impose individual liability on the managers of the defendant entity for employee's unpaid wage claims, since the wage claim statute did not expressly provide for personal liability.  *Id.*  Such is the case with the CAA.

While the CAA authorizes the government to pursue civil actions against an individual, the statute does not allow citizen suits to pursue the same action. 42 U.S. Code § 7604(a) grants standing for citizen suits to be brought against a "person," which is defined as:

> The term "person" includes an individual, corporation, partnership, association, State, municipality, political subdivision of a State, and any agency, department, or instrumentality of the United States and any officer, agent, or employee thereof.

42 U.S. Code § 7602(e)

42 U.S. Code § 7413(a)(3) grants authority to the Administrator of the EPA to enforce the CAA, and grants additional scope of authority to the government that is not present in citizen suits.  Under the federal enforcement section, there is a specific provision:

> For the purpose of this subsection, the term "person" includes, **in addition to the entities referred to in section 7602(e)** of this title, **any responsible corporate officer.**

> 42 U.S.C. 7413(c)(6) (Emphasis added.)

In *Illinois v. Commonwealth Edison Co.*, 490 F. Supp. 1145 (N.D. Ill. 1980), the defendants argued "the deliberate omission of responsible corporate officers from the definition of 'person' contained in [§ 7602(e)] evinces Congress' intent not to allow corporate officers to be named defendants in suits of this type." *Id.* at 1147. The court looked to the language and intent of Congress in drafting these two CAA sections and found "The express application to corporate officers of [§ 7413(c)(6)] of the Clean Air Act militates against bringing such individuals within the ambit of [§ 7602(e)] in which such express inclusion is lacking." *Id.* As a result, the court granted defendants' motion to dismiss all CAA claims against the individual corporate officers of the defendant entity, specifically holding "they are not subject to citizen's suits under [§ 7602(e)] of the Clean Air Act, 42 U.S.C. § 7604." *Id. See also Illinois v. Celotex Corp.*, 516 F. Supp. 716 (C.D. Ill. 1981)(holding that Congress did not intend that corporate officers be subject to civil citizen suits).

The Tenth Circuit recently reached a similar conclusion when asked to interpret different provisions of the CAA and held specifically when the drafter "includes particular language in one section of a statute but omits it in another . . . [the court] presumes that [the drafter] intended a difference in meaning." *Physicians v. Kennecott.* No. 2:11-CV-01181, United States District

Court, D. Utah, Central Division, Memorandum Decision and Order dated June 8, 2016, citing *Daizell v. RP Steamboat Springs, LLC*, 781 F.3d 1201, 1209 (10th Cir. 2015). Indeed, the U.S. Supreme Court created a "special solicitude" exception for standing for State action under the CAA, which relaxed requirements are not applied in citizen suits. *Washington Environmental Council v. Bellon*, 732 F.3d 1131, 1141 (9th Cir. 2013).

Turning to the facts at hand, Sparks, Kiley, and Stuart are all managers and/or employees of one or more of the defendant companies, and Hoskins is a former sales employee of DieselSellerz. Plaintiff does not allege any basis to assert its claims against them other than by virtue of their employment with one or more of those companies. All references to any individuals marketing, operating or working on vehicles, owned by B&W Auto, were done during the course of that individual's employment.

It is logical to restrict authority in citizen suits, as the alleged misconduct has apparently not risen to the degree of egregiousness to justify government action. Therefore, citizens suits should not be allowed to be maintained against individuals, when the primary complaint is against the business activities of the defendant entities. This is precisely the purpose of the protections afforded by Utah's Limited Liability Company Act, and the limitations of power given to private citizens under the CAA. Therefore, this action should be dismissed against all of the individuals.

## V.    *Conclusion*

Plaintiff's evidence boils down to the following: B&W Auto has owned 16 vehicles in the last five years that had emissions modifications that may violate the CAA. Those vehicles were briefly operated in Utah, then sold or given away to out-of state persons. It is undisputed that B&W Auto's total vehicles make up less than a small fraction of 1% of vehicles on Utah roads,

which account for only 36% of the total emissions contribution to the Wasatch Front.  Given how slight the emissions contribution is compared to the incredible amount of other third party sources of those same emissions, it is impossible for Plaintiff to meet the traceability requirement for causation of its injuries, not can it satisfy redressability element under Article III.

Moreover, Plaintiff has produced no evidence that DPG has owned a single vehicle, much less ever sold any vehicles.  Further, other than one product, Plaintiff has not identified any other products advertised for sale by DPG, that are alleged to violate the CAA. Regardless, DPG ceased selling all products alleged to violate the CAA, immediately upon notice from the Plaintiff, more than five months prior to the filing.

Finally, all claims against the individual defendants are based solely on their positions as either managers or employees of either B&W Auto or DPG. Citizen suit plaintiffs, under the CAA, do not have authority to pursue personal liability against individuals acting in the course of their employment.

For all of these reasons, Plaintiff's Motion for Partial Summary Judgment should be denied.


Respectfully submitted this 14th day of November, 2017.


/s/ Janet M. Conway
Janet M. Conway
Attorney for Defendants


42