# IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

| | |
|---|---|
| UTAH PHYSICIANS FOR A HEALTHY ENVIRONMENT, <br><br>            Plaintiff, <br><br> v. <br><br> DIESEL POWER GEAR LLC, 4x4 ANYTHING LLC, SPARKS MOTORS LLC, DAVID W. SPARKS, DAVID KILEY, JOSHUA STUART, and KEATON HOSKINS, <br><br>            Defendants. | **MEMORANDUM DECISION AND ORDER** <br><br><br> Case No. 2:17-cv-32 <br><br> Chief Judge Robert J. Shelby <br><br> Magistrate Judge Dustin B. Pead |

       Plaintiff Utah Physicians for a Healthy Environment (UPHE) brought this citizen enforcement action under the Clean Air Act (CAA). UPHE claims Defendants—three businesses and four individuals—violated the CAA and federally-enforceable Utah State Implementation Plan Regulations relating to the installation, removal, operation, and sale of emission control devices on diesel vehicles.[1] UPHE filed four Partial Motions for Summary Judgment.[2] Defendants also moved collectively for summary judgment.[3] As explained below, Defendants' motion is denied. One of UPHE's motions is granted, one is denied, and two are granted in part and denied in part.

---

[1] The Clean Air Act authorizes citizen suits for violations of "an emission standard or limitation" under the Act, and the term "emission standard or limitation" includes standards established by a State Implementation Plan (SIP). 42 U.S.C. § 7604(a), (f).

[2] Dkts. 64, 81, 108, 109.

[3] Dkt. 107.

# BACKGROUND

Defendant B&W Auto is a used automobile dealership that sells and repairs trucks, with a focus on custom built diesel trucks.[4]  Defendant David Sparks is owner and CEO of B&W Auto.[5]  Sparks also started and is CEO of Defendant Diesel Power Gear (DPG), a "lifestyle brand company" which sells "apparel and accessories for the diesel truck lifestyle."[6]  Defendant Joshua Stuart is CFO and COO of DPG.[7]  4x4 Anything, a division of DPG, is a "drop shipment fulfillment online retailer."[8]  DieselSellerz.com is an online diesel truck marketplace that was previously dismissed from this case.  Stuart is CFO and COO of DieselSeller.com.  Defendant Keaton Hoskins was employed to provide sales and marketing services for DieselSellerz.com from 2013 through 2015.[9]

UPHE, a Utah-based non-profit organization, brought this suit asserting various CAA and Utah SIP claims against Defendants.  UPHE claims Defendants modified diesel trucks in violation of emissions limitation standards, sold parts designed to evade emissions standards, and sold illegally-modified trucks.  According to UPHE, Defendants' violations contribute pollution to air in the Wasatch Front, causing UPHE's members harm.[10]

---

[4] Dkt. 107 at 14.

[5] Dkt. 114 (Sparks Decl.) Ex. 1 at ¶ 4.

[6] Dkt. 107 at 43.

[7] Dkt. 107 at 22.

[8] Dkt. 107 at 19.  Although 4X4 Anything is named as a Defendant, the parties agree it is a d/b/a of DPG. *See* Dkt. 65 at 1 n.2; Dkt. 81 at 2 n.1.

[9] Dkt. 107 at 23.

[10] The Wasatch Front is a metropolitan region along the Wasatch Range in northern Utah.  About eighty percent of the State's population resides along this roughly 120 mile stretch from Brigham City to Nephi. *See* Wasatch Front, Wikipedia, https://en.wikipedia.org/wiki/Wasatch_Front (last updated February 22, 2019).

As redress for these violations, UPHE seeks injunctive relief and civil penalties. On June 8, 2018, the court entered a stipulated preliminary injunction enjoining B&W Auto and Sparks from violating several provisions of the CAA.[11]

## LEGAL STANDARD

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[12] A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[13] A fact is material if, under the governing substantive law, it could "affect the outcome of the suit."[14] When applying this standard, the court is to "view the evidence and make all reasonable inferences in the light most favorable to the nonmoving party."[15] "Cross-motions for summary judgment are to be treated separately; the denial of one does not require the grant of another."[16]

## ANALYSIS

Defendants admit to conduct that violates the CAA but nevertheless move for summary judgment on all of UPHE's claims. They primarily argue UPHE lacks constitutional standing and that the individual Defendants cannot be held liable as "responsible corporate officers." UPHE moves for summary judgment on various claims in four separate Partial Motions for Summary Judgment. The court takes up the threshold issues raised in Defendants' Motion before turning to UPHE's Motions.

---

[11] Dkt. 104.

[12] Fed. R. Civ. P. 56(a).

[13] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[14] *Id.*

[15] *N. Natural Gas Co. v. Nash Oil & Gas, Inc.*, 526 F.3d 626, 629 (10th Cir. 2008).

[16] *Buell Cabinet Co., Inc. v. Sudduth*, 608 F.2d 431, 433 (10th Cir. 1979).

# I.  Standing

Defendants argue UPHE lacks standing to bring its claims.  To satisfy Article III of the Constitution, a plaintiff must have standing to bring a claim in federal court.[17]  When the plaintiff is an association bringing suit on behalf of its members, it must show "[1] its members would otherwise have standing to sue in their own right, [2] the interests at stake are germane to the organization's purposes, and [3] neither the claim asserted nor the relief requested required the participation of individual members in the lawsuit."[18]  Only the first element is in dispute here.[19]

To satisfy the first element, UPHE must show (1) at least one of its members has suffered an injury in fact that is "(a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to [Defendants' illegal conduct]; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."[20]  For the reasons that follow, the court concludes UPHE meets this standard.[21]

## A.  Injury in Fact

At the summary judgment stage, a plaintiff must "set forth by affidavit or other evidence specific facts [demonstrating injury in fact], which for purposes of the summary judgment motion will be taken to be true."[22]  The relevant showing is "not injury to the environment but

---

[17] *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 180 (2000).

[18] *Id.* at 181.

[19] UPHE is a non-profit organization whose purposes include "advocat[ing] for clean air, healthy land and clean water."  Dkt. 58 at 3.  This lawsuit is germane to that purpose.  UPHE asserts its individual members' participation in this lawsuit is not required, and the court agrees.

[20] *Laidlaw*, 528 U.S. at 180–81.

[21] At a hearing on January 23, 2018, the court found Utah Physicians met its burden to make a "threshold showing of standing to advance [its] claims at least to the dispositive motion stage."  Dkt. 79 at 16.

[22] *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) (quotations and citations omitted).

injury to the plaintiff."[23]  And while "generalized harm" to the environment does not alone support standing, "if that harm in fact affects the recreational or even the mere [a]esthetic interest of the plaintiff, that will suffice."[24]  A person who has "reasonable concerns" about pollution suffers injury in fact when their concerns directly affect their recreational, aesthetic, or economic interests.[25]

UPHE provides affidavits from four of its members asserting various injuries relating to air pollution, including health and recreational harms.[26]  Each of the members suffers adverse health effects from elevated air pollution in the Wasatch Front or exposure to diesel exhaust.[27]  Some members are deterred from engaging in outdoor recreational activities due their concerns about fine particulate matter pollution.[28]  For example, member Howie Garber states "when outdoor air pollution levels exceed 30 ug/m3 of PM2.5 I am forced to avoid all outdoor activities, including riding my road bike, due to health concerns . . .  The additional diesel exhaust emitted by [Defendants'] modified vehicles only exacerbates the health risks to me and anyone else breathing the air in the Wasatch Front."[29]

These and other statements in UPHE's members' affidavits establish injury in fact.[30]

---

[23] *Laidlaw*, 528 U.S. at 181.

[24] *Summers v. Earth Island Inst.*, 555 U.S. 488, 494 (2009).

[25] *Laidlaw*, 528 U.S. at 183–84.

[26] *See* Dkt. 58 Exs. B–E.

[27] *See, e.g.*, Dkt. 58 Ex. B (Garber) ¶ 6; Dkt. 58 Ex. C (Jones) ¶¶ 5–11; Dkt. 58 Ex. D (Evans) ¶ 5; Dkt. 58 Ex. E (K. Jones) ¶ 3.

[28] *See, e.g.*, Dkt. 58 Ex. B (Garber) ¶ 7; Dkt. 58 Ex. C (Jones) ¶¶ 10–11; Dkt. 58 Ex. E (K. Jones) ¶ 9.

[29] Dkt. 58, Ex. B ¶¶ 7, 10.

[30] Defendants do not dispute this element of standing is met.

## B. Causation

To satisfy the second requirement of standing, a plaintiff must show its members' injuries are fairly traceable to the defendant's alleged violations and not "the result of the independent action of some third party not before the court."[31]  A plaintiff's burden on causation is "something less than the concept of 'proximate cause,'" but requires proof of at least a "substantial likelihood that the defendant's conduct caused plaintiff's injury in fact."[32]

Although Defendants do not dispute their emissions contribute to air pollution in the Wasatch Front, they strenuously argue any pollution attributable to their violations is negligible in comparison to other sources of pollution.  For that reason, Defendants maintain UPHE cannot fairly trace its members' injuries to Defendants' violations.  Although both sides present compelling arguments, the court ultimately concludes UPHE has satisfied its burden to establish causation.

The Tenth Circuit has not adopted a standard for evaluating causation when many sources contribute to injury-causing air pollution.  Previously, this court applied a standard proposed by UPHE[33] under which a plaintiff must "merely show that a defendant discharges a pollutant that causes or contributes to the kinds of injuries alleged in the specific geographic area of concern."[34]  Several circuits and district courts, including a district court in this Circuit,[35] have applied similar standards in environmental suits.[36]

---

[31] *Lujan*, 504 U.S. at 560.

[32] *Nova Health Sys. v. Gandy*, 416 F.3d 1149, 1156 (10th Cir. 2005) (citations omitted).

[33] Dkt. 79 at 12–13.

[34] *Piney Run Pres. Ass'n v. Cnty. Comm'rs of Carroll Cnty.*, 268 F.3d 255, 264 (4th Cir. 2001) (internal quotation omitted).  Defendants proposed a different standard which would require UPHE "point[] to a polluting source as the seed of [its] injury, and the owner of the polluting source supplies no alternative injury."  *Texas Indep. Producers & Royalty Owners Ass'n v. EPA*, 410 F.3d 964, 972 (7th Cir. 2005).

6

This standard was first applied in Clean Water Act cases, with good reason; when multiple parties discharge pollution into a single waterway, "the pollution of any one may be shown to cause some part of the injury suffered."[37] The standard accommodates the contributory nature of pollution in a specific location, and relieves plaintiffs of the burden to show "to a scientific certainty that the defendant's emissions, and only the defendant's emissions, are the source of the [harm]."[38] Were the rule otherwise, a defendant who polluted a lake could defeat standing merely by pointing to other sources of pollution in the lake.[39]

Defendants urge a different "meaningful contribution" approach in this Clean Air Act case, drawing on a series of cases involving greenhouse gas (GHG) emissions starting with *Massachusetts v. EPA*.[40] In that case, the Supreme Court concluded Massachusetts had standing to challenge the EPA's refusal to regulate GHG emissions.[41] Massachusetts asserted global warming-related injuries, including loss of coastal property due to rising sea levels. The EPA argued causation was not met because any GHG emissions from new motor vehicles "contributes so insignificantly to petitioners' injuries that the [EPA] cannot be haled into federal court to

---

[35] *WildEarth Guardians v. Colorado Springs Utils. Bd.*, No. 17-cv-00357, 2018 WL 317469, at *7 (D. Colo. Jan. 8, 2018).

[36] *Piney Run*, 268 F.3d at 264 (Clean Water Act); *Texans United for a Safe Econ. Educ. Fund v. Crown Cent. Petroleum Corp.*, 207 F.3d 789, 793 (5th Cir. 2000) (Clean Air Act); *Nat. Res. Def. Council v. Southwest Marine, Inc.*, 236 F.3d 985, 994–95 (9th Cir. 2000) (Clean Water Act); *Northwest. Envtl. Def. Ctr. v. Owens Corning Corp.*, 434 F. Supp. 2d 957, 967–68 (D. Or. 2006) (Clean Air Act).

[37] *Public Interest Research Group of New Jersey, Inc. v. Powell Duffryn Terminals Inc.*, 913 F.2d 64, 72 n.8 (3d Cir. 1990).

[38] *Northwest Envtl. Def. Ctr.*, 434 F. Supp. 2d at 967.

[39] *Accord id.* at 967 n.7 ("Were the rule otherwise, a claim alleging harm to an endangered species could be defeated merely by pointing to other potential sources of harm to that species.").

[40] 549 U.S. 497 (2007).

[41] *Id.* at 523-25.

answer for them."[42] The Court disagreed, noting that U.S. motor vehicle emissions amounted to more than 6% of worldwide carbon dioxide emissions—"a meaningful contribution to greenhouse gas concentrations and hence . . . to global warming."[43]

Absent that level of "meaningful contribution" to global warming, plaintiffs have struggled to meet the causation requirement in other GHG cases. For example, the Ninth Circuit found too attenuated an environmental group's claim that state agencies' failure to set emissions standards at oil refineries in Washington "contribute[d] to climate-related changes that result in [plaintiffs'] purported injuries."[44] Although the oil refineries were responsible for almost 6% of GHG emissions in Washington, the effect of those emissions on global climate change was "scientifically indiscernible."[45] The court noted a "natural disjunction" between climate change and the plaintiffs' localized injuries, finding the "multitude of independent third parties . . . responsible for the changes contributing to Plaintiffs' injuries" defeated causation.[46] Similarly, the District of New Mexico found GHG emissions amounting to 0.0009% of global emissions was not a "meaningful contribution" to global GHG levels, and could not therefore be fairly traced to the plaintiffs' climate change-related injuries.[47]

Defendants argue this case is more like a global warming case than a waterway pollution case, and that a "meaningful contribution" or alternative threshold standard should therefore apply. It is true that this case lies somewhere between the two lines of cases. By its nature, air is

---

[42] *Id.* at 523.

[43] *Id.* at 524–25. The Supreme Court also emphasized that Massachusetts was entitled to "special solicitude" in the standing analysis, based on its "special position and interest" as a sovereign state and the fact that it was exercising a procedural right. *Id.* at 518, 520.

[44] *Washington Envt'l Council v. Bellon*, 732 F.3d 1131, 1142 (9th Cir. 2013).

[45] *Id.* at 1143–44.

[46] *Id.* at 1144.

[47] *Amigos Bravos v. U.S. Bureau of Land Mgmt.*, 816 F. Supp. 2d 1118, 1136 (D.N.M. 2011).

less contained than water, so it can be more difficult to trace air pollution back to its sources in a given location relative to water pollution. And Defendants persuasively highlight the many sources contributing to air pollution in the Wasatch Front, including on-road mobile sources, wildfires, and oil refineries.[48]

But the direct relationship between UPHE's injuries and Defendants' pollution makes this case more analogous to a waterway case than a GHG case. Unlike plaintiffs in a GHG case, UPHE need not trace Defendants' emissions from a point source to global climate change and then back to the Wasatch Front. Rather, UPHE complains that Defendants' emissions in the Wasatch Front directly and immediately contribute to air pollution in the Wasatch Front, and that the air pollution causes its members harm.[49]

To be sure, Defendants' emissions are a small fraction of total emissions in the Wasatch Front. But aside from the "meaningful contribution" language used in GHG cases, Defendants do not articulate a principled threshold requirement for causation. Further, a causation standard that precludes citizens from suing for CAA violations directly contributing pollution to the air they breathe would seriously undermine the CAA's citizen enforcement provision.

For these reasons, the court will apply the standard articulated above: to meet its burden on causation, UPHE must show Defendants discharged a pollutant that causes or contributes to the kinds of injuries suffered by UPHE's members in the Wasatch Front. UPHE meets this burden by showing Defendants' violations contribute nitrous oxides (NOx) and particulate

---

[48] Dkt. 107 at 9–13.

[49] *But see Amigos Bravos*, 816 F. Supp. 2d at 1136 ("With GHGs, every inhabitant of our planet is within the 'zone of discharge'; consequently, the issue of geographical proximity to the source of pollution may not be a proper measure of the likelihood of one's injury have been caused by a particular polluter.").

matter (PM) to air in the Wasatch Front,[50] and providing evidence NOx and PM pollution

contributes to the types of injuries suffered by its members in the Wasatch Front.[51]

## C. Redressability

For the third standing requirement, redressability, a plaintiff must show "it is likely, as

opposed to merely speculative, that the injury will be redressed by a favorable decision."[52] The

plaintiff does not need to show a favorable decision will completely relieve an injury or relieve

its every injury.[53] In a citizen enforcement suit, a plaintiff must show the relief it seeks will

specifically redress its members' injuries, "as opposed to merely advancing generalized

environmental interests."[54] Because UPHE must have standing to pursue each form of relief it

seeks, it must show its members' injuries can be redressed by declaratory and injunctive relief,

civil penalties, and a beneficial mitigation project.[55]

Civil penalties, if awarded, would redress UPHE's injuries by deterring future

violations.[56] Declaratory and injunctive relief could also provide redress by curbing ongoing

---

[50] Dkt. 107 at 6 (Defendants admit "[t]he consequences of B&W Auto's nominal violations resulted in increased emissions into the Wasatch Front . . . . ."); Dkt. 69 Ex. 1 at 4 ("[T]he majority of $PM_{2.5}$ and $PM_{2.5}$ precursor gases [along the Wasatch Front] come from mobile sources [including automobiles and trucks]."); Dkt. 69 Ex. 2 at 4 ("In Weber County 54% of NOx comes from on road vehicles of which 44% of the emissions come from diesel vehicles . . .").

[51] *See, e.g.*, Dkt. 69 Ex. 1 at 4 (describing the health and environmental effects of $PM_{2.5}$ and its precursor pollutants).

[52] *Laidlaw*, 528 U.S. at 181.

[53] *Larson v. Valente*, 456 U.S. 228, 243 n.15 (1982).

[54] *WildEarth Guardians v. Public Service Co. of Colorado*, 690 F.3d 1174, 1190 (10th Cir. 2012).

[55] *See Bronson v. Swensen*, 500 F.3d 1099, 1106 (10th Cir. 2007) ("Each plaintiff must have standing to seek each form of relief in each claim.").

[56] *See Laidlaw*, 528 U.S. at 185–86 ("It can scarcely be doubted that, for a plaintiff who is injured or faces the threat of future injury due to illegal conduct ongoing at the time of suit, a sanction that effectively abates that conduct and prevents its recurrence provides a form of redress. Civil penalties can fit that description. To the extent that they encourage defendants to discontinue current violations and deter them from committing future ones, they afford redress to citizen plaintiffs who are injured or threatened with injury as a consequence of ongoing unlawful conduct.").

violations and halting Defendants' continued contribution to Plaintiff's members' pollution-related injuries.[57]

UPHE also seeks mandatory injunctive relief in the form of an injunction ordering Defendants to "recall and either repair or destroy all of the illegal parts and vehicles they have conveyed to third-parties that continue to pollute."[58]  This request is overbroad because it is not tied to the geographic area in which UPHE's members' suffer cognizable injury.  UPHE has not shown how its members' injuries would be specifically redressed if Defendants were ordered to repair or destroy parts and vehicles located outside the Wasatch Front.  UPHE therefore lacks standing to pursue this form of relief.

Finally, UPHE asks that up to $100,000 of any civil penalty be earmarked for use in a beneficial mitigation project as provided by 42 U.S.C. 7604(g)(2).[59]  A mitigation project structured to reduce air pollution in the Wasatch Front could redress UPHE's members' injuries by improving the quality of the air they breathe.  It could also deter Defendants from future violations.[60]

Defendants argue UPHE's claims are not redressable for the same reason they fail to show causation: because Defendants' violations are but a "drop in the ocean" of total air pollution in the Wasatch Front.  According to Defendants, UPHE members' pollution-related injuries cannot be redressed by a favorable outcome in this action because even if UPHE is

---

[57] *See Grand Canyon Trust v. Energy Fuels Res. (U.S.A.) Inc.*, 269 F. Supp. 3d 1173, 1192 (D. Utah 2017) ("Enforcement of a statute or regulation enacted to protect health interests serves to protect the health of those who desire to use affected land, whether for recreation or other purposes.") (citing *Sierra Club v. Johnson*, 436 F.3d 1269, 1279 (11th Cir. 2006)).

[58] Dkt. 58 at 23; Dkt. 49 at 135.

[59] Dkt. 49 at 136.

[60] *See WildEarth*, 690 F.3d at 1189–90 (finding the plaintiff's claim for a beneficial mitigation project moot, but acknowledging a project could provide redress if it conferred a direct benefit on the plaintiff's members or "could deter [the defendant] from future violations").

successful, other sources of emissions will continue to exist in the Wasatch Front and cause harm to the members. This argument fails for the same reasons articulated above. UPHE demonstrates Defendants' violations contribute to the pollution harming its members. Were Defendants' contributions to cease, that pollution would no longer pose a risk to the members. That is enough to satisfy the redressability requirement.[61]

Having shown its members suffer redressable injuries in fact fairly traceable to Defendant's violations, UPHE has standing to pursue each of its claims except for mandatory injunctive relief.

## II.     The Responsible Corporate Officer Doctrine

Defendants argue many of UPHE's claims against the individual Defendants are legally barred because the CAA does not authorize civil enforcement suits against "responsible corporate officers." The court disagrees.

The CAA authorizes citizen suits against "any person" for violations of "an emission standard or limitation" under the Act.[62] Some of UPHE's claims against the individual Defendants center on their personal participation in conduct violating the CAA.[63] For other

---

[61] Other courts confronted with the cumulative nature of pollution have rejected similar redressability arguments. *See, e.g.*, *Northwest Envtl. Defense Ctr. v. Owens Corning Corp.*, 434 F. Supp. 2d 957, 968 (D. Or. 2006) ("Particularly in environmental and land use cases, the challenged harm often results from the cumulative effects of many separate actions that, taken together, threaten the plaintiff's interests. The relief sought in the Complaint need not promise to solve the entire problem . . . ."); *Texans United for a Safe Econ. Educ. Fund v. Crown Cent. Petroleum Corp.*, 207 F.3d 789, 793 (5th Cir. 2000) (rejecting defendant's argument that the plaintiff's injuries were not redressable because an injunction "w[ould] not reduce pollution from other sources not before this Court").

[62] 42 U.S.C. § 7604(a).

[63] The court previously found individual Defendants are "persons" under the CAA who can be sued for their personal participation in violative conduct, "regardless of their status as employees or members of an LLC." Dkt. 79 at 23.

claims, however, UPHE seeks to hold individual Defendants joint and severally liable for the conduct of B&W Auto and/or DPG under the responsible corporate officer doctrine.

The criminal enforcement provision of the CAA was amended in 1977 to add "any responsible corporate officer" to the definition of "person."[64]   That is, Congress explicitly adopted the "responsible corporate officer doctrine" in the CAA criminal enforcement context, making a corporate officer liable if, "by reason of his position in the corporation, [he or she had] responsibility and authority either to prevent in the first instance, or promptly to correct, the violation complained of, and . . . failed to do so."[65]   Congress did not make the same changes to the civil enforcement provision of the Act.  According to Defendants, "the deliberate omission of responsible corporate officers from the definition of 'person' contained in [§ 7602(d)] evinces Congress' intent not to allow corporate officers to be named defendants in suits of this type."[66]

Although the Tenth Circuit has not spoken on this issue, a number of other courts have held responsible corporate officers can be held liable in CAA and Clean Water Act[67] civil enforcement actions, despite the absence of specific language to that effect in the citizen

---

[64] 42 U.S.C. § 7413(c), (h) (1977).

[65] *U.S. v. Park*, 421 U.S. 658, 673–74 (1975) (defining the responsible corporate officer doctrine in the context of the Federal Food, Drug, and Cosmetic Act).

[66] Dkt. 75 at 14 (quoting *Illinois v. Commonwealth Edison Co.*, 490 F. Supp. 1145, 1147 (N.D. Ill. 1980)).

[67] The Clean Water Act presents the same issue; it has a responsible corporate officer provision in the criminal enforcement section but not the civil enforcement section.  *Compare* 33 U.S.C. § 1319(c)(6) (1990) ("For purposes of this subsection, the term 'person' means . . . any responsible corporate officer."), *with* 33 U.S.C. § 1365(a) (providing "any citizen may commence a civil action on his own behalf []  against any person") (1987).

enforcement provisions.[68]  Defendants cite two cases concluding otherwise, but those cases

appear to be outlier decisions.[69]  And holding corporate agents liable in civil suits, under

appropriate circumstances, gives effect to Congress's intent as evinced in the Act's legislative

history:

> The committee's decision with respect to the civil penalty provisions of the act is intended to assure that the rationale of the *Park* case (for food and drug law) will apply to enforcement of the Clean Air Act.  The committee thus intends [t]hat in providing sanctions which reach and touch the individuals who execute the corporate mission . . . the act imposes not only a positive duty to seek out and remedy violations when they occur but also, and primarily, a duty to implement measures that will insure violations will not occur.  The requirement of foresight and vigilance imposed on responsible corporate agents are beyond question demanding, and perhaps onerous, but they are no more stringent than the public has a right to expect of those who voluntarily assume positions of authority in business enterprises whose services and products affect the health and well-being of the public that supports them.[70]

In light of these cases and the legislative history, it is the court's best judgment that the

responsible corporate officer doctrine applies in CAA citizen enforcement suits.  The individual

Defendants in this case can therefore be held liable if they had authority to prevent or correct

---

[68] *See, e.g.*, *U.S. v. Mac's Muffler Shop, Inc.*, No. C85-138R, 1986 WL 15443, at *7 (N.D. Ga. 1986) (finding a defendant personally liable under the CAA because "as president, sole owner and manager of Mac's [he] was in a position to prevent removals of catalytic converters by Mac's"); *Humboldt Baykeeper v. Simpson Timber Co.*, No. C 06-04188CRB, 2006 WL 3545014, at *4 (N.D. Cal. Dec. 8, 2006) (applying the Clean Water Act, noting "courts consistently have held that individuals whose acts or omissions have led to such pollution may be held responsible individually, notwithstanding the fact that they may have been acting in their capacity as an employee or officer of a company"); *City of Newburgh v. Sarna*, 690 F. Supp. 2d 136, 160 (S.D.N.Y. 2010) ("The few courts . . . that have expressly considered the question of whether the responsible corporate officer doctrine applies in a civil CWA case have concluded that it does."), *aff'd in part, appeal dismissed in part*, 406 F. App'x 557 (2d Cir. 2011).

[69] *Illinois v. Commonwealth Edison Co.*, 490 F. Supp. 1145, 1147 (N.D. Ill. 1980); *Illinois v. Celotex Corp.*, 516 F. Supp. 716, 719 (C.D. Ill. 1981) ("[I]t is clear that Congress did not intend that corporate officers be subject to suit under § 7604.").

[70] H.R. Rep. 95-294, at 1149 (1977).

CAA violations and failed to exercise that authority, provided they had knowledge of the facts giving rise to the violation.[71]

In a parallel argument, Defendants argue the individual Defendants cannot be held personally liable unless UPHE pierces the corporate veil. But the responsible corporate officer and corporate veil doctrines are conceptually distinct. The former assigns personal liability based on a corporate officer's failure to exercise his authority to prevent or correct violations, whereas the latter is a mechanism for disregarding a business entity and holding a principal liable for the acts of a business. Plaintiff does not seek to disregard B&W Auto or DPG's corporate formalities and hold individual Defendants liable for the businesses' obligations. The corporate veil doctrine therefore does not apply.

## III.    UPHE's Partial Motions for Summary Judgment

Having resolved the preceding threshold questions, the court turns to UPHE's four Partial Motions for Summary Judgment. Additional arguments raised in Defendants' Motion for Summary Judgment relating to specific claims are addressed in the following analyses.

---

[71] *See Mac's Muffler Shop*, 1986 WL 15443, at *7 (finding the officer's "decision to remove the catalytic converters was done knowing it was against the law"); *Humboldt Baykeeper*, 2006 WL 3545014, at *5 (finding allegations against a responsible corporate officer were sufficient to plead that he acted "with knowledge"). *See also* 20 E. Min. L. Found. § 2.06, Responsible Corporate Officer Doctrine ("[T]he third requirement [of the responsible corporate officer doctrine] is that the officer must have known or believed that the illegal activity of the type alleged occurred."); *id.* ("Because most environmental statutes require knowing violations, the government has not taken the position that the responsible corporate officer doctrine leads to liability solely because of the officer's corporate position and ability to prevent violations. Instead, the government has pursued knowing violations under the responsible corporate officer doctrine only where the officer has knowledge, actual or inferred, of the facts constituting the offense.").

### A. UPHE's Motion to Establish B&W Auto and Sparks' Liability

UPHE moves to establish Defendants B&W Auto and Sparks' liability for violations of the CAA and Utah SIP relating to (a) the removal of pollution control devices from federally-certified vehicles, (b) the installation of aftermarket emission control defeat parts in federally-certified vehicles, and (c) the sale of aftermarket emission control defeat parts as part of vehicles.[72] UPHE moves on these claims with respect to seventeen vehicles, reserving for trial the claims as to other vehicles listed in the Complaint.

Defendants admit B&W Auto and Sparks violated the cited CAA and SIP provisions in question,[73] but argue B&W Auto and Sparks are not liable for these violations because (1) UPHE lacks standing, (2) UPHE has not shown irreparable harm, and (3) Sparks cannot be held liable under the responsible corporate officer doctrine. As explained above, UPHE has standing to bring its claims. Defendants' second argument fails because UPHE has not yet moved for injunctive (or other) relief and is not required to show irreparable harm to succeed on a motion to establish liability. UPHE's Motion is therefore granted as to its first, fifth, thirteenth, and seventeenth causes of action against B&W Auto.

As for Defendants' third argument, Sparks can be held personally liable as a responsible corporate officer if he knew of the facts underlying the violations, had the ability to prevent or correct the violations, and failed to do so. Although UPHE shows Sparks had the ability to prevent and correct the violations, there remains a question of fact whether he had sufficient knowledge of the facts underlying the violations.

---

[72] Dkt. 64.

[73] Dkt. 75 at 7–9 (agreeing with UPHE's statements of the CAA and SIP claims and that those "element[s] ha[ve] been met").

As CEO, manager, and owner of B&W Auto, Sparks was in a position to prevent B&W Auto from removing pollution control devices, installing emission control defeat parts, and selling defeat parts as part of vehicles.[74] But UPHE fails to provide evidence demonstrating as a matter of law that Sparks knew of the facts underlying the violations, *i.e.* that he knew about the removal/installation work or the vehicle sales. UPHE relies on Sparks' deposition, in which he agreed he was akin to "the general" of B&W Auto[75] and "kn[e]w every vehicle" on a list of vehicles from which pollution control devices had been removed.[76] Based on those statements and Sparks' relationship to B&W Auto, UPHE maintains Sparks must have known about the removal/installation work and sales. But UPHE's argument requires the court draw inferences in its favor, which it cannot do in deciding UPHE's Summary Judgment Motion. Furthermore, a reasonable jury could find Sparks did not have the requisite knowledge. UPHE's Motion is therefore denied as to its second, sixth, fourteenth, and nineteenth causes of action against Sparks.

### 1. Pass-Through Sale of "As Is" Vehicles

In their Motion for Summary Judgment, Defendants argue they cannot be held liable for the "pass-through sale" of modified trucks purchased by B&W Auto with emissions defeat parts already installed.[77]

Under 42 U.S.C. § 7522(a)(3)(B), it is a CAA violation:

for any person to manufacture or sell, or offer to sell, or install, any part or component intended for use with, or as part of, any motor vehicle or motor

---

[74] *See Mac's Muffler Shop*, 1986 WL 15443, at *7 ("Mr. McKinney, as president, sole owner and manager of Mac's, was in a position to prevent removals of catalytic converters by Mac's, and is therefore liable for the removals.").

[75] Dkt. 64, Ex. A (Sparks Depo.) at 16:14–25.

[76] *Id.* at 25:13–26:4.

[77] Dkt. 107 at 37–38.

> vehicle engine, where a principal effect of the part or component is to bypass, defeat, or render inoperative any device or element of design installed on or in a motor vehicle or motor vehicle engine in compliance with regulations under this subchapter, and where the person knows or should know that such part or component is being offered for sale or installed for such use or put to such use.

Defendants contend this provision prohibits only the "'sale or installation' of 'parts or components' meant to defeat emissions," and that when a truck is acquired and sold as-is, "the emissions part is not being sold."[78]

Defendants' reading of the statute and application to the facts here is untenable. Section 7522(a)(3)(B) prohibits by its plain language the sale of an emissions defeat part "as part of" a vehicle where the seller knows or should know the part is being "put to such use." This language plainly encompasses B&W Auto's "as is" sale of modified vehicles it knew or should have known to contain defeat emission parts. Insofar as Defendants move for summary judgment on UPHE's seventeenth, eighteenth, and nineteenth causes of action on this basis, the motion is denied.

### B. UPHE's Motion to Establish DPG, Sparks, and Stuart's Liability for Selling Defeat Parts[79]

UPHE next moves to establish DPG, Sparks', and Stuart's liability for selling aftermarket emission control defeat parts in violation of the CAA.[80] In response to this Motion, Defendants primarily reassert their rejected arguments that UPHE lacks standing, fails to show it is entitled to a permanent injunction, and that the claims against Stuart cannot stand under the responsible corporate officer doctrine. Each of these arguments fails for reasons already stated.

---

[78] Dkt. 107 at 37.

[79] References to named Defendant 4x4 Anything have been removed as the parties agree 4x4 Anything is a d/b/a of DPG. *See* Dkt. 65 at n.2; Dkt. 81 at 2 n.1.

[80] Dkt. 81.

There is no genuine dispute of material fact as to DPG, Sparks', and Stuart's liability for these claims, for some of the identified defeat parts. Defendants admit DPG sold "at least 88 exhaust gas recirculation delete kits to customers, including [to] customers in Utah, that have the principal effect of bypassing, defeating, or rendering inoperative pollution control devices on federally-certified motor vehicles." Defendants raise no dispute of fact as to these defeat parts.

But UPHE also claims DPG sold "at least 18 aftermarket exhaust pipes," "at least 49 delete pipes," and "at least 26 delete pipes and EGR delete kits [sold] to Defendant B&W."[81] Defendants argue UPHE fails to provide evidence that any of these specific parts violate the CAA by having the "principal effect . . . to bypass, defeat, or render inoperative" pollution control devices.[82] UPHE responds by claiming the names of these parts are self-explanatory and suffice to establish their primary purpose. Defendants also argue UPHE misstates the number of parts sold, by counting parts purchased by B&W Auto twice.

UPHE's evidence falls short. To succeed on summary judgment, UPHE must demonstrate each element of its claim, and it cannot do so here without evidence—or an admission—showing the parts DPG sold had a "principle effect" that violated the CAA. UPHE's Motion is therefore granted as to its ninth cause of action against DPG, but only for the 88 exhaust gas recirculation delete kits Defendants admit violate the CAA. It is denied as to all other parts.

---

[81] Dkt. 81 at 6–9.

[82] 42 U.S.C. § 7522(a)(3)(B). *See also* Dkt. 88 at 14–16 ("while Defendants do not dispute that some of the listed parts may violate the CAA, there is no evidence presented that any of these parts, much less all of these parts, violate the CAA.").

Turning to the Motion as it relates to Sparks, Defendants admit Sparks "personally caused DPG to order, and subsequently to sell, multiple delete pipes,"[83] and "has always had the authority to direct DPG not to offer to sell defeat parts, but has only used that authority once, after receiving Physicians' pre-suit notice letter."[84] Sparks admits he "knew or should have known the intended use of products sold by DPG,"[85] and that the purpose of a "full delete exhaust kit" is to remove emission control devices on a vehicle.[86] Given these admissions of personal participation, Sparks is liable for DPG's sale of defeat parts. UPHE's Motion is therefore granted as to its eleventh cause of action against Sparks, but only for the parts specified above.

As for Defendant Stuart, CFO and COO of DPG, Defendants admit Stuart is authorized to decide "what parts DPG will sell."[87] Similarly, he admits he "has always had the authority to direct DPG not to offer to sell defeat parts, but has only used that authority once, after receiving Physicians' pre-suit notice letter."[88] Defendants argue UPHE has not shown Stuart personally participated in these violations. But Defendants admit Stuart "participated personally in advertising and promoting the sale of parts through DPG."[89] Furthermore, UPHE shows Stuart is liable under the responsible corporate officer doctrine: Stuart knew of the facts underlying the violations, *i.e.* the advertisement and sale of the parts in question; had the ability to prevent and

---

[83] Dkt. 88 at 10.

[84] Dkt. 88 at 13.

[85] Dkt. 88 at 17.

[86] Dkt. 64, Ex. A (Sparks Depo.) at 133:23–134:13.

[87] Dkt. 88 at 11.

[88] Dkt. 88 at 13.

[89] Dkt. 88 at 12–13.

correct the violations; and failed to do so. UPHE's Motion is therefore granted as to its twelfth cause of action against Stuart, for the parts specified above.

### C. UPHE's Motion to Establish Hoskins' Liability

In its next Motion, UPHE asks the court to find Defendant Keaton Hoskins liable for violations of the CAA and Utah SIP relating to (a) the removal of pollution control devices from federally-certified vehicles, (b) the installation of aftermarket emission control defeat parts in federally-certified vehicles, and (c) owning or operating motor vehicles registered in Utah without maintaining operable pollution control systems.[90]

In its fourth and eighth causes of action, UPHE claims Hoskins illegally altered two vehicles by removing or rendering inoperative emission control systems, in violation of the CAA[91] and a Utah SIP Regulation.[92] In its sixteenth cause of action, for the same two trucks, UPHE claims Hoskins installed defeat parts and components that bypassed or rendered inoperable emissions control devices.[93] And in its twenty-fifth cause of action, UPHE claims Hoskins violated a Utah SIP Regulation by owning or operating vehicles registered in Utah

---

[90] Dkt. 108.

[91] Under the CAA, it is a violation "for any person knowingly to remove or render inoperative any . . . device or element of design [installed on or in a motor vehicle or motor vehicle engine in compliance with regulations under this subchapter] after [the vehicle's] sale and delivery to the ultimate purchaser." 42 U.S.C. § 7522(a)(3)(A).

[92] Utah SIP Regulation R307-201-2 provides: "No person shall remove or make inoperable within the State of Utah the system or device [for the control of crankcase emissions or exhaust emissions in compliance with the Federal motor vehicle rules] or any part thereof, except for the purpose of installing another system or device, or part thereof, which is equally or more effective in reducing emissions from the vehicle to the atmosphere."

[93] Under the CAA, it is a violation "for any person to . . . install, any party or component intended for use with, or as part of, any motor vehicle or motor vehicle engine, where a principal effect of the part or component is to bypass defeat or render inoperative any device or element of design installed on or in a motor vehicle or motor vehicle engine in compliance with regulations under this subchapter, and where the person knows or should know that such part or component is being . . . installed for such use or put to such use." 42 U.S.C. § 7522(a)(3)(B).

without maintaining their emissions control systems in operable condition.[94]  UPHE provides

evidence to support each of these claims.[95]

Hoskins "does not dispute the facts set forth by [UPHE] in its [M]otion,"[96] arguing only

that the claims fail for lack of standing.  As previously discussed, Defendants' standing challenge

fails.  UPHE's Motion is therefore granted on its fourth, eighth, sixteenth,[97] and twenty-fifth

causes of action against Hoskins.

### D.  UPHE's Motion to Establish DPG's Shared Liability for B&W Auto's Violations Regarding Tampered "Giveaway" Trucks

UPHE's final Motion seeks to establish DPG's shared liability for illegal modifications

B&W Auto made to trucks given away as DPG sweepstakes prizes.[98]

Since 2013, DPG has run a series of sweepstakes giveaway promotions.  In connection

with these promotions, DPG has given away or offered to give away various prizes, including at

least 27 trucks.[99]  Customers receive an entry into the sweepstakes for every $5 they spend on

DPG products, or they can obtain an entry without making a purchase by requesting one by

mail.[100]  Although DPG runs the sweepstakes, it contracts with B&W Auto to purchase and

---

[94] Utah SIP Regulation R307-201-2 states:  "Any person owning or operating any motor vehicle or motor vehicle engine registered in the State of Utah on which is installed or incorporated a system or device for the control of crankcase emissions or exhaust emissions in compliance with the Federal motor vehicle rules, shall maintain the system or device in operable condition and shall use it at all times that the motor vehicle or motor vehicle engine is operated."

[95] Dkt. 108 at 3–6.

[96] Dkt. 113 at 3.

[97] UPHE purports to move on its thirteenth cause of action, but it appears UPHE intended to move on the sixteenth cause of action.  The thirteenth cause of action is against B&W Auto whereas the sixteenth is against Hoskins for installing aftermarket defeat parts.  *See* Dkt. 49 at 112.

[98] Dkt. 109.

[99] Dkt. 107 at 19.

[100] Dkt. 115 at 4–5.

convey the trucks to the winners.[101]  Defendants admit that prior to conveying the sweepstakes prizes, B&W Auto modified six of the sweepstakes trucks by removing pollution control devices and/or installing emission defeat parts, and that another four trucks were purchased with pollution control devices already installed.[102]

The parties hold different views with respect to the sweepstakes.  UPHE asks the court to find DPG is equally liable for B&W Auto's illegal modifications to the sweepstakes trucks, under two theories: either B&W Auto was acting as DPG's agent when it made the modifications, or the two businesses were working together as a "joint enterprise."  Conversely, Defendants argue any claims related to the sale of the modified sweepstakes trucks must be dismissed because the trucks were not "sold" but given away as prizes.

UPHE has not established DPG's liability for the modifications under its agency or joint enterprise theories.  A principal is liable for its agent's CAA's violations[103] if the agent's conduct "is within the scope of the agent's actual authority or ratified by the principal."[104]  "An agent acts with actual authority if it 'reasonably believes, in accordance with the principal's manifestations to the agent, that the principal wishes the agent so to act.'"[105]  UPHE provides no evidence showing DPG directed B&W Auto to illegally modify the vehicles or ratified the illegal

---

[101] *See* Dkt. 64, Ex. A (Sparks Depo.) at 79:8–10 ("DPG never actually takes title.  DPG just pays for the invoice for . . . B&W to transfer the title to the owner, to the new winner."); Dkt. 107-3 at ¶ 31 ("DPG also contracted with B&W Auto to provide a custom built truck as a sweepstakes prize.").

[102] Dkt. 107 at 14–18.  There are some discrepancies between the parties' account of which trucks were given away as sweepstakes prizes.  *Compare* Dkt. 109 at 3 *with* Dkt. 107 at 14–18.

[103] 42 U.S.C. § 7602(e) ("The term 'person' includes an individual, corporation, partnership, association, State, municipality, political subdivision of a State, and any agency, department, or instrumentality of the United States and any officer, agent, or employee thereof.").

[104] *1-800 Contacts v. Lens.com.*, 722 F.3d 1229, 1251 (10th Cir. 2013) (quoting Restatement (Third) of Agency § 7.04).

[105] *Id.* (quoting Restatement (Third) of Agency § 2.01).

modifications.[106]   Although Defendants agree DPG "contracted with B&W Auto to provide a custom built truck,"[107] UPHE provides no evidence that B&W Auto reasonably believed, in accordance with DPG's manifestations, that the trucks should be modified in ways that violated the CAA.[108]   And to the extent UPHE relies on Sparks' position as CEO of both companies as evidence of an agency relationship, its does so unsuccessfully.   That the two companies share a CEO does not establish whether B&W Auto manifested an intention that DPG make the modifications in question.

UPHE's joint enterprise theory similarly fails for lack of proof.   As an initial matter, UPHE does not provide authority to show the joint enterprise theory of liability is available for federal claims brought under the CAA.   But even assuming the theory is available, UPHE does not provide evidence it applies here.   Under Utah law, a joint enterprise is "(1) [a]n agreement, express or implied, among the members of the group; (2) a common purpose to be carried out by the group; (3) a community of pecuniary interest in that purpose, among the members; and (4) an equal right to a voice in the direction of the enterprise, which gives an equal right of control."[109] UPHE claims DPG and B&W Auto "share a common purpose of using significantly modified trucks to generate income."[110]   But it provides no evidence the two companies agreed to use of "significantly modified trucks"—let alone trucks modified in violation of the CAA—as the

---

[106] *See* Restatement (Third) of Agency § 3.03 cmt. b ("[A]n agent's apparent authority originates with expressive conduct by the principal toward a third party . . . [t]he fact that one party performs a service that facilitates the other's business does not constitute such a manifestation.").

[107] Dkt. 107-3 at ¶ 31.

[108] *See* Dkt. 114 (Sparks Decl.) Ex. 2 at ¶ 32 ("DPG does not own the giveaway vehicles, nor makes [sic] decisions about what vehicle is provided by B&W Auto.").

[109] *Farmers Ins. Exchange v. Parker*, 936 P.2d 1088, 1090 (Ut. Ct. App. 1997) (quotation omitted).

[110] Dkt. 109 at 4.

sweepstakes vehicles.[111]  Neither does it provide evidence that DPG and B&W Auto shared

equal right of control in the modifications.  UPHE's Motion to establish DPG's liability for

B&W Auto's modifications to the sweepstakes trucks is therefore denied.[112]

Turning to Defendants' argument, the transfer of the sweepstakes trucks to the winners

falls within the definition of "sale."  The CAA does not define the term sale, but according to

Black's Law Dictionary, it is "[t]he transfer of property or title for a price."[113]   "Price," in turn,

is defined as "[t]he amount of money or other consideration asked for or given in exchange for

something else."[114]

Under these definitions, DPG sold the trucks to the sweepstakes winners.  B&W Auto,

acting as DPG's agent,[115] transferred title of the trucks to the winners in exchange for their

participation in the sweepstakes.  DPG asked for and received valuable consideration in

exchange for the conveyance of the trucks, in the form of direct monetary benefits (increased

---

[111] Defendants' arguments relating to "corporate affiliate liability" and the corporate veil are inapposite. Plaintiff does not seek to hold DPG derivatively liable for B&W Auto's actions or to pierce the corporate veil.  Rather, UPHE asks the court find DPG "directly liable for causing B&W Auto's admitted violations."  Dkt. 116 at 4.

[112] UPHE also argues in its Opposition to Defendants' Motion for Summary Judgment that DPG is the "equitable owner" of the sweepstakes vehicles, because it paid for them.  Dkt. 110 at 23.  It claims "DPG is the effective or equitable owner . . . with B&W Auto acting as [DPG's] agent and the mere holder of bare legal title."  Dkt. 110 at 23.  Apart from two bankruptcy cases applying the equitable title doctrine, UPHE provides no authority for its position.  And Defendants cite controlling cases urging a limited application of the doctrine.  *See, e.g.*, *Crouch v. U.S.*, 692 F.2d 97, 100 (10th Cir. 1982).

[113] SALE, Black's Law Dictionary (10th ed. 2014)

[114] PRICE, Black's Law Dictionary (10th ed. 2014).

[115] Although UPHE has not shown B&W Auto acted as DPG's agent in making modifications to the trucks, as discussed above, the record does show B&W Auto acted as DPG's agent in purchasing and conveying the trucks to the sweepstakes winners.  Unlike for the modifications, there is no question of fact as to whether DPG directed B&W Auto to convey the vehicles to the winners.  *See* Dkt. 64, Ex. A (Sparks Depo.) at 79:8–10 ("DPG never actually takes title.  DPG just pays for the invoice for . . . B&W to transfer the title to the owner, to the new winner."); Dkt. 107-3 at ¶ 31 ("DPG also contracted with B&W Auto to provide a custom built truck as a sweepstakes prize.").

sales)[116] and indirect benefits (promotion of its brand).[117]  The fact that each particular winner contributed only a portion of the total consideration received by DPG does not preclude the existence of a sale.[118]  DPG can therefore be held liable for the sale of illegally modified vehicles to sweepstakes winners.  Defendants' motion for summary judgment on this issue is denied.

## CONCLUSION

For the reasons stated:

- Defendants' Motion for Summary Judgment[119] is DENIED;

- UPHE's Partial Motion for Summary Judgment to establish B&W Auto's and Sparks' Liability[120] is GRANTED in part and DENIED in part;

- UPHE's Partial Motion for Summary Judgment to Establish DPG, Sparks', and Stuart's Liability for Selling Defeat Parts[121] is GRANTED in part and DENIED in part;

- UPHE's Partial Motion for Summary Judgment to Establish Hoskins' Liability[122] is GRANTED; and

- UPHE's Partial Motion for Summary Judgment to Establish DPG's Shared Liability for B&W Auto's Violations Regarding Tampered "Giveaway" Trucks[123] is DENIED.

---

[116] Dkt. 64, Ex. A (Sparks Depo.) at 82:13–25; Dkt. 111, Ex. E (Stuart Depo.) at 47:17–49:20.

[117] Dkt. 64, Ex. A (Sparks Depo.) at 80:9–81:13; Dkt. 111, Ex. E (Stuart Depo.) at 47:17–48:2.

[118] UPHE cites several cases examining the legality of lotteries or "bank nights," in which courts found prizes were exchanged for consideration because the hosting businesses gained direct or indirect benefits from the promotion.  *See Affiliated Enterprises v. Gantz*, 86 F.2d 597, 599 (10th Cir. 1936); *State ex rel. Beck v. Fox Kansas Theatre Co.*, 62 P.2d 929, 933 (Kan. 1936); *Iris Amusement Corp. v. Kelly*, 8 N.E. 2d 648, 653 (Ill. 1937); *United-Detroit Theaters Corp. v. Colonial Theatrical Enter.*, 273 N.W. 756, 757 (Mich. 1937).

[119] Dkt. 107.

[120] Dkt. 64.

[121] Dkt. 81.

[122] Dkt. 108.

[123] Dkt. 109.

DATED this 12th day of March, 2019.

BY THE COURT:

_____

ROBERT J. SHELBY
United States Chief District Judge