**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH
CENTRAL DIVISION**

| | | |
|---|---|---|
| Utah Physicians for a Healthy Environment, Inc., | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| Diesel Power Gear LLC, 4X4 Anything LLC, | ) | Case No. 2:17-cv-32-RJS-DBP |
| B&W Auto LLC d/b/a Sparks Motors LLC, | ) | |
| Mr. W. Sparks, Joshua Stuart, and | ) | |
| Keaton Hoskins, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**Plaintiff's CORRECTED Proposed Findings of Fact
and Conclusions of Law**

# TABLE OF CONTENTS

I. Plaintiff's Proposed Findings of Fact ..................................................................1

    A.    Facts Applicable to Causes of Action 1 and 5 ...............................................1

    B.    Facts Applicable to Cause of Action 13 .......................................................4

    C.    Facts Applicable to Causes of Action 17 and 18 ......................................... 8

    D.    Facts Applicable to Cause of Action 17 ..................................................... 10

    E.    Facts Applicable to Causes of Action 9, 11, and 12 ...................................13

    F.    Facts Applicable to Causes of Action 4, 8, and 16 ....................................16

    G.    Facts Applicable to Cause of Action 25 ......................................................17

    H.    Facts Applicable to Causes of Action 21, 22 and 23 ..................................18

    I.    Facts Applicable to Irreparable Harm, Balance of Harms, Public Interest, Gravity of Violations ...................................................................................19

II. Plaintiff's Proposed Conclusions of Law ...........................................................22

    A.    Applicable Provisions of Clean Air Act and Utah SIP ...............................23

    B.    Applicable Declaratory Relief ....................................................................25

    C.    Applicable Injunctive Relief .......................................................................25

    D.    Appropriate Civil Penalty Relief ................................................................28

        1.    Maximum Penalty Values.................................................................28

        2.    Each Removal of a Device or Element of a Design, and Each Action to Bypass, Defeat, or Render Inoperative a Device or Element of Design Should Be Penalized ...................................................................28

            a.    The Court Should Assess Civil Penalties for the Number of Violations Each Defendant Is Found Liable for Causing ............ 28

            b.    The Removal of Each Device or Element of Design is a Separate Violation.........................................................................29

c.     The Advertisement, Sale and/or Installation of Each Defeat Part or Component Constitutes a Separate Violation ..........................29

3.     The Civil Penalty Assessed Should Deter Future Violations ...................30

E.     The Court Should Assess the Civil Penalty by Starting with the Statutory Maximum and then Determine if Any Reduction is Warranted Based on the Statute's Penalty Mitigation Factors ........................................................32

1.     Statutory Penalty Factor 1: Gravity  ..........................................................32

2.     Statutory Penalty Factor 2: Economic Benefit..........................................34

3.     Statutory Penalty Factor 3: The Size of the Violator's Business...............36

4.     Statutory Penalty Factor 4: The Violator's History of Compliance with this Subchapter......................................................................................................36

5.     Statutory Penalty Factor 5: Action Taken to Remedy the Violation ........37

6.     Statutory Penalty Factor 6: The Effect of the Penalty on the Violator's Ability to Continue in Business .................................................................37

7.     Statutory Penalty Factor 7: Such Other Matters as Justice May Require ..39

F.     Civil Penalties Can Be Used for Beneficial Mitigation Projects under 42 U.S.C. § 7604(g)(2)  ...................................................................................39

III. Application of [Draft] Conclusions of Law to [Preliminary] Findings of Fact ......................40

A.     Liability....................................................................................................40

B.     Civil Penalties .........................................................................................47

C.     Injunctive Relief.....................................................................................51

CONCLUSION.............................................................................................................52

**Plaintiff's CORRECTED Proposed Findings of Fact
and Conclusions of Law**

Pursuant to the Court's October 7, 2019 Minute Entry, Dkt. 139, and DUCivR 54-1,

Plaintiff submits its **CORRECTED** proposed findings of fact and conclusions of law below.

## I.  Plaintiff's Proposed Findings of Fact

**A.      Facts Applicable to Causes of Action 1 and 5**.  B&W Auto removed at least  35

pollution control devices and elements of design from at least  7  trucks.  Mr. Sparks may share

responsibility for these actions as alleged in Causes of Action 2 and 5.

1.      Below is a table of B&W Auto emission control device removal violations established at

summary judgment (Dkt. 64, pp. 4 – 7 of 23; Dkt. 75, pp. 11 - 12 of 23; 74 F. Supp. 3d at 1139).

"OC" means oxidation catalyst, "DPF" means diesel particulate filter, "SCR" means selective

catalytic reduction, "MIL" means malfunction indicator light, and "limp mode" means an

electronic feature that is designed to prevent a vehicle's full and continued operation after one or

more emission control devices has been removed or become impaired.

**B&W Auto Removal of Emission Control Devices**

| Truck | Model Year, Make, Engine, VIN Number | Emission control devices in original exhaust system | # of emission control devices removed  by B&W Auto |
|---|---|---|---|
|  |  |  |  |
| BD#1 The OG | 2012 Dodge Ram 2500 6.7L 3C6UD5DL3CG229996 | OC, DPF, SCR, NOx sensor removed by straight pipe, MIL and limp mode removed by delete tune | 6 |
| BD#2 | 2013 Ford F250 6.7L | OC, DPF, SCR, 2 NOx sensors removed by straight pipe, MIL and limp mode removed by delete tune | 7 |
| BD#3 -- 2nd place | 2006 GMC 2500 LBZ Duramax 6.6L | OC removed by straight pipe, MIL and limp mode removed by delete tune | 3 |

| Truck | Model Year, Make, Engine, VIN Number | Emission control devices in original exhaust system | # of emission control devices removed by B&W Auto |
|---|---|---|---|
| BD#6 – 1st place, Kodiak Monster | 2007 GMC Kodiak C4500 LBZ Duramax 6.6L 1GBE4E1257F412479 | OC and DPF removed by straight pipe, MIL and limp mode removed by delete tune | 4 |
| BD#6 – 2nd place | 2008 Dodge 2500 single cab Cummins 6.7L 3D7KS26A28G154303 | OC and DPF removed by straight pipe, MIL and limp mode removed by delete tune | 4 |
| US Duramax | 2007 GMC Silverado 2500 Duramax 6.6L 1GBHC24D77E133892 | OC and DPF removed by straight pipe, MIL and limp mode removed by delete tune | 4 |
| Bro-Dozer | 2011 Ford F350 Powerstroke 6.7L 1FT8W3BT0BEC15796 | OC, DPF, SCR, 2 NOx sensors removed by straight pipe, MIL and limp mode removed by delete tune | 7 |
| | | TOTAL | 35 |

2.      Defendant B&W Auto LLC, including B&W Auto LLC doing business as Sparks Motors LLC ("B&W Auto"), is a registered Utah limited liability company.  Defendant David Sparks is the Chief Executive Officer ("CEO") and sole manager of B&W Auto.  Mr. Sparks holds a majority ownership interest in B&W Auto.  Dkt. 49 (Complaint, ¶23), Dkt. 85 (Answer, ¶19).

3.      Between January 12, 2012 and January 10, 2017, B&W Auto repeatedly and knowingly caused the removal and/or the rendering inoperative of devices or elements of design, installed on or in motor vehicles or motor vehicle engines in compliance with EPA regulations, after such vehicles were sold and delivered to the ultimate purchaser.  The purpose of such devices or elements of design was to reduce the emission of pollutants on a continuous basis.  Dkt. 49 (Complaint, ¶353), Dkt. 85 (Answer, ¶164).

4.      Mr. Sparks knew that B&W Auto was knowingly removing emission control devices from certified diesel vehicles.  Mr. Sparks authorized such activities.  Mr. Sparks supervised

such activities.  Mr. Sparks took no action to stop or curtail such activities.  Dkt. 49

(Complaint, ¶¶77 and 131), Dkt. 85 (Answer, ¶¶49 and 154).

5.      B&W Auto's removal of emission control devices from certified diesel vehicles has

caused such vehicles to emit more pollution into the air of Utah than the vehicles emitted before

the removal of such devices.  Dkt. 49 (Complaint, ¶63), Dkt. 85 (Answer, ¶39).

6.      B&W Auto's removal of emission control devices from certified diesel vehicles

diminished such vehicles' ability to reduce the emission of pollutants on a continuous basis.

Dkt. 49 (Complaint, ¶64), Dkt. 85 (Answer, ¶39).

7.      B&W Auto did not replace the emission control devices that it removed from certified

diesel vehicles with other devices that were equally or more effective in reducing emissions.

Dkt. 49 (Complaint, ¶65), Dkt. 85 (Answer, ¶39).

8.      B&W Auto knowingly removed DPFs, EGR, MIL and "limp mode" systems that were

installed in certified diesel vehicles.  B&W Auto's removal of these emission control devices on

certified diesel vehicles caused such vehicles to emit more pollution into the air of Utah than the

vehicles emitted before the devices were removed.  Dkt. 49 (Complaint, ¶¶67, 70, 71), Dkt. 85

(Answer, ¶¶41, 43).

9.      [Insert additional facts proved at trial that show B&W Auto removed additional emission

control devices and elements of design from additional motor vehicles, and the extent to which

Mr. Sparks is liable for the removal of emission control devices and elements of design.]

  **B.**  **Facts Applicable to Cause of Action 13.**  B&W Auto installed at least  20

aftermarket defeat parts in at least  13  trucks.  Mr. Sparks may share responsibility for these

actions as alleged in Cause of Action 14.

1.     Below is a table showing B&W Auto aftermarket defeat part installation violations established at summary judgment (Dkt. 64, pp. 8 – 11 of 23; Dkt. 75, p. 12 of 23; 74 F. Supp. 3d at 1139).

## B&W Auto Installation of Defeat Parts

| Truck | Model Year, Make, Engine, VIN Number | Aftermarket Defeat Part Installation Facts | # of defeat parts installed by B&W Auto |
|---|---|---|---|
| BD#1 The OG | 2012 Dodge Ram 2500 6.7L 3C6UD5DL3CG229996 | B&W installed straight pipe and delete tune. | 2 |
| BD#2 | 2013 Ford F250 6.7L | B&W installed straight pipe and delete tune. | 2 |
| BD#3 -- 2nd place | 2006 GMC 2500 LBZ Duramax 6.6L | B&W installed straight pipe and delete tune. | 2 |
| BD#6 – 1st place, Kodiak Monster | 2007 GMC Kodiak C4500 LBZ Duramax 6.6L 1GBE4E1257F412479 | B&W installed straight pipe and delete tune. | 2 |
| BD#6 – 2nd place | 2008 Dodge 2500 single cab Cummins 6.7L 3D7KS26A28G154303 | B&W installed straight pipe and delete tune. | 2 |
| US Duramax | 2007 GMC Silverado 2500 Duramax 6.6L 1GBHC24D77E133892 | B&W installed vertical stacks and EFI Live delete tune. | 2 |
| Bro-Dozer | 2011 Ford F350 Powerstroke 6.7L 1FT8W3BT0BEC15796 | B&W installed straight pipe and H&S delete tune. | 2 |
| BD#3 - 1st place US 12-valve | 1994 Dodge Ram 3500 12-valve Cummins 5.9L | B&W installed vertical stacks in place of horizontal straight pipe, did not replace catalytic converter. | 1 |
| Holy Grail | 1997 Dodge Ram 3500 12-valve Cummins 5.9L 3B7KF23D6VG790036 | B&W installed straight pipe, did not replace catalytic converter. | 1 |
| MTN OPs Ultimate Hunting Rig | 2009 Ford F250 XLT Powerstroke 6.4L | B&W installed vertical stacks in place of horizontal straight pipe, did not replace diesel particulate | 1 |

| Truck | Model Year, Make, Engine, VIN Number | Aftermarket Defeat Part Installation Facts | # of defeat parts installed by B&W Auto |
|---|---|---|---|
| | | filter or return ECM to stock settings. | |
| Ford F250 UPHE Test Truck | 2013 Ford F250 Powerstroke 6.7L 1FT7W2BT2DEA61696 | B&W installed vertical stack in bed in place of horizontal straight pipe, did not replace diesel particulate filter or return ECM to stock settings. | 1 |
| Megaram Runner | 2012 Dodge Ram 3500 Cummins 6.7L 3C6UD5NL1CG272747 | B&W installed straight pipe and ECM delete tune rather than restore diesel particulate filter and other pollution control devices. | 2 |
| Super Six | 2008 Ford F550 Powerstroke 6.7L 1FDAW57R48EB95034 | B&W installed straight pipe and vertical stacks, did not replace diesel particulate filter or restore ECM stock settings. | 1 |
| | | Total | 21 |

2.      The phrase "aftermarket defeat parts" means those parts, including but not limited to EGR delete kits, straight pipes and delete-capable reprogrammers and "tunes," that have the principal effect of bypassing, defeating or rendering inoperative emission control devices on certified diesel vehicles, and where the person offering to sell, selling or installing such parts knew or should have known they were being offered for sale, sold and/or installed for that purpose.  Dkt. 49 (Complaint, ¶259), Dkt. 85 (Answer, ¶112).

3.      B&W Auto agrees that Section 203(a)(3)(B) of the Clean Air Act is interpreted by EPA to mean that if a person is in possession of a vehicle with an existing exhaust pipe that is missing a pollution control device such as a catalytic converter, that person is prohibited from installing a replacement pipe without replacing the missing pollution control device.  Dkt. 75, p. 12 of 23; EPA Fact Sheet: Exhaust System Repair Guideline, March 31, 1991, Dkt. 64, Exhibit F.

4.      B&W Auto has installed aftermarket defeat parts in certified diesel vehicles, including but not limited to the installation of EGR delete kits, straight pipes and reprogrammers or

"tunes." The principal effect of these parts is to bypass, defeat or render inoperative emission control devices in certified diesel vehicles, and B&W Auto knew or should have known that by installing such parts those parts would be used as aftermarket defeat parts. Dkt. 49 (Complaint, ¶260), Dkt. 85 (Answer, ¶113).

5.      Certified diesel vehicles in which B&W Auto installed aftermarket defeat parts are currently operating in Utah, and the aftermarket defeat parts in those vehicles are causing such vehicles to emit more pollutants into the air of Utah than they would absent the installation and use of such parts. Dkt. 49 (Complaint, ¶261), Dkt. 85 (Answer, ¶113).

6.      B&W Auto has not retrieved the aftermarket defeat parts that it installed in certified diesel vehicles, or restored the original emission control systems in the certified diesel vehicles in which it installed aftermarket defeat parts. Dkt. 49 (Complaint, ¶262), Dkt. 85 (Answer, ¶113).

7.      Defendant Mr. Sparks knew that B&W Auto was installing aftermarket defeat parts, including straight pipes, EGR delete kits and delete tuners. Mr. Sparks authorized such activities. Mr. Sparks supervised such activities. Mr. Sparks took no action to stop or curtail such activities. Dkt. 49 (Complaint, ¶¶265, 430), Dkt. 85 (Answer, ¶¶116, 202).

8.      The straight pipes installed by B&W Auto described as "CAT/DPF delete" have been principally designed to bypass, defeat and/or render inoperative federally-required emission control devices such as DOCs, DPFs and SCR systems. Dkt. 49 (Complaint, ¶286), Dkt. 85 (Answer, ¶128).

9.      A "turbo-back" exhaust pipe means a hollow pipe (called a "straight pipe") from the turbocharger to the exhaust exit. Dkt. 49 (Complaint, ¶123), Dkt. 85 (Answer, ¶54).

10.     The straight pipes installed by B&W Auto described as "turbo back," applicable to certified diesel vehicles with one or more emission control devices connected to the exhaust pipe such as DOCs, DPFs and SCR systems, have been principally designed to bypass, defeat and/or render inoperative such devices.  Dkt. 49 (Complaint, ¶286), Dkt. 85 (Answer, ¶128).

11.     See also, with respect to individual parts, Dkt. 49 (Complaint, ¶¶280 - 290), Dkt. 85 (Answer, ¶128).

12.     [Insert additional facts proved at trial that show B&W Auto installed additional aftermarket defeat parts, and the extent to which Mr. Sparks is liable for installing aftermarket defeat parts.]

C.     **Facts Applicable to Causes of Action 17 and 18**.  B&W Auto and DPG offered to sell and sold at least  21  aftermarket defeat parts installed in 11 sweepstakes vehicles.  Dkt. 107, pp. 14-18 of 43; 74 F. Supp. 3d at 1144-45.  Mr. Sparks may share responsibility for these actions as alleged in Cause of Action 19.

1.     The 11 sweepstakes vehicles with at least 21 emission control defeat parts offered for sale and sold by DPG and B&W are set forth below:

**B&W Auto and DPG Sales of Defeat Parts in Sweepstakes Vehicles**

| Truck | Model Year, Make, Engine, VIN Number | Sweepstakes Aftermarket Defeat Part Sales | # of defeat parts sold |
|-------|--------------------------------------|-------------------------------------------|------------------------|
|       |                                      |                                           |                        |
| BD #1 The OG | 2012 Dodge Ram 2500 6.7L 3C6UD5DL3CG229996 | Straight pipe and delete tune. | 2 |
| BD #2 | 2013 Ford F250 6.7L | Straight pipe and delete tune. | 2 |
| BD #3, 1st place US 12-valve | 1994 Dodge Ram 3500 Cummins 5.9L | Straight pipe | 1 |

| Truck | Model Year, Make, Engine, VIN Number | Sweepstakes Aftermarket Defeat Part Sales | # of defeat parts sold |
|---|---|---|---|
| BD #3, 2nd place | 2006 GMC 2500 LBZ Duramax 6.6L | Straight pipe and delete tune. | 2 |
| BD #5 | 2009 Ford F250 6.7L red 6-door | Straight pipe, EGR delete, and delete tune. | 3 |
| BD #6, 2nd place | 2008 Dodge 2500 single cab Cummins 6.7L 3D7KS26A28G154303 | Straight pipe and delete tune. | 2 |
| US Duramax | 2007 GMC Silverado 2500 Duramax 6.6L 1GBHC24D77E133892 | Vertical stacks and EFI Live delete tune. | 2 |
| Holy Grail | 1997 Dodge Ram 3500 12-valve Cummins 5.9L 3B7KF23D6VG790036 | Straight pipe. | 1 |
| Holy Grail 2.0 | 1997 Dodge Ram 3500 12-valve Cummins 5.9L 3B7KF23D6VG790036 | Straight pipe. | 1 |
| MTN OPs Ultimate Hunting Rig | 2009 Ford F250 XLT Powerstroke 6.4L | Vertical stacks, EGR delete kit, delete tune, | 3 |
| The Rock | 2013 Dodge Ram 5500 3C7WRNFL5DG553536 | Straight pipe and delete tune. | 2 |
| | | Total | 21 |

2.      Diesel Power Gear LLC ("DPG") is a registered Utah limited liability company.  The sole manager and CEO of DPG is Mr. Sparks.  According to the Operating Agreement for DPG, Mr. Sparks holds 100 percent of the voting interest in DPG.  DPG has purchase and credit agreements with suppliers of aftermarket defeat parts.  Dkt. 49 (Complaint, ¶25), Dkt. 85 (Answer, ¶21).

3.      Since 2013, DPG has run a series of sweepstakes giveaway promotions.  In connection with these promotions, DPG has given away or offered to give away various prizes, including at

least 27 trucks.  Customers receive an entry into the sweepstakes for every $5 they spend on

DPG products, or they can obtain an entry without making a purchase by requesting one by mail.

Although DPG runs the sweepstakes, it contracts with B&W Auto to purchase and convey the

trucks to the winners.  B&W Auto acted as DPG's agent in purchasing and conveying the trucks

to the sweepstakes winners.  Prior to conveying the sweepstakes prizes, B&W Auto modified six

of the sweepstakes trucks by removing pollution control devices and/or installing emission defeat

parts, and another four trucks were purchased with emission defeat parts already installed.  74 F.

Supp. 3d at 1143-44.

4.      The sweepstakes trucks are used to entice consumers to purchase DPG diesel

performance parts and branded attire.  Dkt. 49 (Complaint, ¶¶124, 170), Dkt. 85 (Answer, ¶¶54,

72).

5.       [Insert additional facts proved at trial that show B&W Auto and/or DPG offered to sell

and/or sold additional aftermarket defeat parts in sweepstakes vehicles, and the extent to which

Mr. Sparks is liable for offering to sell and selling aftermarket defeat parts in sweepstakes

vehicles.]

     **D.      Facts Applicable to Cause of Action 17**.  B&W offered to sell and sold 13 defeat

parts in  7 non-sweepstakes vehicles.   Dkt. 107, pp. 15-18 of 43; 74 F. Supp. 3d at 1139.  Mr.

Sparks may share responsibility for these actions as alleged in Cause of Action 19.  The 7 non-

sweepstakes vehicles with at least 13 emission control defeat parts offered for sale and sold by

B&W Auto are set forth below.

**B&W Auto Sales of Defeat Parts in Non-Sweepstakes Vehicles**

| Truck | Model Year, Make, Engine, VIN Number | Non-Sweepstakes Aftermarket Defeat Parts Sales | # of defeat parts sold |
|---|---|---|---|
| | | | |
| Ford F250 UPHE test truck | 2013 Ford F250 Powerstroke 6.7L 1FT7W2BT2DEA61696 | Vertical straight pipe, delete tune | 2 |
| Bro-Dozer | 2011 Ford F350 Powerstroke 6.7L 1FT8W3BT0BEC15796 | Straight pipe and H&S delete tune. | 2 |
| 2011 Denali | 2011 diesel GMC 2500 Denali | Straight pipe and delete tune. | 2 |
| Truck Norris | 2012 diesel GMC 2500 | Straight pipe and delete tune. | 2 |
| The Raptor | 2011 diesel Dodge Ram 2500 | Straight pipe and delete tune. | 2 |
| Tucker Snowcat | 2005 diesel Dodge Ram 2500 | Straight pipe | 1 |
| Super Six | 2008 Ford F550 Powerstroke 6.7L 1FDAW57R48EB95034 | Straight pipe and delete tune. | 2 |

1.      Between January 12, 2012 and January 10, 2017, Defendant B&W Auto repeatedly

caused the offering for sale and/or sale of parts and/or components as part of non-sweepstakes

motor vehicles where a principal effect of such parts and/or components was to bypass, defeat, or

render inoperative a device or element of design installed on or in such motor vehicles in

compliance with EPA regulations, and B&W Auto knew, or should have known, that such parts

and/or components in vehicles were being offered for sale and/or sold for such use or put to such

use.  The purpose of each device or element of design bypassed, defeated or rendered inoperative

by such parts and/or components, was to reduce the emission of pollutants on a continuous basis.

Dkt. 49 (Complaint, ¶461), Dkt. 85 (Answer, ¶212).

2.      B&W Auto has offered to sell and has sold certified diesel vehicles in which aftermarket defeat parts were a part of such vehicles, and where B&W Auto knew or should have known such parts would be put to use as aftermarket defeat parts in those vehicles.  Dkt. 49 (Complaint, ¶294), Dkt. 85 (Answer, ¶131).

3.      B&W Auto offered to sell and sold certified diesel vehicles in which aftermarket defeat parts, including straight pipes, EGR delete kits, and reprogrammers or "tunes" were a part of such vehicles.  Dkt. 49 (Complaint, ¶295), Dkt. 85 (Answer, ¶131).

4.      B&W Auto sold certified diesel vehicles in which aftermarket defeat parts were installed and put to use, and which currently are operating in Utah and other states.  Such vehicles emit more pollutants into the air of Utah and other states than those vehicles would absent their use of such aftermarket defeat parts.  Dkt. 49 (Complaint, ¶296), Dkt. 85 (Answer, ¶131).

5.      B&W Auto has not removed the aftermarket defeat parts from the vehicles it sold, or restored the original emission control devices in the vehicles it sold with aftermarket defeat parts. Dkt. 49 (Complaint, ¶297), Dkt. 85 (Answer, ¶131).

6.      Mr. Sparks knew that B&W Auto was offering to sell and was selling certified vehicles in which aftermarket defeat parts were installed.  Mr. Sparks authorized such activities. Mr. Sparks supervised such activities.  Mr. Sparks had the authority to stop such activities.  Mr. Sparks did not stop such activities.  Dkt. 49 (Complaint, ¶306), Dkt. 85 (Answer, ¶137).

7.      B&W Auto knew, or should have known, that the use of such parts and/or components in the vehicles applicable to Cause of Action 17 that it offered for sale and/or sold was to bypass, defeat, or render inoperative a device or element of design installed on or in such motor vehicles. Dkt. 64, pp. 13-14 of 23; Dkt. 75, p. 13 of 23; 74 F. Supp. 3d at 1139.

-12-

8.      Mr. Sparks knew the straight pipes he sold in vehicles applicable to Cause of Action 19 would be used to bypass, defeat and render inoperative the pollution control devices originally installed in an exhaust pipe, and that the "tunes" in those trucks would suppress the check engine light and prevent the vehicle from going into "limp mode."  Mr. Sparks also knew the tunes in these trucks were illegal.  Dkt. 64, pp. 13-14 of 23; Dkt. 75, p. 13 of 23; 74 F. Supp. 3d at 1139.

9.      [Insert additional facts proved at trial that show B&W Auto offered to sell and/or sold additional aftermarket defeat parts in non-sweepstakes vehicles, and the extent to which Mr. Sparks is liable for offering to sell and/or selling aftermarket defeat parts in non-sweepstakes vehicles.]

      **E.      Facts Applicable to Causes of Action 9, 11 and 12**.  DPG, Mr. Sparks and Joshua Stuart sold  88  EGR delete kits.  74 F. Supp. 3d at 1141.  Relevant to the calculation of a penalty, 39 of the EGR delete kits were sold by these defendants on or before November 2, 2015, and 49 were sold after November 2, 2015.  Dkt. 82-17.

      **DPG, Cause of Action 9.**

1.      DPG sold 88 EGR delete kits in violation of the Clean Air Act.  74 F. Supp. 3d at 1141.

2.      DPG has offered to sell and has sold aftermarket defeat parts.  Dkt. 49 (Complaint, ¶209), Dkt. 85 (Answer, ¶81).

3.      Aftermarket defeat parts that DPG has sold are currently in vehicles in Utah, and are causing those vehicles to emit more pollutants into the air of Utah than they would absent the sale, installation and use of such parts.  Dkt. 49 (Complaint, ¶211), Dkt. 85 (Answer, ¶83).

4.      The installation and use of EGR delete kits sold by DPG adversely affects the emissions performance of vehicles in which they are installed.  EGR delete kits eliminate the ability of an

EGR system installed in a certified vehicle from reducing the emission of pollutants on a continuous basis.  Dkt. 49 (Complaint, ¶243), Dkt. 85 (Answer, ¶104).

5.      EGR delete kits that DPG offered to sell and sold are currently in vehicles in Utah, and are causing those vehicles to emit more pollutants into the air of Utah than those vehicles would absent the installation and use of such EGR delete kits.  Dkt. 49 (Complaint, ¶244), Dkt. 85 (Answer, ¶105).

6.      DPG offered for sale and sold aftermarket exhaust pipes.  DPG offered to sell and sold aftermarket exhaust pipes through its website https://dieselpowergear.com until July 25, 2016.  Dkt. 49 (Complaint, ¶246), Dkt. 85 (Answer, ¶107).

7.      DPG offered for sale and sold straight pipes that had the principal effect of bypassing, defeating or rendering inoperative one or more emission control devices in a certified diesel vehicle's stock exhaust system, and DPG knew or should have known its straight pipes would be put to such use.   Dkt. 49 (Complaint, ¶¶252-53), Dkt. 85 (Answer, ¶110).

8.      The use of straight pipes sold by DPG adversely affects the emissions performance of vehicles in which they are installed.  Straight pipes eliminate the ability of emission control devices installed in certified diesel vehicles from reducing the emission of pollutants on a continuous basis.  Dkt. 49 (Complaint, ¶255), Dkt. 85 (Answer, ¶110).

9.      Straight pipes that DPG has sold are currently in vehicles operating in Utah, and are causing those vehicles to emit more pollutants into the air of Utah than those vehicles would emit absent the installation and use of such straight pipes.  Dkt. 49 (Complaint, ¶256), Dkt. 85 (Answer, ¶110).

10.     Between January 12, 2012 and July 25, 2016, Defendant DPG repeatedly caused the offering for sale and/or sale of parts and/or components intended for use with, or as part of,

-14-

motor vehicles or motor vehicle engines, where a principal effect of such parts and/or components was to bypass, defeat, or render inoperative a device or element of design installed on or in such motor vehicles or motor vehicle engines in compliance with EPA regulations, and DPG knew, or should have known, that such parts and/or components were being offered for sale and/or sold for such use or put to such use.  The purpose of each device or element of design bypassed, defeated or rendered inoperative by such parts and/or components, was to reduce the emission of pollutants on a continuous basis.  Dkt. 49 (Complaint, ¶385), Dkt. 85 (Answer, ¶178).

11.     [Insert additional facts proved at trial that show DPG offered to sell EGR delete kits, and offered to sell and/or sold additional aftermarket defeat parts.]

   **Facts Applicable to Mr. Sparks, Cause of Action 11.**

12.     Mr. Sparks sold 88 EGR delete kits in violation of the Clean Air Act.  74 F. Supp. 3d at 1141.

13.     Mr. Sparks knew that DPG was offering to sell and selling EGR delete kits, straight pipes and delete tunes and tuners.  Mr. Sparks authorized such activities.  Mr. Sparks took no action to stop or curtail such activities at least up to July 25, 2016.  Dkt. 49 (Complaint, ¶221), Dkt. 85 (Answer, ¶87).

14.     Mr. Sparks personally caused DPG to order, and subsequently to sell, multiple delete pipes, and has always had the authority to direct DPG not to offer to sell defeat parts, but has only used that authority once, after receiving Physicians' pre-suit notice letter.  Mr. Sparks knew or should have known the intended use of products sold by DPG, and that the purpose of a "full delete exhaust kit" is to remove emission control devices on a vehicle. 374 F. Supp. 3d 1141.

15.     [Insert additional facts proved at trial that show Mr. Sparks offered to sell EGR delete kits, and offered to sell and/or sold additional aftermarket defeat parts.]

**Facts Applicable to Mr. Stuart, Cause of Action 12**

16.     Mr. Stuart, who also goes by the name Redbeard, is the Chief Financial Officer and Chief Operations Officer ("CFO/COO") of DPG.  Mr. Stuart has an ownership interest in DPG.  Dkt. 49 (Complaint, ¶29), Dkt. 85 (Answer, ¶25).

17.     Mr. Stuart sold 88 EGR delete kits in violation of the Clean Air Act.  74 F. Supp. 3d at 1141.

18.     Mr. Stuart knew of the facts underlying the sale of the 88 EGR delete kits.  Mr. Stuart knew of the advertisement and sale of such kits.  Mr. Stuart had the ability to prevent the sale of the kits.  Mr. Stuart did not stop the sale of the kits.  374 F.Supp. 3d at 1141.

19.     [Insert additional facts proved at trial that show Mr. Stuart offered to sell EGR delete kits, and offered to sell and/or sold additional aftermarket defeat parts.]

    **F.     Facts Applicable to Causes of Action 4, 8, and 16.**  Keaton Hoskins removed at least  5  emission control devices from his 2009 Ford F-250, at least  7  emission control devices from his 2013 Ford 350, and installed a total of at least  5  defeat parts in these two trucks. \

1.     The two trucks from which Mr. Hoskins removed 12 emission control devices, and in which he installed 5 defeat parts are set forth below.

**Hoskins Removal of Emission Control Devices and Installation of Defeat Parts**

| Truck | Model Year, Make, Engine, VIN Number | Emission control devices removed by Hoskins | Aftermarket defeat parts installed by Hoskins |
|---|---|---|---|
|  |  |  |  |
| Ford F250 Red 6-door | 2009 Ford F-250 1FTSW21R59EA81867 | 5:  EGR, OC, DPF, MIL, limp mode | 3:  EGR delete kit, straight pipe, delete tune |

| Truck | Model Year, Make, Engine, VIN Number | Emission control devices removed by Hoskins | Aftermarket defeat parts installed by Hoskins |
|---|---|---|---|
| Ford F350 "Platinum 666." | 2013 Ford F-350 | 7:  OC, DPF, SCR, 2 NOx sensors, MIL, limp mode | 2:  Straight pipe and delete tune |
| | | 12 | 5 |

2.       Mr. Hoskins violated the Clean Air Act and Utah SIP as a result of these

modifications.  74 F. Supp. 3d at 1142.

3.       [Insert additional facts proved at trial that show Mr. Hoskins removed additional

emission control devices and installed additional aftermarket defeat parts.]

       **G.       Facts Applicable to Cause of Action 25.**  Keaton Hoskins owned and

operated multiple vehicles in Utah without maintaining all of their emission control

systems and devices in operable condition.

1.       Between January 12, 2012 and July 20, 2017 Mr. Hoskins repeatedly violated Utah

SIP regulation R307-201-2 by owning and/or operating motor vehicles registered in Utah,

or that should have been registered in Utah, without maintaining in operable condition all

of the federally-required emission control systems or devices in such vehicles at all times.

Complaint, Dkt. 49, ¶¶167, 525; Answer, Dkt. 85, ¶¶68, 238; 374 F. Supp.3d at 1142.

2.       Between 2013 and 2015 Mr. Hoskins owned and operated in Utah a red, 2009 Ford

F-250 6-door diesel truck, from which the pollution control equipment had been removed.

During the period of time that Mr. Hoskins owned and operated the 2009 Ford F250 it was

registered in Utah.  Dkt. 49 (Complaint, ¶159), Dkt. 85 (Answer, ¶68); Dkt. 108, p. 6 of 11;

Dkt. 113, p. 3 of 4; 374 F. Supp.3d at 1142.

3.      Mr. Hoskins repeatedly operated his modified 2009 Ford F250 on public roads and on public lands in Utah, and on private roads and on private lands in Utah, and the 2009 Ford F250 emitted elevated levels of pollutants into Utah's air during these periods.  Dkt. 49 (Complaint, ¶167), Dkt. 85 (Answer, ¶68).

4.      Mr. Hoskins operated in Utah each of the seventeen diesel vehicles admitted by Defendant B&W Auto to be missing pollution control equipment.  Dkt. 108, p. 6 of 11; Dkt. 113, p. 3 of 4; 374 F. Supp.3d at 1142.

5.      Mr. Hoskins operated multiple diesel trucks, provided by IDriveUtah, that had been "deleted" i.e. missing their pollution control equipment.  Dkt. 108, p. 6 of 11; Dkt. 113, p. 3 of 4; 374 F. Supp.3d at 1142.

6.      [Insert additional facts proved at trial that show Mr. Hoskins owned and/or operated additional motor vehicles registered in Utah, or that should have been registered in Utah, without maintaining in operable condition all of the federally-required emission control systems or devices in such vehicles at all times.]

        **H.      Facts Applicable to Causes of Action 21, 22 and 23**.  B&W Auto, DPG and Mr. Sparks owned and/or operated vehicles in Utah without fully operational emission control systems.

1.      Between January 12, 2012 and January 10, 2017, B&W Auto repeatedly owned and/or operated motor vehicles registered in Utah, or that should have been registered in Utah, without maintaining in operable condition all of the federally-required emission control systems or devices in such vehicles at all times.  Dkt. 49 (Complaint, ¶497), Dkt. 85 (Answer, ¶223).

2.      Mr. Sparks and B&W Auto operated the deleted Built Diesel 1 in Utah, and Built Diesel 1 emitted elevated levels of pollutants into Utah's air.  Dkt. 49 (Complaint, ¶136), Dkt. 85 (Answer, ¶58).

3.      B&W Auto operated "Built Diesel 3, second place" in Utah without its catalytic converter.  Dkt. 64, pp. 5-6 of 23; Dkt. 75, p. 12 of 23; 74 F. Supp. 3d at 1139.

4.      Mr. Sparks operated the 2013 Ford F250 "UPHE Test Truck" in Utah without its diesel particulate filter and other emission control devices originally installed in the truck. Dkt. 64, pp. 9-10 of 23; Dkt. 75, p. 12 of 23; 74 F. Supp. 3d at 1139.

5.      Mr. Sparks operated the Megaram Runner in Utah without its diesel particulate filter and the other pollution control devices originally installed in the truck.  Dkt. 64, pp. 10-11 of 23; Dkt. 75, p. 12 of 23; 74 F. Supp. 3d at 1139.

6.      Mr. Sparks operated the Brodozer, a 2011 Ford F-350 diesel truck, in Utah without its catalytic converter.  Dkt. 64, p. 7 of 23; Dkt. 75, p. 12 of 23; 74 F. Supp. 3d at 1139.

7.      Mr. Sparks operated the US Duramaxx truck in Utah without its catalytic converter. Dkt. 64, p. 6 of 23; Dkt. 75, p. 12 of 23; 74 F. Supp. 3d at 1139.

8.      [Insert additional facts proved at trial that show B&W Auto, DPG and Mr. Sparks owned and/or operated additional motor vehicles registered in Utah, or that should have been registered in Utah, without maintaining in operable condition all of the federally-required emission control systems or devices in such vehicles at all times.]

### I.   Facts Applicable to Irreparable Harm, Balance of Harms, Public Interest, Gravity of Violations.

1.      The ambient air in at least seven Utah counties fails to meet the federal, health-based standard for particulate matter ("PM") that is less than 2.5 microns in size ("$PM_{2.5}$").  (A

micron is one millionth of a meter, approximately 50 times smaller than the diameter of a

human hair.)  The counties that do not meet the 24-hour, 35 micrograms per cubic meter

$PM_{2.5}$ standard include Cache, Box Elder, Weber, Davis, Salt Lake, Utah and Toole.  Dkt.

49 (Complaint, ¶12), Dkt. 85 (Answer, ¶9).

2.    The ambient air in parts or all of at least seven Utah counties also fails to meet the

federal, health-based limit for ozone.  The counties that do not meet the 8-hour, 0.070

parts per million ozone standard include Weber, Davis, Salt Lake, Utah, Toole, Duchesne

and Daggett.  Dkt. 49 (Complaint, ¶13), Dkt. 85 (Answer, ¶9).

3.    $NO_x$ (oxides of nitrogen) is a significant contributor to $PM_{2.5}$ and ozone after it is

discharged into the atmosphere and reacts with other gases.  Dkt. 49 (Complaint, ¶14),

Dkt. 85 (Answer, ¶10).

4.    The U.S. EPA has also found that diesel exhaust is "likely to be carcinogenic to

humans." U.S. EPA, 2002. Health Assessment Document for Diesel Engine Exhaust,

*https://cfpub.epa.gov/si/si_public_record_report.cfm?dirEntryId=29060&simple*

*Search=1&searchAll=diesel.*   Dkt. 49 (Complaint, ¶14), Dkt. 85 (Answer, ¶10).

5.    According to the California Air Resources Board ("CARB"), "[a]lmost all of the diesel

particle mass [in diesel exhaust] is in the fine particle range of 10 microns or less in

diameter ($PM_{10}$). Approximately 94 percent of the mass of these particles are less than

2.5 microns in diameter. Because of their small size, these particles can be inhaled and a

portion will eventually become trapped within the small airways and alveolar regions of

the lung."  CARB Report on Diesel Exhaust, April 22, 1998, available at:

*http://www.arb.ca.gov/toxics/dieseltac/de-fnds.htm*.  Dkt. 49 (Complaint, ¶17), Dkt. 85

(Answer, ¶13).

6.    An August 2013 study conducted by the University of Utah and Davis County showed that an increase in opacity of emissions (density of smoke) from diesel vehicles is directly correlated to a significant increase in fine particulate matter.  For diesel vehicles that failed the Davis County opacity test, for example, the emission of particulate matter in the 1.0 - 2.0 micron range was *100 times that of the diesel vehicles that passed the test.*  Davis County Summary of Particulate Matter Testing, 2003. Dkt. 58, ¶15, p. 15 of 25, Dkt. 65, ¶15, p.23 of 46.

7.    According to UDEQ [Utah Department of Environmental Quality], "Ozone affects the lungs and respiratory system in many ways. Exposure can lead to increased school or work absences, visits to doctors and emergency rooms, and hospital admissions. Research also indicates that ozone exposure can increase the risk of premature death from heart or lung disease." See, *http://www.deq.utah.gov/Pollutants/O/ozone/ozonehealth.htm.*  Dkt. 49 (Complaint, ¶20), Dkt. 85 (Answer, ¶16).

8.    The efforts of Dr. Jones, a professional endocrinologist and educator at the University of Utah, to improve reproductive health and in utero development in the state are harmed by high levels of air pollution.  According to Dr. Jones,

> We have shown that the sperm quality of men in the Wasatch Front decreases after an episode of high levels of particulate pollution.  We also know that poor air quality is associated with increased rates of miscarriage.  Even short term exposure in utero has an adverse effect on the developing child.  This has been proven in laboratory animals as well as humans.  My efforts to improve the chances of women to have children, and for those children to be healthy, are being harmed by high levels of air pollution in the Wasatch Front.

Dkt. 58, ¶16, p. 9 of 25, Dkt. 65, p. 14 of 46.

9.    Plaintiff's members suffer adverse health effects from elevated air pollution in the Wasatch Front and exposure to diesel exhaust. 374 F. Supp. 3d at 1132.

10.    Some of Plaintiff's members are deterred from engaging in outdoor recreational activities due their concerns about fine particulate matter pollution.  374 F. Supp. 3d at 1132.

11.    Plaintiff's members suffer from elevated, unhealthful levels of ozone.  Dkt. 49 (Complaint, ¶20), Dkt. 85 (Answer, ¶16).

12.    Defendants' excess emissions contribute nitrous oxides (NOx) and particulate matter (PM) into the air in the Wasatch Front, and NOx and PM pollution contributes to the types of injuries suffered by its Plaintiff's members in the Wasatch Front.  374 F. Supp. 3d at 1132.

## II.  Plaintiff's Proposed Conclusions of Law

In this Clean Air Act citizen suit, the Plaintiffs, Utah Physicians for a Healthy Environment, Inc. ("Physicians") allege that defendants David Sparks ("Heavy D"), Joshua Stuart ("Redbeard") and Keaton Hoskins ("The Muscle"), and their related limited liability companies including B&W Auto LLC and Diesel Power Gear LLC ("DPG"), violated Clean Air Act Section 203(a)(3)(A) and (B), 42 U.S.C. § 7522(a)(3)(A) and (B), and Utah SIP Regulation R307-201-2, 40 C.F.R. § 52.2320(c)(59), by removing pollution control devices from diesel vehicles, selling and installing pollution control defeat parts, and selling defeat parts installed in vehicles.  Plaintiff's amended complaint also alleges defendants DPG, David Sparks and Keaton Hoskins violated Utah SIP Regulation R307-201-2 by owning and/or operating vehicles in Utah (registered or that should have been registered) without their required pollution control equipment installed and operational.

The Court has previously found that it has subject matter jurisdiction in this case and that Physicians have standing.  *Utah Physicians for a Healthy Env't v. Diesel Power Gear LLC*, 374 F. Supp. 3d 1124, 1130 and 1137 (D. Utah 2019).  In that same ruling, the Court established a

number of violations.  Now, after a bench trial, the court has found additional violations and is
ordering declaratory, injunctive, and civil penalty relief to remedy the violations and to deter
future violations.

### A.     Applicable Provisions of Clean Air Act and Utah SIP

The Clean Air Act (or the Act), EPA regulations, and the Utah SIP prohibit removing or
tampering with motor vehicle emission control devices, selling parts that disable emission
control devices, and operating tampered vehicles.  Specifically, the Act and EPA regulations[1]
prohibit:

- any person knowingly[2] to remove or render inoperative any [] device or element of design
  [installed on or in a motor vehicle or motor vehicle engine in compliance with regulations
  under this subchapter] after [the vehicle's] sale and delivery to the ultimate purchaser;
  and

- any person to manufacture or sell, or offer to sell, or install, any part or component
  intended for use with, or as part of, any motor vehicle or motor vehicle engine, where a
  principal effect of the part or component is to bypass, defeat, or render inoperative any
  device or element of design installed on or in a motor vehicle or motor vehicle engine in
  compliance with regulations under this subchapter, and where the person knows or
  should know that such part or component is being offered for sale or installed for such
  use or put to such use.

---

[1] 42 U.S.C. § 7522(a)(3)(A) and (B) and 40 C.F.R. § 86.1854-12(a)(3)(i) and (ii) read identically,
and are incorporated herein by reference.

[2] "Knowingly" in this context means "voluntarily and intentionally, and not by mistake or
accident."  United States v. Mac's Muffler Shop, Inc., 1986 U.S. Dist. LEXIS 18108; 25 ERC
(BNA) 1369 (N.D. Ga. 1986); United States v. Haney Chevrolet, Inc., 371 F. Supp. 381, 384
(M.D. Fla. 1974).

Moreover, the Utah SIP prohibits any person from owning or operating a motor vehicle registered in Utah if any emission control system or device has been disabled. The Utah SIP also prohibits disabling emission control systems or devices:

> Any person owning or operating any motor vehicle or motor vehicle engine registered in the State of Utah on which is installed or incorporated a system or device for the control of crankcase emissions or exhaust emissions in compliance with the Federal motor vehicle rules, shall maintain the system or device in operable condition and shall use it at all times that the motor vehicle or motor vehicle engine is operated. No person shall remove or make inoperable within the State of Utah the system or device or any part thereof, except for the purpose of installing another system or device, or part thereof, which is equally or more effective in reducing emissions from the vehicle to the atmosphere.[3]

All of these prohibitions against tampering and the advertisement, sale and installation of defeat parts are emission standards or limitations, as defined by Clean Air Act at 42 U.S.C § 7604(f) and 42 U.S.C. § 7602(k), because they limit the quantity, rate, or concentration of emissions of air pollutants on a continuous basis by prohibiting persons from removing or defeating emission control devices and elements of design that reduce emissions on a continuous basis and are required to remain operational in a vehicle at all times. The anti-tampering and anti-defeat prohibitions are also requirements relating to the operation or maintenance of vehicles to assure continuous emission reduction, and are design, equipment, work practice and operational standards. Utah SIP Regulation R307-201-2 also is an emission standard or limitation because it relates to both the operation and maintenance of motor vehicles in Utah to assure continuous emission reductions.

---

[3] Utah Admin. Code R307-201-2. This section has been approved by EPA as part of Utah's SIP to implement the Clean Air Act, and is therefore federally-enforceable ("Utah SIP Regulation R307-201-2"). 40 C.F.R. § 52.2320(c)(59), 71 Fed. Reg. 7679 (February 14, 2006). R307-201-2 was subsequently renumbered after its inclusion into the Utah SIP, and exists as a matter of state law at Utah Admin. Code R307-201-4. *See https://rules.utah.gov/publicat/code/r307/r307-201.htm.*

B.     **Applicable Declaratory Relief**

28 U.S.C. § 2201(a) empowers the court to "declare" the type and number of Defendants'

violations of the Utah SIP and Clean Air Act and related regulations.  Furthermore, 28 U.S.C. §

2202 provides that the court may grant "further necessary or proper relief based on a declaratory

judgment or decree … after reasonable notice and hearing, against any adverse party whose

rights have been determined by such judgment."

C.     **Applicable Injunctive Relief**

A core purpose of the Clean Air Act is "to protect and enhance the quality of the Nation's

air resources so as to promote the public health and welfare and the productive capacity of its

population."  42 U.S.C. § 7401(b).  In Clean Air Act citizen suits brought to protect and enhance

the nation's air, the Court is authorized to order injunctive relief and other equitable remedies to

address a defendants' violations.  42 U.S.C. § 7604(a) ("The district courts shall have

jurisdiction... to enforce such an emission standard or limitation, or such an order… as the case

may be, and to apply any appropriate civil penalties[.]")

When considering injunctive relief to address a defendant's violations, a court evaluates

whether: "(1) [the plaintiff] has suffered irreparable injury; (2) . . . remedies available at law,

such as monetary damages, are inadequate to compensate for the injury; (3) . . . considering the

balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and

(4) . . . the public interest would not be disserved by a permanent injunction.  *eBay Inc. v.*

*MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).

In addition to the *eBay* factors, an "injunction must be tailored to remedy specific harm

shown,"  *Rogers v. Scurr*, 676 F.2d 1211, 1214 (8th Cir. 1982) and be "no more burdensome

than necessary to provide complete relief to the plaintiffs."  *Califano v. Yamasaki*, 442 U.S. 682,

-25-

702 (1979).

When the action involves the enforcement of a "public interest statute, a court places 'extraordinary weight … upon the public interests' because the 'suit involve[es] more than a mere private dispute.'" *United States v. Ameren Missouri*, No. 4:11-cv-00077-RWS, 2019 WL 4751941, at *62-63 (E.D. Mo. Sep. 30, 2019) (*quoting United States v. Marine Shale Processors*, 81 F.3d 1329, 1359 (5th Cir. 1996) (citing *Virginia Ry. V. Sys. Fed'n No. 40, AFL*, 300 U.S. 515, 552 (1937)).  According to the court in *Ameren*,

> Additionally, where an injunction will remediate environmental harm, courts have considered '(1) whether the proposal 'would confer maximum environmental benefit,' (2) whether it is 'achievable as a practical matter,' and (3) whether it bears 'an equitable relationship to the degree and kind of wrong it is intended to remedy.' *United States v. Deaton*, 332 F.3d 698, 714 (4th Cir.2003) (quoting a standard articulated in *United States v. Cumberland Farms of Conn., Inc.*, 826 F.2d 1151, 1164 (1st Cir. 1987) and echoed in *United States v. Sexton Cove Estates, Inc.*, 526 F.2d 1293, 1301 (5th Cir. 1976)).

*Id.*

Accordingly, in a Clean Air Act mobile source enforcement action, a defendant can be permanently enjoined from removing any further emission control devices or advertising, selling or installing any further emission control defeat parts.  "The courts have an obligation, once a violation of the [law] has been established, to protect the public from a continuation of the harmful and unlawful activities." *United States v. Parke, Davis and Company,* 362 U.S. 29, 48 (1960).

A defendant found in violation of the Clean Air Act also can be required to remediate or offset the past, present and future excess emissions caused by its past violations.  *See id.*, 2019 WL 4751941, at *74 (finding that simply requiring the installation of pollution controls at a violating plant will not redress past harm, the *eBay* factors require the installation of controls at another of the company's plants); *see also U.S. v. Volvo Powertrain Corp.*, 758 F.3d 330, 335

-26-

(D.C. Cir. 2014) (Under court-approved consent decree, to "offset excess $NO_x$ emissions caused by the alleged violations, the manufacturers [] agreed to comply with certain EPA emissions standards earlier than EPA regulations otherwise required.").

A defendant can also be ordered to bear the expense of restoration projects. *See United States Tribe v. Hubenka*, No. 10-cv-93-J, 2014 WL 12634287, at *19 (D.Wyo. Oct. 22, 2014). In this Clean Water Act case the Court ordered*,*

> the defendant to ***bear the expense of restoring*** the environment and removing the dikes in this case[.]…. The Clean Water Act contemplates that a restorative injunction may be considered as an appropriate remedy for violations of the Act…. Imposition of restoration is an inherent part of the injunctive relief contemplated by the Act and is within this Court's equitable jurisdiction.  The objective of the Act is to 'restore and maintain the chemical, physical, and biological integrity of the Nation's waters[.]'  33 U.S.C. § 1251(a).  *See also United States v. Telluride Co.*, 146 F.3d 1244, 1245-1246 (10th Cir. 1998).  []  In evaluating remediation or restoration proposals, courts consider three factors: (1) whether the proposal would confer maximum environmental benefits; (2) whether it is achievable as a practical matter; and (3) whether it bears an equitable relationship to the degree and kind of wrong it is intended to remedy.  [Cites omitted.]"

(Emphasis added.)  *See also United States v. Tull,* 615 F. Supp. 610, 627 (E.D. Va. 1983)*, aff'd,* 769 F.2d 182 (4th Cir. 1985)*, rev'd on other grounds,* 481 U.S. 412 (1987) (In Clean Water Act case the district court required restoration of wetlands damaged by defendant).

Finally, a defendant can be ordered to finance a remedial or mitigation fund to address past and ongoing harms caused by a defendant's violations.  *See Public Interest Research Group of New Jersey, Inc. v. Powell Duffryn Terminals Inc.*, 913 F.2d 64, n. 19 (3rd Cir. 1990) ("[A] court may fashion injunctive relief requiring a defendant to pay monies into a remedial fund, if there is a nexus between the harm and the remedy."); *see also* United States' [] Memorandum in Support of Entry of Partial Consent Decree, *In re Volkswagen "Clean Diesel" Marketing, Sales Practices, and Products Liability Litigation*, Case No. 3:15-md-02672-CRB, Dkt. #1973 at 22 (N.D.Ca. Sep. 30, 2016) (creation of "Environmental Mitigation Trust" to mitigate past and

future excess VW NO$_x$ emissions.)

### D. Appropriate Civil Penalty Relief

1. <u>Maximum Penalty Values</u>

Applying the "top down" approach to the determination of a civil penalty, the maximum

statutory penalty for each violation must first be determined.  See *infra*, Section II.E.  The Clean

Air Act provides that any person, "other than a manufacturer or dealer," who violates 42 U.S.C.

§ 7522(a)(3)(A) and (B), "shall be subject to a civil penalty of not more than $2,500."  42 U.S.C.

§ 7524(b).  By regulation, 40 C.F.R. § 19.4, Tables 1 and 2, this value has been escalated to

$3,750 for each violation that occurred between January 13, 2009 and November 2, 2015, and up

to $4,735 for each violation after November 2, 2015 if assessed after February 6, 2019.  For

violations of the Utah SIP, this Court is authorized to assess a civil penalty of not more than

$25,000 per day.  42 U.S.C. § 7413(b).  This value has also been escalated by 40 C.F.R. § 19.4,

such that SIP violations are subject to a civil penalty of up to $37,500 for each violation that

occurred between January 13, 2009 and November 2, 2015, and up to $99,681 for each violation

after November 2, 2015 if assessed after February 6, 2019.

2. <u>Each Removal of a Device or Element of a Design, and Each Action to Bypass, Defeat,
or Render Inoperative a Device or Element of Design Should Be Penalized.</u>

   a. *The Court Should Assess Civil Penalties for the Number of Violations Each
Defendant Is Found Liable for Causing.*

The Court should assess a civil penalty for each violation the Defendants have

committed.  *See United States v. Mac's Muffler Shop*, 1986 WL 15443 at *8 (N.D. Ga. 1986)

("[B]oth Mac's and Mr. McKinney are liable for each of the fourteen catalytic converter

removals as to which liability is admitted….").  Does the removal of each device or element of

design in a motor vehicle in violation of 42 U.S.C. § 7522(a)(3)(A) constitutes a separate offence

-28-

within the meaning of 42 U.S.C. § 7524(a)?  This question is answered by the plain language of these two provisions as shown below.

     b.     *The Removal of Each Device or Element of Design is a Separate Violation.*

42 U.S.C. § 7522(a)(3)(A) states:

(a) Enumerated prohibitions.  The following acts and the causing thereof are prohibited—

(3)(A) . . . for any person knowingly to remove or render inoperative any [] device or element of design [installed on or in a motor vehicle or motor vehicle engine in compliance with regulations under this subchapter] after [the vehicle's] sale and delivery to the ultimate purchaser . . .

42 U.S.C. § 7524(a) states, in pertinent part:

(a) Violations

**. . .** Any person other than a manufacturer or dealer who violates section 7522(a)(3)(A) of this title or any person who violates section 7522(a)(3)(B) of this title shall be subject to a civil penalty of not more than $2,500. Any such violation with respect to paragraph [] (3)(A) [] of section 7522(a) of this title shall constitute a separate offense with respect to each motor vehicle or motor vehicle engine.

Because § 7522(a)(3)(A) defines a violation as the removal of any device or element of design in a motor vehicle, and because § 7524(a) subjects any person who violates § 7522(a)(3)(A), i.e., any person who removes any device or element of design, to a penalty of up to $2,500, each device or element of design removed from a motor vehicle "constitute[s] a separate offense with respect to each motor vehicle."

     c.     *The Advertisement, Sale and/or Installation of Each Defeat Part or Component Constitutes a Separate Violation.*

42 U.S.C. § 7522(a)(3)(B) states:

(a) Enumerated prohibitions.  The following acts and the causing thereof are prohibited—

(3)(B) for any person to manufacture or **s**ell, or offer to sell, or install, any part or

-29-

component intended for use with, or as part of, any motor vehicle or motor vehicle engine, where a principal effect of the part or component is to bypass, defeat, or render inoperative any device or element of design installed on or in a motor vehicle or motor vehicle engine in compliance with regulations under this subchapter, and where the person knows or should know that such part or component is being offered for sale or installed for such use or put to such use.

42 U.S.C. § 7524(a) states, in pertinent part:

(a) Violations

. . . Any person other than a manufacturer or dealer who violates [] section 7522(a)(3)(B) of this title or any person who violates section 7522(a)(3)(B) of this title shall be subject to a civil penalty of not more than $2,500. [].  Any such violation with respect to section 7522(a)(3)(B) of this title shall constitute a separate offense with respect to each part or component.

As with § 7522(a)(3)(A) removal violations, the calculation of separate § 7522(a)(3)(B)

violations subject to a penalty pursuant to § 7524(a) is determined by the plain language of these

two provisions.

Because § 7522(a)(3)(B) defines a violation as the advertisement, sale and/or installation

of any part or component where a principal effect of the part or component is to bypass, defeat,

or render inoperative any device or element of design, and because § 7524(a) subjects any person

who violates § 7522(a)(3)(B), i.e., any person who advertises, sells and/or installs any such part

or component, to a penalty of up to $2,500, each part or component advertised, sold and/or

installed "constitute[s] a separate offense with respect to each part or component."

3.    The Civil Penalty Assessed Should Deter Future Violations

Where the facts of a case show the need for both specific and general deterrence, as here,

using the maximum penalty approach supports Congress' intent to deter.  In *Tull v. United*

*States*, 481 U.S. 412, 422-23 (1987), for example, the Supreme Court noted the Clean Water

Act's creation of maximum civil penalties "to further retribution and deterrence clearly

-30-

evidences … more than a concern to provide equitable relief."  Congress's establishment of

maximum civil penalties under the Clean Air Act have the same purpose.  *See Pound*, 498 F.3d

at 1094 n. 2 ("The penalty provisions of the CAA and the Clean Water Act (CWA) are virtually

identical; thus, CWA cases are instructive in analyzing issues arising under the CAA").

     As a consequence, in penalizing Clean Air Act violations, courts have "give[n] effect to

the major purpose of a civil penalty: deterrence."  *Mac's Muffler Shop*, 1986 WL 15443 at *8.  In

*Mac's Muffler Shop*, the court continued,

> Civil penalties are imposed 'first, to discourage the offender himself from
> repeating his transgression; and second, to deter others from doing likewise.'
> [Cites omitted.]  They 'should be large enough to hurt, and to deter anyone in the
> future from showing as little concern as [the defendant] did for the need to
> [comply].'  [Cites omitted.][4]

     In this case, because defendants have their own nationally-broadcast television show and

millions of followers on social media, the need for general deterrence is paramount.

- https://go.discovery.com/tv-shows/diesel-brothers/

- https://www.facebook.com/Heavydsparks/

- https://www.facebook.com/TheMuscleOfDieselSellerz/

- https://www.facebook.com/redbearddiesel/

*U.S. v. LeCarreaux*, No. 90-1672 (HLS), 1992 WL 108816, at *15 (D.N.J. Feb. 19, 1992) (The

court stated, in assessing the civil penalty in a CERCLA case, that "the deterrent effect on other

members of the CERCLA-regulated community is critically important in assessing a civil

---

[4] *See also United States v. A.A. Mactal Construction Co., Inc.*, No. 89–2372–V, 1992 WL
245690, at *1-2 (D. Kan. Apr. 10, 1992) ("[I]n order for civil penalties to serve a deterrent
function, the amount of the penalty must be high enough to ensure that there is no incentive for
violators to simply absorb the penalty as a cost of doing business.  In addition, the probability
that a significant penalty will be imposed must be high enough so that non-compliance results in
a substantial monetary risk for the violator.").

penalty.  Even if the defendants in this case are not in a position to repeat the violations, a

substantial penalty is warranted to deter others."

> **E.**    **The Court Should Assess the Civil Penalty by Starting with the Statutory Maximum and then Determine If Any Reduction is Warranted Based on the Statute's Penalty Mitigation Factors**

The Clean Air Act at 42 U.S.C. § 7524(b), provides the factors the Court is to "take into

account" in the assessment of a civil penalty for § 7522 violations.

> [T]he court shall take into account the gravity of the violation, the economic benefit or savings (if any) resulting from the violation, the size of the violator's business, the violator's history of compliance with this subchapter, action taken to remedy the violation, the effect of the penalty on the violator's ability to continue in business, and such other matters as justice may require.

The Clean Air Act at § 7413(e), requires similar considerations, along with the duration of the

violation, in assessing penalties for violation of the Utah SIP.

According to the Tenth Circuit, in assessing penalties under the Clean Air Act, courts

"generally presume that the maximum penalty should be imposed." *Pound v. Airosol Company,*

*Inc.*, 498 F.3d 1089, 1095 (2007).  Using this "top down" approach, courts then use the statutory

factors cited above to determine "what degree of mitigation, if any, is proper." *Id*.  Moreover,

the burden of showing that a civil penalty would have a detrimental effect on the violator's

business rests with the violator.  *See, e.g., Pub. Int. Res. Grp. of New Jersey, Inc. v. Powell*

*Duffryn Terminals, Inc.,* 720 F. Supp. 1158, 1166 (D.N.J. 1989)*, aff'd in part and rev'd in part,*

913 F.2d 64 (3rd Cir.1990) (([CWA case] concluding that defendant had 'failed to demonstrate

that assessing a severe penalty would jeopardize defendant's continued operation').

> 1.    *Statutory Penalty Factor 1: Gravity*

As the court pointed out in *Mac's Muffler Shop*, 1986 WL 15443 at *9, the first factor

considered in assessing a civil penalty, injury to the public, does not require proof of actual

injury to identifiable individuals, for civil penalties are not 'tied to damages actually suffered.'
[Cite omitted.] …. In that case, that also involved violations of motor vehicle emission control
standards, defendants' removal of emission control devices "constituted injury to the public *per
se*." *Id*. The court added:

> [M]ost environmental statutes, like the one involved here, do not require proof of actual
> injury, because 'numerous polluters contribute to an environmental harm like the
> pollution of rivers. It is not possible to divide up the general harm and allocate shares to
> particular polluters.' [Cite omitted.]…. The evidence shows that defendants' violations
> have resulted in injury to the environment and increased risk to public health. Catalytic
> converters reduce emissions of hydrocarbons, carbon monoxide and nitrogen oxides.
> These substances can cause serious respiratory and circulatory problems, especially to
> infants, children and persons sensitive to respiratory irritants.

In *Pound*, the Tenth Circuit rejected the district court's determination that the defendants'

Clean Air Act violations were not serious because there was no evidence of "measurable injury

to the environment of the public." 498 F.3d at 1099. Instead, noting "the difficulty in measuring

these types of harm," the Court found persuasive the reasoning in *Pub. Interest Research Group

of New Jersey, Inc. v. Powell Duffryn Terminals, Inc,* 913 F.2d 64 at 79, which held violations

need only pose a risk or potential risk of environmental harm to warrant a penalty. This is

particularly true, according to the Court in *Pound*, where Congress has prohibited the

presumptively harmful conduct in the Clean Air Act outright. *Id.*

Here, tampering with motor vehicle pollution controls is prohibited for good reason. In

creating the Clean Air Act, Congress found, in part, that "the increasing use of motor vehicles…

has resulted in mounting dangers to the public health and welfare." 42 U.S.C. § 7401(a)(2).

"Diesel engines emit nitrous oxides ("NOx"), non-methane hydrocarbons, and particulate matter

("PM"), all of which are harmful to the environment and human health." *National

Petrochemical & Refiners Ass'n v. E.P.A.*, 287 F.3d 1130, 1134 (D.C. Cir. 2002). $NO_x$ is also a

significant contributor to $PM_{2.5}$ and ozone after it is discharged into the atmosphere and reacts

with other gases.  The U.S. EPA has also found that diesel exhaust is "likely to be carcinogenic

to humans."  U.S. EPA, 2002, Health Assessment Document for Diesel Engine Exhaust,

*https://cfpub.epa.gov/si/si_public_record_report.cfm?dirEntryId=29060&simpleSear=1&search*

*All=diesel.*[5]

    2.    *Statutory Penalty Factor 2: Economic Benefit*[6]

  This factor must encompass every benefit that defendants received from violation of the

law.  *Mac's Muffler Shop*, 1986 WL 15443 at **10 ("This element is not necessarily limited to

defendants' monetary profit from the violation, but must encompass ***every benefit*** that

defendants received from violation of the law.")(emphasis added).  Thus, in *Mac's Muffler*, the

court found that the Defendant's direct earnings from removing catalytic converters from cars

"did not include the indirect benefits such as the 'good will' derived by the defendants in

"accommodating" customers in violation of the law."); *see also Vista Paint Corp. II,* 1996 WL

477053 at *15 ("Vista received significant economic benefit from its violations… by avoiding

the cost of eliminating the sale of non-compliant coatings, including nonsalability of any

inventory of non-compliant paint in stock.  It also avoided the manufacturing and marketing

costs of switching certain of its brands to a compliant coating status.")

    "[A]ny profits realized through the sale, or offer of sale, of a prohibited product ought to

be included when assessing the economic benefit of a CAA violation, the rationale being that one

---

[5] *See also U.S. v. Volvo Powertrain Corp.*, 758 F.3d 330, 335 (D.C. Cir. 2014) (Noting that $NO_x$ is a precursor to $PM_{2.5}$ and stating that: "[E]levated levels of fine particulate matter have been linked to 'adverse human health consequences such as premature death, lung and cardiovascular disease, and asthma.'  *Catawba Cnty. v. EPA,* 571 F.3d 20, 26 (D.C.Cir. 2009).").

[6] This penalty factor is listed as the same under the Clean Water Act, 33 U.S.C. § 1319(d), while under the Clean Air Act, 42 U.S.C. § 7413(e)(1), this factor is listed as "the economic benefit of noncompliance[.]"

ought not to profit from one's wrongful conduct." *Pound,* 498 F.3d at 1099-1100 ("'[P]recise economic benefit to a polluter may be difficult to prove,' *Powell,* 913 F.2d at 80. Given this reality, we acknowledge that there are 'methods other than the delayed or avoided capital expenditure for ascertaining economic benefit,' *Municipal Authority of Union Township,* 150 F.3d at 266…. [E]ven if we assume, *arguendo,* that there is no reasonable means to measure Airosol's economic benefit of noncompliance, it follows that there would be insufficient evidence to mitigate the imposition of a penalty on this basis, and not, as Airosol suggests, that it should not be penalized at all.").

   "[E]conomic benefit should serve as the floor below which the maximum civil penalty should not be mitigated." *A.A. Mactal Constr. Co.*, 1992 WL 245690 at *3-4 (The District of Kansas found that the "significance of including this factor is that unless the violator is fined an amount at least as great as the economic gain it enjoyed in not complying with the regulation, the statute serves little deterrent value." Even though the Court found the defendant to "have a very limited ability to pay", it reduced the maximum penalty to the economic benefit amount.); *see also Gulf Park,* 14 F.Supp.2d at 862-64 ("In order for the penalty to serve the purpose of deterrence, it should exceed the economic benefit enjoyed by the defendants. *See Student PIRG of N.J. v. Monsanto,* 29 Env't Rep. Cas. (BNA), 1078, 1090 (D.N.J.1988) (some additional penalty over and beyond the economic benefit should be imposed to discourage other and future violations). In *Municipal Authority of Union Township,* 929 F. Supp. at 806, the court noted that without imposing a penalty exceeding economic benefit, 'those regulated by the Clean Water Act would understand that they have nothing to lose by violating it.'…. [T]he Court must endeavor to reach a 'rational estimate of [the violator's] economic benefit, *resolving uncertainties in favor of a higher estimate.'* [Cite omitted.]")

3.    *Statutory Penalty Factor 3: The Size of the Violator's Business*[7]

This factor is related to the sixth factor, "the effect of the penalty on the violator's ability to continue in business."  In *Pound,* 498 F.3d at 1098, the Tenth Circuit remanded the case to the district court to consider "the size of [defendant] Airosol's business."

*In United States v. Vista Paint Corp.* (*Vista Paint Corp. II*), 1996 WL 477053, at *12, the district court considered the two factors "size of the business and the economic impact of civil penalties on Vista's business (sometimes characterized collectively as the 'ability to pay')… [as] inextricably interrelated." *Id.* at *8, *12.  The court then went on to note that, "Vista is an expanding business with increasing annual gross sales revenues in the range of 45 to 47 million dollars annually.  It has a healthy financial structure with considerable assets and net worth, [and] annual net income."  *Id.*

4.    *Statutory Penalty Factor 4: The Violator's History of Compliance with this Subchapter*[8]

In *Pound*, 498 F.3d at 1098, the Tenth Circuit remanded to the district court to take into account the defendant's history of compliance, including that the defendant had failed to comply prior to the litigation, had been aware of the regulation but failed to comply, and continued to violate the law after the district court found its activity violative.

Willful or deliberate violations warrant penalties at the maximum prescribed.  *Mac's*

---

[7] This penalty factor is not included under the Clean Water Act, 33 U.S.C. § 1319(d), while under the Clean Air Act 42 U.S.C. § 7413(e)(1), this factor is listed as "the size of the business[.]"

[8] The Court in *Mac's Muffler Shop* considered "the good or bad faith of the defendant in violating the [law]" as one of the civil penalty factors.  1986 WL 15443 at *8.  While under Clean Air Act 42 U.S.C. § 7413(e)(1) one of the enumerated penalty factors is "the violator's full compliance history and good faith efforts to comply."  CWA 33 U.S.C. § 1319(d) lists "any history of such violations, [and] any good-faith efforts to comply with the applicable requirements," as factors.  Therefore, the good or bad faith of the defendant in violating the law is relevant to the "violator's history of compliance with this subchapter" penalty factor under 42 U.S.C. § 7524(b).

*Muffler Shop*, 1986 WL 15443 at *9-10 ("Where a violation is willful or deliberate, however, there is bad faith per se, [cite omitted], and willful or reckless disregard of the law warrants a penalty 'at or near the maximum prescribed.' [Cite omitted.]").  *See also Vista Paint Corp. II,* 1996 WL 477053 at *12 (In considering this factor, the court found that the Defendant "knowingly and intentionally violated federal law," and that "such non good faith conduct supports a substantial penalty.*")*.

   5. *Statutory Penalty Factor 5: Action Taken to Remedy the Violation*[9]

   A defendant's failure to remedy the violation and continued demonstration not to comply "weighs heavily in favor of imposing a substantial penalty."  *See Hubenka*, No. 10-CV-93-J, 2014 WL 12634287, at *24-25 (D. Wyo. Oct. 22, 2014).

   6. *Statutory Penalty Factor 6: The Effect of the Penalty on the Violator's Ability to Continue in Business.*[10]

   In evaluating this factor, courts will consider the assets of the business, assets of individually liable owners, and the earning and borrowing capacity of the business.  *See Mac's Muffler Shop*, 1986 WL 15443 at *1, *5, *9 (Although the Defendant muffler shop had limited assets, the court considered the owner's assets in concluding that "the penalty assessed by the Court is well within defendants' ability to pay."); *United States v. Gulf Park Water Co. Inc.,* 14 F. Supp. 2d 854, 869 (S.D. Miss. 1998) (Business entity had "a cash flow problem," but court looked to the owner's assets in considering the Defendants' ability to pay); *Vista Paint Corp. II,* 1996 WL 477053 at *12 (Vista's "*earning capacity and borrowing capacity* are such that the

---

[9] This penalty factor is not listed under CWA 33 U.S.C. § 1319(d), nor Clean Air Act 42 U.S.C. § 7413(e)(1).

[10] Under CWA 33 U.S.C. § 1319(d), this penalty factor is listed as "the economic impact of the penalty on the violator."  Under Clean Air Act 42 U.S.C. § 7413(e)(1), this factor is listed as "the economic impact of the penalty on the business."

total civil penalties the Court adjudicates against it in this case will not undermine its financial structure and place it in jeopardy of 'going out-of-business.'  Vista is capable of paying the penalties which will be ordered by the Court.  The Court concludes that those two factors [size of business and economic impact] do not support a non substantial civil penalty."  (Emphasis added.)).

As mentioned above, the Defendants have the burden of proof on all mitigating factors, including ability to pay, and as to this factor, courts have ruled that Defendants must show that "a penalty will have a ruinous effect."  *See U.S. v. Mountain State Carbon, LLC*, No. 5:12-CV-19, 2014 WL 3548662, at *35 (N.D.W. Va. Jul. 17, 2014) ("Where a violator cannot show that a penalty will have a ruinous effect, the economic impact factor under [Clean Water Act] Section 309(d) will not reduce the penalty.  *United States v. Gulf Park Water Co., Inc.,* 14 F.Supp.2d 854, 868 (S.D.Miss.1998).").

Indeed. courts will assess penalties, even if Defendants attempt to "create the appearance that [they do] not have the financial wherewithal to satisfy any penalty."  *See Hubenka*, 2014 WL 12634287 at *26 ( (In this Clean Water Act case, the court stated: "the evidence adduced during trial, even giving due to consideration to his myriad efforts to engage in somewhat questionable real estate transaction[s], demonstrates Hubenka seeks to preclude satisfaction of a penalty, evade his responsibilities and create the appearance that he does not have the financial wherewithal to satisfy any penalty.  He has sold and re-sold real property; he has transferred property between himself, his wife, and other entities.  The stated goals in imposing a civil penalty include retribution and deterrence.  Any penalty imposed should be sufficient to deter future violations and exact retribution in some small part, particularly in view of the continuing and flagrant violations over a long period of years.").

-38-

    7.     *Statutory Penalty Factor 7:* <u>Such Other Matters as Justice May Require</u>

The court may consider evidence of other violations and the systemic nature of the violations as an aggravating consideration in the penalty assessment.  *See Mac's Muffler Shop*, 1986 WL 15443 at *n.1 ("The systematic nature of defendants' violations is obviously relevant to determining defendants' good or bad faith in violating the law as well as eliminating the benefits received by defendants from this course of conduct.")

**F.    Civil Penalties Can Be Used for Beneficial Mitigation Projects under 42 U.S.C. § 7604(g)(2).**

42 U.S.C. § 7604(g)(2) states that:

[T]he court in any action under this subsection to apply civil penalties shall have discretion to order that such civil penalties, in lieu of being deposited in the fund referred to in paragraph (1) [to the United States Treasury], be used in beneficial mitigation projects which are consistent with this chapter and enhance the public health or the environment.  The court shall obtain the view of the Administrator in exercising such discretion and selecting any such projects.  The amount of any such payment in any such action shall not exceed $100,000.

The Tenth Circuit has found that "[t]he court, in its discretion, may designate a portion of the penalties to 'be used in beneficial mitigation projects which are consistent with this chapter and enhance the public health or the environment.'  § 304(g)(2).  *WildEarth Guardians v. Public Service Co. of Colorado*, 690 F.3d 1174, 1180, 1188 (10th Cir. 2012) ("[C]itizen suit provisions authorize courts to earmark up to $100,000 of any civil penalty they award to 'be used in beneficial mitigation projects which are consistent with this chapter and enhance the public health or the environment.'  Clean Air Act § 304(g)(2).")

### III. Application of [Draft] Conclusions of Law to [Preliminary] Findings of Fact

**A. Liability**

1. <u>Cause of Action 1 – Defendant B&W Violated the Utah SIP by Removing or Making Inoperable Emission Control Devices in Motor Vehicles in Utah.</u>

Under Utah SIP Regulation R307-201-2, no person shall remove or make inoperable within the State of Utah a system or device for the control of crankcase emissions or exhaust emissions from any motor vehicle or motor vehicle engine.  In its ruling on Physicians's motion for partial summary judgment, the Court found that between January 12, 2012 and January 10, 2017, B&W Auto violated R307-201-2 by removing or disabling emission control systems or devices from seven trucks within the State of Utah.  Dkt. 122, at 16.  At trial, Physicians established that B&W removed or disabled ____ emission control systems or devices in __ motor vehicles.

2. <u>Cause of Action 2 – Defendant Sparks Violated the Utah SIP by Removing or Making Inoperable Emission Control Devices in Motor Vehicles in Utah.</u>

Is Defendant Sparks personally liable for the seven violations of B&W found by Court at summary judgment?  Yes.  Mr. Sparks admitted in his Answer that he knew B&W Auto was knowingly removing emission control devices from certified diesel vehicles and that he both authorized and supervised B&W's removal actions.  He also admitted that he had the authority to stop B&W Auto, but he did not.  The evidence at trial confirmed that Sparks had personal knowledge of each of the seven vehicles addressed at summary judgment, as well as ____ other trucks from which B&W Auto removed or disabled emission control devices.  Accordingly, Mr. Sparks is jointly and severally liable with B&W Auto for removing _____ emission control devices in violation of R307-201-2.

3. <u>Cause of Action 3 – Dropped.</u>

4.  Cause of Action 4 – Defendant Hoskins Violated the Utah SIP by Removing or Making Inoperable Emission Control Devices in Motor Vehicles in Utah.

The court previously found at summary judgment that Defendant Hoskins violated R307-201-2 by removing or disabling _____ emission control systems or devices from two trucks within the State of Utah.  Dkt. 122, at 22.  At trial, it was shown that Mr. Hoskins removed an additional ___ emission control systems or devices.

5.  Cause of Action 5 – Defendant B&W Violated the Clean Air Act and Accompanying Regulations by Knowingly Removing Federally-Required Emission Control Devices on Certified Diesel Vehicles.

Clean Air Act Section 203(a)(3)(A), 42 U.S.C. § 7522(a)(3)(A), and 40 C.F.R. § 86.1854-12(a)(3)(i), make it illegal for any person knowingly to remove or render inoperative any device or element of design installed on or in a motor vehicle or motor vehicle engine in compliance with EPA regulations after the vehicle's sale and delivery to the ultimate purchaser. The Court previously found at summary judgment that B&W Auto had violated this prohibition, Dkt. 122, at 16, removing emission control devices and elements of design from seven trucks. At trial, Physicians proved that B&W Auto removed ___ devices and elements from the seven trucks, and an additional ____ devices and elements of design from an additional ___ trucks. Thus, B&W Auto has committed ___ violations of this prohibition.

6.  Cause of Action 6 – Defendant Sparks Violated the Clean Air Act and Its Accompanying Regulations by Knowingly Removing Federally-Required Emission Control Devices on Certified Diesel Vehicles.

Mr. Sparks admitted in his Answer that he knew B&W Auto was knowingly removing emission control devices from certified diesel vehicles and that he both authorized and supervised B&W's removal actions.  He also admitted that he had the authority to stop B&W Auto, but he did not.  The evidence at trial confirmed that Mr. Sparks had personal knowledge of each of the seven vehicles addressed at summary judgment, as well as of  ___ other vehicles from which B&W

-41-

removed or disabled emission control devices.  Accordingly, Mr. Sparks is jointly and severally

liable with B&W Auto for removing ___ emission control devices or elements of design in

violation of Clean Air Act Section 203(a)(3)(A), 42 U.S.C. § 7522(a)(3)(A), and 40 C.F.R.

§ 86.1854-12(a)(3)(i).

      7.     <u>Cause of Action 7 – Dropped.</u>

      8.  <u>Cause of Action 8 – Defendant Hoskins Violated the Clean Air Act and Its
Accompanying Regulations by Knowingly Removing Federally-Required Emission Control
Devices on Certified Diesel Vehicles.</u>

The court previously found at summary judgment that Defendant Hoskins violated Clean

Air Act Section 203(a)(3)(A), 42 U.S.C. § 7522(a)(3)(A), and 40 C.F.R. § 86.1854-12(a)(3)(i) by

knowingly removing or rendering inoperative emission control devices from two trucks.  Mr.

Hoskins removed at least <u>5</u> emission control devices from his 2009 Ford F-250 and at least <u>7</u>

devices from his 2013 Ford 350.  He also installed at least <u>5</u> defeat parts in these two trucks.  In

total, Hoskins committed ___ violations of this prohibition.  At trial Mr. Hoskins was shown to

have committed an additional ___ violations of this prohibition.

      9.  <u>Cause of Action 9 – Defendant DPG Violated the Clean Air Act and Its Accompanying
Regulations by Offering to Sell and/or Selling Aftermarket Defeat Parts.</u>

Clean Air Act Section 203(a)(3)(B), 42 U.S.C. § 7522(a)(3)(B), and 40 C.F.R. § 86.1854-

12(a)(3)(ii) make it illegal for any person to sell and/or offer to sell after aftermarket defeat parts.

In its ruling on Physicians' motion for partial summary judgment, the Court found that DPG

violated this prohibition with respect to 88 EGR delete kits.  Relevant to the calculation of a

penalty for the sale of these parts, 39 of the EGR delete kits were sold on or before November 2,

2015, and 49 were sold after November 2, 2015.  Dkt. 82-17.  At trial, Physicians proved that

DPG offered to sell and/or sold an additional ____ aftermarket defeat parts.

10.     Cause of Action 10 – Dropped.

11. Cause of Action 11 – Defendant Sparks Violated the Clean Air Act and Its
Accompanying Regulations by Offering to Sell and/or Selling Aftermarket Defeat Parts.

Clean Air Act Section 203(a)(3)(B), 42 U.S.C. § 7522(a)(3)(B), and 40 C.F.R. § 86.1854-

12(a)(3)(ii) make it illegal for any person to sell and/or offer to sell aftermarket defeat parts.  In

its ruling on Physicians' motion for partial summary judgment, the Court found that Sparks

violated this prohibition with respect to 88 EGR delete kits.

In his Answer, Mr. Sparks admitted that he knew DPG was offering to sell and selling

EGR delete kits, straight pipes and delete tunes.  Mr. Sparks admitted that he authorized such

activities.  Mr. Sparks admitted that he took no action to stop such activities until he received

Physicians' July 25, 2016 pre-suit notice letter.

At trial, Physicians confirmed that Sparks not only knew of DPG's sales of EGR delete

kits, but also DPG's advertisement and sale of exhaust delete pipes.  Consequently, Mr. Sparks is

jointly and severally liable with DPG by offering to sell and selling a total of _____ aftermarket

defeat parts in violation of 42 U.S.C. § 7522(a)(3)(B), and 40 C.F.R. § 86.1854-12(a)(3)(ii).

12. Cause of Action 12 – Defendant Stuart Violated the Clean Air Act and Its Accompanying
Regulations by Offering to Sell and/or Selling Aftermarket Defeat Parts.

Clean Air Act Section 203(a)(3)(B), 42 U.S.C. § 7522(a)(3)(B), and 40 C.F.R. § 86.1854-

12(a)(3)(ii) make it illegal for any person to sell and/or offer to sell aftermarket defeat parts.  In

its ruling on Physicians' motion for partial summary judgment, the Court found that Stuart

violated this prohibition with respect to 88 EGR delete kits.

For the reasons set forth in the Court's previous Summary Judgment Order, in addition to

the 88 EGR delete kits, Mr. Stuart is liable for offering to sell and/or selling additional

aftermarket defeat parts.  In sum, Mr. Stuart is jointly and severally liable with DPG for offering

to sell and/or selling a total of _____ aftermarket defeat parts in violation of 42 U.S.C. §

7522(a)(3)(B), and 40 C.F.R. § 86.1854-12(a)(3)(ii).

13.  <u>Cause of Action 13 – Defendant B&W Violated the Clean Air Act and Its Accompanying Regulations by Installing Aftermarket Defeat Parts in Vehicles and Engines.</u>

Clean Air Act Section 203(a)(3)(B), 42 U.S.C. § 7522(a)(3)(B), and 40 C.F.R. § 86.1854-

12(a)(3)(ii) make it illegal for any person to install any part or component intended for use with,

or as part of, any motor vehicle or motor vehicle engine, where a principal effect of the part or

component is to bypass, defeat, or render inoperative any device or element of design installed

on or in a motor vehicle or motor vehicle engine in compliance with EPA regulations, and where

the person knows or should know that such part or component is being installed for such use or

put to such use.  In its ruling on Physicians's motion for partial summary judgment, the Court

found that Defendant B&W had installed defeat parts in thirteen trucks.  ____ of those defeat part

installation violations occurred before November 3, 2015, ____ after.  Dkt. 122, at 16.  At trial,

Physicians established that B&W had installed an additional ____ defeat parts in an additional

_____ trucks.  Of those ____ additional violations, ____ occurred before November 3, 2015.

14.  <u>Cause of Action 14 – Defendant Sparks Violated the Clean Air Act and Its Accompanying Regulations by Installing Aftermarket Defeat Parts in Vehicles.</u>

Defendant Sparks is jointly and severally liable for Defendant B&W Auto's violations in

Cause of Action 13.  Mr. Sparks admitted in his Answer that he knew B&W Auto was installing

aftermarket defeat parts including straight pipes, EGR delete kits and delete tunes.  Mr. Sparks

admitted that he supervised such activities.  Mr. Sparks admitted that he authorized such

activities.  Mr. Sparks admitted that he took no action to stop such activities.

15.  <u>Cause of Action 15 – Dropped.</u>

16.     Cause of Action 16 - Defendant Hoskins Violated the Clean Air Act and Its
Accompanying Regulations by Installing Aftermarket Defeat Parts in Vehicles and Engines.

The court previously found at summary judgment that Defendant Hoskins violated Clean

Air Act Section 203(a)(3)(B), 42 U.S.C. § 7522(a)(3)(B), and 40 C.F.R. § 86.1854-12(a)(3)(ii)

by installing at least  5  aftermarket defeat parts in two trucks.  These violations occurred before

November 3, 2015.  At trial Mr. Hoskins was shown to have committed an additional ___

violations of this prohibition.

17.     Cause of Action 17 – Defendant B&W Violated the Clean Air Act and Its Accompanying
Regulations by Offering to Sell or Selling Vehicles with Aftermarket Defeat Parts.

Clean Air Act Section 203(a)(3)(B), 42 U.S.C. § 7522(a)(3)(B), and 40 C.F.R. § 86.1854-

12(a)(3)(ii) make it illegal for any person to offer to sell or sell any part or component as part of

any motor vehicle where a principal effect of the part or component is to bypass, defeat, or

render inoperative any device or element of design installed on or in a motor vehicle in

compliance with EPA regulations, and where the person knows or should know that such part or

component in the motor vehicle is to be put to such use.  In its ruling on Physicians' motion for

partial summary judgment, the Court found that Defendant B&W had violated this prohibition

with respect to the sale of ____ defeat parts in six sweepstake trucks.  ____ of those violations

occurred after November 3, 2015.  At trial, Physicians established that Defendant B&W also

violated this prohibition with respect to the sale of _____ defeat parts in another _____

sweepstakes trucks.  Of that latter set of violations, ___ occurred after November 3, 2015.

18.     Cause of Action 18 – Defendant DPG Violated the Clean Air Act and Its Accompanying
Regulations by Offering to Sell or Selling Vehicles with Aftermarket Defeat Parts.

Pursuant to the Court's ruling at summary judgment, Dkt. 122, at 25-26, with respect to

the violations related to the sale of defeat parts in sweepstakes trucks, DPG and B&W are jointly

and severally liable.

19.     Cause of Action 19 – Defendant Sparks Violated the Clean Air Act and Its
Accompanying Regulations by Offering to Sell or Selling Vehicles with Aftermarket Defeat
Parts.

Defendant Sparks is jointly and severally liable with B&W Auto and DPG for the sale of

defeat parts in sweepstakes trucks.  Mr. Sparks is jointly and severally liable with B&W Auto for

the sale of defeat parts in non-sweepstakes trucks.  Mr. Sparks knew the straight pipes in these

vehicles would be used to bypass, defeat and render inoperative the emission control devices

originally installed in such vehicles.  He knew the "tunes" installed in those trucks would

suppress the check engine light and prevent the vehicle from going into "limp mode."     .

20.     Cause of Action 20 – Dropped.

21.     Cause of Action 21 – Defendant B&W Violated the Utah SIP by Owning or Operating
Motor Vehicles Registered in Utah Without Maintaining All Emission Control Systems and
Devices in Operable Condition.

The Utah SIP prohibits any person from owning or operating a motor vehicle or motor

vehicle engine registered in Utah if the emission controls have been disabled.  At trial,

Physicians established that Defendant B&W owned and/or operated ___ such vehicles that were

registered, or should have been registered, in Utah.  Consequently, Defendant B&W is liable for

____ violations of this prohibition.

22.     Cause of Action 22 – Defendant DPG Violated the Utah SIP by Owning or Operating
Motor Vehicles Registered in Utah Without Maintaining All Emission Control Systems and
Devices in Operable Condition.

The Utah SIP prohibits any person from owning or operating a motor vehicle or motor

vehicle engine registered in Utah if the emission controls have been disabled.  At trial,

Physicians established that Defendant DPG owned and/or operated ___ such vehicles that were

registered, or should have been registered, in Utah.  Consequently, Defendant DPG is liable for

____ violations of this prohibition.

23.     Cause of Action 23 – Defendant Sparks Violated the Utah SIP by Owning or Operating Motor Vehicles Registered in Utah Without Maintaining All Emission Control Systems and Devices in Operable Condition.

The Utah SIP prohibits any person from owning or operating a motor vehicle or motor vehicle engine registered in Utah if the emission controls have been disabled.  At trial, Physicians established that Defendant Sparks owned and/or operated ___ such vehicles that were registered, or should have been registered, in Utah.  Consequently, Defendant Sparks is liable for ____ violations of this prohibition.

24.     Cause of Action 24 – Dropped.

25.     Cause of Action 25 – Defendant Hoskins Violated the Utah SIP by Owning or Operating Motor Vehicles Registered in Utah Without Maintaining All Emission Control Systems and Devices in Operable Condition.

In its motion for partial summary judgment, Physicians established that Defendant Hoskins is liable for owning or operating motor vehicles registered in Utah without maintaining operable pollution control systems.  Dkt. 122, at 21-22.  Hoskins has admitted that between 2013 and 2015, he owned and registered in Utah a red, 2009 Ford F-250 6-door diesel truck, from which the pollution control equipment had been removed.  During that time, he operated it on public roads and lands in Utah.  Hoskins has also admitted that he operated in Utah each of the seventeen diesel vehicles admitted by Defendant B&W Auto to be missing pollution control equipment.  *Id.*  Physicians established at trial that Mr. Hoskins operated ___ additional vehicles that were registered, or should have been registered, in Utah in violation of this prohibition.

## B.  Civil Penalties

In assessing the civil penalty in this case, the Court shall use the "top down" methodology approved by the Tenth Circuit in *Pound v. Airosol Company, Inc.*, 498 F.3d 1089,

1095 (2007).  Accordingly, the Court has calculated the statutory maximum for the violations

found above, and then considered whether mitigation is appropriate in light of the statutory

factors listed in 42 U.S.C.A. § 7524(b) and 42 U.S.C. § 7413(b).  After consideration of all of

these factors, none mandate a reduction in the penalty amounts.  In assessing this penalty, the

Court is cognizant of Congress' mandate that penalties should be assessed so that violations of

environmental law will be deterred both specifically and generally.  *See Tull*, 481 U.S. at 422-23;

*Mac's Muffler Shop*, 1986 WL 15443 at *8.  Thus here, substantial penalties are being imposed

in order to deter both the Defendants and their many followers from violating the Clean Air Act.

Substantial penalties are also necessary to punish Defendants' actions which involved

intentionally tampering with vehicle emission control parts, knowingly marketing the sale of

defeat devices, and publicizing their disregard for the Clean Air Act through book sales, videos

on the internet, and a reality television series on the Discovery channel.

As mentioned above, none of the statutory factors listed under 42 U.S.C.A. § 7524(b)

mandates a reduction of the penalty amounts.

Gravity.  This factor warrants a penalty augmentation.  The air quality where these

violations have occurred is poor.  Defendants' violations have only made it worse.

The Defendants' tampered diesel trucks discharge excess nitrous oxides ("NOx"), non-

methane hydrocarbons, and particulate matter ("PM"), all of which are harmful to the

environment and human health."  *National Petrochemical & Refiners Ass'n v. E.P.A.*, 287 F.3d

1130, 1134 (D.C. Cir. 2002).  $NO_x$ is also a significant contributor to $PM_{2.5}$ and ozone after it is

discharged into the atmosphere and reacts with other gases. The U.S. EPA has also found that

diesel exhaust is "likely to be carcinogenic to humans." U.S. EPA, 2002. Health Assessment

Document for Diesel Engine Exhaust,

https://cfpub.epa.gov/si/si_public_record_report.cfm?dirEntryId=29060&simpleSearch=1&searc hAll=diesel . According to the California Air Resources Board ("CARB"), "[a]lmost all of the diesel particle mass [in diesel exhaust] is in the fine particle range of 10 microns or less in diameter ($PM_{10}$). Approximately 94 percent of the mass of these particles are less than 2.5 microns in diameter. Because of their small size, these particles can be inhaled and a portion will eventually become trapped within the small airways and alveolar regions of the lung." CARB Report on Diesel Exhaust, April 22, 1998, available at:

http://www.arb.ca.gov/toxics/dieseltac/de-fnds.htm

Given the adverse air quality along the Wasatch Front, strong enforcement of the Clean Air Act's anti-tampering and anti-defeat part provisions is immediately necessary as a matter of pubic health.

Economic Benefit, Size of the Violator's Business and the Violator's Ability to Continue in Business, History of Compliance and Actions Taken to Remedy the Violations, and Other Factors as Justice May Require.

*[With respect to these statutory factors, Physicians note that the Defendants have the burden of proof to show why the maximum penalty amounts should be mitigated. In the proposed pretrial order, Doc. 144, at 7, the Defendants appear to assert that they will present some evidence with respect to the economic benefit and ability to pay factor. At this time, however, the nature and probity of this evidence to the issue of penalty assessment is unclear to Physicians. Physicians note that with respect to these factors, it is appropriate to consider (1) the significant profits made by Defendants through their sweepstakes in which many of their tampered trucks were offered as the enticing prize, and (2) Defendants' ability to pay in light of their income, assets and likely future earnings. See United States v. Vista Paint Corp. (Vista Paint Corp. II), 1996 WL 477053, at \*8 and \*12.]*

-49-

Having evaluated all of the violations, the court assesses the following penalties.  In so doing, the Court calculated the penalties as follows.  For violations of the Utah SIP, the court assessed a penalty of $37,500 per day for violations that occurred before November 3, 2015, and $99,681 for violations committed afterward.  The penalties were assessed on a per day per violation basis.  Similarly, for violations of the Title II Clean Air Act prohibitions and its accompanying regulations, the court assessed a penalty of $3,750 per day for violations that occurred before November 3, 2015, and $4,735 for violations committed afterward.

For their violations found in Causes of Action 1, 2, 5, 6, 13, 14, 17, and 19, Defendants B&W and Sparks are jointly and severally liable for a civil penalty of _____.

For their violations found in Causes of Action 18 and 19, Defendants DPG and Sparks are jointly and severally liable for a civil penalty of _____.

For their violations of Causes of Action 9, 11, and 12, Defendants DPG, Sparks, and Stuart are jointly and severally liable for a civil penalty of _____.

For his violations in Causes of Action 4, 8, 16, and 25, Defendant Hoskins is liable for a civil penalty of _____.

For their violations found in Causes of Action 21, 22, and 23, Defendants B&W, DPG, and Sparks are jointly and severally liable for a civil penalty of ____.  B&W and Sparks are also jointly and severally liable for a separate, additional penalty of ____.

Such penalties are due and payable to the Federal Treasury within thirty (30) days, except for the amount of $_____ earmarked for the Tampered Diesel Truck Restoration Program which shall be paid within thirty (30) days by the Defendants to Davis County from the total amount of penalties assessed.

## C.  Injunctive Relief

The Court orders that Defendants are permanently enjoined from bypassing, defeating, or rendering inoperative any device or element of design installed on motor vehicles in compliance with regulations promulgated under Title II of the Clean Air Act and the Utah SIP.  In addition, the Defendants are permanently enjoined from offering to sell and/or selling and/or installing any aftermarket defeat parts.

The Court orders Defendants to take appropriate steps, including, but not limited to, the mitigation and offset of Defendants' past and currently ongoing excess emissions caused by their violations of 42 U.S.C. §§ 7522(a)(3)(A) and (B) and the Utah SIP by: (1) restoring all tampered vehicles within their control to originally certified condition with all emission control devices intact, and (2) funding a project to restore tampered vehicles through the Davis County Health Department, *see* "Tampered Diesel Truck Restoration Program Agreement," (Plaintiff's Exhibit 70).

Case 2:17-cv-00032-RJS-DBP   Document 146   Filed 10/29/19   Page 54 of 54

**III. CONCLUSION**

In light of the findings of fact and conclusions of law, the Court ORDERS that Judgment on behalf of Plaintiff be entered.

SO ORDERED.

DATED: _____

<div style="margin-left: 40%;">

For Plaintiff,

  s/  Reed Zars_____
Reed Zars, Utah Bar #16351
Attorney at Law
910 Kearney St.
Laramie, WY  82070
307-760-6268
reed@zarslaw.com

  /s George E. Hays_____
George E. Hays, admitted pro hac vice
Attorney at Law
P.O. Box 843
Bellevue, WA 98009
415-566-5414
georgehays@mindspring.com

</div>