Cole S. Cannon (Utah Bar No. 12053)
cole@cannonlawgroup.com
Janet M. Conway (Utah Bar No. 7488)
janet@cannonlawgroup.com
CANNON LAW GROUP
53 South 600 East
Salt Lake City, Utah 84102
Telephone: (801) 363-2999

*Attorneys for Defendants*

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UTAH PHYSICIANS FOR A HEALTHY ENVIRONMENT, INC., | **DEFENDANTS' CORRECTED PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW** |
| Plaintiff, | |
| v. | **Case No.: 2:17-CV-00032** |
| DIESEL POWER GEAR, LLC, 4X4 ANYTHING, LLC, SPARKS MOTORS, LLC, DAVID W. SPARKS, JOSHUA STUART, AND KEATON HOSKINS, | **Chief District Judge Robert J. Shelby** **Magistrate Judge Dustin B. Pead** |
| Defendants. | |

**I. PROPOSED FINDINGS OF FACT**

*A. Air Pollution Along the Wasatch Front*

1.     The Wasatch Front is a metropolitan region along the Wasatch Range in northern Utah. About eighty percent of the State's population resides along this roughly 120 mile stretch from Brigham City to Nephi. *Utah Physicians for a Healthy Environment v. Diesel Power Gear*, 374 F. Supp. 3d 1124, f. 10 (D. Utah 2019).

2.     Utah has suffered from poor air quality for a long time, and Utah's Wasatch Front had become non attainment areas for both $PM_{2.5}$ and ozone prior to B&W Auto and DPG coming into existence. Declaration of Janet M. Conway "Conway Decl.," Dkt Nos. 65-6 and 107-2, Exh. "1," *Utah Division Of Air Quality 2009 Annual Report*, Exhibit "4," at p. 8.

3.     The U.S. Department of Transportation, Bureau of Transportation Statistics reported that as of 2013, there were over 3,000,000 registered vehicles in Utah, and 1,600,000 licensed Utah drivers. *Id.*, *Table 5.1: Motor-Vehicle Registrations: 2013* and *Table 4.2: Licensed Drivers: 2013*, Exhibit "6."

4.     In 2016, on-road mobile sources produced about 36% of the annual pollution – nitrous oxides (NOx), particulate matters ($PM_{2.5}$), and volatile organic compounds (VOCs) – along the Wasatch Front. *Id., Utah Division of Air Quality 2016 Annual Report*, Exhibit "7", at p. 23-24. More specifically, 35% of NOx is from on-road mobile sources. *Id.* at p. 26. Only 12% of $PM_{2.5}$, 7% of $PM_{10}$ and 2% of VOC is attributable to on-road mobile sources. *Id.* at p. 27-28.

5.     On-road mobile sources include all highway vehicles such as cars, light duty trucks, heavy-duty trucks and motorcycles using gasoline and diesel fuels. *Id.*

6.     Brock LaBaron, Deputy Director, Utah Department of Environmental Quality reported that vehicle operation is not a significant source of ozone, and intercontinental transport of ozone and nitrogen oxides (NOx) from Asia contributes up to 20 percent of the West's total ozone concentrations and it has been shown to be growing by 0.5–1 parts per billion (ppb) per year. *Id.*, *Pollution in Utah: Not Always the Usual Suspects*, Exhibit "8." Another major contributor is wildfires, which are on the rise in the western states. *Id.*

7.     Utah's Department of Health, Bureau of Epidemiology has reported that vehicle operation is not a significant source of either $PM_{2.5}$ or $PM_{10}$ pollutants, as over 30% of <u>primary</u> $PM_{2.5}$ particle emissions in Utah came from dust; fires contributed over 15%, fuel combustion contributed 15%, and mobile sources only emitted 12.5% of the total primary $PM_{2.5}$ particles.  In 2014, 67% of the <u>primary</u> $PM_{10}$ particles in Utah came from dust, largely from unpaved roads. The next highest source categories, agriculture and industrial processes, contributed approximately 17% and 5%, respectively, of the total primary $PM_{10}$ particles.  *Id.*, *Air Pollution and Public Health in Utah*, Exhibit "9."

8.     The Kennecott Utah Copper Bingham Canyon Mine is a major source contributor of $PM_{10}$, $PM_{2.5}$ and NOx emissions along the Wasatch Front, having moved in excess of 1.5 million tons of material annually, resulting in thousands of tons of emissions, and that amount has increased every year since 2006.  *Id.*, *Physicians v. Kennecott.* No. 2:11-CV-01181, United States District Court, D. Utah, Central Division, Memorandum Decision and Order dated June 8, 2016, Exhibit "10."

9.      As of 2014, as posted by the Utah Department of Environmental Quality, Kennecott had an emissions limit for the Bingham Copper Mine for the combined emissions of $PM_{10}$, SO2, and NOx (7,350 Tons Per Year) and combined emissions of $PM_{2.5}$, SO2 and NOx (6,205 Tons Per Year) encompass facility wide emissions. *Id.*, *Kennecott Utah Copper, LLC, Public Notice of Intent, dated January 13, 2014*, Exhibit "11."

10.      Another major contributor of same emissions also caused by diesel trucks is Pacificorp's four coal burning plants.  In 2016, Plaintiff sent the EPA formal comments, which stated:  "PacifiCorp's central Utah fleet of power plants is responsible for a substantial share of the NOx, particulates, and ozone along the Wasatch Front. . . Point sources of NOx emissions in Utah are the state's main source of NOx, and Utah's point sources consist primarily of PacifiCorp's fleet of coal-fired power plants." *Id.*, *Comments Of Utah Physicians For A Healthy Environment On The Epa's Co-Proposals For Implementing The Utah State Regional Haze State Implementation Plan*, Exhibit "13."

11.      Utah Department of Environmental Quality reported another major source of the same emissions that are found in diesel exhaust are the five major oil refineries along the Wasatch Front, and indeed point sources in 2014, in Salt Lake County alone, accounted for 7,271.81 tons of NOx, 2,560.04 tons of $PM_{10}$, 1,227.34 tons of $PM_{2.5}$ and 1,610.40 tons of VOC., *Id., 2014 Inventory Compiled with Oil Gas Locomotive Aircraft NonRoad Updates*, Exhibit "16."

12.      Tesoro Oil Refinery, located along the Wasatch Front, recently settled a litigation in July, 2016, brought by the EPA, and the Department of Justice, Office of Public Affairs, for, according to its official press release, dated July 18, 2016, emitting illegal levels from its Salt

Lake City refinery of the same pollutants found in diesel exhaust. *Id., Oil Refiners to Reduce Air Pollution at Six Refineries Under Settlement with EPA and Department of Justice*, Exhibit "17."

13.     Tesoro is currently expanding operations, resulting in increased emissions. *Id., Utah Physicians for a Healthy Environment v. Tesoro Marketing and Refining*, Utah Court of Appeals, Appeal No. 20141132-CA, Opening Brief filed March 18, 2015, Exhibit "18."

### B. Parties

14.     Plaintiff, Utah Physicians for a Healthy Environment ("UPHE"), is a nonprofit organization, who works on behalf of its members to protect and enhance the air quality in Utah, including the airshed of the Wasatch Front in Utah.

15.     B&W Auto is a used automobile dealership, that primarily sells passenger trucks. It also has a repair shop, which focuses on custom built diesel trucks, that are later given away by Diesel Power Gear, or builds as promotional tools for corporate clients or its own business.

16.     At all relevant times, B&W Auto has filed its annual company registration with the State of Utah, maintained all required local and state business licenses, paid state and federal taxes, maintained separate financial statements, paid dividends, maintained insurance, and otherwise maintained all required corporate compliance records.

17.     Diesel Power Gear ("DPG") is a lifestyle brand company, which sells clothing, miscellaneous apparel and accessories for the diesel truck lifestyle.

18.     At all relevant times, DPG has filed its annual company registration with the State of Utah, maintained all required local and state business licenses, paid state and federal taxes,

maintained separate financial statements, paid dividends, maintained insurance, and otherwise maintained all required corporate compliance.

19.     At all relevant times, Sparks has been the owner and CEO of B&W Auto. Sparks is also largest owner and CEO of DPG.

20.     Joshua Stuart was hired in March, 2014, to be the chief financial officer and chief operating officer for DPG.

21.     Stuart is not a mechanic, nor has working knowledge of the wide variety of automotive parts available through DPG's vendors. Stuart does not manage day-to-day operations, but handles executive level responsibilities, typically performed by CFOs, including compliance with sweepstakes regulations, management of the finances, payroll, etc..

22.     Keaton Hoskins is not a mechanic by profession, nor has he ever been employed by B&W Auto or DPG.

### C. CAA Violations

#### i.     B&W Auto Violations

23.     UPHE moved for summary judgment with respect to 17 vehicles (Truck Nos. 1-17, as identified below), and this Court granted Plaintiff's motion as to its first, fifth, thirteenth, and seventeenth causes of action against B&W Auto.  Truck Nos. 18-20, while not included in the summary judgment ruling, are additional trucks owned by B&W Auto, relevant to this action.

24.     Truck No. 1, "Built Diesel 1," 2012 Dodge Ram 2500 6.7L. B&W Auto removed pollution control device(s), and installed emission defeat part(s). This truck was provided as a

DPG giveaway sweepstakes prize to a Missouri resident in August, 2013. This truck was driven less than 500 miles in Utah prior to permanently leaving the state.

25. Truck No. 2, "Built Diesel 2," 2013 Ford F250 6.7L. B&W Auto removed pollution control device(s), and installed emission defeat part(s). This truck was provided as a giveaway sweepstakes prize to a Maryland resident in February, 2014. This truck was driven less than 2,500 miles in Utah prior to permanently leaving the state.

26. Truck No. 3, "Built Diesel 3 – 2nd place aka OBS," 2006 GMC 2500 Duramax LBZ 7.3L. B&W Auto removed pollution control device(s), and installed emission defeat part(s). This truck was provided as a giveaway sweepstakes prize to a California resident in June, 2014. This truck was driven less than 100 miles in Utah prior to permanently leaving the state.

27. Truck No. 4, "Built Diesel 6 - 1st place aka Kodiak," 2007 GMC Kodiak c4500 LBZ Duramax 6.6L. B&W Auto removed pollution control device(s), and installed emission defeat part(s). This truck was offered for sale "as-is," after the sweepstakes winner declined it as a prize in August, 2015, but B&W Auto determined it was not suitable to sell and permanently dismantled truck. This truck was driven approximately 5 miles in Utah prior to being dismantled.

28. Truck No. 5, "Built Diesel 6 - 2nd place," 2008 Dodge 2500 single cab Cummins 6.7L. B&W Auto removed pollution control devices(s), and installed emission defeat part(s). This truck was provided as a giveaway sweepstakes prize to a Florida resident in August, 2015. This truck was driven less than 100 miles in Utah prior to permanently leaving the state.

29. Truck No. 6, "US Duramaxx," 2007 GMC Silverado 2500 Duramax 6.6L. B&W Auto removed pollution control device(s)s, and installed emission defeat part(s). This truck was

provided as a giveaway sweepstakes prize to a Colorado resident in June, 2015. This truck was driven approximately 50 miles in Utah prior to permanently leaving the state.

30.     Truck No. 7, "Bro-Dozer," 2011 Ford F350 6.7L. B&W Auto removed pollution control device(s), and installed emission defeat part(s). This truck was built as a novelty off-road vehicle, and is not capable of passing safety inspection. While B&W Auto briefly offered Bro-Dozer for sale "as-is," B&W Auto removed the listing and continues to own Bro-Dozer as a novelty item. This truck has been driven approximately 50 miles in Utah.

31.     Truck No. 8, "Built Diesel 3 - 1st place," 1994 Dodge Ram 3500 12-valve 5.9L. B&W Auto purchased "as-is" with pollution control devices removed. This truck was provided as a giveaway sweepstakes prize to an Idaho resident in June, 2014. This truck was driven approximately 250 miles in Utah prior to permanently leaving the state.

32.     Truck No. 9, "Holy Grail," 1997 Dodge Ram 2500 SLT 5.9L. B&W Auto purchased "as-is" with pollution control devices removed. This truck was provided as a giveaway sweepstakes prize to a Kansas resident in November, 2015. It was then traded back to B&W Auto, used again as a giveaway truck, and provided again as a sweepstakes prize to a Connecticut resident in July, 2018. This truck has been driven approximately 50 miles in Utah, and permanently left the state in October, 2018.

33.     Truck No. 10, "Mountain Ops Ultimate Hunting Rig," 2009 Ford F250 XLT 6.4L. B&W Auto purchased "as-is" with pollution control devices removed and emission defeat parts installed. This truck was provided as a giveaway sweepstakes prize to a Texas resident in April.,

2015. This truck was driven approximately 50 miles in Utah prior to permanently leaving the state.

34.     Truck No. 11, 2013 Ford F250 (UPHE's truck). B&W purchased this truck from a local Utah auction "as is," with pollution control devices removed and emission defeat parts installed. B&W Auto listed this truck for sale on ebay.com, and sold it "as-is" to a resident of St. George, Utah in October, 2014. The bill of sale clearly states this truck is sold "as-is", that there may be major mechanical issues with truck, including excessive exhaust, and the purchaser may have the truck inspected by his own mechanic prior to purchase. This truck was driven approximately 100 miles in the Wasatch Front, prior to transfer to St. George, Utah, before it permanently left the state, and was purchased by UPHE in Colorado.

35.     Truck No. 12, "Megaram," 2012 Dodge Ram 3500. B&W Auto purchased with pollution control devices removed and emission defeat parts installed. B&W installed an emission defeat part (delete tune). B&W Auto continues to own this truck, and it is used primarily for non-driving promotional purposes only.

36.     Truck No. 13, "Super Six," 2008 Ford F550 6.7L. B&W Auto purchased with pollution control devices removed and emission defeat parts installed. B&W custom built this truck for SEMA (Specialty Equipment Market Association) trade show, then sold to Homeland Munitions, a company based in Nevada. This truck was driven approximately 25 miles before permanently leaving the state.

37.     Truck No. 14, "Truck Norris," 2012 GMC 2500. B&W Auto purchased "as-is" with pollution control devices removed and emission defeat parts installed. This truck was used

as part of a Diesel Brothers episode with Chuck Norris, and thereafter sold to Maverik Stores, a convenience store & gas station chain based in Utah, to be used as a promotional item. This truck was driven approximately 500 miles in Utah prior to being transferred to Maverick Stores in October, 2016.

38. Truck No. 15, 2011 GMC Sierra 2500 HD GMC Denali. B&W Auto purchased this truck "as is" with pollution control devices removed and emission defeat parts installed. B&W Auto thereafter sold this vehicle "as-is" to an Arizona resident in April, 2016. This truck was driven approximately 5 miles in Utah prior to permanently leaving the state.

39. Truck No. 16, "The Raptor," 2011 Ford F250 6.7L Powerstroke. B&W Auto purchased "as-is" with pollution control devices removed and emission defeat parts installed. This truck was used as part of a Diesel Brothers episode, and thereafter thereafter sold "as-is" to Rhinorush Energy, an energy drink company based in Idaho, to be used for promotional purposes.

40. Truck No. 17, "Tucker Snowcat," B&W Auto purchased "as is" with pollution control devices removed and emission defeat parts installed. This vehicle was sold to a Coalville, Utah dog-sledding business in December, 2017, as a "heavy equipment" sale, since tires were removed and large snowcat tracks installed, converting it from a motor vehicle for use on the Utah roads to a winter service snowcat, fully tracked and designed to move only on snow.

41. Truck No. 18, "Hercules" 2008 Crew Cab LT Chevrolet Duramax. B&W Auto purchased from a private seller "as-is" with extreme body/frame damage, and with pollution control devices removed and emission defeat parts installed. B&W Auto custom built this truck

for a Diesel Brothers episode, and continues to own this truck, since it is a novelty item, not capable of passing any safety inspections. The vehicle is used for non-driving promotional purposes only.

42.     Truck No. 19, "Mini Megaram," 2014 Dodge Ram 1500 Laramie 3.0L eco-diesel. B&W bought this truck. This truck was purchased new and driven by Dave Sparks for a year, completely stock. Then, B&W Auto custom built it for a Diesel Brothers episode. While Sparks has no specific recollection of the specifics done to this truck, it appears that pollution control device(s) were removed and emission defeat part(s) installed. This truck was provided as a giveaway sweepstakes prize to a South Dakota resident in November, 2015.

43.     Truck No. 20. "The Rock" 2013 Dodge Ram 5500 6.7L. This truck was purchased "as-is" with pollution control device(s) removed and emission defeat part(s) installed. This truck was twice offered as a giveaway sweepstakes prize option (among other trucks), but the winner chose another vehicle both times. B&W Auto thereafter entered into an agreement with I Drive Utah Trucks (an unrelated company that sells used diesel trucks) to sell this truck to a resident in North Carolina, and was sold in February, 2019.

## ii. *Diesel Power Gear's Violations*

44.     DPG has given away 11 B&W Auto custom built vehicles specifically as: Built Diesel 1, Built Diesel 2, Built Diesel 3 - 1st place, Built Diesel 3 – 2nd place aka OBS, Built Diesel 5 (see Keaton Hoskins violations below), Built Diesel 6 - 2nd place, US Duramaxx, Mini Megaram, Holy Grail (x2), and Mountain Ops Ultimate Hunting Rig.

45.     At summary judgment, this Court has found those giveaways constitute sales in violation of the Clean Air Act.

46.     DPG has sold 88 egr delete emissions defeat parts that violate the CAA.

47.     DPG has sold 16 dpf delete emissions defeat parts that violate the CAA.

48.     Of the total 104 emission defeats parts sold, only 14 were sales to Utah residents (of which nine were to B&W Auto).

49.     DPG was not a manufacturer of any of the delete parts. Instead, DPG was an online drop-shipment retailer of hundreds of Clean Air Act compliant parts (e.g. bumpers, lights) and the delete kits were part of the distributors' catalog.

50.     DPG never had possession of the DPF and EGR delete kits. The kits were ordered by customers through the DPG website and shipped directly from the manufacturer or distributor.

51.     DPG's estimated net profit on the total of sales of DPF and EGR kits is less than $20,000.

52.     Immediately upon receipt of the notice letter from UPHE, DPG removed all products that could violate the CAA from its website.

### iii.  David Sparks Liability

53.     At summary judgment, this Court found David Sparks personally liable for DPG's violations relating to parts sales.

54.     David Sparks is personally liable for B&W Auto's violations, as it relates to trucks not already modified at the time of B&W's purchase of the vehicle.

55.     David Sparks is personally liable for DPG's violations relating to giveaway trucks.

56.     David Sparks has not personally owned any trucks that violate CAA or Utah SIP, but briefly operated each of the above-identified vehicles that B&W Auto owned in Utah.

### iv. Joshua Stuart Liability

57.     At summary judgment, this Court found Joshua Stuart personally liable for DPG's violations relating to parts sales. Evidence will show that Stuart worked under the direction of David Sparks.

58.     While DPG liable for the giveaway trucks that violate the CAA, Plaintiff's Twentieth Cause of Action, relating to Stuart personal liability, was dismissed by this Court on January 23, 2018.

### v. Keaton Hoskins Liability

59.     At summary judgment, this Court found Hoskins liable for violations of the CAA and Utah SIP relating to (a) the removal of pollution control devices in federally-certified vehicles, (b) the installation of aftermarket emission control defeat parts in federally-certified vehicles, and (c) owning or operating motor vehicles registered in Utah without maintaining operable pollution control devices.

60.     The Court granted Plaintiff's motion for summary judgment on its fourth, eighth, sixteenth, and twenty-fifth causes of action against Hoskins.

61.      Hoskins purchased one of his personally owned vehicles, known as "the Muscle's 6-Door," with pollution control devices removed and emissions defeat parts installed. He

thereafter sold that vehicle to B&W Auto, to be used as "Built Diesel #5" giveaway truck, and was awarded as a sweepstakes prize to an Alaska resident.

62.     Hoskins also caused a second truck, known as the "Platinum 6x6," to have certain emissions control defeat parts installed, and thereafter sold that vehicle to a private third party. This truck is completely unrelated to any company defendants in this case.

### D. Factors for Penalty Phase Consideration

#### i. B&W Auto

63.     B&W Auto has a shop foreman, shop manager, and dealership manager that manage B&W Auto's operations, as well as multiple employees, including mechanics and sales people, that perform the day-to-day duties of the shop.

64.     As part of B&W Auto's business, it obtains diesel trucks at local auction inexpensively, many with performance modifications already installed, and these trucks are especially easy to re-sell with only cosmetic improvements.

65.     The inspection period at the auctions is very abbreviated and oftentimes the trucks are purchased sight unseen. Thus the condition of the vehicle—including the presence of delete parts—is oftentimes unknown at the time of purchase.

66.     The economic benefit or savings resulting from the violations are difficult to quantify however an ordinary truck owner could get a full delete with straight pipe, EGR, and DPF modification for $2,500-3,000. Thus the economic benefit derived by B&W selling "dirty trucks" should not exceed $2,500. In other words, had all 18 trucks been unmodified then each of the buyers could have modified them for $3,000 (on the high end) themselves. Thus, presumably,

no buyer would attribute more value to a part of the truck they could purchase elsewhere for cheaper.

67. B&W Auto is a small business with approximately $450,000-500,000 of gross profit per year. After overhead, general and administrative is removed the company has operated at an average small loss for two years.

68. The financial condition of company tenuous because it has incredibly high fixed costs (shop, equipment, payroll) however it produces very few trucks to sell. This slowness is primarily attributable to the filming of a reality TV show within the shop that requires almost every task to be filmed in very slow detail. Thus, the fixed costs end up exceeding the gross profit generated by B&W resulting in a loss. B&W has been sustained by personal loans from David Sparks and Diesel Power Gear (which loans are reflected on the balance sheets).

69. Plaintiffs have put forth no evidence of measurable harm to the Wasatch Front's airshed as a result of B&W Auto's violations.

### ii. Diesel Power Gear

70. DPG has multiple managers, including Heather Pledger, who is both DPG shipping manager and 4x4 Anything manager, and John Whiting, who is the general manager.

71. In April, 2013, Sparks created a sweepstakes giveaway promotion to build DPG's business, using one of B&W Auto's custom built trucks as the prize. DPG contracted with a sweepstakes promotions company to organize the giveaway and ensure compliance with sweepstakes laws. DPG also contracted with B&W Auto to provide a custom built truck as a sweepstakes prize.

72. DPG does not own any of the giveaway vehicles, nor makes decisions about what vehicle is provided by B&W Auto.

73. In summer, 2014, DPG expanded product lines to to sell automotive parts and accessories, and no automotive parts were sold prior to that time.

74. Unlike DPG's clothing line, which is manufactured and distributed by DPG, DPG is a drop shipment fulfillment online retailer for all parts, which are supplied directly to consumers by large national vendors. DPG is not an exclusive distributor of these vendors' parts.

75. Ms. Pledger manages day-to-day operations and sales of DPG's automotive parts, including working with vendors to determine which products to add to DPG's website.

76. All parts listed on DPG's website, and information about those parts, were obtained from large third party vendor suppliers.

77. Of the 5,000 products available for purchase, the products identified by Plaintiff as violating the CAA represent less than 3% of the entire product line.

78. Due to the immense popularity of the videos and large following on social media, Magilla Entertainment, a media production company, contracted with the four individuals to create a new reality show for the Discovery Channel, called The Diesel Brothers. The Diesel Brothers features diesel trucks being built for off-road recreational use. Its audience and the Defendant companies' target market are passionate about diesel trucks as a recreational lifestyle.

79. Presumably as a result of learning about the Diesel Brothers' television show, Plaintiff's counsel diligently investigated the possible scope of potential emissions violations

affiliated with the Diesel Brothers, and on July 27, 2016, UPHE's counsel sent the Diesel Brothers a notice letter addressed to the "Diesel Brothers."

80.     Immediately upon receipt of the notice letter, DPG removed all products that could violate the CAA from its website.

81.     The economic benefit resulting from the violations of parts sales are less than $20,000.

82.     The economic benefit resulting from the violations for giveaway trucks are the trucks are purchased by DPG from B&W at fair market value, which includes the value of the "delete" kit. Diesel Power Gear's position is that it has not benefited from the violations as those costs were "built in" to the cost DPG paid for the truck that was given away.

83.     The size of DPG's business has ranged from net income of negative $14,729 (2014) through $271,550 (2018). The business is primarily driven by apparel sales.

84.     The financial condition of company is relatively stable with a net income gravitating around $200,000-$300,000 annually.

85.     Plaintiffs have put forth no evidence of measurable harm to the Wasatch Front's airshed, as a result of DPG's violations.

### iii. David Sparks

86.     Sparks has worked with the EPA to ensure compliance with the CAA, and has caused a bold disclaimer to be displayed at the beginning of every Diesel Brothers episode, to encourage its followers to not tamper with emissions control systems on their vehicles, which states: "Diesel Brothers doesn't endorse or support the use of aftermarket devices that adversely

affect the performance of emission systems on vehicles. Diesel Brothers recommends only using EPA-certified aftermarket parts."

87.     The economic benefit or savings resulting from B&W Auto violations went to B&W Auto, so the only economic benefit Sparks personally gained is a minimal flow through which are reflected on Schedule C of David Sparks personal tax return. Thus, any benefit that B&W received is mirrored (though not duplicated) onto David Sparks' personal financial position.

88.     The economic benefit resulting from DPG violations of parts sales went to DPG, so the only economic benefit Sparks personally gained is a minimal flow through which are reflected on the K1 of David Sparks personal tax return. Thus, any benefit that DPG received is mirrored (though not duplicated) onto David Sparks' personal financial position.

89.     Sparks' personal financial condition relatively stable making an average income of approximately $215,000 (without having seen 2018 tax return as of this draft). Most of David Sparks income derives from 1) a salary at DPG, 2) talent fees paid by the reality TV show, and 3) endorsement deals and rights of publicity (e.g. Ariat working boots). The B&W dealership and shop as a stand alone is not a meaningful source of income to David Sparks.

### iv. Joshua Stuart

90.     Stuart is not personally familiar with the parts at issue in this lawsuit, as DPG's automotive product line includes approximately 5,000 automotive parts and accessories, ranging from aftermarket lighting to suspension lift kits to diesel performance parts.

91.     Stuart was unaware that any products sold by DPG may violate the CAA, until he received notice from Plaintiff in July, 2016. As soon as Stuart received notice, he caused Pledger to immediately and permanently remove all identified listings from the website, more than five months prior to the date this case was filed.

92.     The economic benefit resulting from DPG violations of parts sales went to DPG, so the only economic benefit Stuart personally gained is a minimal flow through: which are reflected on the K1 of Joshua Stuart's personal tax return. Thus, any benefit that DPG received is mirrored (though not duplicated) onto Joshua Stuart's personal financial position.

### v. Keaton Hoskins

93.     Hoskins believes that removal of emissions parts are necessary to increase performance and fuel efficiency, and that fuel efficiency helps the environment.

94.     Hoskins' personal financial condition is stable, but his annual income is significantly less than $100,000 annually.

95.     UPHE has not put forth evidence of measurable harm to the Wasatch Front airshed, as a result of Hoskins' violations.

## II. Proposed Conclusions of Law

### A. Nature of the Action and Jurisdiction

1.      This is a citizen's action for injunctive relief and civil penalties under the federal Clean Air Act ("CAA"), 42 U.S.C. §§ 7401 through 7671q.

2.      Jurisdiction of the court is invoked under 42 U.S.C. § 7604(a) (citizen suit provision of the CAA), 28 U.S.C. § 1331 (federal question statute), and 28 U.S.C. § 1355 (recovery of penalties).

3.      Jurisdiction additionally exists under 28 U.S.C. § 1331 (federal question), including 42 U.S.C. § 7522 (motor vehicle tampering and defeat device prohibitions) and 40 C.F.R. § 52.2320(c)(59), Utah Admin. Code R307-201-2 (federally-enforceable Utah motor vehicle emissions systems requirements).

4.      Venue is proper pursuant to 28 U.S.C. §§ 1391(b) and (c). Venue is laid in the Central Division of the District of Utah.

### B. Clean Air Act–Statutory and Regulatory Framework

5.      Pursuant to the Clean Air Act, 42 U.S.C. §§ 7401 et seq., the Environmental Protection Agency (EPA) is charged with setting primary air quality standards for certain pollutants in order to protect the public health. 42 U.S.C. § 7409(b)(1). The EPA is also charged with setting secondary air quality standards for certain pollutants in order to protect the public welfare. 42 U.S.C. § 7409(b)(2). Oregon Env. Council v. Dept. of Env. Quality, 775 F.Supp. 353 (D. Or., 1991).

6.     The Clean Air Act provides that states are responsible for preparing their own implementation plans for achieving and maintaining the air quality standards set by the EPA. 42 U.S.C. § 7410(a)(1). The states are required to submit their implementation plans to the EPA for approval. Id. The EPA may approve an implementation plan submitted by a state only if the plan meets all of the requirements of the Clean Air Act. 42 U.S.C. §§ 7410(a)(3)(A), 7502(b). *Oregon Env. Council v. Dept. of Env. Quality*, 775 F.Supp. 353 (D. Or., 1991) "Once the EPA approves a SIP, it becomes federal law. *Safe Air for Everyone v. EPA*, 488 F.3d 1088, 1091 (9th Cir.2007).

7.     The applicable provisions of CAA Section 203(a), 42 U.S.C. § 7522(a) are set forth as follows: (a) Enumerated prohibitions. The following acts and the causing thereof are prohibited— (3)(A) . . . for any person knowingly1 to remove or render inoperative any [] device or element of design [installed on or in a motor vehicle or motor vehicle engine in compliance with regulations under this subchapter] after [the vehicle's] sale and delivery to the ultimate purchaser; or (3)(B) for any person to manufacture or sell, or offer to sell, or install, any part or component intended for use with, or as part of, any motor vehicle or motor vehicle engine, where a principal effect of the part or component is to bypass, defeat, or render inoperative any device or element of design installed on or in a motor vehicle or motor vehicle engine in compliance with regulations under this subchapter, and where the person knows or should know that such part or component is being offered for sale or installed for such use or put to such use.

8.     Utah SIP regulation R307-201-2, Automobile Emission Control Devices, provides: Any person owning or operating any motor vehicle or motor vehicle engine registered

in the State of Utah on which is installed or incorporated a system or device for the control of crankcase emissions or exhaust emissions in compliance with the Federal motor vehicle rules, shall maintain the system or device in operable condition and shall use it at all times that the motor vehicle or motor vehicle engine is operated. No person shall remove or make inoperable within the State of Utah the system or device or any part thereof, except for the purpose of installing another system or device, or part thereof, which is equally or more effective in reducing emissions from the vehicle to the atmosphere.

### C. Liability

#### i. B&W Auto

9.    B&W Auto violated Clean Air Act Section 203(a)(3)(A) and (B), 42 U.S.C. § 7522(a)(3)(A) and (B), and Utah SIP Regulation R307-201-2, 40 C.F.R. § 52.2320(c)(59), by removing pollution control devices from diesel vehicles, selling and installing pollution control defeat parts, and selling defeat parts installed in vehicles.

10.    B&W Auto removed pollution control device(s) from eight trucks, identified as Trucks 1-7, 19, resulting in 8 violations.

11.    B&W Auto installed emission defeat part(s) on nine trucks, identified as Trucks 1-7, 12, 19, resulting in 9 violations.

12.    B&W sold seventeen trucks with pollution control device(s) removed, and emission defeat part(s) installed, identified as Trucks 1-3, 5-6, 8, 9 (twice), 10-11, 13-16, 19-20, and Keaton's first truck, resulting in 17 violations.

13. B&W Auto owned all 20 trucks during which time they did not have required emissions control devices installed, and currently owns three vehicles with emission defeat parts. This results in 20 violations of Utah SIP R307-201-2.

### ii. Diesel Power Gear

14. DPG sold 88 egr delete kits, which are emissions defeat parts, resulting in 88 violations of the CAA.

15. DPG sold 16 dpf delete kits, which are emissions defeat parts, resulting in 16 violations of the CAA.

16. DPG sold 11 vehicles that had emissions defeat parts, as part of its promotional giveaway program, identified as Trucks 1-3, 5-6, 8, 9 (twice), 10, 19, and Keaton's first truck, resulting in 11 violations of the CAA.

### iii. David Sparks

17. Sparks is personally liable for DPG's CAA violations, relating to the sale of emission defeat parts.

18. Sparks operated vehicles each of the 20 trucks owned by B&W Auto, resulting in 20 violations of Utah SIP regulation.

19. Sparks is personally liable for B&W Auto's violations, relating to the 20 trucks.

20. Sparks is personally liable for DPG violations relating to the 11 giveaway trucks.

### iv. Joshua Stuart

21. Stuart is personally liable for DPG's violations, relating to the sale of emissions defeat parts.

### v. Keaton Hoskins

22. Keaton Hoskins violated the Clean Air by removing emissions control devices on one truck and replacing those devices with emissions defeat parts. This results in a total of 2 violations of the CAA, and 2 violations of the Utah SIP regulations (which are duplicative).

23. Keaton purchased a second truck "as is" with pollution control devices removed and emission defeat parts installed.

24. Hoskins thereafter sold both trucks with emissions defeat parts, resulting in two additional violations of the CAA.

25. Hoskins also violated Utah SIP Regulation R307-201-2 by owning and/or operating two vehicles in Utah (registered or that should have been registered) without their required pollution control equipment installed and operational.

### D. *Total CAA and Utah SIP Violations per Defendant*

26. The Court finds B&W Auto committed 34 total violations of the CAA.

27. The Court finds B&W Auto has committed 20 violations of Utah SIP, in that it owned and operated 20 vehicles with emission defeat parts, and currently owns three vehicles (Megaram, Hercules, Brodozer).

28. The Court finds DPG committed 104 violations of the CAA for the sale of emission defeat parts. However, only 14 parts were sold to Utah customers.

29. The Court finds DPG committed 11 violations for the giveaway of trucks with emission defeat parts. However, none of these trucks were sold to Utah residents.

30.     The Court finds Keaton Hoskins committed 4 violations for removal of emission control parts and installation of emission defeat parts, and sale of trucks with emissions defeat parts, relating to his two personally owned trucks.

31.     The Court finds Keaton Hoskins owned and operated two vehicles with emission defeat parts, in violation of Utah SIP.

### E. Remedies

32.     The remedies provided by the Clean Air Act, pursuant to 42 U.S.C. § 7604, are to obtain enforcement of the standards promulgated pursuant to the Act or to have the court impose civil penalties against violators of such standards. See 42 U.S.C. § 7604(a). Any civil penalties imposed under this section do not go to the plaintiffs; instead, these penalties must either go to the United States Treasury or be deposited in a special fund for beneficial mitigation projects. See 42 U.S.C. § 7604(g). Additionally, the court cannot impose such a civil penalty in excess of $100,000 in any action under that subsection. See id. at (g)(2). *Gutierrez v. Mobil Oil Corp*., 798 F.Supp. 1280 (W.D. Tex., 1992)

### i. Duplicative Remedies for violations of Utah SIP and CAA

33.     It is undisputed that a plaintiff generally may not double recover damages. See, e.g., *U.S. Industries, Inc. v. Touche Ross & Co.*, 854 F.2d 1223, 1259-60 (10th Cir.1988) (compensatory damages for federal securities claim and state breach of fiduciary duty claim duplicative); *Clappier v. Flynn*, 605 F.2d 519, 530-31 (10th Cir.1979) (compensatory damages for federal civil rights claim and state civil rights claim duplicative).

34.     "Where a jury award duplicates damages, the court, either sua sponte or on motion of a party, should reduce the judgment by the amount of the duplication." *Mason v. Oklahoma Turnpike Auth.*, 115 F.3d 1442, 1459 (10th Cir. 1997)

35.     The first four causes of action are for violations of Utah SIP Regulation R307-201-2, for removing emission control devices from vehicles.  The next four causes of action are for violations of CAA Section 203(a)(3)(A), for removing emission control devices from vehicles. To award remedies for the same underlying conduct under both the CAA and Utah SIP would result in a duplicative remedy.

### *ii. Civil Penalty Award Should be Minimal*

36.     Under CAA Section 205(a), 42 U.S.C. § 7524(a), the maximum penalty for a CAA violation prior to November 1, 2015 is $3,750 for each illegally modified vehicle and for each illegal part sold.  For violations occurring after November 1, 2015, the maximum penalty is $4,454 for each such violation.

37.     "Courts generally presume that the maximum penalty under the Clean Air Act should be imposed, and then consider the factors described in § 7413(e) to determine what degree of mitigation, if any, is proper." *Sierra Club v. Khanjee Holding (US) Inc.*, 655 F.3d 699, 707 (7th Cir. 2011);  *Pound v. Airosol Co., Inc.*, 498 F.3d 1089, 1095 (10th Cir. 2007).

38.     Section 7413(e)(1) sets forth the factors that a court "shall" take into consideration in determining the penalty, if any, to be assessed for a violation of the Act, which are: a. the gravity of the violation, b. the economic benefit or savings (if any) resulting from the violation, c. the size of the violator's business, d. the violator's history of compliance with this subchapter,

e. action taken to remedy the violation, f. the effect of the penalty on the violator's ability to continue in business, g. such other matters as justice may require, including whether attorneys' fee award should be balanced with penalty award.

39.     Consideration of the first factor, seriousness of the violations, mitigates against imposition of the full penalty. In determining the seriousness of the violations, "the court looks to several factors, including, but not limited to: (1) the number of violations; (2) the duration of noncompliance; (3) the significance of the violation (degree of exceedance and relative importance of the provision violated); and (4) the actual or potential harm to human health and the environment." *Hawaii's Thousand Friends,* 821 F.Supp. at 1383 (citing EPA, "Clean Water Act Penalty Policy," Feb. 11, 1985, at 3–5).

40.     In determining the amount of penalty, the court must consider the nature of the violations, the size of the business that was in existence at the time and the present business, the ability to pay. And the amount of penalty is always at the discretion of the Court. The Court must take into account the good or bad faith of the defendant and the need to deter others. *US v. Walsh*, 783 F. Supp. 546 (W.D. Wash., 1991)

41.     Court should substantially reduce maximum penalty because Plaintiffs have no provided evidence of degree of seriousness of violation, because the nature of pollutants discharged and its lack of impact on environment. *Weber v. Trinity Meadows Raceway, Inc.* 1996 WL 477049, 42 ERC 2063 (N.D. Texas)

42.     A civil penalty amount, reduced to 25% of net income for the defendant's most recent year, which represents $2,500 per violation (10% of the statutory maximum), is both

sufficient to deter Defendants from allowing future violations and sufficient to punish Defendants for past violations. *U.S. v. Midwest Suspension and Brake*, 49 F.3d 1197 (6th Cir., 1995).

43.     The gravity of harm component should not be based on social media marketing and video recordings, as well as the celebrity status of the individuals, but rather on the lack of evidence of the amount of actual pollutants actually discharged into the Wasatch Front as a result of the violations.

44.     Emphasis should also be based on the lack of economic benefit to Defendants resulting from the violations, including the lack of financial profit from violations, especially with regard to Diesel Power Gear and Hoskins. Morover, any calculations for penalty amount should be based on Defendants' ability to pay and continue business operations.

45.     Defendants have produced its financial records and complete sale history for Diesel Power Gear, showing Defendants generate a modest income, based largely on clothing apparel sales, their television show, and media appearances.

46.     Therefore, civil penalty should be reduced to no greater than 25% of Defendants' most recent annual net income.

### iii. Remediation Program Must Be Proportionate to Actual Harm

47.     42 U.S.C. § 7604(g)(2) contains "the beneficial mitigation project provision is unique to the Clean Air Act..." and provides:

... the court in any action under this subsection to apply civil penalties shall have discretion to order that such civil penalties, in lieu of being deposited [in a United States Treasury fund], be

used in beneficial mitigation projects which are consistent with this chapter and enhance the public health or the environment.

48.    The provision limits expenditures to $100,000 and requires consultation with the Environmental Protection Agency. *Cambrians for Thoughtful Dev., U.A. v. Didion Mil.,* 571 F.Supp.2d 972 (W.D. Wis., 2008)

49.    Remediation programs should not mitigate harm out of proportion with the harm that resulted from the unlawful conduct. *See* EPA's policy on supplemental environmental projects (https://www.epa.gov/enforcement/supplemental-environmental-projects-seps); DOJ's January 9, 2018, memorandum entitled, "Settlement Payments to Third Parties" (https://www.justice.gov/enrd/page/file/1043726/download).

50.    Defendants have provided ample evidence of the major and significant sources of the particulate matter and nitrogen oxides along the Wasatch Front, caused by Kennecott's mine, the five major oil refineries in Salt Lake, the power company's four coal-burning plants, and millions of on-road vehicles driven daily in Utah.

51.    The total on-road vehicles in Utah account for just over 1/3 of the air pollution, not counting out-of-state travelers and commercial diesel semi-trucks traveling in and through Utah There are over 3 million registered vehicles in Utah, including the 7,000 VW fraudulently concealed modified diesels.

52.    There is simply no way to conclude that emissions from the vehicles owned by B&W Auto, which were only briefly operated in Utah, with most sold or transferred out-of-state,

based on the lack of evidence of the amount of actual pollutants actually discharged into the Wasatch Front as a result of the violations, has harmed the Wasatch Front airshed.

53.     Likewise, there is no way to conclude that 104 parts sales, with only 14 going to Utah customers, has had any impact whatsoever on the Wasatch Front airshed.

54.     Finally, there is no evidence to conclude that Hoskins' two vehicles has had any impact whatsoever to the Wasatch Front airshed.

55.     For that reason, Plaintiff's requested mitigation relief of $100,000 to fund a mitigation project "would far exceed" the irreparable harm produced by past emissions. Accordingly, the "[plaintiffs' mitigation proposal [did] not bear an equitable relationship to the degree and kind of harm it is intended to remedy." *United States v. Cinergy Corp.*, 582 F. Supp. 2d 1055, 1061 (S.D. Ind. 2008)

### iv. Injunctive Relief

56.     Not every violation of the Clean Water Act justifies the issuance of an injunction. See *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 320, 102 S.Ct. 1798, 1807, 72 L.Ed.2d 91 (1982). Injunctive relief is appropriate only when the district court deems it "necessary to secure prompt compliance with the Act." *Id*. Although the district court exercises considerable discretion in making this determination, proof of irreparable injury and the inadequacy of legal remedies are prerequisites to the granting of injunctive relief in a Clean Water Act case. *Id*., 456 U.S. at 311-13, 102 S.Ct. at 1803; *Natural Resources Defense Council v. Texaco*, 906 F.2d 934, 937-41 (3rd Cir. 1990).

57. Injunctive relief only appropriate for ongoing violations that will result in immediate and irreparable harm.

58. The terms of the preliminary injunction against B&W Auto should be extended for another 12 months after date of this Court's judgment.

59. DPG ceased selling parts that could violate the CAA upon notice of lawsuit over three years ago, and no risk of immediate and irreparable harm to justify permanent injunction.

60. Stuart was held personally liable for DPG's violations relating to parts sales, and no risk of immediate and irreparable harm to justify permanent injunction.

61. Sparks was held personally liable for DPG's violations relating to parts sales, and no risk of immediate and irreparable harm to justify permanent injunction.

62. Sparks was held personally liable for B&W Auto's violations relating to the custom truck builds, but any injunction should be limited in scope.

63. Keaton Hoskins ceased owning any diesel trucks prior to the initiation of this lawsuit, and no risk of immediate and irreparable harm to justify permanent injunction.