IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH

CENTRAL DIVISION


UTAH PHYSICIANS FOR A HEALTHY )

ENVIRONMENT,                  )

          Plaintiff,          )

vs.                           )     Case No. 2:17-CV-32RJS

DIESELSellerz.com, et al.,    )

          Defendants.         )

_____)




          BEFORE THE HONORABLE ROBERT J. SHELBY

          --------------------------------------

                    November 5, 2019


                      Bench Trial


                      Volume I

```
1                        A P P E A R A N C E S

2

3     For Plaintiff:              REED ZARS
                                  910 Kearney Street
4                                 Laramie, Wyoming

5                                 GEORGE E. HAYS
                                  P.O. Box 843
6                                 Bellevue, Washington

7

8

9

10

11    For Defendant:             COLE S. CANNON
                                 53 South 600 East
12                               Salt Lake City, Utah

13                               JANET M. CONWAY
                                 53 South 600 East
14                               Salt Lake City, Utah

15

16

17

18

19

20

21

22    Court Reporter:            Ed Young
                                 351 South West Temple
23                               Room 3.302
                                 Salt Lake City, Utah 84101-2180
24                               801-328-3202
                                 ed_young@utd.uscourts.gov
25
```

```
 1                            I N D E X

 2
       Witness                     Examination              Page
 3     -------                     -----------              ----

 4     Michael Joseph St. Denis Mr. Zars (Direct)              9
       Michael Joseph St. Denis Ms. Conway (Cross)            44
 5     Michael Joseph St. Denis Mr. Zars (Redirect)           65
       Michael Joseph St. Denis Ms. Conway (Recross)          66
 6     Michael Joseph St. Denis Mr. Zars (Further Direct)     71
       Michael Joseph St. Denis Ms. Conway (Further Recross)  73
 7
       Charles Gee                Mr. Zars (Direct)           76
 8     Charles Gee                Ms. Conway (Cross)          98

 9     Darrin Matheson            Mr. Zars (Direct)          103
       Darrin Matheson            Ms. Conway (Cross)         107
10
       Kirtly Jones               Mr. Zars (Direct)          109
11     Kirtly Jones               Mr. Cannon (Cross)         113

12     Josh Stuart                Mr. Hays (Direct)          115
       Josh Stuart                Mr. Cannon (Cross)         128
13

14

15

16

17

18

19

20

21

22

23

24

25
```

1

2                                    I N D E X

3
         Exhibit                                          Received
4        -------                                          --------
         Plaintiff's Exhibits 1, 2, 3, 4, 9 through 24,
5        23 through 30, 34, 51, 54, 57, 61, 62 and 70.          7
         Plaintiff's Exhibits 72, 75 through 83, 88
6         through 90, 92 through 94, and all of the
          exhibits of the defendants.                           8
7        Plaintiff's Exhibit 40                                10
         Plaintiff's Exhibit 31                                22
8        Plaintiff's Exhibit 33                                25
         Plaintiff's Exhibit 35                                32
9        Plaintiff's Exhibit 36                                33
         Plaintiff's Exhibit 37                                34
10       Plaintiff's Exhibit 38                                36
         Plaintiff's Exhibit 39                                41
11       Plaintiff's Exhibit  8                                67
         Plaintiff's Exhibit 41                                86

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1   November 5, 2019                              9:00 a.m.

 2                    P R O C E E D I N G S

 3

 4          THE COURT:  Good morning, everyone.

 5          We'll call case number 2:17-CV-32.  It is our Utah

 6   Physicians versus DIESELSellerz case.  Counsel, you're quite

 7   familiar to me at this point, but why don't we go ahead and

 8   make our appearances, should we?

 9          MR. ZARS:  Your Honor, thank you.  Reed Zars for

10   the plaintiff.

11          MR. HAYS:  George Hays for the plaintiff.

12          MS. CONWAY:  Janet Conway for the defendants.

13          MR. CANNON:  Cole Cannon for the defendants.  With

14   me today is Joshua Stuart, one of the defendants and

15   representative of the corporate defendant.

16          THE COURT:  Thank you.

17          This is the time to commence a bench trial.

18          We're prepared to proceed, counsel?

19          MR. ZARS:  Yes, Your Honor.

20          THE COURT:  Ms. Conway, the defendants are

21   prepared to proceed?

22          MS. CONWAY:  Yes, Your Honor.

23          THE COURT:  All right.  This case is quite

24   familiar to me.  I don't know how many hearings we have had,

25   many, and, of course, the Court has issued substantive
```

 1    rulings on liability on numerous of the counts and I'm

 2    familiar with the issues generally.  I think much of the

 3    evidence and testimony has already been introduced by way of

 4    affidavit and declaration in connection with summary

 5    judgment motions.

 6             All of that is by way of me saying I don't know

 7    that any sort of opening statements would be particularly

 8    helpful, and I am mindful of our time, but if there is

 9    something that I think would be helpful to hear before we

10    begin with the testimony, I will defer to you.  Then I guess

11    I will just ask whether any of the parties have contemplated

12    or discussed invocation of the exclusionary rule.

13             I will take that as a no.  Okay.

14             Mr. Zars, would the plaintiff like to open?  Would

15    you like to call your first witness?

16             MR. ZARS:  Thank you, Your Honor.

17             I am not planning on making an opening.  I think

18    you are correct that you are very familiar with the

19    evidence.  We have one potential housekeeping issue and that

20    is, as you saw, the parties stipulated to the entry of a

21    number of the exhibits.  If it is appropriate, I would move

22    for their admission at this time.

23             THE COURT:  Let's do that now, should we?  Will

24    you identify those exhibits for the record and those will

25    all be received.

1              MR. ZARS:  Yes.  I am working now from our exhibit

2      list.  The ones that have been admitted or agreed to be

3      admitted by stipulation include Plaintiff's Exhibits 1, 2,

4      3, 4, 9 through 24, including 24, Exhibits 23 through 30,

5      including 30, and then Exhibits 34, 51, 54, 57, 61, 62 and

6      70.  That, Your Honor, makes up the stipulated documentary

7      exhibits.

8              THE COURT:  Those exhibits are received by

9      stipulation.

10             (Plaintiff's Exhibits 1, 2, 3, 4, 9 through 24,

11              23 through 30, 34, 51, 54, 57, 61, 62 and 70

12              were received into evidence.)

13             MR. ZARS:  Thank you.

14             THE COURT:  Do we have a witness to call?

15             MR. ZARS:  I don't mean to interrupt, we have

16     exhibits that are videos that I will continue on if that --

17             THE COURT:  I'm sorry.  I jumped ahead of you.

18             MR. ZARS:  The video exhibits that have been

19     stipulated to be admitted are 72, 75 through 83, 88 through

20     90, 92 through 94.  The exhibits that the parties have also

21     stipulated to for entry include all of the exhibits of the

22     defendants.

23             THE COURT:  Those will all be received then.

24     Thank you.

25             MR. ZARS:  Thank you.

 1              (Plaintiff's Exhibits 72, 75 through 83, 88

 2               through 90, 92 through 94, and all of the

 3               exhibits of the defendants.)

 4          THE COURT:  There won't be the need to separately

 5     move the admission for any of those.

 6          MR. ZARS:  Thank you, Your Honor.

 7              Here is how I intend to proceed.  As you know, we

 8     have a truck downstairs for the Court's view.  The

 9     individual who would be explaining the parts is Dr. St.

10     Denis and he is here.  My plan, but it can be modified by

11     Your Honor, would be to put him on the stand initially and

12     have him go through his credentials and my intent would be

13     to have him endorse as an expert what he is to talk about.

14              I thought at that point, to the extent he is

15     qualified or deemed admitted as an expert, we could break

16     and have him view the truck.  A bunch of the following

17     testimony that I anticipate has to do with him describing

18     the parts that Your Honor would have then seen.  If that is

19     acceptable, I would proceed in that manner.

20          THE COURT:  It is.  Thank you.

21              What I have in mind is we won't try to take a

22     court reporter with us into the garage and transcribe the

23     discussion.  We'll make sure that defendants' counsel and

24     any experts they wish to have with us will be present and

25     we'll hear from anybody.  We'll come up and you'll have a

1    chance to make whatever record that you would like to make

2    about what we have just witnessed or done.  It will be

3    helpful to the Court for sure.

4            Do you wish to start by calling Dr. St. Denis

5    then?

6            MR. ZARS:  Please, Your Honor.

7            THE COURT:  Thank you.

8            Is the doctor in the courtroom?

9            Would you come forward, Doctor, and we'll

10   administer the oath.

11                   MICHAEL JOSEPH ST. DENIS

12              Having been duly sworn, was examined

13                  and testified as follows:

14           THE WITNESS:  Michael Joseph St. Denis.

15   M-i-c-h-a-e-l, J-o-s-e-p-h, S-t. D-e-n-i-s.

16                   DIRECT EXAMINATION

17   BY MR. ZARS

18   Q.   Please state your name for the record.

19   A.   Michael Joseph St. Denis.

20           MR. ZARS:  I am looking for the exhibit binder.

21   Do we have one for the witness?

22           May I approach?

23           THE COURT:  Please.

24   BY MR. ZARS

25   Q.   Dr. St. Denis, I have handed you the exhibits, the

1    plaintiff's exhibits in this case.  I ask you to review

2    Exhibit 40 and please describe what that exhibit reflects.

3    A.    Exhibit 40 is my resume.

4    Q.    Does that document accurately disclose your educational

5    and professional background and accomplishments?

6    A.    Yes, it does.

7    Q.    Would you in brief describe what your resume discloses

8    in terms of your educational and professional experience.

9    A.    I have a bachelor's degree in chemistry from the

10    University of the Pacific, a master's in physics and

11    chemistry from the University of the Pacific, and a

12    doctorate in environmental science and engineering from

13    U.C.L.A.

14        It describes the dissertation research I did, which was

15    conducted at Ford Motor Company, studying computer controls

16    and how they affect the vehicle emission rates.  And then it

17    describes my experience working after I graduated from

18    U.C.L.A.

19    Q.    Very good.

20             MR. ZARS:  I would move for the admission of his

21    resume.

22             MS. CONWAY:  No objection, Your Honor.

23             THE COURT:  It is received.

24             (Plaintiff's Exhibit 40 was

25              received into evidence.)

1          THE COURT:  Mr. Zars, I think you had a binder of

2   exhibits for the Court, but I don't -- now I have located

3   them.  Thank you.

4          MR. ZARS:  We also provided them electronically,

5   Your Honor.  We're working out some of the rust here, Your

6   Honor.

7          THE COURT:  That is fine.  We're good.  Thank you.

8          Go ahead.

9   BY MR. ZARS

10  Q.   With respect to your educational background, would you

11  please tell us what classes you took, with particular

12  emphasis on motor vehicle emissions, air pollution effects

13  and things related to the matter before us.

14  A.   The focus of my study was related to air pollution

15  mostly from vehicles.  So it included air pollution

16  regulatory issues, it included epidemiology, so looking at

17  health effects from air pollution.  It looked at air

18  pollution dispersion modeling and air pollution chemistry.

19  Q.   What was the specific work that you performed to obtain

20  your Ph.D.?

21  A.   Beyond the classwork I had to do the equivalent of

22  another master's degree which was designing an instrument to

23  measure air pollution.  Then my dissertation research was

24  done at Ford Motor Company and that was studying how the

25  certification test process is not necessarily representative

1   of how cars behave on the road, because the computers in

2   cars can be intelligent enough to detect the test.

3   Q.   Is Volkswagen an example of that?

4   A.   Volkswagen is an example of that.  I was actually asked

5   to help on that case.

6   Q.   Do you have any postgraduate training in the work that

7   you do?

8   A.   None specifically, no.

9   Q.   Where are you currently employed?

10  A.   I currently own an engineering company in Rockland,

11  California named ReveCorp, R-e-v-e-C-o-r-p, which is focused

12  on doing research related to vehicles and vehicle emissions

13  and testing vehicles.

14  Q.   And what is your position within that company?

15  A.   I am the principal there.  I lead all of the scientific

16  research that goes on.

17  Q.   How long have you held that position?

18  A.   12 years.  Since I founded the company.

19  Q.   Can you give us a brief example of the types of work

20  that you have performed in your role as the principal in

21  ReveCorp?

22  A.   Yes.  We're basically focused on helping reduce air

23  pollution from vehicles, so anything related to that.  We

24  have helped many of the states put in place their vehicle

25  inspection programs.  We do research for the car companies

1    and the oil companies, U.S. E.P.A., the California Resources

2    Board.  You mentioned Volkswagen.  I have actually worked on

3    the two recent cases, Fiat Chrysler, which was settled in

4    May, and Audi Volkswagen, which was settled about a month

5    ago, and both of those where we had to obtain vehicles and

6    test them and develop reports on their emissions and that

7    same sort of process.

8    Q.    Have you delivered any lectures or speaking engagements

9    on these matters?

10   A.    Yes.  I team taught a class at the University of

11   Michigan that was designed for people out of school that

12   were moving into the emissions testing arena.  It was mostly

13   people that were going to work at the E.P.A.'s lab in

14   Michigan or going to work for the car companies.  It was to

15   teach them about how the emissions control systems worked

16   and the regulatory requirements to put the systems in their

17   vehicles and how those things interacted.

18        I have taught classes at U.C.L.A., Cal State Fullerton,

19   and we teach classes to states frequently.  In September I

20   taught a class to the state of Vermont's auditors and

21   inspectors that go out to make sure that inspection stations

22   are doing proper inspections, and to train them about air

23   pollution and how the emission control systems interact with

24   that.

25        There is an annual forum, a training forum for people

1    in this field and I have been giving talks at that for 15

2    years or so.

3    Q.    Do you have any patents?

4    A.    I have two patents, one related to testing

5    dynamometers, which are the rollers that you put a car on

6    when you test it, and one related to onboard diagnostics, a

7    device that tests vehicles to determine whether or not they

8    are ready to be tested in an I and M program such as the one

9    here.

10   Q.    When you say I and M, what do you mean by that?

11   A.    Sorry.  The inspection and maintenance programs, the in

12   use compliance programs where people come in on a regular

13   basis to make sure that their vehicle is still complying

14   with the emissions standards.

15   Q.    Thank you.

16         Did you prepare an expert report in this matter?

17   A.    Yes, I did.

18   Q.    What do you intend to testify to today?

19   A.    I intend to testify that we received a truck.  You

20   requested that we do an emissions test on it, which we did,

21   and compared those results to the standard and to other

22   vehicles to look at its relative impacts.

23   Q.    Do you believe your testimony would be helpful in

24   assisting the Court in understanding the facts in this

25   matter?

1    A.    Yes.   I think it will be helpful to understand the

2    impact of removing the emissions controls from the vehicles

3    versus what their controlled state is.

4         MR. ZARS:   Your Honor, I move at this time to

5    tender Dr. St. Denis as an expert in the field of air

6    pollution regulation and mobile source emissions control

7    systems.

8         MS. CONWAY:   Your Honor, I object to the extent

9    that that is awfully broader than what he just testified

10   that he is qualified to do.   I don't know if he is

11   necessarily an expert in air pollution versus an expert in

12   diagnosing and testing vehicles.   I don't know if he has

13   necessarily been established as an expert in air pollution

14   in general.

15        THE COURT:   Well, he is clearly qualified as an

16   expert to offer testimony in some areas.   If you think that

17   Mr. Zars strays into subject matter calling for opinion

18   testimony for which we have not established a proper

19   foundation, you will let us know, but I will tentatively

20   receive him as an expert.

21        MS. CONWAY:   Thank you, Your Honor.

22        THE COURT:   Thank you.

23        MR. ZARS:   Thank you, Your Honor.

24        At this time I would propose, whatever the

25   technical term is, but to pause and take the view of the

1    vehicle downstairs.

2         THE COURT:  Let's do that.  My clerk will assist

3    you and the lawyers and others with the aid of the C.S.O. in

4    getting to the truck and I will meet you there.

5         Mr. Cannon, you have a question?

6         MR. CANNON:  Thank you, Your Honor.  It came to

7    our attention at the pretrial conference that this vehicle

8    has already been restored to -- I don't want to put words in

9    Mr. Zars' mouth -- to factory settings.  It creates issues

10   for us under Rules 401 and 402 and 403.  I don't know

11   exactly where those lines are drawn, but in my mind a truck

12   that has been modified outside of our control is

13   effectively, and I am not trying to be pejorative about it,

14   but it is tampering with evidence, if the intent of offering

15   this truck is to show the Court that this is a truck that

16   the defendants modified.

17        Well, maybe three years ago it was, but the truck

18   you're about to look at it is not, and it might be highly

19   prejudicial to actually see it.  We have not stipulated to

20   the admission of the truck as evidence.  To the extent that

21   we are just talking about how a truck works, meaning here is

22   the D.P.F. and here is the catalytic converter and the

23   muffler, then I'm fine to go look at that truck, recognizing

24   that it is only as relevant as any other car in the garage,

25   and that if we tipped it upside down, we would see kind of

1   how the flow works.  That is my concern.  That did not come

2   to our attention until actually at the pretrial conference.

3           THE COURT:  Mr. Zars, the point of this exercise I

4   think is as a demonstrative and educational for the Court.

5           Is that what you had in mind?

6           MR. ZARS:  That is what we had in mind.  It does

7   happen to be a truck that they have even admitted in their

8   papers was theirs and had been, quote, deleted.  You will

9   see the straight pipe there and that is theirs and that is

10  what was in the truck.  You're correct that we could have

11  had another truck or we would have used a diagram.  We are

12  not trying to prove anything that we otherwise have not

13  already proven.

14          THE COURT:  We'll go see it and if there are

15  specific objections that you wish to lodge when we return to

16  the courtroom, Mr. Cannon, we'll hear those.

17          We'll recess.  Thank you.

18          (WHEREUPON, the vehicle observation was taken.)

19          THE COURT:  Mr. Zars.

20          Dr. St. Denis, sir, I will just remind you that

21  you remain under oath, sir.

22          Let me just make a short record.  We just went off

23  the record and Dr. St. Denis and counsel and others, not

24  everybody who is known to me, was with us on-site for a

25  demonstrative exercise with a truck that I think I

1    understand the plaintiffs obtained in 2016.

2           MR. ZARS:  Yes, Your Honor.

3           THE COURT:  Dr. St. Denis illustrated various

4    components of what I will call the exhaust system and some

5    of the computer features and notice information and signage

6    on the vehicle, along with the portion of the exhaust system

7    that was removed from the vehicle I think you said in May of

8    this year.  Counsel were both invited to ask Dr. St. Denis

9    to address any part of the vehicle that they wished to talk

10   about while we were there.  Our visit lasted about ten or 15

11   minutes.

12          Mr. Zars, anything more you wish to say about that

13   on the record?

14          MR. ZARS:  No, Your Honor.  I could have Dr. St.

15   Denis summarize again on the record what he pointed out to

16   you, if that would be appropriate or we can move on.  I do

17   have one exhibit that I could present to Dr. St. Denis that

18   summarizes --

19          THE COURT:  We'll receive whatever testimony that

20   you would like to elicit.

21          Ms. Conway, anything from the defense for the

22   benefit of the record?

23          MS. CONWAY:  Your Honor, I will just reserve my

24   time for cross-examination.  I don't have any comments about

25   downstairs.

1          THE COURT:  All right.  Mr. Zars.

2     BY MR. ZARS

3     Q.   Dr. St. Denis, would you kindly and briefly describe

4     what you showed us downstairs.

5     A.   Yes.  With the F-250 that we looked at downstairs, I

6     pointed out the emissions control label that is underneath

7     the hood which shows that it was certified by Ford Motor

8     Company in 2012, and it indicates the major emissions

9     control components that are required to be on the vehicle.

10         I identified a pipe that we replaced in the vehicle

11    with the emissions control components which was from the

12    downpipe with the exhaust from the vehicle basically to the

13    tailpipe that contains the diesel oxidation catalyst, the

14    selective catalytic converter and the particulate filter for

15    the vehicle.

16         I identified where the computer was, the exhaust gas

17    recirculation, which is also a control for NOx, and noted

18    that that had been disabled through the vehicle's computer,

19    and showed where you could plug into the computer to

20    communicate with the computer that is onboard to find out

21    what systems are supported by the vehicle, and showed where

22    you would add diesel exhaust fluid to the vehicle for the

23    selective catalytic converter.

24    Q.   I direct your attention to Exhibit 31.  Would you

25    please explain that exhibit and its origin.

1   A.   This is from the Ford service manual and this describes

2   the three major emission control components underneath the

3   vehicle.  It is in the opposite order than we are reviewing

4   it downstairs, just so that there is no confusion.

5        If you start on the left-hand side that would be the

6   side where the exhaust comes out of the vehicle.  The

7   right-hand side would be where it goes out to the tailpipe.

8   In this series of three emissions controls there are four

9   thermocouples.  The numbers that are on here are identified

10  where they are below, and I will not go through and explain

11  where each one is, but basically before and after each

12  component there is a thermocouple to look at the operating

13  temperature of it.

14       Item two is where the diesel exhaust fluid is injected

15  into the system.  At the furthest end to the right, items

16  four and five are pressure transducers that look at the

17  pressure across the diesel exhaust particulate filter.

18       The first item -- the first major emissions control 11

19  is the diesel oxidation catalyst.  That has efficiency

20  generally of 30 to 50 percent of reducing hydrocarbons and

21  particles from the vehicle.  The second emission control,

22  which is nine, is selective catalytic reduction, and that

23  has an efficiency of generally about 90 percent.  It works

24  in combination with the exhaust gas recirculation, which is

25  on the intake side of the engine and not shown here.

1       The exhaust gas recirculation has an efficiency of

2   between 30 and 50 percent as well.  So when you combine the

3   exhaust gas recirculation with the selective catalytic

4   reduction that is underneath, it generally reduces the NOx

5   emissions from the vehicle more than 95 percent.

6       Then the last item, which is item eight, is the diesel

7   particulate filter and it is a periodic filter in that it

8   builds up particles and then it is cleaned on occasion.

9   That is generally 60 to 80-percent efficient at reducing

10  particles.  As I mentioned, the diesel oxidation catalyst is

11  somewhere between 30 and 50 percent.  When you combine those

12  you get at least a 90-percent reduction of the particles

13  emissions from the vehicle.

14      All of the sensors that are on here are connected back

15  to the vehicle's computer.  The onboard diagnostics that is

16  required to be on all the vehicles sold in the U.S. since

17  '96 is monitoring these to make sure they are working

18  properly.

19      In some instances, if you look at the NOx sensors --

20  let's see what the numbers are.  It should be seven at one

21  end, and there is one at the upper end which is one, and

22  those are actually measuring NOx, but the diesel particulate

23  filter does not actually measure particles, it just measures

24  the pressure differential which tells whether or not it is

25  working, can it be cleaned, is it getting plugged.

 1          These all report back to an onboard diagnostic system

 2     like I mentioned.  If something is not working properly,

 3     according to the E.P.A. regs for the vehicle, it turns on

 4     the check engine light so that the motorist knows right away

 5     that there is a problem with the system and they can take it

 6     in and get it repaired.

 7     Q.    Does Exhibit 31 accurately and fully reflect what we

 8     saw downstairs as far as the emissions that are shown on the

 9     diagram, the emissions equipment?

10     A.    Yes.  The equipment on this diagram is identical to

11     what is installed on the vehicle downstairs.

12              MR. ZARS:  I move for the admission of Exhibit 31.

13              MS. CONWAY:  I object, Your Honor, to the extent

14     that this is an incomplete copy.  He has referred to this as

15     an emissions system, but the label on the title says exhaust

16     system and I do not have the complete document to reference

17     a single page out of it.

18              THE COURT:  The objection is overruled.

19              We'll receive Exhibit 31.

20              (Plaintiff's Exhibit 31 was

21               received into evidence.)

22     BY MR. ZARS

23     Q.    During our review downstairs, Dr. St. Denis, you

24     identified the equipment that had been installed earlier

25     this year by the Ford dealership.  Are you familiar with how

 1    much that restoration cost?  I would refer you to Exhibit

 2    31.

 3         Excuse me.  33, to the extent that would be helpful.

 4              MS. CONWAY:  Your Honor, if I might object.  This

 5    is not a document that was generated by this individual, and

 6    to the extent that they are asking him to bring this exhibit

 7    in through this individual, that is not connected to the

 8    repair invoice that he is referring to, I object.

 9              THE COURT:  Do you question the authenticity of

10    the document?

11              MS. CONWAY:  Your Honor, I believe it lacks

12    foundation.

13              THE COURT:  Do you question the authenticity of

14    the document?

15              MS. CONWAY:  I certainly trust that Mr. Zars'

16    representations are honest.

17              THE COURT:  I understand your objection.

18              Mr. Zars, what is your questions for the witness?

19              MR. ZARS:  I can work on a little more foundation

20    with him.

21    BY MR. ZARS

22    Q.   Dr. St. Denis, did you compare this invoice that is

23    shown here as Exhibit 33 with what equipment you showed us

24    today on the truck?

25    A.   Yes.  This lists all of the components from the

1   downpipe back that were replaced on the vehicle.  I did

2   speak to Cody Holley at the Ford dealer about what was done

3   and the price of this invoice, and this does represent what

4   I saw versus what he said they put back on the vehicle.

5   Q.   As a person in your field and with your expertise,

6   would it be normal or customary for an expert like you to

7   rely on this type of invoice from a Ford dealership?

8   A.   Yes.  We have done this in the past, sent vehicles to

9   have the emissions controls repaired, both in emissions

10  cases where we are trying to replace the system and in

11  recalls, which we're working on several of those now.

12  Q.   Do you have any reason to suspect either the

13  authenticity of this document or the truth of its

14  statements?

15  A.   No.

16  Q.   The question that I have for you is what was the

17  disclosed cost of restoring that equipment as shown by this

18  exhibit?

19  A.   $8,572.78.

20        MR. ZARS:  I move for the admission of Exhibit 33.

21        THE COURT:  Mr. Zars, help me understand the

22  relevance of the exhibit.

23        MR. ZARS:  The relevance, Your Honor, is the

24  extent of the -- well, the harm that is caused to a vehicle

25  when it is removed, and I think it is relevant to the

1    determination of a penalty.  If one were to destroy wetlands

2    it would be useful for the Court to know what it would cost

3    to restore the wetlands and what significant impact that is.

4    That is why.  I just indicate that this is not a $5 part.

5            THE COURT:  Well, we enjoy some flexibility

6    because we don't have a jury that we're concerned about

7    being exposed to evidence that may not ultimately be

8    relevant.  I will know at the end when we conclude what the

9    Court may properly consider and not consider and how much

10   weight to give to it.

11           Ms. Conway, any objection?  The motion is to

12   receive Exhibit 33.

13           MS. CONWAY:  No objection, Your Honor.

14           THE COURT:  It is received.

15           (Plaintiff's Exhibit 33 was

16            received into evidence.)

17   BY MR. ZARS

18   Q.   Dr. St. Denis, are the controls that you identified a

19   result of legal requirements to your knowledge?

20   A.   Yes.  Starting with Congress passing the Clear Air Act

21   and then E.P.A. putting rules in place to do what Congress

22   asked, which was to clean the air, the E.P.A. passed rules

23   that required that vehicles meet certain standards, and in

24   some cases specified what technology should be used to

25   obtain those standards.

1    Q.   Would you briefly sketch the evolution of those

2    standards with particular focus on diesel emissions.

3    A.   Sure.  As I mentioned, it started with the Clean Air

4    Act in 1970.  Very briefly, light duty gasoline cars, which

5    were the biggest source of on-road pollution, so light duty

6    cars had catalytic converters starting in '75.  The next

7    biggest source of air pollution was diesels.  The E.P.A.

8    started focusing on diesels in 1985.  They required that

9    they have exhaust gas recirculation to reduce NOx.  In '95

10   they added diesel oxidation catalysts to help reduce

11   particulates.

12        They realized that those two controls were not as

13   effective as they wanted.  Part of the reason was sulfur

14   levels in diesel would poison the catalyst.  In 1991 they

15   issued a document -- sorry -- starting in 2001 they issued a

16   document that was about ways to get both the fuel and the

17   controls in the vehicle to come together to decrease

18   emissions from the vehicles.  That resulted starting in 2007

19   with the addition of the diesel particulate filters which we

20   saw downstairs.  And then in 2011 they added selective

21   catalytic reduction.  Those are the four major controls that

22   are on the vehicle downstairs.

23   Q.   How did, and I assume this is the E.P.A., articulate

24   the legal requirement and in what terms or methods?  For

25   example, did it require trucks to have a diesel particulate

1  filter on it specifically?

2  A.   Yes.  In some cases the E.P.A. allows the manufacturer

3  leeway.  In this case they specified that they had to have

4  diesel particulate filters.  It is all in a document in the

5  Federal Register that the E.P.A. released in 2001.  In that

6  document they laid out their reasoning for requiring certain

7  kinds of emissions controls and what the new standards that

8  the vehicles had to meet would be and how those came to be.

9         MR. ZARS:  May I approach the witness?

10        THE COURT:  Yes, of course.

11        MR. ZARS:  I am not intending this as an exhibit.

12  BY MR. ZARS

13  Q.   Would you please identify that document?

14        MS. CONWAY:  Do you have one for me?

15        MR. ZARS:  I'm sorry.

16  BY MR. ZARS

17  Q.   Is this the Federal Register that you referenced that

18  was issued in 2001, Dr. St. Denis?

19  A.   Yes.  I'm familiar with this.  This is, in the air

20  pollution world, kind of a famous benchmark, if you will.

21  In early 2001 the E.P.A. released this and they laid out

22  their reasoning for all of the future emission controls

23  which we are seeing put in place today to reduce emissions.

24      This document starts out with the reasoning from the

25  health effects and they talk about how -- excuse me.  They

1    talk about how their studies of diesel emissions have led

2    them to believe that it causes premature mortality.  It can

3    cause cancer.  It is carcinogenic and mutantogenic.  For

4    those reasons they need to reduce diesel emissions, both

5    NOx, which contributes to the ozone and the particulates,

6    and the particulates directly emitted from the vehicles.

7          Just to be clear, and so I don't confuse things, NOx

8    itself is a pollutant, and NOx forms ozone which is a

9    pollutant and that is referred to as a secondary pollutant

10   or it reacts in the environment to make ozone.

11         NOx also reacts with other things in the environment to

12   also make particles, so not only are there particles

13   directly emitted from these vehicles, but the NOx emissions

14   also form additional particles which are known to be

15   carcinogenic and mutantogenic.  So this is the E.P.A.'s

16   method of saying pretty much everything that comes out of a

17   diesel truck is a concern to us and we need to reduce all of

18   the emissions down.  It was both attacking particles and NOx

19   for that reason.

20   Q.   Would you kindly provide the cite of that, if you're

21   familiar with it.

22   A.   Yes.  This is in the E.P.A.'s O.T.A.Q., the Office of

23   Air Pollution website.

24   Q.   Okay.

25         MR. ZARS:  Your Honor, the cite to that Federal

1    Register is 66 Fed Reg 5,002.

2    BY MR. ZARS

3    Q.    Are you familiar with how the manufacturers in fact,

4    other than Ford that we saw, responded to these requirements

5    and regulations?

6    A.    Yes.  I looked at the emissions control systems of

7    other manufacturers and they use these identical control

8    methods.  Sometimes they may be in a different order but

9    generally they are the same components.

10   Q.    I would like to now turn to the testing that you

11   performed on the vehicle we saw earlier today.  When did you

12   undertake that testing, Dr. St. Denis?

13   A.    The vehicle was received in late April of 2016.  There

14   is a check-in process that we use at the lab.  The testing

15   was done at S.G.S. Lab in Aurora, Colorado.  I have done

16   work with that lab for over 20 years.  Some of the car

17   companies are actually resident at the lab and they do some

18   of their certification work for the E.P.A. there at the lab.

19        I use that lab because it is kind of considered an

20   E.P.A. certified lab, in that it meets the American

21   Association of Labs accreditation standards, I.S.O.

22   standards, and I have done research for the E.P.A. there and

23   the California Resources Board and done work for other

24   cases.  I mentioned both Fiat Chrysler and Audi.  Recently

25   we did testing for those cases there.  I have a good rapport

1    with the lab and spend a lot of time there.

2        The vehicle was received, as I mentioned, in late

3    April.  The vehicle was checked in and documented including

4    the photos that are in my declaration showing the straight

5    pipe in place in the truck.  We did an O.B.D. scan to

6    determine what the computer believed was the emissions

7    controls that were installed on the vehicle and still

8    operating.  Then the vehicle --

9    Q.   Let me stop you there and ask a couple of initial

10   questions and then we'll go to what you were saying.  I'm

11   sorry.

12       What was the purpose, as you understood it, of

13   conducting this testing?

14   A.   I was asked to do a certification test on the vehicle,

15   so we used the federal test procedure for certifying

16   vehicles on the test that is identical to what was done on

17   the vehicle -- that class of vehicle, maybe not this

18   particular one, but that class of vehicle when it was

19   certified in 2012.

20   Q.   Were the results that you found to be compared with

21   other results, what was the significance of the results that

22   you were seeking to obtain through the testing?

23   A.   Well, we wanted to know the emission rates of both the

24   NOx and particulates and we were asked to document the

25   condition of the vehicle.  Were all the emissions controls

 1   present?  Was the computer using the code that came from the

 2   factory?

 3   Q.    You mentioned that you used the federal test method.

 4   What specific method was used and why did you use that?

 5   A.    The federal test procedure is referred to as the FTP-75

 6   and it is a three-phase test.  The vehicle is prepared for

 7   the test by changing the fuel on it and warming it up and

 8   soaking it overnight.  It sat on the dynamometer so they can

 9   do a test while the vehicle is cold.  We drive a particular

10   driving pattern and measure the emissions during that.

11        We continue driving after the vehicle is warmed up so

12   we get the emissions from the cold part of the vehicle's

13   operation and the warmed up operation, and shut the vehicle

14   off and let it soak and sit without running for ten minutes,

15   and restart it and we capture hot start emissions and

16   driving after a hot start.  Those three phases of emissions

17   are combined using a formula that the E.P.A. designates to

18   come up with a single number for the emissions from this

19   vehicle.

20   Q.    Is the FTP-75 method the same method that was used to

21   certify the vehicle?

22   A.    Yes, that is the same procedure.

23   Q.    Is that why you used it?

24   A.    That is the reason.

25   Q.    I direct your attention, please, to Exhibit 35.  Would

1    you please explain what that exhibit is?

2    A.    This is Ford Motor Company's application for

3    certification from U.S. E.P.A.

4    Q.    What standards did Ford indicate they needed to meet as

5    an emissions standard for this vehicle with specific respect

6    to NOx and P.M., particulate matter?

7    A.    The emissions standards are a function of the fuel, the

8    vehicle type and the vehicle weight.

9    Q.    No, I mean the numerical values.

10   A.    For NOx the standard was 0.2 grams per mile.  For

11   particulate matter it is 0.02 grams per mile.

12   Q.    When you performed the testing, did the test results

13   from S.G.S., were they delivered to you in these same units,

14   in grams per mile?

15   A.    Yes, they were.

16   Q.    Okay.  To your knowledge and information, is Exhibit 35

17   a true and accurate representation of Ford Motor Company's

18   application for a certification of a 2013 Ford F-250 diesel?

19   A.    Yes, it is.  I researched this myself.

20              MR. ZARS:  I move for the admission of Exhibit

21   35.

22              MS. CONWAY:  No objection, Your Honor.

23              THE COURT:  It is received.

24              (Plaintiff's Exhibit 35 was

25               received into evidence.)

```
 1   BY MR. ZARS

 2   Q.   Would you please turn to Exhibit 36 and identify and

 3   describe what we're looking at for Exhibit 36.

 4   A.   Exhibit 36 is the certificate of conformity from the

 5   U.S. E.P.A.  After the E.P.A. receives the application from

 6   the Ford Motor Company, they review it and they say, yes, it

 7   complies with the standards and then they issue this to

 8   allow them to sell the vehicle.

 9   Q.   Is this a true and accurate representation of the

10   certificate of conformity that was issued by E.P.A. to the

11   best of your understanding?

12   A.   Yes, it is.  I researched this myself.

13              MR. ZARS:  I move the admission of Exhibit 36.

14              MS. CONWAY:  No objection, Your Honor.

15              THE COURT:  It is received.

16              (Plaintiff's Exhibit 36 was

17               received into evidence.)

18   BY MR. ZARS

19   Q.   I direct your attention to Exhibit 37.  Please explain

20   what we're looking at there.

21   A.   Exhibit 37 are three pictures which were taken in

22   April of 2016 when the vehicle was received at the

23   laboratory, to document what was connected from the downpipe

24   to the exhaust of the vehicle.

25   Q.   Who took these pictures?
```

1    A.   A technician at the S.G.S. lab.

2    Q.   Were they taken prior to the testing?

3    A.   They were taken prior to the emissions testing, yes.

4    Q.   Are the pictures taken by the S.G.S. laboratory and the

5    people you have worked with in the past known to you to be

6    reliable and authentic?

7    A.   Yes.  They do a significant amount of this kind of work

8    for us, documenting the status of vehicles.

9             MR. ZARS:  I move for the admission of Exhibit 37.

10            MS. CONWAY:  No objection, Your Honor.

11            THE COURT:  37 is received.

12            (Plaintiff's Exhibit 37 was

13             received into evidence.)

14   BY MR. ZARS

15   Q.   Turning your attention now, Dr. St. Denis, to Exhibit

16   38, would you please identify that exhibit for the Court.

17   A.   Exhibit 38 is the results from the emissions tests that

18   were performed on the F-250 by S.G.S.

19   Q.   Within that report are you able to show us where the

20   NOx and P.M. results are shown, again, referring back to the

21   units that you described in the Ford application, that is in

22   the grams per mile?

23   A.   Yes.  If you turn to page 6 in there, and it would be 6

24   in the P.D.F., the results are highlighted in the bottom

25   left column.  As I mentioned, there are three phases to the

1    test.  You can see phase one, phase two and phase three.

2    They have their own individual emission rates for NOx.

3    Those emission rates are combined into a single number and

4    you can see the NOx emissions rate was 4.3211 and the units

5    are above grams per mile.

6    Q.   I'm circling that on the screen.  Have I circled it

7    correctly?

8    A.   Yes.

9    Q.   Where are the particulate matter results?

10   A.   The particulate matter results are two pages -- three

11   pages further ahead.  Page 9.  There you go.

12        Again, there are three phases to the federal test

13   procedures, so you can see that it says filter one, two,

14   three, and those are phases one, two and three.  The results

15   from each of those are combined into a single number.  At

16   the bottom highlighted it says weighted grams per mile,

17   phases one through three, 0.0858 grams per mile.

18   Q.   Directing your attention to the screen that I have

19   circled, is that the correct --

20   A.   That is correct.

21   Q.   -- final particulate matter result from the S.G.S.

22   testing?  Thank you.

23        In your understanding are these true and correct copies

24   of the emission results that were provided to you by the

25   S.G.S. Laboratory?

1   A.   Yes.

2   Q.   Are these results that persons in your position and

3   expertise would rely upon?

4   A.   Yes.

5            MR. ZARS:  I move for the admission of Exhibit 38.

6            MS. CONWAY:  No objection.

7            THE COURT:  38 is received.

8            (Plaintiff's Exhibit 38 was

9              received into evidence.)

10  BY MR. ZARS

11  Q.   You earlier indicated, Dr. St. Denis, that not only had

12  the truck at S.G.S. Labs been evaluated visually and it sent

13  you pictures and it also had been evaluated through the

14  FTP-75 test procedure, and also the O.B.D. had been scanned

15  to determine the health or lack thereof of the O.B.D.

16  system.

17       Directing your attention to 39, Exhibit 39, does that

18  exhibit reflect the results of the O.B.D. scan --

19  A.   Yes.

20  Q.   -- that was performed?

21  A.   Yes.  This is the O.B.D. scan that was performed on the

22  vehicle.

23  Q.   Would you please direct your attention to the results

24  of that scan.

25  A.   Sure.  There are 11 major systems in general that are

1    monitored on the vehicle by the onboard diagnostic system.

2    They are specified in that column on the left at the bottom

3    of the first page.  It says monitor and the first one says

4    misfire, for example.

5         It also notes if it is available and that means is the

6    computer system checking that system.  Does it believe it is

7    on the vehicle?  And then complete, the status to the right

8    that says complete says that it has had a chance to check

9    that system, meaning that it has communicated with it to

10   find out what its status is.

11        The first three components, misfire, fuel system, and

12   what says component, which is basically all of the other

13   components that are not included anywhere else, that is poor

14   labeling by the E.P.A., sometimes referred to as

15   comprehensive components, those are all of the other little

16   sensors that are not directly in the emissions control path.

17        In this vehicle when it is operating normally you would

18   see the fuel system would actually say supported.  I would

19   expect that there would be the results of complete or

20   incomplete for it, and in this instance it says unsupported,

21   which means the computer looking at that system has been

22   turned off in the software.

23        Others that are in there and that are important -- the

24   fifth one down, NOx after treatment, that is the selective

25   catalytic reduction and that says unsupported, but this

1  vehicle was manufactured with it.  It says so on its federal

2  certification label and on the documents we looked at

3  earlier when they submitted the application for

4  certification to U.S. E.P.A.  That should say supported.

5      We actually scanned the vehicle after all the emissions

6  controls were put back on and the correct software was put

7  in it and now it does say supported.  So both the E.P.A.

8  cert and what we see when it is functioning property

9  indicate that.

10      If you go to the next page at the top, the other one

11  that is easy to see is the exhaust gas recirculation at the

12  very top there, the E.G.R.D.V.T. system, and that says

13  unsupported.  I mentioned that the hardware was on the

14  vehicle but the computer was not using it.  It had been

15  turned off.  That unsupported indicates that the computer

16  has been told not to look at it and not to use that system.

17  Although the hardware was there, it was not communicating

18  with it.

19  Q.  When a monitor indicates that a specific element like

20  the NOx after treatment is unsupported, what is the effect

21  of that statement?  That is, if it is unsupported would a

22  check engine light still show up and say I'm missing my NOx

23  after treatment sensor or system?

24  A.  No.  This has told the car's onboard diagnostic system

25  to ignore that system, and so even if the component were

1    broken or removed, the check engine light won't turn on when

2    it is nonfunctional or missing.  The effect of making it

3    unsupported is that the motorist does not get a notification

4    that that component is not functioning properly or is not

5    installed in the vehicle.

6    Q.   Do you understand how this could happen or did happen

7    to this vehicle?

8    A.   Yes.  The advertisement for the vehicle said that it

9    had an H & S tune, indicating that the software in it had

10   been changed.  If you go to the last page of this -- sorry,

11   the second to the last page, I believe, of this it will say

12   mode nine test results.  There we go.

13        The third thing down, cal I.D. one, calibration I.D.

14   one it has for the value, that is the value of basically the

15   serial number of the software that should be in the vehicle.

16   It is down to your right.

17        Can you see that there?  Nope.

18             MR. ZARS:  Can you eliminate the red there?  I am

19   sorry.

20             THE CLERK:  Hit the bottom of the screen there.

21   It clears it.

22             THE WITNESS:  It says D-D-C-H-3-C-3.  It is the

23   third item down under the mode nine test results.

24   BY MR. ZARS

25   Q.   There?

1    A.    There.  Uh-huh.

2    Q.    What is the significance of that?

3    A.    That is the serial number of the software that is in

4    the vehicle.  When the manufacturer puts the vehicle out, it

5    has a certain software serial number in it.  They may

6    increment it one at a time as they update the software in

7    the vehicle.  This is not a version of software that Ford

8    Motor Company put in the vehicle.  After the vehicle was

9    restored to factory settings, we did scan the vehicle again

10   and the software -- this is not the software that should

11   have been in the vehicle.

12        There is also a check underneath that that says -- four

13   lines down, C.V.N., and that is a way to confirm that the

14   software version number hasn't been tampered with.  That

15   number is incorrect as well.  We can tell that it has been

16   tampered with.  This is commonly used in vehicle inspection

17   programs to look for fraud where people have reprogrammed

18   their vehicles or taken components out.  It is used in

19   almost every state in the U.S. that does inspection

20   programs.

21        As it turns out, my company maintains a list of many of

22   these software versions that states use to look for fraud in

23   vehicles to see if people have tampered with them.

24   Q.    To your understanding is Exhibit 39 a true and accurate

25   reflection of the O.B.D. scan that was performed by S.G.S.

1    Labs and delivered to you?

2    A.   Yes.

3    Q.   Is this type of information on an O.B.D. scan something

4    a person of your expertise would rely on in your field?

5    A.   Yes.

6              MR. ZARS:  I move for the admission of Plaintiff's

7    Exhibit 39.

8              MS. CONWAY:  No objection, Your Honor.

9              THE COURT:  39 is received.

10             (Plaintiff's Exhibit 39 was

11              received into evidence.)

12   BY MR. ZARS

13   Q.   Mr. St. Denis, you indicated that you had information

14   that the vehicle had been subjected to what you indicate was

15   an H & S tune.  I refer you, please, to Exhibit 34.  Is it

16   from that exhibit that you obtained the information that the

17   vehicle had been subjected to a, quote, H & S tune?

18   A.   Yes.  It is the ninth line down.  It says full D.P.F.

19   delete with H & S tune.

20             MR. ZARS:  I can't remember whether -- it is

21   admitted.  Okay.  That is an admitted exhibit so I don't

22   need to move for its admission.  Thank you.

23   BY MR. ZARS

24   Q.   Returning now to the results, would you please tell us

25   or compare the results that were determined, the test

1    results that were delivered to you from S.G.S. compared to

2    the test results of Ford when it certified the vehicle?

3    A.   Yes.  First, do you have a copy of my declaration

4    there?

5        There is a table in there that may be easier for people

6    to see and the numbers are laid out there.  I can tell you

7    off the top of my head, but it may be easier if everybody

8    looks at them.

9            MR. ZARS:  I am doing this, Your Honor, to refresh

10   his memory, if that is acceptable.

11   BY MR. ZARS

12   Q.   I am handing you your declaration, Doctor.

13   A.   The standard for NOx is, as I mentioned, .2 grams per

14   mile.  When the vehicle was certified it had emissions of

15   .12 grams per mile.  When we tested the truck, the NOx

16   emissions were 4.2 grams per mile.  Excuse me.  4.3 grams

17   per mile.  I am glad I have got this.

18       For P.M. the standard is 0.02 grams per mile.  When the

19   truck was certified it actually had 0.004 grams per mile.

20   When we tested the truck, the emissions were 0.0856 grams

21   per mile.

22   Q.   So looking at this from the before and after picture,

23   to what extent did the emissions of NOx increase or show an

24   increase from the results that you saw from S.G.S. compared

25   to the original emissions?

1    A.    The emissions for NOx for this truck increased 36 fold

2    over what it was when it was initially certified and

3    operating properly.  The emissions of P.M. increased 21 fold

4    over what it was operating properly.  These emission rates

5    are what we would expect to see.

6          As I mentioned, the NOx emissions controls, the E.G.R.

7    and the selective catalytic converter have efficiences of

8    removing NOx that are in the area of 95 or higher percent.

9    If you look at this as 36 times a normal truck, that is

10   about a 97-percent reduction from what we saw without the

11   controls and what we see when we test it with the controls,

12   what Ford reported for it with the controls.  The same sort

13   of thing with the particulate matter.

14   Q.    You indicated earlier that these controls are also used

15   on other vehicles of a similar vintage.  Would you expect

16   these results to be similar if the same kind of a

17   modification was done on a Dodge or a G.M.C. vehicle?

18   A.    Yes.  These emissions controls are ubiquitous across

19   all of the vehicles.  Like I mentioned, the E.P.A. kind of

20   specified the technology that should be used and similar

21   technology is used on Chrysler products or G.M. products and

22   all other medium duty diesels.

23   Q.    In your view of the results, can you describe the

24   relevant impact of this type of vehicle on air pollution

25   emissions?

1    A.    Because the emissions of this vehicle are 36 times

2    another vehicle, three of them would be equal to 100 other

3    vehicles.   In fact, if you look at the emissions rates from

4    these vehicles that are basically uncontrolled at this

5    point, and compare them to the in use vehicles that are

6    operating properly, this is a significant increase.

7         I do a lot of work in the vehicle inspection side, and

8    I talked to Weber County, and they started a new program,

9    which is actually an interesting point, to see what happens

10   when you start testing vehicles, and they started testing

11   diesel vehicles in 2017, and they found that seven percent

12   of the vehicles that they did inspections on had been

13   tampered with and had had emissions controls removed.   If

14   one of these increases the emissions 36 percent, just that

15   seven percent that have been tampered with would basically

16   triple the emissions from these diesel trucks in Weber

17   County.

18              MR. ZARS:   I think that is it for me, Your Honor.

19                        CROSS-EXAMINATION

20   BY MS. CONWAY

21   Q.    Good morning.

22   A.    Good morning.

23   Q.    We appreciate you taking the time to give us a little

24   bit of an education and I certainly have a few follow-up

25   questions from the demonstration downstairs.

1      The first question that I have, though, is related to

2 this certificate of conformity that was issued by Ford.  Is

3 that my understanding, and it would be Exhibit 35, is the

4 application for the exhibit?

5 A.   35 is the application for a certificate of conformity,

6 yes.

7 Q.   If I refer to page 3 of that exhibit, this page lists

8 the specific devices that Ford has put on the truck to

9 control the discharge of exhaust gas pollutants?

10 A.   Page 4 maybe, the certification of summary information

11 report.  Is that what you're referring to?

12 Q.   I am referring to the top of the next page that has

13 after treatment devices and lists what those devices are.

14 It is listed on the bottom as page 3 of 13 on C.S.I.'s

15 submission.

16 A.   Emissions configuration number one?  Is that what you

17 are referring to?

18 Q.   It is page 3 of 13 on Plaintiff's Exhibit 35, and it

19 starts with test group D-F-M-X-D-0-6.7-6-1 is the very top

20 of the page.

21 A.   Yes.

22 Q.   Are these the devices that Ford represented to the

23 E.P.A. are the ones that control the pollution discharge?

24 A.   They are some of them.

25      Let's see.  Yes, I believe they are all listed here.

1    Q.    Can you point to me anywhere in the application where a

2    sensor is included as an emissions control device in the

3    C.O.C.?

4    A.    Sure.  Air fuel sensor number one type -- exigent oxide

5    air fuel sensor number one.

6    Q.    Now, is that listed as an after treatment device or is

7    that listed as the engine configuration?

8    A.    Listed as the engine configuration.

9    Q.    Could you show me where a treatment device is listing a

10   sensor on this application?

11   A.    It is actually in the onboard diagnostic portion of the

12   application which explains how the system is monitored and

13   what turns on the check engine light.  That may be

14   referenced or it may be part of this.  I don't know off the

15   top of my head.  I will have to look.

16   Q.    Well, let me ask you a question a different way.  You

17   testified that the diesel particulate filter reduces NOx,

18   specifically reduces the amount of NOxs that are in the air?

19   A.    No.

20   Q.    Particulate matter.  My apologies.  Diesel particulate

21   matter.  The oxygenation catalyst would reduce other

22   pollutants as well coming out of the exhaust.  Does a sensor

23   reduce pollutants coming out of the exhaust?

24   A.    No.

25   Q.    So would it be considered a device that controls

1    pollution in the sense that it will reduce the discharge?

2    A.   Yes.  So the sensor is required for the computer to

3    make the proper decision about the temperature and what

4    needs to be done inside of the catalyst, which is the part

5    that is actually doing the pollution reduction, but it needs

6    information such as the temperature of what is being fed to

7    it to make the right decisions.  So the sensor itself does

8    not reduce pollution, but the sensor with the computer with

9    the catalyst combined are what make that system work

10   properly.

11   Q.   Just so I understand, it is part of a system that

12   communicates with the computer, but the sensor in and of

13   itself does not have any impact on the amount of exhaust

14   that is actually discharged out of the pipe?

15   A.   Your question is does it affect the amount of exhaust

16   that is discharged?

17   Q.   Correct.

18   A.   The amount of exhaust that is discharged is not a

19   function of the emissions control system at all.  Are you

20   referring to the amount of pollution that is released?

21   Q.   I'm referring to exhaust gas.  Does it change the

22   amount of exhaust gas that comes out at the end of the pipe?

23   A.   It can, yes.

24   Q.   On the Ford that we looked at downstairs --

25   A.   Yes.

1    Q.    You're saying a sensor can reduce pollutants?  I mean,

2    if I understand the catalytic reduction, the selective

3    catalytic reduction inserts urea liquid that is going in and

4    then it breaks the nitrogen exode into two separate

5    chemicals so it has an actual impact of reducing what is

6    coming out of that exhaust?

7    A.    Correct.

8    Q.    Does a sensor do the same thing?

9    A.    The sensor does not do the reduction.  However, the

10   catalyst cannot do what it needs to do without the

11   information from the computer telling it is the temperature

12   proper.  For instance, the selective catalytic reduction

13   catalyst takes urea and --

14   Q.    You have answered my question.  Thank you.

15   A.    Okay.

16   Q.    The next question is relating to the straight pipe.

17   Downstairs I made a note that you said the straight pipe is

18   used to transport exhaust to the back of the car.

19   A.    Uh-huh.

20   Q.    Is it a fair statement that the original exhaust

21   systems were just designed to safely channel the exhaust gas

22   away from the inside passenger cabin and out into the air?

23   A.    What do you mean by the original exhaust system?

24   Q.    Prior to 1996 was there an exhaust pipe on a vehicle?

25   A.    Yes.

1    Q.   And what was its purpose?

2    A.   To channel the exhaust to the rear of the vehicle.

3    Q.   Okay.  And this straight pipe that we looked at

4    downstairs, its purpose is to transport exhaust to the back

5    of the vehicle?

6    A.   Yes.

7    Q.   Does the existence of that pipe -- if that pipe was not

8    there at all, would that change the amount of pollution that

9    is coming out of that vehicle?

10   A.   No.

11   Q.   You mentioned the test results.

12        First let me back up real quick because I made another

13   note downstairs and you commented that you knew the

14   components that are contained on the ford because of the

15   Mitchell manual?

16   A.   Among other reasons, yes.

17   Q.   And could you explain what the Mitchell manual is?

18   A.   Mitchell produces guides that have pictures and

19   descriptions of the emissions controls that are on vehicles

20   when they are manufactured.  They are used in vehicle

21   inspection programs.  I mentioned Weber County doing visual

22   inspections.  The technician may not know every vehicle that

23   has been manufactured, so he uses that guide to guide him as

24   to what components to look for that should be present on the

25   vehicle.

1    Q.    Is Mitchell a government agency?

2    A.    No.

3    Q.    Are they paid by government agencies to produce these?

4    A.    In some cases.  So many of the government agencies that

5    do the inspections pay them to get the guides to do these

6    inspections, sure.

7    Q.    Is Mitchell a private company?

8    A.    Yes.

9    Q.    Do they also produce repair manuals for shops --

10   A.    I believe so.

11   Q.    -- that would be unrelated to emissions?

12   A.    Yes.

13   Q.    To the extent that we are trying to determine what an

14   emissions control device is, does the Clear Air Act or Code

15   of Federal Regulations refer to the Mitchell manual to

16   determine how an emissions part is defined and included or

17   is it instead to the certificate of conformity?

18   A.    It is the certificate of conformity, and the label

19   underneath the hood also transfers that information to go

20   with the vehicle, yes.

21   Q.    Which is the vehicle emission certification information

22   label?

23   A.    That key label, yes.  The vehicle emissions information

24   label.

25   Q.    Are these based on the Mitchell guide?

1    A.    No.

2    Q.    We talked about test results.  Let's first get into how

3    it came to come into your possession for testing.  We have

4    referred to an eBay sales ad.  If I recall, the date of that

5    listing was October of 2014.  The eBay listing was

6    October of 2014 is when the vehicle was for sale?

7    A.    I can look.  I believe that is right.

8    Q.    When did you first come into possession of this

9    vehicle?

10   A.    April 26th, 2016.

11   Q.    And do you know what has happened to that vehicle

12   between 2014 and 2016 --

13   A.    I do not.

14   Q.    -- and the date of the ad?

15         Do you know how many owners it has had since 2014 to

16   2016?

17   A.    I believe one.

18   Q.    So the owner is Utah Physicians.  So in 2014 Dave

19   Sparks' company sold it to the plaintiffs?

20   A.    I'm sorry?

21   Q.    I asked how many owners have had this vehicle since

22   that ad was placed on eBay.

23   A.    I thought you said between 2014 and 2016.

24   Q.    Correct.

25   A.    So ever or just since 2014?

1   Q.   Since 2014.

2   A.   Since 2014 my understanding is two.

3   Q.   Two owners.  Could you identify who those people are?

4   A.   Travis Hansen and Reed Zars.

5   Q.   Where is Travis Hansen located?

6   A.   He was at the time located in St. George, Utah.  I

7   don't know now.

8   Q.   How many miles were on the vehicle when you tested it?

9   A.   I don't remember, but I can look at the report from the

10  lab if you would like.

11  Q.   Please.

12  A.   I don't remember which exhibit it is.  I believe it is

13  here.  There we go.

14       It is Exhibit 38.  51,149.

15  Q.   Sorry.  How many?

16  A.   51,149.  I guess I should be clear.  That's at the

17  start of the test.  I don't have the documentation with me

18  of when we received it and it may have been three or four

19  miles less than that because we had to move it into the test

20  zone.

21  Q.   That is fine.  Thank you.

22       Would you be able to say that the certificate of

23  conformity testing was performed on vehicles that had never

24  been driven?

25  A.   No, that is not true.

1    Q.   How many miles were on the certificate of conformity

2    test vehicles?

3    A.   The certificate of conformity requires that vehicles be

4    tested -- it depends on how they are certified, but they

5    have to be tested in a way that represents or is adjusted

6    for their useful life.  I believe the certificate of

7    conformity is 120,000 for this vehicle.

8    Q.   So at 120,000 miles they stop a vehicle with normal

9    wear and tear and it would have the same exact emission test

10   results as a vehicle never driven?

11   A.   Not necessarily, no.

12   Q.   What is the average life span of a diesel particulate

13   filter?

14   A.   I don't know.

15   Q.   How many miles before that filter gets clogged or needs

16   to be replaced?

17   A.   Two questions.  They regenerate somewhere between 100

18   and 500 miles typically, but generally it depends greatly on

19   how the person drives the vehicle.  If you do stop-and-go

20   driving, the filter will never warm up and it will actually

21   stop you and ask you to regenerate it.  If you do a lot of

22   towing trailers or heavy work, it will generate by itself

23   and do that a little more frequently.

24   Q.   Would the diesel particulate filter register the same

25   emissions results if it had been driven zero miles versus a

1    vehicle that has been driven 100,000 miles as a tow vehicle?

2    Would that particulate filter results be the same?

3    A.   The filter does not have results.  Are you asking about

4    a vehicle --

5    Q.   Vehicle results with the same filter.

6    A.   It would depend upon the vehicle.  The filters are

7    designed to last a useful life, so in this case at

8    120,000 miles it should still meet the standard.

9    Q.   You talked about O.B.D. systems and you mentioned that

10   they came into play in the middle of the 1990s.

11   A.   Uh-huh.

12   Q.   Does the O.B.D. system provide information for the

13   owner unrelated to emissions?

14   A.   No.

15   Q.   For instance, what about a tire pressure sensor?

16   A.   No.

17   Q.   What about a gas tank lid being taken off of a vehicle

18   or not fully secure?

19   A.   Yes.

20   Q.   Will that send a code?

21   A.   On a gasoline vehicle, yes.  On a diesel vehicle, no.

22   Q.   But would that be considered an emissions control check

23   engine --

24   A.   Yes.

25   Q.   -- whether a tire sensor lights up on your computer?

1   A.   I don't understand the question.

2   Q.   My understanding is that the O.B.D. system is the

3   onboard diagnostic system --

4   A.   Yes.

5   Q.   -- which is your main computer.  The E.C.U. is the main

6   computer and that is your level of communication to your

7   dash to let you know something is going on with your

8   vehicle.

9   A.   No.

10  Q.   No?  Please explain it to me then.

11  A.   The onboard diagnostic system -- and I worked on these

12  regulations when they were written, and I have helped states

13  and the E.P.A. revise them -- is specifically only about are

14  the emissions control systems in the vehicle working

15  properly.  The tire pressure monitor system is completely

16  separate from that, including things like your light coming

17  on saying you need to have your oil changed.  That is not

18  part of the onboard diagnostic system.  It is only looking

19  at things that would increase the emissions generally one

20  and a half times the level at which the vehicle was

21  certified.  So if the standard is .2 and the vehicle was

22  over .3 grams per mile, if the system is working properly,

23  it should turn on the check engine light to let you know

24  that.  It does not control the vehicle operation.  It only

25  monitors the operation of the vehicle emissions controls.

1    Q.    What about a misfire?

2    A.    The engine computer would be related to what caused

3    that and O.B.D. would recognize it, and depending upon the

4    conditions, may or may not turn on the check engine light to

5    the owner.

6    Q.    If you have a misfire, would that necessarily increase

7    the amount of emissions coming out in your vehicle or is it

8    just letting you know that there might be a problem with

9    your motor?

10   A.    A misfire can increase your emissions, yes.

11   Q.    Beyond the .2?  So can you have misfires that don't

12   trigger a check engine light?

13   A.    Yes.

14   Q.    So is it the standard for the one and a half -- what is

15   the standard for when that check engine light comes on

16   again?

17   A.    I can give you lots of details about how O.B.D. works.

18   It works differently by the manufacturers and some people

19   have exceptions for specific things that the car companies

20   have given them permission to do.  Generally with misfire

21   the way that an order technology car's misfire is monitored

22   is it is actually looking at the speed of the crankshaft

23   changing.  That could happen if you drove over railroad

24   tracks, for instance.  It could cause the crankshaft to have

25   some weird harmonic that would mimic a misfire.

1              In that case the computer -- the car companies asked

2       the E.P.A. can we have a temporary code where we would say,

3       oh, I think I saw a misfire and it holds onto it, and in

4       that case if it sees it again, it will turn on the check

5       engine light.  After some designated period of time or a

6       number of starts if it does not see it, it won't turn it on.

7       I can't say that every time there is a misfire it turns on

8       the light.  Sometimes it takes two occurrences.  The same

9       thing with the loose gas cap that you mentioned.

10      Q.   Forgive me if I am a little confused by that last

11      response, because if I understood you correctly, the

12      manufacturers can work with the government to allow for

13      other components in the vehicle to trigger a check engine

14      light that are not necessarily requiring a certain minimum

15      threshold of discharge coming out?

16      A.   I don't think I understand your question.

17      Q.   Is it true that the manufacturers can work with the

18      government to allow for trouble codes to be created that are

19      not necessarily being triggered by that threshold of the

20      emissions level?

21      A.   No.  The goal is for anytime the emissions are over a

22      certain threshold it turns on the check engine light.

23      Q.   So a misfire, that would trigger a check engine light?

24      A.   It would.

25      Q.   It is being triggered because it has now created two

 1    times the level of emissions into the environment?

 2    A.   Yes.  You can't say what the emissions level is from

 3    each misfire because it depends on a bunch of conditions,

 4    what the emissions would be from a single misfire.  There

 5    are compromises that are made, for instance, the gas cap

 6    example you gave.  So that it does not inconvenience people

 7    and it is more clear, the E.P.A. has made allowances so if

 8    it sees the gas cap is loose and it actually thinks it is

 9    leaking vapors and it will turn on another light the says

10    that the gas cap is loose.  Then if you don't fix it, then

11    it turns on the check engine light.

12         So there are compromises where it tries to make it not

13    as inconvenient for the motorist.  If every time you drove

14    over railroad tracks the light came on for a misfire, you

15    would be going to the shop for something that may or may not

16    be there.

17    Q.   So there are occasions where that check engine light

18    will let somebody know there might be something happening

19    with their car, but it is not necessarily being triggered by

20    reaching above the threshold for the emissions standard?

21    A.   Correct.

22    Q.   Thank you.

23         Let's go to the test results themselves.  My

24    understanding is -- we're talking about Exhibit 38, I

25    believe.

1    A.   Sure.

2    Q.   I am looking at -- I apologize.  These are not

3    paginated in such a way that -- towards the end I am looking

4    at the test 0-3-1-3-2-4-9-2 and I am seeing weighted results

5    for NOx at 4.3 -- 4.1772 grams per mile.  4.1772.

6    A.   The weighted summary here I see here says 4.3211.  I

7    can figure out what page that is.

8    Q.   You are on the right page.  I'm just trying to

9    understand these results here.  So we have the total grams

10   and then we have total grams per mile, if I understand that.

11   A.   I don't know.  I see where you are looking, yes.

12   Q.   And I am seeing a number value under NOx of 4.1772.

13   A.   Yes.  I don't see that.  I don't know where you are

14   looking exactly.

15   Q.   We have the fuel economy at the bottom line is 4.3211.

16   We are looking at the same thing.

17   A.   Very last line?

18   Q.   The very last line.  Fuel economy and miles per gallon.

19   15.54 F.T.P. weighted.

20   A.   Yes, I see that.

21   Q.   Then go over three rows to NOx.

22   A.   Yes.

23   Q.   Then I am going up to the very top and you see total

24   grams is 46.1933?

25   A.   Got it.

1    Q.    And the line underneath that is 4.1772, which is

2    identified as total grams per mile.

3    A.    Yes.

4    Q.    So is it fair to say that this vehicle that you tested

5    was emitting 4.1772 grams of NOx per mile?

6    A.    These are weighted results so it didn't continuously

7    emit that rate.  So in answer to your question, it was not

8    always emitting that rate.  It would have been higher

9    probably when it was cold started and lower when it was

10   warmed up, which are these three phase numbers that are

11   below.

12   Q.    So what is phase one?

13   A.    Phase one is the cold start phase.  For NOx the

14   emissions would be actually lower, not higher for phase one.

15   Q.    Okay.  Phase two?

16   A.    Phase two is hot running, so they don't shut the

17   vehicle off after they cold start it.  They continue

18   operating it.

19   Q.    And then phase three?

20   A.    After phase two they shut the vehicle off.  It rests

21   for ten minutes.  Then they restart it and they drive the

22   same cycle they did in phase one for phase three.

23   Q.    So if I have a cold vehicle that is just sitting in my

24   parking lot, and I just turn the key on and let it run for

25   three minutes and then turn it off, the amount of emissions

1    would actually be that .7056 grams versus the 4.1772?

2    A.    No.

3    Q.    If the NOx, when the engine is started and it is cold,

4    you're saying until it is warmed up your test results showed

5    .7056 grams per mile?

6    A.    Yes.

7    Q.    So is it fair to say that if somebody has a vehicle

8    that is sitting cold and they turn it on and just let it run

9    for a couple of minutes and then turn it back off, the

10   amount of NOx grams per mile is much lower than had it been

11   warmed up and running around town?

12   A.    Yes.  I can't say definitively because there are a

13   bunch of conditions there, so what was the ambient

14   temperature and what speed were they driving around, were

15   they towing something, and I can't just take the two

16   examples and tell you.  There could be instances where it

17   could be either way depending on the vehicle conditions.

18   Q.    Well, I appreciate that.  For the sake of this

19   calculation, how about we just go with that 4.1772 as the

20   total or, rather, the 4.321.  My point is this is a gram per

21   mile of pollutants?

22   A.    Yes.

23   Q.    And so if a vehicle was driven 100 miles in the Wasatch

24   Front, that total amount of excess emissions is 417 grams?

25   A.    I don't know where you get that number.  Sorry.

1   Q.   Well, a gram per mile for one mile results in just over

2   four grams of NOx?

3   A.   Yes.

4   Q.   So if that vehicle is driven 100 miles total --

5   A.   Yes.

6   Q.   -- over its entire life in Utah --

7   A.   Okay.

8   Q.   -- the total grams of NOx that it emitted was

9   approximately 417?

10   A.   You are multiplying the 4.17 times 100?  Is that what

11   you're doing?

12   Q.   Yes.

13   A.   Not necessarily.  So it depends upon a bunch of

14   conditions about how the vehicle is driven and how long it

15   is idled and that sort of thing.

16   Q.   Is that a fair ballpark estimate at least?

17   A.   Sure.

18   Q.   We are not talking about 100,000 grams, are we?  Is it

19   possible to even get to 100,000 grams on your test for

20   100 miles?

21   A.   NOx?

22   Q.   NOx.

23   A.   No.

24   Q.   Moving over to the particulate matter, I believe that

25   that is the very last page of Exhibit 38.  I see the

1    particulate matter, the weighted grams for all three phases,

2    the average is 2.0858.  That is correct?

3    A.   Yes.

4    Q.   Is that also the same for NOx?  Like for the

5    particulate matter, does it change if the engine is cold and

6    how it has been driven?

7    A.   Yes.

8    Q.   And so if an engine is cold and it is just keyed on for

9    a couple of minutes, is that like the NOx in the sense that

10   it is significantly less than a warmed up, running around

11   town vehicle?

12   A.   No.  Actually with P.M. it is a little bit higher when

13   it is colder.

14   Q.   Higher.  Then reduced down?  How much higher?

15   A.   It depends on the driving conditions.

16   Q.   If I recall on your certificate of conformity, just so

17   that we understand it here, the certificate of conformity I

18   have listed the NOx was putting out .2 grams of NOx per

19   mile?

20   A.   That is the standard, yes.

21   Q.   And then .02 particulate matter?

22   A.   Yes.

23   Q.   So for this test we have .02 particulate matter is

24   stock and .0858 is what the test results showed for this

25   truck?

1    A.    Yes.

2    Q.    And, likewise, the NOx was also 4.1772 versus the .2

3    for NOx?

4    A.    What they used for NOx is the weighted number at the

5    bottom, so the 4.32.

6    Q.    Do you know how this vehicle came to be into your

7    possession?  I mean, you said it came from Travis Hansen.

8    Do you know when it left the Wasatch Front area?

9    A.    It was delivered to the lab on April 26th.  I don't

10   know when it left.

11   Q.    Do you know when this car was registered in Colorado?

12   A.    I don't believe it was ever registered in Colorado.

13   Q.    When was the last time it was registered?

14   A.    I don't know.

15   Q.    Who was the last person to register it?

16   A.    I believe it is Reed Zars.  I believe it is still

17   registered to Reed Zars.

18          MS. CONWAY:  One second.

19   BY MS. CONWAY

20   Q.    One last quick question.  Relating to the Ford repair

21   receipt of May of this year --

22   A.    Yes.

23   Q.    -- that was a dealership repair.  Are you aware if

24   there are competitors in the area of that Ford dealership?

25   A.    I don't know.  I am not familiar with the area.

1   Q.   Do you know what the price differences are between

2   different shops for such repairs?

3   A.   I don't know.

4           MS. CONWAY:   I have nothing further.

5                   REDIRECT EXAMINATION

6   BY MR. ZARS

7   Q.   Dr. St. Denis, I have a couple of follow-up, quick

8   questions for you.

9        Defense counsel referred you to Exhibit Number 8 which

10  is the -- well, maybe you can explain it to us.   What is

11  Exhibit 8, please?

12  A.   The Mitchell guide.

13  Q.   Please explain what is contained within the pages that

14  are included in that exhibit.

15  A.   The Mitchell guide is generally used by vehicle

16  inspection -- well, it has several applications.   In this

17  instance it is used by inspection facilities to make sure

18  that all of the emissions control components that came from

19  the factory are still on the vehicle.   My understanding is

20  Mitchell gets that information from the certificate of

21  conformity and the application for the certificate by the

22  manufacturers.

23  Q.   Based on what you are saying, it sounds as though the

24  governmental requirements that are set forth on the label

25  that you showed us earlier today, and the certificate of

1   conformity that is a part of the exhibit, that that is the

2   source of the information that is set forth in the Mitchell

3   guide?

4   A.   Yes.

5   Q.   The guide that is before us in Exhibit 8 I take it is

6   limited to a certain fuel type.  Can you explain that,

7   please.

8   A.   Yes.  This particular one here is both gasoline and

9   diesel and it says domestic and import cars, trucks and vans

10   and class A motor homes, not heavier vehicles, and it

11   probably ends at 26,000 pounds gross vehicle weight rating.

12   Q.   Quickly reviewing the pages within what we have

13   provided to the Court, is it limited to, for example, a

14   diesel?

15   A.   No.

16   Q.   From what we have provided to the Court --

17   A.   I have not looked through all of the pages in here.  I

18   have looked up vehicles in here.  I would have to look

19   through these to see which ones they are but, yes, this

20   portion is all diesel.

21   Q.   Okay.  In your business do you rely on the Mitchell 1

22   guide to determine maybe not dispositively, but to determine

23   what the pollution control equipment is on vehicles?

24   A.   Yes.  This is one of the tools that we use.

25   Q.   And who else uses this guide?

1   A.   Most of the vehicle inspection programs in the U.S. use

2   this to do their visual inspections under state mandated

3   programs.

4   Q.   Are these governmental entities that rely on this

5   guide?

6   A.   Yes.

7   Q.   Is this a true and accurate representation of at least

8   the diesel related emissions controls as far as you know?

9   A.   Yes.

10  Q.   Do experts in the field, such as yourself, customarily

11  rely on the Mitchell 1 guide to determine what emissions

12  controls are on diesel vehicles?

13  A.   Yes.

14           MR. ZARS:  I move for the admission of Plaintiff's

15  Exhibit 8.

16           MS. CONWAY:  No objection.

17           THE COURT:  Exhibit 8 is received.

18           (Plaintiff's Exhibit 8 was

19            received into evidence.)

20           MR. ZARS:  I am done.  Thank you.

21           With that I would ask the witness be excused,

22  unless there is an objection.

23           MS. CONWAY:  One follow-up question, Your Honor.

24           THE COURT:  Okay.

25                      RECROSS-EXAMINATION

1   BY MS. CONWAY

2   Q.   One follow-up question, Mr. St. Denis.

3        Dr. St. Denis, I am looking at your declaration, which

4   I don't have a copy of for you, unfortunately, but my

5   understanding is in your declaration -- is there anywhere in

6   your declaration where you state that you relied upon the

7   Mitchell guide in determining what the devices are in your

8   declaration?

9   A.   I do have it in front of me.  I do not believe that

10  that is in here.

11  Q.   Is it true that your declaration states that you're

12  relying upon the certificate of compliance by Ford to

13  determine the devices on the truck?

14  A.   We're using the application for certificate from Ford,

15  yes, and the E.P.A. and the label on the vehicle as well.

16  Q.   But not the Mitchell guide?

17  A.   The shop used the Mitchell guide originally.

18  Q.   In your declaration --

19  A.   Not in here, no.

20  Q.   Thank you.

21       MR. ZARS:  Nothing more from me, Your Honor.  I

22  ask that the witness be excused.

23       THE COURT:  Dr. St. Denis, are you familiar with

24  the statutes and regulations generally that govern and set

25  out the standards for new vehicle sales concerning devices

1    and elements of design and components to address pollution?

2    That was a poorly worded question.

3              There is a statute, Title 42 Chapter 85, for air

4    pollution prevention and control, and there is a subpart

5    concerning emission standards.  Is that anything that you're

6    familiar with or work with in your experience?

7              THE WITNESS:  Yes.

8              THE COURT:  You're familiar then with the

9    compliance regulations concerning the implementation of

10   devices to combat air pollution?

11             THE WITNESS:  Yes.

12             THE COURT:  Ms. Conway asked you some questions

13   about Exhibit 35, which was Ford's application, and she

14   directed you to a section listing after treatment devices,

15   listing three, and I think the import of your testimony was

16   that these are the three devices that are in Ford's

17   application that appear to relate to pollution control, the

18   diesel particulate filter, the oxidation catalyst and the

19   selective catalyst reduction system.  Those are the three

20   devices that you identified?

21             THE WITNESS:  Yes, and the exhaust gas

22   recirculation, which is actually listed below, but it says

23   engine configuration.

24             THE COURT:  That is my question.  Are there

25   elements of design on the truck that we looked at downstairs

1    at the time that Ford manufactured it that operate to reduce

2    pollution emissions in addition to those devices or in

3    concert with those devices?  Is that a phrase you're

4    familiar with, elements of design?

5              THE WITNESS:  Yes.

6              THE COURT:  Are there elements of design, in

7    addition to the three devices themselves that are installed

8    on that vehicle at the time it's manufactured, that

9    contribute to combating air pollution?

10             THE WITNESS:  Yes.

11             THE COURT:  What are those design elements?

12             THE WITNESS:  The largest one is the software in

13   the computer which controls the amount of fuel that is

14   injected for each cycle of combustion.  Also, just the

15   timing of combustion and --

16             THE COURT:  Is that related to the sensors that

17   you were discussing with Ms. Conway?

18             THE WITNESS:  No.

19             THE COURT:  What title would you affix to what you

20   have just described?  I don't understand how to categorize

21   it in my mind.

22             THE WITNESS:  There are lots of variables when the

23   engine is designed.  For instance, they could use more

24   E.G.R. and less selective catalytic reduction to get rid of

25   NOx, or they can make other changes to the combustion

1    process.  So the design engineers, generally using software,

2    balance those things to get their desired outcome.

3           THE COURT:  Would you say that the software, and

4    you showed us in another one of the exhibits I think as part

5    of your test, your test results, Exhibit 38 -- do you have

6    that in front of you?

7           THE WITNESS:  Yes.

8           THE COURT:  That is not it.  I'm sorry.  I'm

9    trying to catch up with these exhibits.

10          There was a table where --

11          THE WITNESS:  39?

12          THE COURT:  -- you went through the values.  39.

13   That was it.  Under mode nine test results --

14          THE WITNESS:  Yes.

15          THE COURT:  -- and I think your testimony, if I

16   understood it, was that these results provided evidence that

17   there had been a modification to the software that

18   controlled the operation of the system.

19          THE WITNESS:  Correct.

20          THE COURT:  Is that software a design element

21   designed to reduce air pollution?

22          THE WITNESS:  Yes.

23          THE COURT:  Is it software generally that you were

24   talking about earlier?

25          THE WITNESS:  Yes.

1       THE COURT:  Are there other elements of design

2  besides those that we have talked about then, the component

3  parts and the software that are required to be installed on

4  the vehicle when it is manufactured and are designed to

5  reduce air pollution?

6       THE WITNESS:  I think we have covered them, yes.

7       THE COURT:  The straight pipe that we saw

8  downstairs and that is depicted in the pictures from the

9  lab, is the straight pipe a part or component that has the

10  principal effect of bypassing and defeating or rendering

11  inoperable a device or element of design intended to reduce

12  air pollution?

13       THE WITNESS:  Yes.

14       THE COURT:  On the vehicle that you inspected and

15  that we looked at downstairs, are there other parts or

16  components that you're aware of that you can identify that

17  were installed that would have the same principal effect,

18  that is to bypass, defeat, or render inoperative the

19  pollution control devices on the vehicle?

20       THE WITNESS:  The software that was installed in

21  the computer.

22       THE COURT:  Anything else?

23       THE WITNESS:  No.

24       THE COURT:  Okay.  Mr. Zars, any additional

25  questions in light of that?

1          MR. ZARS:  Yes.

2               FURTHER REDIRECT EXAMINATION

3   BY MR. ZARS

4   Q.    It left open, it seems to me, the question of how Dr.

5   St. Denis may define or determine the correct terminology

6   for sensors and whether they themselves are a device or

7   element of design that assists or helps in assisting the

8   control of emissions from a vehicle.

9   A.    Yes.  When the Judge referred to the straight pipe and

10  I said it is everything from the downpipe back, that

11  includes not just those three catalysts, but the sensors

12  that give information to the computer about when should it

13  be injecting urea, for instance, when should it be using

14  more fuel to heat up the catalyst so that it does a certain

15  task.  It is everything that is in that diagram that I went

16  through earlier, all of those components.

17  Q.    Does the removal of a sensor, one or more, affect the

18  operation of the equipment, for example, the D.P.F. or the

19  selective catalytic reduction system?

20  A.    Yes.

21  Q.    How?

22  A.    Well, if the computer does not know whether or not, for

23  instance, what the temperature is of one of the catalysts,

24  it will turn on the check engine light because that sensor

25  is not working, but the reason it does that is it can't add

1  extra fuel to raise the temperature of that catalyst into

2  the range where it functions optimally, and so without it,

3  it can't use that device.  There would be a danger.  For

4  instance, if I added fuel and it was already hot, I could

5  melt the catalyst.

6            MR. ZARS:  That is all that I have, Your Honor.

7            THE COURT:  Are the sensors federally mandated?

8            THE WITNESS:  Yes.

9            THE COURT:  Are they required elements of

10  emissions control systems for certificates of compliance?

11            THE WITNESS:  Yes.

12            THE COURT:  Ms. Conway.

13            MS. CONWAY:  One question, Your Honor.

14                   FURTHER RECROSS-EXAMINATION

15  BY MS. CONWAY

16  Q.   Is the battery, the car battery in the vehicle

17  considered an element of design that you need in order to

18  make the emissions control system work?

19  A.   No.

20  Q.   Would the computer be able to operate if the battery is

21  not on?

22  A.   Funny, but yes, because the vehicle would get the power

23  from the alternator, not the battery.  The battery is

24  generally used to start the vehicle.  The current that the

25  car uses while it is in operation comes from the alternator,

1    not the battery.

2    Q.    So is the alternator an element of design required to

3    make the emissions system work?

4    A.    I don't quite know how to answer that.  If you did not

5    have an alternator, the vehicle would not run, so you

6    wouldn't have emissions because it is not running.

7    Q.    Well, would you be able to have a check engine light

8    illuminate without these components in the car?

9    A.    No.

10          MS. CONWAY:  Thank you.

11          THE COURT:  All right.  Dr. St. Denis, we

12   appreciate your time.  You're welcome to stand down and

13   you're free to leave if you would like.

14          I think this is probably a good time for a recess.

15   Now we're near enough to the lunch hour and I don't know if

16   it makes sense just to have lunch and come back and have an

17   afternoon session.  Probably it does to me.

18          Is 35 minutes enough time for everyone to come

19   back and, say, resume at noon?  Do you need more time than

20   that?  How about 45 minutes, ten after 12:00?  Okay.

21          Thank you.  We'll see you all then.

22          We'll be in recess.  Don't wait for me.  I will be

23   a minute.

24          (Recess)

25          THE COURT:  Welcome back, everyone.

1          Mr. Zars, does the plaintiff have another witness

2     to call?

3          MR. ZARS:  Yes, Your Honor.  I will call Mr. Chuck

4     Gee.

5          THE COURT:  Mr. Gee, come on up and take an oath,

6     please.

7                         CHARLES GEE

8               Having been duly sworn, was examined

9                    and testified as follows:

10         THE WITNESS:  Are we going by Charles or Chuck?

11         MR. ZARS:  Your preference.

12         THE WITNESS:  Chuck Gee, C-h-u-c-k, G-e-e.

13                    DIRECT EXAMINATION

14    BY MR. ZARS

15    Q.   Good afternoon, Mr. Gee.  Would you please state your

16    current occupation.

17    A.   I am the program manager working for Worldwide

18    Environmental Products under contract with the Davis County

19    Health Department.

20    Q.   How long have you worked in that capacity?

21    A.   Seven years.

22    Q.   What is the role that you perform in that capacity?

23    A.   I work as the liaison between our company, Worldwide,

24    and the health department, working in partnership really

25    with the Davis Health Department in managing and operating

1    the vehicle emissions program that the health department

2    oversees.

3    Q.    Do you test a specific type of vehicle at your

4    location?

5    A.    Our primary function at the Kaysville testing facility

6    is for diesel vehicles that require opacity testing.  We

7    also conduct special testing on vehicles that require

8    additional testing, processes that the typical testing

9    facilities through the county are not able to provide.  So

10   we test not just the diesel vehicles but also specialized

11   testing for gasoline, challenge testing, waivers, whatever

12   the health department needs.  Our primary function is for

13   the diesel vehicles testing.

14   Q.    Dr. St. Denis this morning described programs that he

15   called I.M., inspection maintenance.  Is that the service or

16   the program in which you function?

17   A.    Yes.

18   Q.    That is limited to Davis County, is that correct, here

19   in Utah?

20   A.    Well, Worldwide has contracts with Davis County and

21   Cache County both, for program management.

22   Q.    Are there other counties in Utah that have I.M.

23   programs but don't have a contract with Worldwide?

24   A.    Yes.  There are three other counties, Utah County, Salt

25   Lake County and Weber County.

1    Q.    And they have separate contractors, I take it, that

2    assist them in administering their I.M. programs?

3    A.    Yes.

4    Q.    Why are there I.M. programs in those counties and

5    apparently not the other Utah counties?

6    A.    An I.M. program is required when the particular area or

7    jurisdiction does not meet air quality standards as

8    stipulated by the Clear Air Act.  So the five counties that

9    we're talking about here in Utah have been in violation of

10   air quality standards necessitating an I.M. program, a

11   vehicle emissions testing program.

12   Q.    What is the, if you will, expected end result or reason

13   why the testing is performed and why there is an I.M.

14   program?  What is its objective?

15   A.    The objective is to help reduce the air pollution in

16   the areas, so that the areas of population that we're

17   talking about, the five counties, the ambient air quality

18   that are not meeting the standards -- we're trying to reduce

19   the pollution.

20        When we talk about vehicle emissions testing and the

21   air quality standards, there are several different

22   pollutants that we're trying to reduce, but the end result

23   is to help reduce pollution from vehicles that are being

24   used on the road and improve air quality.

25   Q.    And by you testing both gasoline and diesels, I take it

1   you consider and -- is it fair to say you consider both of

2   those types of fuel vehicles that contribute to the

3   pollution --

4   A.   Yes.

5   Q.   -- here in these counties?

6   A.   Yes.

7   Q.   Getting down to what -- well, let me back up for a

8   moment.

9        Just a little bit more about your background, if you

10  would.  What sort of training have you had to perform the

11  skills that you do?

12  A.   My training and my background consist of working with

13  the vehicle manufacturers, so the manufacturer training

14  regarding their products, the ongoing training or in-service

15  training for emissions program and operation conferences.  I

16  don't know what --

17  Q.   Do you attend the I.M. conference that Dr. St. Denis

18  indicated that he was at for the last 15 years?

19  A.   I have not attended it for the last 15 years,

20  but close, and the last ten years anyway, yes.

21  Q.   Well, let me ask you first, how are vehicles selected

22  for inspection and testing at your and the other testing

23  facilities in Davis County?

24  A.   Well, Davis County sets the guidelines for which

25  vehicles receive the particular types of tests.  So in Davis

1     County we test vehicles that are 1968 and newer model years.

2     Based on the fuel type, the weight, and the model year of

3     the vehicle will determine which type of emissions test the

4     vehicle undergoes.

5     Q.    Will you please describe and give us an example, let's

6     say, of a diesel vehicle that comes into your Kaysville

7     testing center to be evaluated.  What do you or your

8     inspectors do to examine and test that vehicle?

9     A.    To start off with, we establish the model year of the

10    vehicle.  We establish the fuel type.  Then we will go

11    through and do a visual inspection on the vehicle using

12    information from the under hood label that was referenced by

13    Dr. St. Denis, the vehicle emission control information

14    label, or the engine label, whichever.  If that information

15    is missing, then we'll refer to the Mitchell 1 guide that we

16    have referenced earlier.  We use that to establish what

17    emission devices the vehicle should have.

18         So we conduct this visual inspection to make sure that

19    those systems are present and at least appear operable.

20    Then depending on the model year and the weight of the

21    vehicle, we will take it through the tests that are

22    applicable for that vehicle, whether that be a loaded mode

23    dynamometer test where we measure the opacity of the exhaust

24    or we conduct an O.B.D. emissions test where we gather the

25    information from the vehicle itself rather than measuring

1   the emissions from the tailpipe.

2       So the steps that you're asking about -- the visual

3   inspection is we enter the information into the emissions

4   analyzer and the information regarding the vehicle owner,

5   and then really it is the analyzer software that will

6   determine from that point which tests the vehicle goes

7   through, and then we'll follow the prompts on the analyzer

8   and complete the test.

9   Q.   Let me ask you a couple questions related to the visual

10  test.

11  A.   Okay.

12  Q.   Can you give us some examples of what would cause a

13  failure of a visual inspection on a diesel vehicle?

14  A.   Well, any of the emission devices or systems that

15  should be present, if they are missing or if they appear to

16  have been tampered with in any way that would render them

17  inoperable will cause the vehicle to fail the emissions

18  test.

19  Q.   Would the presence of a straight pipe -- I know you

20  were not down there with us this morning, but you otherwise

21  are familiar with the truck that the Court examined this

22  morning.  But would the presence of a straight pipe, how

23  would that be seen by your station with the visual

24  inspection?

25  A.   That would constitute a failure of the emissions test.

1    That straight pipe would be considered a tampering

2    situation, where the truck had been modified from its

3    original configuration.  With that straight pipe in place of

4    the emissions devices that we have been talking about, that

5    would be a tampered vehicle and would fail the emissions

6    test.

7    Q.    If you encountered a vehicle that just had one of the

8    emissions control devices not present or removed, for

9    example, the diesel particulate filter, but others like the

10   catalytic converter were still present, would that

11   constitute a failure of a visual inspection or would that

12   pass?

13   A.    It would still fail.  If any one or more of the

14   emissions devices are missing or appear to be inoperable,

15   rendered inoperable, then the vehicle will fail.

16   Q.    If a vehicle that has, as Dr. St. Denis indicated, a

17   number of sensors determining temperature pressure, or a

18   D.E.F. injector, for example, if one of those is missing or

19   has been disabled, what result on the visual inspection

20   would there be?

21   A.    That constitutes a failure as well.  That is all

22   considered to be tampering.  Any action that has been taken

23   on the vehicle that changes it from its original

24   configuration that would render the emissions control

25   systems inoperable or modified from their original intended

1   operation would constitute a failure.  So any additional

2   electronic system that is added to the vehicle would also be

3   considered tampering.  So if we have something that has been

4   added to the vehicle that would electronically modify the

5   operation, that would also be considered tampering and would

6   fail.

7   Q.   You anticipated my question.  I was going to ask and I

8   still will whether there are modifications or tampering that

9   would elude or not be seen by a visual inspection, but that

10  would otherwise amount to or cause that vehicle to fail your

11  emission test?

12  A.   Yes.

13  Q.   Can you give us an example or two of those that are

14  invisible basically to the naked eye?

15  A.   Yes.  So if the engine computer has been electronically

16  modified so that the software that is designed to operate

17  and monitor the vehicle emissions system, if that software

18  has been changed from the original configuration or has been

19  changed in a way that is not certified by the vehicle

20  manufacturer, that is considered electronic tampering and

21  will constitute a failure.

22  Q.   Are there electronic modifications that you're familiar

23  with that will modify the physical operation of one or more

24  of the devices, for example, an exhaust gas recirculation

25  system?

1    A.    Sure.   That is quite common actually to have a software

2    program that is designed to disable the E.G.R. system, the

3    exhaust gas recirculation.   The components may still be

4    present on the engine, but electronically that system is

5    disabled so that it is no longer functioning.

6    Q.    Is there another test that you can perform that is not

7    your visual, because I take it these are almost sight unseen

8    changes that you're describing, but what methods are there

9    that you employ to determine whether there has been

10   electronic tampering?

11   A.    We query the engine computer and gather information

12   from the onboard diagnostic system, which is a subsystem of

13   the engine computer, and look to see what emission control

14   systems are being supported by the O.B.D. system as far as

15   monitoring is concerned, and we match that with the systems

16   that should be present and should be supported or monitored

17   by the O.B.D. system.

18   Q.    I would like to refer you, please, to Plaintiff's

19   Exhibit 41.   I ask you if you recognize that document?

20   A.    Yes.

21   Q.    What is that, please.

22   A.    So this is a summary of inspections that myself and my

23   shop foreman, Darrin Matheson, performed on a set of

24   vehicles that were located at the Diesel Brothers location

25   on Redwood Road.   This took place back in 2017 as indicated

1    by the date there.

2         So we have the vehicles that we inspected identified by

3    the V.I.N., and then the second column is the vehicle

4    description, the model year of the vehicle and the make, and

5    we have the visual results of the inspection, and then the

6    column labeled O.B.D. results identify the emissions control

7    systems that the vehicles should have had and should have

8    been supported or monitored by the onboard diagnostic system

9    but were not.  The N.S. there means that it is not

10   supported.

11   Q.   And the final column?

12   A.   The final column is the identification of emissions

13   devices or control systems that should have been present

14   based on information from the Mitchell 1 guide, which is

15   something that we use at the Kaysville testing center for

16   reference if the under hood label or the engine label is

17   missing.

18   Q.   To the best of your knowledge does this summary fairly

19   and accurately and completely represent the findings that

20   you made during your inspection of at least those vehicles

21   that you deemed to have been tampered?

22   A.   Yes.

23             MR. ZARS:  I move for the admission of Exhibit 41.

24             MS. CONWAY:  No objection.

25             THE COURT:  Exhibit 41 is received.

1              (Plaintiff's Exhibit 41 was

2               received into evidence.)

3     BY MR. ZARS

4     Q.   I understand that Mr. Matheson was the individual that

5     performed the visual inspection and so I will keep my

6     examination of you to the O.B.D. side of the inspection.

7          If you could just walk us through the five vehicles

8     here and explain, to the extent it is not otherwise just

9     apparent, what your findings were on the electronic

10    inspection and what you found, if anything, to have been

11    missing or disabled.

12    A.   Okay.  Yes.  So starting at the top with the 2012

13    Dodge, and N.M.H.C. is another acronym to represent the

14    diesel oxidation C.A.T., and that actually stands for

15    non-methane hydrocarbon, and it is a term that we use --

16    well, some I.M. programs use it instead of the oxidation

17    C.A.T., but in either case that is the oxidation catalyst

18    that should be supported by the O.B.D. system as far as

19    being monitored for any types of malfunctions but was not

20    supported.  So the software had been tampered with and the

21    monitoring had been turned off for that particular system.

22         The next one, the NOx or S.C.R. is the selective

23    catalyst reduction system that we have been talking about.

24    It is the same thing there.  That software had been modified

25    and the monitoring had been disabled for that system.  On

1    the exhaust gas recirculation system, the monitoring had

2    been disabled, and then the particulate filter or the P.M.

3    filter monitoring had been disabled for that as well.

4         Those four systems should have been present and should

5    have been monitored for proper operation by the O.B.D.

6    system and they were not.

7    Q.   Let me stop you there.  Well, let's say your N.M.H.C.

8    catalyst is not supported.  Does that mean that the computer

9    apparently no longer needs it?  How would you describe it

10   when you say not supported?

11   A.   Not supported just means that as far as the engine

12   computer, and more specifically the onboard diagnostic

13   system portion of the engine computer, as far as it is

14   concerned, that component is not present.  It is not being

15   monitored for any types of malfunctions.  As far as the

16   engine computer is concerned, the device is not even

17   present.

18   Q.   Does its absence trigger the malfunction indicator

19   light under these configurations?

20   A.   No.  No, because the monitoring has been disabled so

21   the engine computer wouldn't know if it was present or not.

22   Q.   Do you recall the extent to which, if at all, you

23   turned these vehicles on and determined whether their check

24   engine lights or their malfunction indicator lights were on

25   when they were operating?

1   A.   I did.   I can't say that I remember specifically for

2   each one of these vehicles if I verified the operation.

3   Further on in this exhibit there are further details.   I

4   would have to refer to those.

5   Q.   We'll do that later.

6        Would you quickly move through the other ones.   You did

7   the Mega Ram Runner.   Now we are into the Bro-Dozer, the

8   Raptor, Hercules and the Tucker Snowcat.

9   A.   Right.   Basically it is the same for each of these

10  vehicles.   For each of the systems that are listed there,

11  and we're talking about the 2011 Ford F-350, so the

12  non-methane hydrocarbon catalyst was not supported.   The

13  selective catalyst reduction system, the particulate filter

14  and the E.G.R. system, and then in this case the boost

15  pressure system, so the turbocharger system was also turned

16  off, the monitoring for the turbocharger was disabled.   So

17  any type of modifications or malfunctions in the

18  turbocharger system would not be identified by the O.B.D.

19  system as well.

20  Q.   Are there changes to a turbocharger or modifications or

21  aftermarket devices that could then affect emissions on a

22  turbocharger?

23  A.   That could affect emissions?   Yes.   So the idea behind

24  a turbocharger on a diesel engine is to increase volumetric

25  efficiency, get more air into the cylinders, and with more

1    air you can add more fuel.  So if the turbocharger system is

2    not being monitored for proper operation we could see

3    boosted pressures that go beyond what the original certified

4    configuration would allow for, and with the system not being

5    monitored for operation, we would not know that that type of

6    operation beyond the design limits have been exceeded.

7         The next vehicle down is the 2011 Ford F-250.  The same

8    with those four systems that are listed there.  Each of

9    those should have been supported and monitored for proper

10   operation and the software had been modified so that the

11   monitoring was not taking place.

12        The 2008 Chevy 2500, those three systems that are

13   listed there should have been monitored and were not.

14        The last item, the last vehicle, the 2005 Dodge, there

15   is nothing listed there as far as monitoring that had been

16   turned off.  The 2007 and older vehicles in this weight and

17   fuel category did not have federal requirements for

18   monitoring of the emission devices, so there were emission

19   devices that were still required on those vehicles, but the

20   O.B.D. system was not required to monitor those systems for

21   proper operation.  So for that particular vehicle, I didn't

22   list any that were not supported because they didn't need to

23   be.

24   Q.   I follow.

25        Turning to several of the background pages, I take it

1     to get to that other question of the operation of the

2     malfunction indicator light or anything else -- if I could

3     turn your attention to the V.I.N., and can you tell us what

4     that means, V.I.N.?

5     A.   The vehicle identification number.

6     Q.   Yes.  What is that?

7     A.   So that is the unique number that that vehicle has to

8     identify it as a unique vehicle from any others that have

9     been produced and sold by that manufacturer.

10    Q.   Like a Social Security number for vehicles?

11    A.   Yes.

12    Q.   Okay.

13    A.   In a manner of speaking.

14    Q.   Okay.  So turning to the vehicle that had the last four

15    V.I.N. numbers 2-7-4-7, which I believe was the Mega Ram

16    Runner, walk us through the extent to which this comports or

17    compares to your findings.

18    A.   Ask me that again.

19    Q.   Are we on the same page?  It is the page right after

20    the glossary of abbreviations and it appears to be a more

21    detailed view of your O.B.D. scan.

22    A.   Okay.  I'm on that page.

23    Q.   Okay.  Please tell us what the preclearing D.T.C. and

24    postclearing D.T.C. means.

25    A.   In order to gather the information from the engine

1    computer, I was using what we refer to in the industry as a

2    scan tool.  It is a computerized device that we're able to

3    connect to the vehicle day link connector that allows for

4    communication with the engine computer.  So with this

5    handheld scan tool, I was able to query the engine computer

6    and determine, based on the information that was present,

7    which of the readiness monitors that are listed on the left

8    were supported.  And if they were supported, for example,

9    the misfire fuel system and the boost pressure system on

10   this particular vehicle, those three were supported but had

11   not been completely evaluated.  So those are indicated as

12   wait in the postclearing D.T.C.s.

13        Then we have one that is listed as okay, the

14   comprehensive component monitor.  So what that means is that

15   the engine computer had been able to completely evaluate the

16   comprehensive component monitoring system and determine the

17   operational status of that system.  The misfire fuel system

18   and the boost pressure system hadn't been fully evaluated,

19   so the engine computer did not know if there were

20   malfunctions in those systems or if they were operating

21   properly.  And then the rest of the systems are listed as

22   not supported.

23   Q.   Is it your testimony that when you have indicated from

24   the information provided through the scan tool that a

25   monitored device is not supported, it should have been

1    supported, if you follow me?

2    A.   I didn't follow that completely.  Through the scan

3    tool?

4    Q.   Okay.  This scan tool apparently indicated to you in

5    the postclearing D.T.C. column certain devices, for example,

6    the NOx S.C.R. after treatment you have listed as N.S. or

7    not supported.

8    A.   Okay.

9    Q.   Should it have been supported?

10   A.   It should have been supported, yes.

11   Q.   Okay.

12   A.   But the scan tool does not tell me that specifically.

13   The under hood emissions label tells me that it should be,

14   and the information from the Mitchell guide tells me that it

15   should be.

16   Q.   I follow.  Okay.  So it could be that you had a scan

17   that said N.S., but it couldn't be N.S. and that is because

18   it may not have been supported by that model year of

19   vehicle?

20   A.   That is correct.

21   Q.   Okay.  I just wanted to be clear on that.  I thank you

22   for that.

23            MR. ZARS:  I just want to make sure that I had

24   that exhibit admitted.

25   BY MR. ZARS

1   Q.   Moving back to your inspection of vehicles, what

2   happens if a vehicle fails either through your O.B.D.

3   testing or through a visual inspection or both?  What do you

4   do at the station?

5   A.   Well, depending on why it failed we provide the

6   information of course to the vehicle owner or whoever

7   brought the vehicle in for emissions testing, and then we

8   provide some general guidance as far as what they need to do

9   in order to get the vehicle into compliance.

10       So if a vehicle has been electronically tempered with,

11   for example, we'll advise them of the regulation that

12   prohibits such modifications and give them information

13   regarding the process to bring the vehicle back into

14   compliance.  So if it has been changed electronically, for

15   example, we'll suggest to them that they take that vehicle

16   to an authorized repair facility and have the engine

17   computer reprogrammed so that the engine computer software

18   is factory certified software as it should be.

19   Q.   If it is missing a physical component like a diesel

20   particulate filter, is it fair to say that you advise them

21   to put that back on?

22   A.   Certainly.

23   Q.   Are you familiar with vehicles that come to your

24   station that fail as a result of having something like a

25   straight pipe on this vehicle or have been electronically

1    modified as you have indicated?

2    A.   Am I familiar?

3    Q.   Yes.

4    A.   Yes.  We see this quite often.

5    Q.   What happens if an individual does not fix the vehicle

6    that you have found to be tampered with?

7    A.   If the vehicle is not repaired, then it is not going to

8    pass the emissions test, so that vehicle won't be registered

9    legally anyway, and it shouldn't be registered for operation

10   on the public roads here in the State of Utah.

11   Q.   Can you say with confidence that those that have failed

12   are no longer operating in Utah?

13   A.   No.

14   Q.   Why is that?

15   A.   There are, as we have established, there are five

16   counties here in the State of Utah that have emissions

17   testing programs, so if a vehicle owner chooses to register

18   the vehicle in a county that does not have emissions

19   testing, then that vehicle that would fail and not be

20   allowed to be registered, they have basically circumvented

21   the program and they are still operating that vehicle on the

22   road illegally.

23   Q.   Are you familiar with instances such as that that you

24   have described?

25   A.   Specifically?  In general, yes, but as far as any

1    particular owner or specific vehicle, no.

2    Q.    I would like you to turn to Exhibit 70.

3          Are you familiar with this document?

4    A.    Yes.

5    Q.    Please describe it and your understanding of it in

6    brief.

7    A.    So this is a program that will help restore tampered

8    vehicles, restore them back to their original configuration.

9    So vehicles that may not be repaired properly or repaired

10   and registered in the emission county that the vehicle

11   owners actually live in, so it is a repair assistance

12   program in order to help people financially pay for repairs

13   that are needed on vehicles that fail the emissions test.

14         As we established earlier, some of those repairs are

15   very expensive and a vehicle owner -- especially with a new

16   vehicle owner, and we see this fairly often, where a person

17   will buy a vehicle from out of the area, unknowing that the

18   vehicle has been tampered with.  So they bring the vehicle

19   in for an emissions test and they are told that the vehicle

20   won't pass the Davis County emissions test because the

21   vehicle has been modified.  So that is a financial burden

22   they were not prepared for, so this program is designed to

23   help get vehicles such as that repaired properly and able to

24   be driven on the road legally and registered in the county

25   that it should be.

1    Q.   Is it fair to say that you're familiar with vehicles

2    such as the ones that are targeted by this program that have

3    been significantly tampered with that could be repaired with

4    funds from this program?

5    A.   Yes.

6    Q.   Do you have reason to believe that people would take

7    advantage or at least individual vehicle owners would take

8    advantage of this program?

9    A.   Yes.  Absolutely.

10   Q.   What benefits would this program have in terms of air

11   pollution and the reduction of air pollution?

12   A.   Well, as we were talking earlier with Dr. St. Denis,

13   vehicles that have been tampered with are emitting P.M. and

14   NOx emissions 20, 30 times beyond what the certification

15   levels are, and so being able to repair tampered vehicles

16   and bring them back into compliance is going to have a

17   significant impact on the air pollution that we have here

18   along the Wasatch Front in reducing the P.M. and the NOx

19   emissions.

20   Q.   How does this subset of vehicles that we're calling the

21   tampered vehicles compare with the other vehicles that you

22   see coming through your testing station in terms of

23   emissions and in terms of their relative emissions?

24   A.   How much higher?

25   Q.   Yes.

1    A.    So in Davis County we measure opacity and that is

2    really the direct tailpipe measurement that we make.   So

3    tampered vehicles will fail the opacity limits.   The limit

4    is 20 percent, meaning 20 percent of the light passes

5    through that exhaust stream, 20 percent or greater, and if

6    that light is blocked or obscured, then the vehicle is going

7    to fail the emissions test.   So typically a vehicle that is

8    tampered with will be many times over the limit.   It is not

9    uncommon to see trucks fail with opacity measurements in the

10   60 to 70-percent range.

11   Q.    Got it.   Were you involved in the development of this

12   program or proposed program in Exhibit 70?

13   A.    Yes.

14   Q.    Is this a fair and accurate representation of the

15   program as it was approved by the Davis County Health

16   Department and the Davis County Board of Commissioners?

17   A.    Yes, it is.

18           MR. ZARS:   I move -- it is already in.

19           MR. HAYS:   It is in.

20           MR. ZARS:   I move for it again.   Okay.   I'm sorry.

21   I don't need to do that.

22   BY MR. ZARS

23   Q.    I thank you for your testimony.   That is it.

24           THE COURT:   Okay.   There will be more questions

25   for you.

1           Ms. Conway.

2                       CROSS-EXAMINATION

3     BY MS. CONWAY

4     Q.    Good afternoon.

5     A.    Good afternoon.

6     Q.    I only have a couple of questions so I should be pretty

7     brief.

8           You mentioned at the beginning of your testimony that

9     there are five counties in Utah in violation of the federal

10    emissions standards.  Could you please tell me which five

11    counties those are?

12    A.    Just to be clear, they were in violation of the air

13    standards, the air quality standards.  Those five counties,

14    from south to north, are Utah County, Salt Lake County,

15    Davis County, Weber County and Cache County.

16    Q.    Do you know when these counties were found to be in

17    violation of the standards, what year approximately?

18    A.    The four counties here along the Wasatch Front I

19    believe were found to be out of compliance in the late

20    seventies.  Those four counties have had emissions testing

21    programs for many years.

22          Cache County was out of compliance for the small

23    particulates, and I believe that happened in 2013-2014.

24          Well, actually that is not right, because we

25    implemented the program for Cache in 2013, so their ambient

1    air quality standards were violated in the years prior to

2    that.

3    Q.    You said that they were in violation.  Are you familiar

4    with any counties that are now in compliance on this list?

5    A.    I don't know the answer to that.

6    Q.    Has Summit County ever been in violation of the

7    emissions standards to your knowledge?

8    A.    I am not really qualified to answer that.

9    Q.    How about St. George and Washington County?

10   A.    The same.  I know that there has been talk about those

11   areas with the ozone standards and the anticipated changes

12   to the ozone standards, but I would have to go back and

13   really look to see.  I don't know the answer to that.

14   Q.    You mentioned that Davis County sets the test

15   parameters for those inspections, and my understanding is

16   that your first point of reference is always the certificate

17   of compliance label on the vehicle.

18         Is that correct?

19   A.    We look for that, yes.

20   Q.    And then if that is missing and if that is not on the

21   vehicle, then the second reference guide would become

22   Mitchell?

23   A.    That is correct.

24   Q.    If the vehicle did have the vehicle label, would that

25   be your point of reference for testing purposes or do you

1   still go to the Mitchell guide?

2   A.   No.  If the under hood label is present, then there is

3   no need to reference the guide.

4   Q.   Do you know if the certificate label and the Mitchell

5   guide -- are they exact replicas of each other?  Do they

6   contain identical information?

7   A.   To my knowledge, yes.

8   Q.   So the Mitchell guide -- everything that is listed in

9   the Mitchell guide would also be found on the certificate

10  label?

11  A.   The under hood label, yes.

12  Q.   And if it is not on the under hood label, would that be

13  considered something that you would have to worry about, if

14  it is not on the label?

15  A.   So if an emission device is not listed on the under

16  hood label or is not listed in the Mitchell guide, then that

17  system is not one that would cause the vehicle to fail an

18  emissions test if it were not present.  There are examples

19  of where there may be, for example, an E.G.R. system that

20  would be normally present, but if that device was not needed

21  for emissions certification but was there for some other

22  reason such as fuel economy, it wouldn't be listed as an

23  emissions device, and so if it had been modified in some way

24  that would not be grounds for failing an emissions test.

25  Q.   That is very helpful.

1        Also, we heard testimony earlier about the certificate

2   of conformity having what they called the useful life

3   mileage.  By way of example, the truck that we looked at,

4   that label said that it was 120,000 miles.  What happens if

5   a truck comes to you that has 150,000 miles for purposes of

6   the emissions requirements?

7   A.   We still use the same -- the devices need to be present

8   and they need to appear operable.  As far as the electronics

9   system is concerned, if the vehicle falls within a model

10  year or weight range where we do any type of electronic

11  query, they still need to meet the same standards.

12  Q.   What if the cost of the repair ultimately costs more

13  than the actual value of the car?  I assume you have those

14  occasions to see cars that are not worth $1,000 that are

15  looking at -- what do you do in that situation?

16  A.   That is really not our call.  That is the vehicle

17  owner's call.

18  Q.   Are they still required to pay the costs to get the

19  repairs done?

20  A.   If they choose to keep the vehicle and desire to

21  operate it on the road, and if they choose to register it

22  legally, yes, they are still responsible for getting the

23  vehicle repaired.

24  Q.   That essentially dovetails into that restoration

25  program assistance.  We have noticed here on Plaintiff's

1    Exhibit 30 that we are talking about up to $6,000 for the

2    cost of the repairs.  Would that be a fair amount to

3    generally get a car to emissions standards?

4    A.   For a diesel vehicle?

5    Q.   Correct.

6    A.   Yes.

7    Q.   And the vehicles that you inspected at my client's

8    property, do you have any opinion as to who tampered with

9    the trucks that you inspected?  Do you have any knowledge

10   who did the tampering?

11   A.   I have no opinion on that.

12            MS. CONWAY:  That's all that I have.  Thank you.

13            THE COURT:  Redirect?

14            MR. ZARS:  Nothing further.

15            THE COURT:  All right.  Thank you, Mr. Gee.  You

16   are welcome to stand down and you're free to leave if you

17   would like.

18            Mr. Zars?

19            MR. ZARS:  The plaintiffs call its next witness,

20   Darrin Matheson, please.

21            THE COURT:  Mr. Matheson, come up here if you

22   would, please.

23                      DARRIN MATHESON

24            Having been duly sworn, was examined

25                 and testified as follows:

1          THE WITNESS:  Darrin Matheson, D-a-r-r-i-n,

2     M-a-t-h-e-s-o-n.

3                    DIRECT EXAMINATION

4     BY MR. ZARS

5     Q.   Good afternoon, Mr. Matheson.

6     A.   Hello.

7     Q.   We just heard from Mr. Gee about the inspection that

8     had been performed at the defendants' facility in Woods

9     Cross.  Were you present at that inspection in June of 2017?

10    A.   I was.

11    Q.   Did you perform an inspection of the vehicles?

12    A.   A visual inspection.

13    Q.   Are you an employee of Worldwide?

14    A.   I am.

15    Q.   What is your title, please.

16    A.   Diesel shop foreman.

17    Q.   How long have you held that position?

18    A.   With Davis -- I started out with Davis County, and then

19    when Worldwide took over, so I have been at it for 22 years.

20    Q.   In the course of that time how many vehicles do you

21    believe that you have inspected?

22    A.   Thousands.

23    Q.   Have you been to any trainings on visual or electronic

24    inspection of vehicles?

25    A.   I have.

1    Q.    Can you describe those, please.

2    A.    On my electronic it was at Weber State.  When the

3    O.B.D. first came out it was with Weber State University.

4    On the diesel training it has basically just been on the go

5    training.

6    Q.    What do you mean by on the go training?

7    A.    Well, like I said, I have been doing it for 22 years.

8    I started out with a guy who was actually a diesel mechanic,

9    and he was the one that trained me on it.

10   Q.    Are you familiar with Plaintiff's Exhibit 41?  Is that

11   in front of you?

12   A.    Yes.

13   Q.    What is Exhibit 41?

14   A.    It shows what the tampering was that I saw.

15   Q.    In particular were you responsible for the visual

16   inspection results that are set forth in the third column?

17   A.    I was.

18   Q.    I take it that before you could determine whether a

19   device like the first item there on the Mega Ram Runner was

20   missing, you needed to establish whether it needed to be

21   present.

22         Is that correct?

23   A.    Correct.

24   Q.    How did you do that?

25   A.    With the Mitchell manual and looking underneath.

```
 1   Q.   Okay.  When you refer to the Mitchell manual, are you

 2   referring to Plaintiff's Exhibit 8?

 3   A.   Yes.

 4   Q.   Back to that first vehicle, if you recall, what did you

 5   see or not see that then made you conclude that it was

 6   missing the O.C., the O.C.R., the E.G.R. and P.T.O.X. and

 7   the breather P.C.V.?

 8   A.   What was the first of the question again?

 9   Q.   I'm sorry.  These are things that are missing.

10   A.   Correct.

11   Q.   So it is hard to describe something visually that does

12   not exist.

13   A.   Right.

14   Q.   What was the visual input that you received to

15   determine that these devices were missing?

16   A.   It was straight pipe.

17   Q.   What do you mean by straight pipe?

18   A.   No components underneath, just a pipe running straight

19   back.

20   Q.   Are you familiar, even though you were not down there

21   this morning, with the truck that was viewed by the Court?

22   A.   Yes.

23   Q.   Would you describe what had been on the truck as a

24   straight pipe before it was restored to its original

25   condition?
```

1    A.   Just a pipe with a big black tip on the end.

2    Q.   Yes.  With no sensors in it or no controls in it.

3         Is that correct?

4    A.   No.

5              THE COURT:  I know you mean there were no sensors

6    or controls.  Is that true?  You answered the question no.

7    You meant to say that there were no sensors or controls

8    present on the straight pipe?

9              THE WITNESS:  Correct.

10   BY MR. ZARS

11   Q.   When there should have been?

12   A.   When there should have been.

13   Q.   Turning to the second vehicle there, the 2011 Ford

14   F-350, the Bro-Dozer, you indicated a number of devices were

15   missing there.  Again, what did you see if you didn't see

16   those devices?

17   A.   A straight pipe.

18   Q.   Turning to the Raptor, the same question.

19   A.   Yes, a straight pipe.

20   Q.   Turning to the Hercules truck, the same question.

21   A.   A straight pipe.

22   Q.   What about the Dodge Tucker Snowcat?

23   A.   That was missing the O.C.  I am not positive whether it

24   had a muffler on it or it.  I don't remember.

25   Q.   Okay.  So where the O.C. or the oxidation catalyst

1    should have been, what was there?

2    A.    Just a piece of pipe.

3    Q.    A straight pipe?

4    A.    Right.

5          MR. ZARS:  That's all that I have for the visual

6    side of the inspection.

7          THE COURT:  Ms. Conway.

8          MS. CONWAY:  Likewise I will be brief.

9                      CROSS-EXAMINATION

10   BY MS. CONWAY

11   Q.    Mr. Matheson, the first question that I have is with

12   regard to -- on this sheet you mentioned that the Mega

13   Ram -- all of the vehicles, but let's start with the Mega

14   Ram, that your visual inspection involved looking to see

15   underneath the vehicle and because you saw the straight

16   pipe, these items were not present?

17   A.    Correct.

18   Q.    Could you please tell me where the breather P.C.V. is

19   located?

20   A.    It is underneath the hood.

21   Q.    So is it on the exhaust pipe?

22   A.    No.

23   Q.    How about the Ford Raptor?  You also mentioned that

24   your visual inspection revealed a straight pipe and you

25   determined that it was missing these parts listed.  Could

```
 1    you tell me where the E.G.R. is located?
 2    A.    It is under the hood.
 3    Q.    So is it on the pipe?
 4    A.    No.
 5    Q.    Do you have any idea how these vehicles came to be in
 6    these conditions at the time you inspected them?
 7    A.    I don't.
 8            MS. CONWAY:  If I can have a second?
 9            I am good.  Thank you.
10            THE COURT:  Mr. Zars?
11            MR. ZARS:  Nothing further, Your Honor.
12            THE COURT:  Thank you, Mr. Matheson.  You are
13    welcome to stand down and you are free to leave if you would
14    like.
15            THE WITNESS:  Thank you.
16            THE COURT:  Thank you.  Watch that chair on your
17    way out.
18            Mr. Zars.
19            MR. ZARS:  May we take a small recess before I
20    continue?  I have just one remaining witness, Your Honor.
21            THE COURT:  Yes, of course.  Ten minutes?
22            MR. ZARS:  Thank you, sir.
23            (Recess)
24            THE COURT:  Mr. Zars?
25            MR. ZARS:  Yes, Your Honor.
```

1          First, I am told I may have misspoken about only

2    having one more witness.  We have several more, but I was

3    speaking of my own.  That is Dr. Kirtly Jones, our next

4    witness, and then we're going to move to Mr. Stuart,

5    depending on how much time we have.

6          THE COURT:  Thank you.

7          Dr. Jones, come forward, if you would, please.

8          Thank you.  Right over here.

9                         KIRTLY JONES

10          Having been duly sworn, was examined

11                and testified as follows:

12          THE WITNESS:  My name is Kirtly, K-i-r-t-l-y,

13    Jones, J-o-n-e-s.

14                    DIRECT EXAMINATION

15    BY MR. ZARS

16    Q.   Good afternoon, Dr. Jones.  Thank you for being here.

17          Are you a member of the plaintiff's group, Utah

18    Physicians for a Healthy Environment?

19    A.   I am.

20    Q.   Are you a board member as well?

21    A.   I am.

22    Q.   Dr. Jones, what is your educational background, please.

23    A.   I am board certified in O.B.G.Y.N. and a

24    subcertification in reproductive endocrinology.  So I

25    trained and went to college -- went to med school and

1    trained at Harvard in their fellowship program and then came
2    here to the University of Utah where I had an academic
3    appointment for 36 years.
4    Q.   What was you undergraduate degree in?
5    A.   Molecular and cellular and developmental biology.
6    Q.   What was your specialty during your residency?
7    A.   My residency was in obstetrics and gynecology.
8    Q.   Are you still practicing medicine at this time?
9    A.   No.  I am a professor emeritus.  I still teach, but I
10   am not clinically active at this time.  I have a license to
11   practice, but I don't have a clinic anymore.
12   Q.   Where do you still teach?
13   A.   At the University of Utah.
14   Q.   What do you do in that role at the university?
15   A.   I teach reproductive medicine both to O-B-G-Y-N
16   residents and to medical students sometimes.  I do a podcast
17   on women's health for the University of Utah's web medicine
18   podcast group.
19   Q.   With respect to the influences and the effects of air
20   pollution, have you studied in that area or field?
21   A.   Meaning academically studied or --
22   Q.   Well, in your professional career.
23   A.   Yes.  We have published -- my group, the Fertility
24   Center at the University of Utah has published papers on air
25   quality effect on fertility, specifically male infertility.

1  Q.   Would you be able to summarize what those papers or

2  results indicated?

3  A.   The paper published in 2010 --

4           THE COURT:  One moment, Dr. Jones.

5           Yes, Mr. Cannon.

6           MR. CANNON:  Your Honor, if I could object to the

7  whole line of questioning here.  The question is encouraging

8  Dr. Jones to testify about a report or a study that she

9  conducted more or less using her resume as an

10 endocrinologist and we're getting into expert witness

11 territory under Rule 702.  Under Rule 26, 26(2)(b), Dr.

12 Jones hasn't been designated as an expert nor did she submit

13 a written report, including all of the factors that we would

14 normally rely on, including resume and the facts and the

15 data that was relied on in generating that report.  At best

16 Dr. Jones would qualify as a lay witness under Rule 701, so

17 I guess I would ask the Court to strike any testimony that

18 is expert in nature.

19          THE COURT:  Mr. Zars?

20          MR. ZARS:  Yes.  I am not attempting to elicit any

21 opinion testimony from her.  The challenge I suppose here is

22 that a doctor would appear to be sort of facially an expert,

23 but I am glad to limit this discussion to her personal

24 knowledge and experience and not rely on studies.  I think

25 that is fair enough.

```
 1              THE COURT:  All right.  Your next question then.

 2              I am going to say that the objection is sustained

 3    I think based on your response and we'll go question by

 4    question.

 5              MR. ZARS:  Very good.

 6    BY MR. ZARS

 7    Q.   Let's move to whether you can describe or tell us the

 8    effects that you have experienced personally from air

 9    pollution.

10    A.   Well, personally my reactions, my physical reactions to

11    air pollution fall into both the fact that my eyes burn and

12    that becomes a difficulty when I am driving mostly.  It is

13    uncomfortable at other times, but I have difficulty with

14    corneal irritation or my eyes burn.  If it gets to be more

15    significant or if I am exposed acutely to pollution from a

16    tailpipe that is coming at me, I cough.  I have -- I call it

17    reactive airways or adult onset asthma, which is mostly

18    irritated by air pollution.  Those are the two things that I

19    personally experience.

20    Q.   What caused you to be a member -- why did you become a

21    member and want to be a member of the Utah Physicians Group?

22    A.   Well, for me I am concerned about sensitive populations

23    who bear an undue burden of the consequences of air

24    pollution.  In my field it would be children and pregnant

25    women.  Now I'm an older person so an older person, and
```

1    persons with cardiopulmonary disease, and those are special

2    and sensitive groups, and that is the people who I cared for

3    and this is the person who I am, so I am concerned about

4    those groups.

5    Q.   Is that one of the roles or functions of the Utah

6    Physicians Group to express concern?  What does the group

7    attempt to do?

8    A.   Our concern is both to educate clinicians and the

9    population about the effects of air pollution on health.

10   Our efforts are to advocate for cleaner air and a cleaner

11   environment and not just air.  We work in lead as well and

12   clean water, but right now air is our number one concern.

13   So we advocate for clean air.  We educate clinicians and

14   people about the effects that are now becoming increasingly

15   known and prevalent here in Utah and nationally and

16   internationally on air quality, but we are focused here

17   primarily in Utah.

18             MR. ZARS:  That is all that I have.

19                        CROSS-EXAMINATION

20   BY MR. CANNON

21   Q.   Good afternoon, Dr. Jones.  Go Utes.  I teach at the

22   university as well.  I have a couple of questions to follow

23   up on.

24        You talked about adult onset asthma.  Have you

25   personally been diagnosed with adult onset asthma?

1    A.    No.   I am a physician so I know what the symptoms are,

2    and so I know when I get it and I know appropriately how to

3    treat it.

4    Q.    So besides your self-diagnosis, you have not been --

5    A.    No.   I have not seen a pulmonologist for that

6    diagnosis.

7               THE COURT:   Dr. Jones, you anticipated

8    Mr. Cannon's question.   We have a court reporter who is

9    trying to take down everything that is said today and that

10   task is impossible if you're both speaking at the same time.

11   Please just try to patiently wait for Mr. Cannon to conclude

12   before you begin.

13   BY MR. CANNON

14   Q.    You also indicated, and I don't want to put words in

15   your mouth, but you believe that the adult onset asthma is a

16   result, in part at least, from the air pollution in the

17   Wasatch Front.

18         Is that a fair summary?

19   A.    Yes.

20   Q.    You also talked about coughing and having your eyes

21   burn when a truck emits emissions on the roadway that you're

22   near.

23         Is that a fair statement?

24   A.    Yes.

25   Q.    Do you have any evidence that suggests that the trucks

1    that have actually caused such coughing or adult onset

2    asthma or eye irritation were actually any of the trucks

3    operated by my clients, the defendants in this matter?

4    A.   No.

5              MR. CANNON:  Thank you for your time.

6              THE WITNESS:  Thank you.

7              THE COURT:  Mr. Zars?

8              MR. ZARS:  I have nothing further.

9              THE COURT:  Thank you, Dr. Jones.  You're welcome

10   to stand down.  You are free to leave if you would like.

11             Mr. Hays?

12             MR. HAYS:  I would like to call Mr. Stuart.

13             THE COURT:  Mr. Stuart, if you would come forward

14   here, we'll administer the oath.  Thank you.

15                         JOSH STUART

16             Having been duly sworn, was examined

17                   and testified as follows:

18             THE WITNESS:  Josh Stuart, J-o-s-h, S-t-u-a-r-t.

19                      DIRECT EXAMINATION

20   BY MR. HAYS

21   Q.   Good afternoon, Mr. Stuart.  My name is George Hays and

22   I am one of the plaintiff's counsel.  We have not met, but

23   greetings.

24   A.   Pleasure to meet you.

25   Q.   Could you tell the Court what your current job is?

1   A.   My current position is C.F.O. for Diesel Power Gear.

2   Q.   C.F.O. for Diesel Power Gear?

3   A.   Diesel Power Gear.

4   Q.   Who is the C.E.O.?

5   A.   That would be my business partner, Dave Sparks.

6   Q.   How long have you been the C.F.O.?

7   A.   Let's see.  About five years.

8   Q.   This is 2019, so that would take us back to 2014?

9   A.   Yep.

10  Q.   What was your position before that?

11  A.   My position before that was an unpaid volunteer.

12  Q.   How long did you act as an unpaid volunteer?

13  A.   Nine months.

14  Q.   Do you have an ownership -- what is Diesel Power Gear?

15  A.   Diesel Power Gear is a company that sells diesel

16  truck -- apparel for diesel truck enthusiasts, clothing and

17  some truck parts.

18  Q.   Is it legally a partnership, an L.L.C.?

19  A.   An L.L.C., yep.

20  Q.   I see.  Do you have an ownership stake in the L.L.C.?

21  A.   I do.

22  Q.   What is your stake?

23  A.   30 percent.

24  Q.   Who are the other shareholders?

25  A.   The other shareholders are Dave Kiley and Dave Sparks.

```
1    Q.    What are their shares?

2    A.    Dave Sparks is 40 percent and Dave Kiley is 30 percent.

3    Q.    Okay.  Do you have an ownership stake in any other

4    L.L.C.s in which Mr. Sparks is involved?

5    A.    I do.

6    Q.    Which ones?

7    A.    DIESELSellerz and Legion Tires and DaRezz.

8              THE COURT:  Will you spell that?

9              THE WITNESS:  D-a-R-e-z-z.

10   BY MR. HAYS

11   Q.    Are each of those L.L.C.s or some --

12   A.    L.L.C.s.

13   Q.    Do you have an ownership stake in any partnerships that

14   Mr. Sparks is involved in?

15   A.    No, no other corporations.

16   Q.    What about partnerships?

17   A.    No.

18   Q.    No?

19   A.    No.

20   Q.    Okay.  So tell me what you do as C.F.O. on a day-to-day

21   basis.

22         Is it okay if I call Diesel Power Gear D.P.G.?

23   A.    Yeah.  That would be better.

24   Q.    Okay.

25   A.    Let's see.  Basically make sure invoices are paid,
```

1    bills are paid, make sure that there is enough cash flow to

2    cover expenses, also if any departments -- budgeting for any

3    of the departments that request any purchases, just typical

4    business operations on the financial end.

5    Q.   And how much of your work involves work for D.P.G.

6    versus the other L.L.C.s?

7    A.   I would say 90 percent of my work is with D.P.G.

8    Q.   So can you tell me what the gross sales were for

9    D.P.G. in 2014?

10   A.   In 2014 I cannot off the top of my head.  Would it be

11   in one of the exhibits?

12   Q.   Yes.  Let's look at Exhibit 1,008.

13   A.   Which one?

14   Q.   1,008.  Mr. Zars is bringing it up on the screen for

15   us.

16              THE COURT:  It sometimes just takes a moment.

17   BY MR. HAYS

18   Q.   Page PDF-47, please.  Look at that screen there and if

19   you look at the column in the first block on income, for

20   2014 does that help you answer that question?

21   A.   Yes.

22   Q.   So the answer is?

23   A.   $2,895,966.

24   Q.   And in 2015?

25   A.   3,643,430.

1    Q.    Okay.  I just want to walk through the progress for

2    D.P.G. here.  So what about 2016, do you know what the gross

3    receipts were that year?

4    A.    Off the top of my head it seems like it was around

5    8 million.

6    Q.    I have around 8.1 million.

7    A.    Okay.

8    Q.    What about in 2017?

9    A.    I want to say 12 million.

10   Q.    I have 12.8 million.  Does that sound right?

11   A.    That sounds right.

12   Q.    And in 2018?

13   A.    About the same, about 13 million.

14   Q.    I have 12.4 million.

15   A.    Yeah.

16   Q.    Okay.  All right.  Now, I would like to go to

17   exhibit -- hold on one second.

18        I'm showing you an exhibit which has been already

19   admitted and the number is 1,020.  Can you tell me what this

20   exhibit is?

21   A.    It appears to be a profit and loss statement from

22   D.P.G. for 2018.

23   Q.    So as C.F.O. you're familiar with this document?

24   A.    Uh-huh.  Yes.

25   Q.    Okay.  All right.  So I would like to look at the

1    second page.  Stop right there.

2        I am going to circle an item here, management fees.

3    How much were the management fees for that year?

4    A.   $990,000.

5    Q.   To whom were those fees paid?

6    A.   To DaRezz.

7    Q.   Why?

8    A.   So where we are multiple L.L.C.s, we have D.P.G.,

9    DIESELSellerz, and there is also Sparks Motors that I'm not

10   a partner with, but they also work and do a lot of business

11   together, and so there is a lot of shared expenses that we

12   all have.

13       So we have DaRezz, which is a management company, that

14   basically pays all of the shared expenses and then invoices

15   other companies their portion of it.  For instance, the

16   building that we are in, all the businesses have occupancy

17   in that building, and so DaRezz will pay the rent and then

18   bill each individual their portion.  So then each party will

19   have to pay DaRezz for the management fees to cover those

20   expenses.

21   Q.   I am going to put this exhibit aside for a moment and I

22   would like to bring up Exhibit 1,015.  I will erase this.

23       Are you familiar with -- what is this exhibit?

24          MR. CANNON:  I would like to object based on being

25   vague.  We don't have a hard copy up there and he can't see

1    the whole document.

2             Could you maybe just scroll down so he can see

3    what we are talking about?

4             MR. HAYS:  These are your exhibits.

5             MR. CANNON:  Well, we only brought one copy for

6    today.

7             THE COURT:  Let's do this.  Mr. Stuart, if you are

8    asked to answer a question and you're unsure of the answer

9    and you think that you need to review some additional

10   portion of a document other than what Mr. Hays is showing

11   you in order for you to give an informed answer, just let

12   him know that and he would be happy to show whatever you

13   need to see.

14            THE WITNESS:  Sounds good.  Could you scroll down?

15            MR. HAYS:  Yes.

16            THE WITNESS:  Okay.  Yeah.

17   BY MR. HAYS

18   Q.   Are you familiar with this document?

19   A.   Yes.

20   Q.   What is it?

21   A.   Can you scroll back up and I will read the title.  It

22   appears to be a profit and loss statement for Diesel Power

23   Gear of 2016.

24   Q.   As C.F.O. are you familiar with this document?

25   A.   Yes.

```
 1    Q.    Can we go to the second page, please.

 2              MR. ZARS:  May I interrupt?  Why don't we just

 3    give them the hard copy.

 4              MR. CANNON:   That would be helpful.

 5              MR. ZARS:  They are just sitting over there on the

 6    floor.

 7              THE WITNESS:  This says 1,015, but --

 8    BY MR. HAYS

 9    Q.    If that is not working for you we can stick with the

10    screen.

11    A.    Okay.

12    Q.    Okay.  I want to refer you to the second page.  How

13    much were the management fees that D.P.G. paid to DaRezz in

14    2016?

15    A.    2016.

16    Q.    Page 2, middle of the page.

17    A.    Scroll up a little bit.  Down I guess it would be.

18    254,250.

19    Q.    Thank you.  Why were the management fees in 2016

20    254,000 but in 2018 they were 990,000?

21    A.    Well, if you scroll up a little bit to the top, the

22    best of -- well, for one, the date on this is May 23rd,

23    2017, and it is also, you'll notice, on an accrual basis and

24    we don't ever file our taxes on time.  We always file for an

25    extension, and so our taxes wouldn't have been filed until
```

1    October of 2017.  So this was probably a rough draft at

2    best, and all of the other expenses from the previous year

3    were not actually fully calculated yet.

4    Q.    Is there another document that you all have not

5    provided to us that shows what the actual management fee was

6    in 2016?

7    A.    I assume there is an updated document for the profit

8    and loss.  As to whether you have it or not, I wouldn't

9    know.

10   Q.    Okay.  I still don't understand why -- the management

11   fees are for management that DaRezz is providing.  So back

12   to 2018, it was 990,000.  Why is it so much?

13   A.    So you are asking why it was --

14   Q.    You work for D.P.G. and you are providing all the

15   financial management.  So why do you have to pay DaRezz

16   $990,000 for management?

17   A.    To manage the expenses and everything else that it

18   manages.

19   Q.    How many employees does that cover?

20   A.    Well, it does not cover the employees.  It covers the

21   expenses.  Once again, I was explaining how they are shared

22   expenses for all of the businesses and so a lot of it is the

23   cost of operating.

24   Q.    Okay.  Well, why don't we look at one of the profit and

25   loss statements or one of the tax statements for DaRezz and

1    maybe you can explain to me what is going on with that.

2    Let's look at Exhibit 1,007.

3         The question I have for you is whether you're familiar

4    with Exhibit 1,007?

5    A.   It appears to be a tax return for DaRezz.

6    Q.   Okay.  And are you familiar with this document?

7    A.   Yes.  Uh-huh.

8    Q.   Can you tell me what most of the -- like what were the

9    chief expenses of DaRezz in this tax year?

10   A.   What year was it?  Can you go back up?  Was it 2018?

11   Q.   I think this is 2015.

12   A.   2015.  What the chief expenses were?

13   Q.   Yes.  Let's look at page 19.  Okay.  This shows that

14   DaRezz received management fees of 1.4 million, does it not?

15   A.   Yep.  It sure does.

16   Q.   Now, if we scroll down a little bit, what did DaRezz do

17   to receive $1.4 million in management fees from D.P.G.?

18   A.   So, like I said, they paid the invoices, and the

19   1,400,000 almost all of it was a straight pass-through to

20   cover those expenses.

21   Q.   What were the chief expenses?

22   A.   I don't know.  There was rent, just regular business

23   expenses.

24   Q.   Let's look at page 6.  Look at line 9.  What does line

25   9 represent there?

1   A.   Salaries and wages.

2   Q.   Other than to partners -- so to whom were those

3   salaries and wages paid?

4   A.   I would assume to employees.

5   Q.   Well, you are the C.F.O.  Do you know?

6   A.   Not off the top of my head, no.

7   Q.   Well, you're a shareholder in DaRezz.  Who is the

8   C.F.O. for DaRezz?

9   A.   Dave Sparks.

10  Q.   So Dave would know?

11  A.   You would have to ask him.

12  Q.   Okay.  So in 2016 the management fees were, according

13  to these documents around 200 some odd thousand, but in

14  other years they were close to one million.  You say that

15  the reason for that discrepancy is because that one year was

16  not finalized but the others were?

17  A.   Well, it also could be when you bring in more revenue,

18  costs of doing business increases, therefore, the fees

19  increase.

20  Q.   I see.  But if there were fewer management fees, then

21  D.P.G. would have more income than it states.

22       Is that correct?

23  A.   I don't know if I understand the question.

24  Q.   Well, if you go through it year by year, the biggest

25  expense that D.P.G. has is management fees that it pays to

1    DaRezz, correct?

2    A.   Not necessarily.  That is not the biggest expense.

3    Q.   Well, show me.  What bigger expense is there for D.P.G.

4    than management fees?

5    A.   I would say off the top of my head cost of goods sold.

6    Q.   Cost of goods sold?

7    A.   Yes.

8    Q.   And beyond that?

9    A.   Marketing.

10   Q.   Okay.  So those are all costs, but if you would add

11   back $1 million of management fees to D.P.G. every year,

12   then D.P.G.'s income would be closer to like one million

13   something a year instead of around 100,000 or less, correct?

14   A.   Well, that is like saying if you just took off a

15   million dollars of business expenses, because that is what

16   those management fees are for --

17   Q.   The management fees are to boost your business

18   expenses?

19   A.   I don't understand.

20   Q.   Well, I am just trying to understand what you just

21   said.

22   A.   I am saying that the majority of those management fees

23   are not to pay just people for sitting over there managing.

24   It is to pay actual bills that come in.

25   Q.   Well, we looked at the one year and it looked like

1    almost all of those management fee expenses were salaries

2    and wages, right?

3    A.   Well, that is a bill that you have to pay.  If you have

4    contractors and things, you have to pay those.

5    Q.   I see.  Okay.  So D.P.G. in the last couple of years

6    has grossed over $12 million.  What is your forecast in

7    terms of future earnings for the next three years?

8    A.   Well, based on the growth that we have been having, we

9    actually increased quite a bit the first few years and then

10   actually decreased last year, so I would actually be -- I

11   would say at least maybe 10, 15 percent.

12   Q.   Your estimate is that you are only going to make 10

13   percent of what you had made in the previous years?

14   A.   You asked what the increase would be.

15   Q.   I see.  You estimate that the company would gross 10 to

16   15 percent more each year?

17   A.   Yes.

18   Q.   I see.  Is that written down in a forecast somewhere or

19   is that just based on your knowledge?

20   A.   That is just based on you asking me and me responding

21   off the top of my head.

22   Q.   Okay.  Do you go through a forecasting exercise as part

23   of your C.F.O. work?

24   A.   You just witnessed it.

25           MR. HAYS:  One moment, Your Honor.

1   BY MR. HAYS

2   Q.   That 10 to 15 percent would be per year, correct?

3   A.   Yeah.

4   Q.   Okay.

5         MR. HAYS:  No more questions at this time, Your

6   Honor.

7         MR. CANNON:  First, I intend to call Mr. Stuart

8   again when I have all of our binders on our burden shifting

9   that we have talked about, but I will just ask a couple of

10  questions about this DaRezz thing.

11                    CROSS-EXAMINATION

12  BY MR. CANNON

13  Q.   If you look at your screen and Exhibit 1,007, you

14  indicated, Mr. Stuart, that this is for calendar year 2015.

15  A.   Uh-huh.  Correct.

16  Q.   Is that a yes?

17  A.   Yes.

18  Q.   As the Court directed, let's not speak over each other

19  so that our court reporter can keep up with us.

20        In your opinion is there a valid business purpose for

21  the management fees that are paid through DaRezz?

22  A.   Yes.

23  Q.   In fact, are there some negotiation that happens by and

24  among your partners on how you arrive at the numbers for the

25  DaRezz management fees?

1   A.   Yes.

2   Q.   Why would that be?

3   A.   Well, to make it efficient.  DaRezz is not meant to

4   really make any money.  It is just meant to pay the bills

5   and manage the intercompany expenses.

6   Q.   Are you aware that the lawsuit that we're here to

7   litigate was filed on or about January of 2017?  Does that

8   sound about right to you?

9   A.   Yes.

10  Q.   This tax year was reporting for 2015, correct?

11  A.   Yes.

12  Q.   Two years prior to the time this lawsuit was even

13  filed?

14  A.   Yes.

15  Q.   Was there any manipulation of the numbers to try to

16  reduce the income of Diesel Power Gear by virtue of paying a

17  management fee to DaRezz?

18  A.   No.

19  Q.   Were you advised by a professional, say an accountant,

20  to set up the business in this way?

21  A.   Yes.

22  Q.   We talked about whether or not you had produced an

23  updated 2016 financial statement and you indicated that I

24  believe the May of 2017 version was potentially a draft.

25  Did you produce the 2016 tax return?

```
 1   A.   Yes.
 2   Q.   And is that tax return in your opinion an accurate
 3   reflection of the income of the business?
 4   A.   Yes, it is.
 5   Q.   This may be an obvious question, but does having $12
 6   million of gross revenue mean that you are a profitable
 7   company?
 8   A.   No, it does not.
 9   Q.   If, for example, DaRezz or D.P.G. through DaRezz
10   stopped paying these management fees, would it have
11   negatively impacted the business?
12   A.   Yes, it would have.
13             MR. CANNON:  No further questions at this time.
14             MR. HAYS:  Nothing further at this point, Your
15   Honor.
16             THE COURT:  Thank you, Mr. Stuart.  You're welcome
17   to return to counsel table, if you would like.
18             THE WITNESS:  Would you like these binders back?
19             THE COURT:  You can leave them there.
20             Do you need them?
21             MR. HAYS:  I don't.
22             MR. ZARS:  Not immediately.
23             THE COURT:  Mr. Hays?
24             MR. HAYS:  I am going to bounce it back to Mr.
25   Zars.
```

```
1              THE COURT:  Mr. Zars?

2              MR. ZARS:  We call David Sparks.

3              THE COURT:  Is Mr. Sparks here?

4              MR. CANNON:  No, Your Honor, but this is probably

5   as good a time as any to cross this bridge.

6              Do you want to go first?

7              MR. ZARS:  Go ahead.  He was supposed to be here.

8              MR. CANNON:  Your Honor, the last time we were

9   here for the final pretrial conference you had asked me as I

10  stood here whether my clients intended to be at the trial.

11  You even said, and I am not trying to put you on the spot,

12  and I know you have a lot of people you represent, but my

13  answer was I always courage my clients to show up at trial,

14  because I like them to be informed what is happening.

15  Nonetheless, I do not know their schedule and that I would

16  work with Mr. Zars on the scheduling of witnesses.

17             This week is what is called the S.E.M.A.

18  conference down in Las Vegas.  It is, if you will, the Super

19  Bowl of the automotive world.  It is the largest conference

20  and it is the place where Mr. Sparks is -- first and

21  foremost, he is a publicity person and he makes his money

22  through appearances and things like that.

23             The absolute truth of the matter was my clients

24  were notified of the trial date two months ago in writing

25  and we all were very optimistic of a settlement.  They came
```

1   here and sat for seven hours with Judge Warner and we

2   appreciate that, but we didn't quite get it done.

3            After the final pretrial conference I called my

4   clients and said, hey, we're finally preparing for this.

5   When can you be there?  They said, well, it is S.E.M.A.

6   during that week and so it is going to be very difficult.  I

7   said, well, I would like at least one of my clients to be

8   present the entire time.  So I have Josh Stuart here who has

9   decided to stay back from S.E.M.A. and he represents Diesel

10  Power Gear as well.

11           B & W Auto, the other defendant in this case, we

12  have a manager, Jim, who is able to speak.  He was planning

13  on Thursday morning, but he said he is generally flexible,

14  and he did not go down to S.E.M.A. to my knowledge.

15           Mr. Sparks and Mr. Keaton Hoskins said that they

16  would be available to testify all day on Friday.  I informed

17  Mr. Zars of that.  He was not happy about that result.  I

18  apologized.  In my perfect world all of my clients would sit

19  here for four full days with me, but it is what it is.

20           Mr. Zars then endeavored to subpoena my client

21  yesterday.  As the Court is probably aware, parties to a

22  trial do not have a requirement to be at trial and they have

23  to be subpoenaed pursuant to Rule 45.  The subpoena was sent

24  to Mr. Sparks' place of business, and I believe that the

25  subpoena is ineffective for personal service pursuant to

1    Rule 45(b) which actually requires hand delivery.

2              With all of that said, there is a rule, Rule 43,

3    that allows a party to appear by telephone if that is

4    needed.  I don't want to slow down the court.  So Mr. Sparks

5    said he could carve out a couple of hours to appear by

6    phone, but he does plan on being here all day Friday.  I

7    have no intention to prejudicing Mr. Zars' case at all and

8    respect his need to examine Mr. Sparks.  So if the Court

9    allows or Mr. Zars needs it, we can continue the testimony.

10   I certainly don't expect him to close his case in chief

11   until he has the opportunity to examine Mr. Sparks.

12             So that is where we are at.  I have a lot of case

13   law supporting the subpoena issue, but I was hoping that we

14   didn't have to get into that.

15             I guess there is one other schedule thing to

16   indicate.  I don't think we need Thursday, and I will defer

17   to plaintiff's counsel on that, but I think we can get away

18   with -- at least for our sort of burden shifting case in

19   chief, it will be nothing more than a reexamination of

20   Keaton, and Mr. Stuart I will put back up there and then Mr.

21   Sparks.  I expect maybe I will spend an hour or a half an

22   hour with each, if that, and talk about some of the

23   mitigating factors.

24             I know that that does not look great that he is

25   not here right now.  I would say it was a bad week, but he

1    did cancel his events on Friday to be here all day Friday.

2              THE COURT:  Thank you.

3              MR. CANNON:  Thank you.

4              THE COURT:  Mr. Zars?

5              MR. ZARS:  Of course it certainly was not our

6    understanding from the pretrial, Your Honor, that Mr. Sparks

7    wouldn't be here.  We were told for the first time that Mr.

8    Sparks' priorities were at the S.E.M.A. conference instead

9    of before this Court on Thursday, October 31st.  That

10   S.E.M.A. conference is scheduled a year, at least, in

11   advance.

12             So at that time I sent this first e-mail to the

13   defendants' counsel.  I will let you read it.

14             THE COURT:  Mr. Zars, go ahead.

15             MR. ZARS:  There is the responsive e-mail where we

16   were told that on Sunday, just this last weekend, Sunday

17   evening, that they would not accept service.  Well, they

18   would for one day and not the other days for Mr. Sparks.  So

19   that left me on Sunday evening -- first I was left with the

20   impression that they had accepted service because I had not

21   heard back from them after requesting it immediately, so I

22   assumed, you know, with the courtesy of lawyers in preparing

23   for trial, that they would accept service.  They didn't.

24             On Monday morning -- I am sorry.  I am sitting

25   down.  Bad form.  Excuse me.

1          I sent the subpoenas through a process server to

2     at least try to serve Mr. Sparks at his place of business.

3     Mr. Hays is prepared to discuss the law on this issue as

4     well, but Magistrate Pead's decision is exactly on point,

5     that a Rule 45 subpoena can be served pursuant to Rule 5 and

6     does not need to be in hand.

7          For the second set of subpoenas we didn't request

8     his presence today, but we requested it for Wednesday and

9     Thursday and Friday.  We have no other witnesses that are as

10    central to this case as Mr. Sparks and this was the plan

11    that we were proceeding with.  We're done with Mr. Stuart.

12    We have Mr. Hoskins who also says he is at the S.E.M.A.

13    conference and is out until Friday as well.  So I am left

14    with my case in chief with no other witnesses, even though I

15    was relying on them to prove up all of the liability issues

16    that we have discussed before and the financial issues.

17          If you would like to hear from --

18          THE COURT:  What efforts, if any, did you make to

19    confirm -- my recollection is largely what Mr. Cannon

20    described from our discussion at the final pretrial

21    conference.  What efforts, if any, did the plaintiff make to

22    ensure the availability of the defendants that you wished to

23    call in your case in chief at the time that you wished to

24    call them?  Did you notify defendants' counsel of your

25    proposed schedule and when you wished to have the individual

1    defendants available?  Did you discuss with defendants'

2    counsel the need for a subpoena to ensure their attendance

3    at trial?  Were there any communications like that following

4    our final pretrial conference?

5              MR. ZARS:  In our joint revised pretrial

6    conference, we listed Mr. Sparks as the first witness on our

7    list.  I took, and it appears to have been a mistake, from

8    the comments made in court that the defendants would be

9    present in court, so I wouldn't need to subpoena them or at

10   least they would tell me if I did, but we didn't have an

11   arrangement obviously and they --

12             THE COURT:  So what are you asking me to do, Mr.

13   Zars?

14             MR. ZARS:  Enforce the subpoenas.

15             THE COURT:  Do what, order Mr. Sparks to be here

16   tomorrow?

17             MR. ZARS:  Yes, Your Honor.

18             THE COURT:  He is out of state.  Is that right?

19   Your understanding is he is out of state?

20             MR. ZARS:  He is out of state.

21             THE COURT:  And you were aware of this issue this

22   morning when we began?

23             MR. ZARS:  I certainly was.  We didn't hear

24   anything from them other than they felt as though the

25   subpoenas were ineffective.  I didn't share that legal

1    opinion.  I knew it was going to come up, but I remained

2    hopeful that they would say, yes, Mr. Sparks, you need to be

3    back here for trial.

4            THE COURT:  What prejudice do you anticipate, Mr.

5    Zars, if Mr. Sparks and Mr. Heaton are not available until

6    Friday?  Did I say Heaton?  I mean Hoskins.

7            MR. ZARS:  Our trial schedule and sequence is

8    thrown off.  That is, I don't have really any other

9    witnesses to put on, so I am being asked to close my case

10   before I am done.

11           THE COURT:  I understand.  Let me say back to you

12   what I think you just said.  Are you saying that in your

13   judgment, understanding that you don't yet know what you

14   would hear from these witnesses, but your current belief is

15   that you would call Mr. Sparks and Mr. Hoskins and rest?

16           MR. ZARS:  Yes.

17           THE COURT:  Okay.  What prejudice follows from

18   proceeding out of order and requiring the defendants to put

19   on their case in chief in the interim and then cycle back

20   before you have closed your case in chief?  In fact, it

21   seems to me, if anything, it is potentially prejudicial to

22   the defendants.  There is a burden shifting model here and

23   the target is not fixed yet, because they have not yet heard

24   the testimony of those witnesses.  Your case would remain

25   open until we have those witnesses available, and in the

```
 1    interim you would have the benefit of hearing the

 2    defendants' case in chief.  We may have some scheduling

 3    issues, but it sounds to me like the trial would still

 4    conclude in the time that we have allotted and we would

 5    accommodate the witnesses and get all of the testimony and

 6    the evidence.

 7             Am I thinking of it incorrectly?

 8             MR. ZARS:  We may be cooling our heels on parts of

 9    Wednesday and Thursday.  I don't know how long they plan for

10    the proposed testimony.  It just seemed very inefficient.

11    Many of us have other things to do in our lives than sit and

12    wait for somebody with very discretionary participation in

13    Las Vegas.

14             THE COURT:  Do you have copies of the subpoenas?

15             MR. ZARS:  Yes.

16             THE COURT:  May I see them?

17             MR. ZARS:  Sure.

18             Will you accept them on the screen?  I just

19    received the returns, though, via e-mail and I saw them

20    come --

21             THE COURT:  Sure.  Yes.

22             Will you pull the subpoena for Mr. Sparks?

23             MR. ZARS:  There are three separate subpoenas.

24             THE COURT:  For whom?

25             MR. ZARS:  Each day, so for Mr. Sparks for
```

```
 1   Wednesday, Thursday and Friday plus the witness fee.

 2              MR. HAYS:  Would you mind turning on --

 3              THE CLERK:  It is on.

 4              MR. HAYS:  Your Honor, they are all the same

 5   except the date changes.

 6              THE COURT:  One more time.

 7              MR. HAYS:  All the subpoenas for Wednesday,

 8   Thursday and Friday are the same except the date changes.

 9              THE COURT:  One more time, Mr. Zars.  They were

10   served on one of the corporations at the place of business,

11   I guess?

12              MR. ZARS:  Exactly, Your Honor.

13              THE COURT:  When, yesterday?

14              MR. ZARS:  Okay.  I have been in court all day,

15   but I saw an e-mail go by where the process server indicated

16   that they had been -- gave me the returns.  That was today,

17   Tuesday, for the service on Monday, so they were served on

18   Monday.  I am sorry.  I am thinking as I talk, but they were

19   served on Monday.

20              THE COURT:  Under the rule at least, and I am just

21   candidly befuddled, I mean, the defendants understood, Mr.

22   Sparks at least, and maybe Mr. Hoskins, were primary

23   witnesses in the case.  I mean, maybe the largest unresolved

24   question in the case is Mr. Sparks' knowledge about the

25   events.  You had a trial order knowing that he was a will
```

1    call witness in the plaintiff's case in chief in a bench

2    trial set to run for four days.  At some point you learned

3    he was not going to be available.  I don't know when that

4    was in connection with when you notified Mr. Zars.

5         In the interim you learned that there were

6    subpoenas, and now we know that they were served yesterday,

7    and I think it is incumbent on the defendants to move to

8    quash the subpoena and I don't think you have done that.

9         So what are we doing?  Where are we?  In all of my

10   years of practice and on the bench I don't believe I have

11   had a party not appear for trial, and then refuse to comply

12   with a subpoena that comes for a trial that everybody knew

13   about months ago.

14        I am not sure where to go, Mr. Cannon.

15        MR. CANNON:  Yes.  I can --

16        THE COURT:  Should we just close our court?

17   Should all of us just move around Mr. Sparks' business

18   decision that it is more important for him to attend a

19   conference than to participate in the defense of this suit?

20   I actually don't want you to answer this question.  I just

21   assume that you have discussed with the defendants the

22   statutory civil penalties that are at stake in this case,

23   given the number of violations that are admitted and those

24   in front of us.  I don't know that the defendants understand

25   the potential gravity of the judgment in this case.  I don't

1    know where we will land.  I have not prejudged it.  I have

2    not yet heard any of the mitigation.  I don't know where

3    we'll go.  I don't mean to infer anything other than, holy

4    shit, where are we?

5              MS. CONWAY:  I appreciate all of those remarks.  I

6    appreciate personally the gravity of the situation and I

7    appreciate that Mr. Zars needs to call Mr. Sparks.

8              First off, I have never felt like a four-day trial

9    was absolutely necessary.  We were being led down that path

10   by the plaintiff because they had so many experts.  To give

11   a little bit of context to perhaps our side of the story a

12   little bit, the final joint pretrial order that was filed,

13   there are seven witnesses by my count that the plaintiff

14   said they will call, but which they have not subpoenaed,

15   most notably the accountants, two sets of accountants for

16   the defendant, and I think two other witnesses from their

17   own group.

18             THE COURT:  Well, there is a Mr. Garber.

19             MR. CANNON:  Heather Pledger is one that they were

20   going to call.  You can see James Pound, Mark Elwood, so

21   they did call some but they did not call others.  My point

22   is it was not obvious to us when and who they were actually

23   going to call.  I was the one who initiated the October 30th

24   e-mail to Mr. Zars.  I said can you get on a phone call

25   today?  I have not heard from you on how you want to do this

1  scheduling.  Let's see what we can work out together.  I

2  said do you have a few minutes today to catch up on the

3  witness schedule?  I am hoping to create an easy flow for

4  everyone.  Thanks.

5       Even if Mr. Sparks were in town this whole week, I

6  don't think it is the Court's job to wait around for him and

7  I appreciate why it feels that way right now.  I would still

8  have suggested that we put Mr. Sparks on the same day.  In

9  other words, I do my burden shifting thing the same day that

10  he does his case in chief.  I feel like that is efficient.

11  I would encouraged the same day, whether that day was Friday

12  or that day was Thursday.

13       THE COURT:  Well, that day it turns out is

14  tomorrow.

15       MR. CANNON:  Yes.  Again, when you said there was

16  a subpoena, the subpoena got served yesterday.  We are

17  making binders and we are getting ready for trial and I get

18  a phone call from Mr. Stuart that says a subpoena showed up,

19  which really surprised me because a week before or four days

20  before we had talked to Mr. Zars and candidly I thought it

21  was fine.  I didn't walk away from that phone call thinking

22  this is a big problem.

23       Then the subpoenas shows up.  It is interesting to

24  note, by the way, that the subpoenas call him for three

25  days.  I know Mr. Zars is not intending to examine

```
 1   Mr. Sparks and Mr. Hoskins for three full days.  Rule 45(b)
 2   prohibits an attorney from, you know, incurring upon a
 3   witness an undue expense and burden.  I don't know if that
 4   was meant to -- they know that S.E.M.A. is going on and they
 5   wanted to make his life miserable and make him look bad, and
 6   I am not sure why, but --
 7             THE COURT:  They want him available for testimony
 8   in their case in chief as everyone has known since at least
 9   the final pretrial, if not my summary judgment ruling.
10             MR. CANNON:  Yes.  I guess my only response to
11   that is they said the same thing about James Pound and Mark
12   Elwood, which they did not plan on calling.  For me it was
13   easy to say, hey, let's do the accounts on Wednesday morning
14   and let's have your other witnesses on Thursday and Friday.
15   Here we are.
16             THE COURT:  How many witnesses do you intend to
17   call in your case in chief?
18             MR. CANNON:  Us?  Three, potentially four.
19             THE COURT:  How long do you anticipate it will
20   take to hear that testimony?
21             MR. CANNON:  Two hours.
22             THE COURT:  To hear from all four witnesses?
23             MR. CANNON:  Yes.  It is more or less like you
24   just saw, the cross-examination of, you know, some key
25   financial indicators and, you know, part of this is -- maybe
```

1    it is no excuse, but, like I said, this is the Super Bowl of

2    his profession and this is how he is able to make money to

3    pay penalties.

4          THE COURT:  I would not have scheduled a trial

5    that interfered with such an important business interest if

6    anybody had brought that to our attention when we scheduled

7    this trial months ago.

8          Nobody else was apparently aware of it except for

9    Mr. Sparks or maybe some of the other defendants.  Had they

10   mentioned it, we would not have interfered.  Once we

11   scheduled the trial, that is the trial date and nobody ever

12   notified me until just now that it created a conflict for

13   any of the defendants.

14         MR. CANNON:  I am just trying to give the Court my

15   mindset.  I had a call that I initiated to try to figure out

16   the scheduling so that it could be as smooth as can be.  I

17   determined that Friday was the day -- I hung up from that

18   call thinking everything was copacetic and everybody was in

19   agreement.  The next thing I know, yesterday afternoon we

20   get subpoenas served, and I have my legal basis why those

21   are ineffective, but I think your question that you asked

22   Mr. Zars earlier what attempts did you make between October

23   7th and October 30th to make sure your -- I mean, with all

24   due respect to Mr Zars, it is not my job to do his job.  My

25   job is to get my clients here when they are required to be

1    here for my case in chief.

2            THE COURT:  No.  You are not on notice when you

3    and Mr. Zars are working through the stipulated trial order

4    that Mr. Sparks is a will-call witness during the

5    plaintiff's case in chief, and if there is some commitment

6    that Mr. Sparks has that conflicts with the trial date, it

7    is not incumbent on you to call and try to schedule a time

8    for him to testify.

9            MR. CANNON:  I did that as soon as I knew.  I

10   notified --

11           THE COURT:  Was that Friday?

12           MR. CANNON:  No.

13           THE COURT:  Thursday?

14           MR. CANNON:  To the best of my recollection, and I

15   have this e-mail, and at noon on the 30th I said, hey, can

16   we catch up about the witness scheduling?  At that point I

17   didn't know which day I could get him to be here.  I

18   thought, gee, if he has to have his whole case in chief

19   before the burden shifts to us, why don't we put him last

20   and we can both handle him at the same time.  I wasn't

21   really trying to be picky about Friday, I just thought it

22   made sense for the Court and both parties.  I didn't think

23   there was an issue until --

24           THE COURT:  What are you proposing?

25           MR. CANNON:  Well, I was going to make an oral

1    motion to quash the subpoenas, and then I was going to

2    suggest that we can do a stipulated order that he is here

3    Friday morning.  I would suggest if the plaintiff is not

4    going to call these other seven witnesses that I count on

5    their will-call list or, for that matter, anybody else on

6    their may-call list, I would like them to say so now.

7              THE COURT:  Are we looking at different orders?  I

8    am looking at docket 144 that was filed October 25th that

9    was the joint revised pretrial order.  Is there one since

10   then?

11             MS. CONWAY:  Unfortunately, Your Honor, mine is

12   not stamped but it does -- I thought it was the most recent

13   edition.  It has all of our electronic signatures on it.

14             Give me a second.

15             If we turn to page 11 of that order, we can

16   probably quickly compare --

17             THE COURT:  I'm looking at page 12 of that order

18   and it lists the will-call witnesses, and we have heard from

19   all of them now except for Dr. Garber, the two accountants

20   or C.P.A.s, Mr. Hoskins and Mr. Sparks.

21             MR. CANNON:  I have on my version Cody Holley,

22   Heather Pledger, Evan Nelson.

23             MS. CONWAY:  Those are may-calls.

24             MR. CANNON:  I am sorry.  I see that.  I was

25   looking at the may use the following depositions.

1          THE COURT:  I'm still trying to understand what

2     you are proposing.  You are making an oral motion to quash

3     the subpoenas on what basis?

4          MR. CANNON:  That they were not served pursuant to

5     Rule 45(b) which requires hand delivery to the actual

6     subpoenaed party, even if they are a party to the case.

7          THE COURT:  You rely on what authority for that?

8          MR. CANNON:  The plain language of the rule

9     itself, 45(b), but also the case of Hall versus Sullivan,

10    229 F.R.D., District of Massachusetts 2005.

11         THE COURT:  I am sorry.  One more time the case

12    cite.

13         MR. CANNON:  Hall vs. Sullivan, 229 F.R.D. 501 at

14    502, Massachusetts, 2005.  Another one is Arnsberg versus

15    the United States.  That is A-r-n-s-b-e-r-g, 757 F2d 971,

16    and that is the Ninth Circuit, 1985.

17         The two quotes, by the way, from those two cases

18    are the defendants bear the responsibility of using proper

19    methods to secure their witnesses.  The Hall quote is the

20    majority of courts have held that personal service is

21    required, while a growing minorities of others have not.

22         In full disclosure to the Court, there are some

23    minority jurisdictions that don't require hand delivery, but

24    I think it is the super minority, and I did not find any

25    Tenth Circuit case that would indicate that this is one of

1    those.

2            Honestly, I didn't spend much more than, you know,

3    30 minutes on this issue, because it was a surprise to me

4    after our phone call.

5            THE COURT:  And if I quash the subpoena, you

6    propose what by way of our schedule?

7            MR. CANNON:  Well, it starts with a question for

8    me.  What other witnesses, if any, does the plaintiff have?

9            THE COURT:  I think we just heard the answer to

10   that.  None.

11           MR. CANNON:  None.  No other witnesses.

12           Then I would say we -- well, I would say based on

13   the Court's time, whatever is more convenient, I can put on

14   two witnesses tomorrow, Mr. Stuart, both in a personal

15   capacity and in the capacity as Diesel Power Gear, and Jim

16   Anderson in the capacity as the manager of B & W Auto.

17   Those are the only witnesses I would have tomorrow.  If the

18   Court would prefer, I could call them Wednesday.  And then

19   we'll start bright and early with Mr. Sparks and Mr. Keaton

20   on Friday.

21           THE COURT:  People keep saying Mr. Keaton.  Am

22   I --

23           MR. CANNON:  Sorry.  It is Mr. Hoskins.  Yes.  Mr.

24   Hoskins.  Keaton Hoskins.  His real first name is Mark.

25           THE COURT:  Okay.  Thank you, Mr. Cannon.

1          Mr. Hays, you're relying on what authority for the

2    proposition that the service of the subpoenas is effective?

3          MR. HAYS:  If I may, Your Honor, can I have a

4    couple of minutes?  May I hand out some documents?

5          Your Honor, I have given the Court first a copy of

6    Rule 45(b), and I think the language that Mr. Cannon was

7    referring to is -- I have highlighted it on page 2, section

8    (b)(1).  Serving a subpoena requires delivering a copy to

9    the named person, so delivering a copy.  There is an

10   ambiguity there.

11         Turning next to the next document which is Rule

12   5(b)(2)(B), says that the paper is served under this rule by

13   (b) leaving it (i) at the person's office with a clerk or

14   other person in charge of, or if no one is in charge in a

15   conspicuous place in the office.  That is the method that we

16   chose.

17         In terms of our authority in terms of how to

18   interpret that language, I would like to draw the Court's

19   attention to an opinion from Judge Pead and the cite is 2018

20   WestLaw 4215114.  This was an opinion issued last September.

21   In this case, and this was not a subpoena for a trial, but

22   it was a subpoena that obtained documents, and the recipient

23   claimed that the Rule 45 subpoena was defective because it

24   was not personally served.  On page 3 Judge Pead walks

25   through the authority, the same authority that Mr. Cannon

1    discussed, and then talked about the majority authority and

2    the minority authority, but talks about how Wright & Miller

3    talks about an emerging minority position, and then Judge

4    Pead says in this case given the responses filed, and I am

5    reading on page 3 at star 3, it is clear that nonparties and

6    Attorney Bramwell have received the subpoenas.

7          Indeed, nonparties do not raise a failure to

8    receive.  Same as here.  Rather, they challenge the

9    subpoenas on the basis of procedural technicalities.  While

10   the Court certainly could require defendants to re-serve the

11   subpoenas, to do so would elevate form over substance and

12   fly in the face of securing the, quote, just and speedy and

13   inexpensive determination of every action and proceeding

14   citing Rule 1.

15         Courts have authority governed not by rule or

16   statute but by the control necessarily vested in them to

17   manage their own affairs so as to achieve the orderly and

18   expedited disposition of cases.  Based on that, Judge Pead

19   said he was not quashing the subpoenas and found them to be

20   effective.

21         I think the same principle applies here.  We

22   supplied the subpoenas to the defendants last week, and then

23   when we heard on Sunday night that their e-mail had not gone

24   through, then we first thing Monday morning subpoenaed them

25   again using Rule 5, and then we found this authority which I

1    think backs up that we have acted appropriately here, Your

2    Honor.

3            THE COURT:  I know that Mr. Zars covered this

4    ground already, and I think I was still trying to get my

5    legs under me, but the initial e-mail, Mr. Zars, that you

6    sent to defendants' counsel requesting that counsel accept

7    service of the subpoenas, that was when?

8            MR. ZARS:  Your Honor, that was Thursday,

9    October 31, immediately after our call where we were told

10   blankly that we're only having Sparks available on Friday.

11   Then we tried to talk about that.  So then I sent them a

12   request and I saw no other avenue and that was October 31,

13   Your Honor.

14           THE COURT:  Just so I have the time line in mind,

15   the e-mail response you received back was received when?

16           MR. ZARS:  Sunday evening I think around 7:00 p.m.

17   You will note that I -- well, it was only up on the screen

18   and we can print a copy out for you, but I had requested

19   them to tell me immediately if they wouldn't be accepting

20   service.  That was Thursday.

21           THE COURT:  Was Sunday November the 3rd?

22           MR. ZARS:  Yes.  Today is the 5th.  On Tuesday,

23   yes.

24           THE COURT:  Will you put the defendants' counsel's

25   response back on the screen?

```
 1              We're stuck.  There are no further witnesses for
 2     the plaintiff to call.  We could proceed with Mr. Stuart's
 3     testimony right now as part of the defendants' case in
 4     chief, but I am going to consider what you have all said and
 5     what has happened and I will notify you of my decision.
 6              I think, Mr. Cannon, in your comments you proposed
 7     that we -- it was unclear.  I was unsure if you thought
 8     today was Monday.  We started on a Tuesday.  You mentioned
 9     to skip a day and -- I don't know.  You were proposing that
10     we take your testimony when?
11              MR. CANNON:  I was just saying whatever is
12     convenient for the Court.  If it is better for the Court to
13     take off tomorrow, I would suggest that we do that and
14     reconvene on Thursday morning, at which point I will call B
15     & W Auto, Diesel Power Gear and Joshua Stuart, and then
16     Friday -- it might be 9:00 to noon on Thursday morning.  So
17     no court tomorrow and then we reconvene on Friday.
18              THE COURT:  I don't know what we're going to do.
19     I want to think carefully about this.  I don't want to
20     unduly prejudice the defendants.  I am very disappointed
21     that we are here.  Initially I see this as a product of the
22     defendants' failure to communicate adequately with the
23     plaintiff, but I am going to think about it.  We have your
24     telephone numbers, I think, where we could reach you to
25     schedule a telephone conference.  I will consider what you
```

1    have had to say and we'll notify you when we resume, but at

2    least for the time being -- well, I will notify you when we

3    will resume.  I need some time.  I want to make sure that I

4    am making a decision that is consistent with my legal

5    obligations under the controlling authority.

6            I guess I should have asked you this question, Mr.

7    Hays, while I'm thinking about it.  You didn't come across

8    any Tenth Circuit authority in your research on this

9    question of the subpoenas?

10           MR. HAYS:  I am afraid not, Your Honor.  Actually

11   there was nothing in the Tenth Circuit on that point that I

12   found.

13           THE COURT:  Okay.  I know it is not convenient to

14   any of you or any of your clients or other interested

15   parties to recess and know when we are going to reconvene

16   again, but I don't want to make a rash decision one way or

17   the other that would unduly prejudice either of you, so I

18   want some time to think about it and make an informed

19   decision and we'll be in touch.

20           Mr. Cannon.

21           MR. CANNON:  It might be helpful -- there was a

22   note that the New York Bar Association wrote to the

23   Administrative Office of the United States Courts to weigh

24   in on this issue and they listed a bunch of pros and cons

25   why personal service should not be accepted and why it

1    should be required.  If it would help the Court -- I think

2    it is a pretty balanced sort of non -- I don't know.  If it

3    would help the Court to research it, I could e-mail that to

4    you and you could see a lot of case law that probably Mr.

5    Hays and I both found.  It is summarized quite nicely.

6         THE COURT:  I am unsure even what I think the most

7    important issue is relating to the subpoenas.  Like some of

8    the language that Mr. Hays just communicated from a Judge

9    Pead decision -- I mean, this is what we know.  These are

10   parties to the suit.  They knew about and agreed to the date

11   for the trial.  They understood through their counsel that

12   they were necessary witnesses in the plaintiff's case in

13   chief and would be called in the plaintiff's case in chief,

14   and did not notify plaintiff's counsel until a day and a

15   half before trial that they were not going to be available

16   until the last day of -- you're showing some confusion on

17   your face, but it sounds to me like it was an open question

18   still until your Sunday evening e-mail or Ms. Conway's

19   Sunday evening e-mail.

20         So there is not a question about notice, which is

21   what I think the service requirement is designed to do, is

22   to ensure there is adequate and fair notice.  I am going to

23   do some case research.  I don't know.  It seems to me that

24   it is entirely possible that there will be an appropriate

25   sanction.  I don't know what that is and I don't want to get

1    ahead of myself and ahead of the case law.  I will go think

2    some more about it and we'll be in touch.

3            With that said, Mr. Zars, is there something more

4    you think we can take up here before we recess?

5            MR. ZARS:  Well, I will try to keep my emotions in

6    check, but I wanted to inform the Court that to balance the

7    prejudice here, I left my family and my daughter putting on

8    her first musical with all of her brothers and I had to

9    leave all of that because I wanted to be here.  I'm sorry.

10   I miss them more than anything and it was very hard for me

11   to be here.

12           I am just very distressed that I could have been

13   told and if he had told me to start trial on Wednesday or

14   Thursday, I wouldn't have suffered.  As much as I have my

15   loyalty to the Court, I also have loyalty to my family.  I

16   am just going to fall apart.  It has been hard.  I would

17   never have done his to any attorney and I never would have

18   segregated it out and said, well, I can accept this subpoena

19   and not that.  I would have accepted any subpoena.  I am the

20   representative of my client.  I am sorry.

21           THE COURT:  I appreciate very much your comments.

22           Is there something more unrelated to the Court's

23   schedule and these subpoenas that we need to take up while

24   we are here and while we have some time?  Anything further?

25           MR. HAYS:  We have nothing further at this time,

1    Your Honor.

2              THE COURT:  Ms. Conway?

3              MS. CONWAY:  Nothing further at this time, Your

4    Honor.

5              THE COURT:  Okay.  We'll be in touch.  Thank you.

6              Don't wait for me.

7              We'll be in recess.

8              (Recess)

9              THE COURT:  We'll go back on the record in our

10   Utah Physicians versus DIESELSellerz case, 2:17-CV-32.  My

11   apologies, counsel, for sending you all away and then

12   bringing you all back.  I thought it was important that I

13   digest what you all said and think about it and have a

14   chance to do a little research, as I expressed before we

15   left, but then I didn't want to leave uncertainty for all of

16   you and your clients and interested parties and members of

17   the public or others who are interested in these

18   proceedings.  I thought it was important that this be said

19   on the record and that is just easier to do in the

20   courtroom.  I thought it was important that I be available

21   to discuss what I'm about to say with any of you or answer

22   any questions.

23             Let me start with a statement and an expression of

24   where I think we have been and what I think is in front of

25   me and what I'm ordering or ruling or deciding and then

1    where we go from here.

2              So as a preliminary matter, we set this date for

3    trial with the consent of all of the parties I think five

4    months ago, at least five months ago.  Let me say, and maybe

5    we said this in our earlier session, but this may form a

6    different transcript, this part of this hearing, let me say

7    of course we would have accommodated the defendants had they

8    said that the biggest trade show of the year is this week

9    and they would rather we set it for another time.  Nobody

10   ever communicated that to the Court in any way.

11             The defendants' lawyers, of course, are the agents

12   for the defendants, so information in the possession of the

13   defendants' lawyers is information in the hands of the

14   defendants themselves and vice versa.

15             We were together for a final pretrial conference

16   three or four week ago, and I didn't stop to look up the

17   exact date, where we again were discussing the trial that

18   was set to begin today.  We talked about, among other

19   things, the availability of witnesses and schedules and I

20   urged the parties to coordinate if there were schedules that

21   we needed to accommodate.  I'm sure what I said was that we

22   would accommodate third-party witnesses, but we would

23   generally accommodate witnesses even if we had to go out of

24   order.  I remember that discussion.

25             Nobody expressed any concern at that time about a

 1    potential conflict with the trial dates.  I do know that in

 2    advance of that final pretrial conference, the parties

 3    exchanged drafts of a proposed joint trial order in which

 4    the plaintiffs revealed, if it was not already known before,

 5    that Mr. Sparks would be a will-call witness in their case

 6    in chief.

 7          And, of course, how could it be otherwise?  It may

 8    be the single largest question that is open still coming to

 9    trial, Mr. Sparks' corporate officer liability based on his

10    own knowledge, a question that I said was drawing inferences

11    from the deposition testimony in favor of the non-moving

12    party, ambiguous enough to escape summary judgment, so I'm

13    sure we'll have more examination about that.

14          As I understand what was said today, and then the

15    e-mails that I have reviewed more carefully, Mr. Cannon

16    reached out to plaintiff's counsel last Wednesday,

17    October 30th, and I presume knowing at the time that the

18    individual defendants, and especially Mr. Sparks, did not

19    plan to be here, but I don't know that.  In any event, that

20    was communicated no later than a telephone call that counsel

21    had the following day, on Halloween, October 31st.

22          Mr. Zars' e-mail that afternoon expressed alarm at

23    learning for the first time, notwithstanding that Mr. Sparks

24    was a will-call witness, a necessary party, with notice of

25    the trial date for many months before, and having been

1    informed he wouldn't be here, Mr. Zars promptly that

2    afternoon prepared and sent to defendants' counsel in an

3    e-mail subpoenas, trial subpoenas for Mr. Sparks, which is

4    appropriate under Rule 5(b).

5           In fact, it is preferred, where a party who is

6    going to be subpoenaed is represented by counsel, it is a

7    courtesy so that we don't harass individuals by having

8    process servers show up at their house or their corporate

9    office to serve subpoenas when there is lawyers who

10   represent them.

11          Mr. Zars asked the defendants to notify him

12   immediately if counsel were unwilling or unable to accept

13   service of the subpoenas and whether through mistake or

14   inadvertence or intent, and I am drawing no conclusion what

15   it was, but what I do know is that the defendants didn't

16   respond until Sunday night, fully days later, about a day

17   and a half before trial, when they informed the plaintiffs

18   for the first time that they couldn't accept service or

19   wouldn't accept service of anything except the subpoena for

20   Mr. Sparks' attendance on Friday.

21          That was communicated Sunday night and Mr. Sparks

22   was served through delivery of the subpoena to a

23   representative of Mr. Sparks' company at Mr. Sparks' company

24   Monday afternoon at 12:30.  So promptly.  No one raised any

25   concern with the Court at least until today at 3:00 when the

1    plaintiffs called Mr. Sparks to testify and then we were

2    informed that he is not here.

3         Defense counsel at a minimum knew of this issue

4    last week and didn't raise it with the Court.  Neither did

5    the plaintiff, though it seems to me from the communication

6    exchanged that the plaintiff was not in a position to

7    control this and was trying to get information from the

8    defendants.

9         The subpoena was served yesterday afternoon.  I

10   think it is incumbent on the defendant if they wish to

11   obtain relief from the subpoena to move to quash the

12   subpoena.  That was not done until today when we had this

13   discussion at about 3:00 in the afternoon at the close of

14   the first day of this bench trial when Mr. Cannon made an

15   oral motion to quash the subpoena, on the basis that the

16   service of the subpoena did not satisfy the requirement of

17   hand delivery under Rule 45.

18        First, my view is under the facts and

19   circumstances of the case that that motion is untimely, that

20   Mr. Sparks didn't seek relief from the subpoena through his

21   counsel until after he was called to testify on the first

22   day of trial, with actual notice that he was expected to be

23   here and that the plaintiffs desired to call him in their

24   case in chief and roughly 27 or 28 hours after service of

25   the subpoena on the eve of trial.  If it was an issue that

1    Mr. Sparks needed resolved earlier, the motion should have

2    been made earlier rather than after the time he is called to

3    testify.  So in my judgment the motion is untimely and

4    should be denied for that reason.  Second, I conclude the

5    motion should be denied on its merits.

6            First, Rule 5 defines service and service of

7    process and it permits for service in the manner that we

8    have here.  Second, Rule 5(b) permits service through

9    counsel of represented parties and Mr. Zars asked counsel to

10   accept service of the subpoenas last week, Thursday.

11           Second or related to that, rather, the service

12   requirement for subpoenas is designed to ensure adequate

13   notice but, of course, Mr. Sparks has had notice of this

14   trial date for about five months.  There is no question that

15   he understood that he was expected at trial and his counsel

16   knew no later than the final pretrial conference that he was

17   a necessary witness as part of the plaintiff's case in chief

18   and would be required to be here and available for the

19   plaintiff to call as a witness.  Whether Mr. Sparks had

20   actual knowledge of that or just knowledge through his

21   counsel in our conversation, it is actual notice or it is at

22   least constructive notice, but it is notice, legal notice

23   that he is required to be here.  He is not here.

24           I am convinced that service of the subpoena was

25   appropriate and legally valid and, in any event, quashing

1   the subpoena is unnecessary because Mr. Sparks had actual

2   notice of the trial date and the necessity to be here.

3          I presume, based on the statements of counsel,

4   that Mr. Sparks will not be here until Friday.  Of course,

5   that means he will be in contempt of court for failure to

6   comply with a court subpoena.

7          Mr. Cannon.

8          MR. CANNON:  I'm sorry to interrupt.  I appreciate

9   the thoughtful narrative on this order, but I have talked to

10  Mr. Sparks during this break, and I guess I have a lot to

11  say, but I will only report this much.  He completely fell

12  on the sword and he said I am really sorry.  He said just

13  please communicate to the Court a couple points, if I would.

14  You can hear it from him firsthand.

15         Number one, he said in my mind I know I'm cutting

16  a check to somebody in this room, whether it is to us or to

17  them for penalties and he said I needed to make money to do

18  that.  This only happens once a year.  He said it was dumb

19  thinking but that was his subjective thinking, number one.

20         Number two, he said historically S.E.M.A. is

21  during the Halloween week and that is why his brain synapses

22  didn't click when he got the messages and e-mails.  It just

23  didn't click for him.  It was an honest mistake there.

24         Number three, him and his wife are celebrating

25  their anniversary down there.  No problem.  He said I was

1   trying to do too much.  I was trying to show up to court and

2   do it in a way that would be efficient to the court where I

3   could do my cross-examination and they could do their

4   direct.  I screwed up.  I'm sorry.  I will drive all night

5   to be here tomorrow if that is what the Court wants.

6           The way he is looking at this is, you know, on my

7   effort I contacted Mr. Zars, as your recitation of facts

8   said, and I said to him, well, what witness schedule works?

9   We told him Friday -- you're right.  In that phone

10  conversation I communicated to him, hey, I found out that

11  Friday is the day that Mr. Sparks can be there.  He didn't

12  like that.  He countered with I think Tuesday, Wednesday,

13  Thursday and Friday.  I don't think there is any good faith

14  basis why Mr. Sparks needs to be subpoenaed for four days.

15          It is probably also worth noting, I communicated

16  to my clients, and maybe I shouldn't have, because I thought

17  I heard in the final pretrial conference, that you adjourn

18  every day at 3:00, maybe 3:30.  So I communicated that to my

19  clients and said, hey, when you come to trial, plan on being

20  done at that time.  So I didn't think today was an issue no

21  matter what.  I did try to contact Mr. -- I did actually

22  call Mr. Zars yesterday and I sent a few texts.  He went as

23  far as offering, in case it matters for sanction purposes,

24  he offered --

25          THE COURT:  Go ahead.

1             MR. CANNON:  We offered $3,500 for any

2    inconvenience the schedule may have caused with travel

3    plans.  We thought that that was the only potential

4    prejudice under the theory of, gosh, maybe we could have

5    ended on Thursday and not had to go all the way to Friday.

6    That was the way we viewed the world.

7             Nonetheless, Mr. Sparks said he will drive here

8    all night and be here tomorrow morning if that is what the

9    Court needs, and just tell him how long he needs to be in

10   court and he will do it.  He is very sorry.  If that changes

11   how we schedule, then we can get right back on track.

12            THE COURT:  I believe in transparency and so I am

13   going to share maybe more than I should.  There is a valid

14   subpoena issued that compels his testimony here tomorrow.

15   If he does not appear for testimony tomorrow, he will be in

16   contempt of court for violating a valid trial subpoena.  I

17   have not researched this thoroughly, but this is what I

18   believe to be the case.  Any civil contempt sanctions that

19   the Court might consider are designed only to obtain

20   compliance with a court order and a court ordered subpoena,

21   court issued subpoena.  A lawful subpoena I think is, in

22   fact, a court order.

23            What I was going to say before you spoke, Mr.

24   Cannon, was that I presume -- based on our earlier

25   conversation, I did presume during the break when I arrived

1    at this conclusion in my mind, and what I was prepared to

2    say was that I assumed he would not be here until Friday,

3    and that in effect he would be in contempt of court.

4           Of course, if he were here testifying on Friday he

5    would purge that contempt.  There would be an open question

6    in my mind about whether any additional sanction might be

7    appropriate and I don't know, but what I was going to say

8    under the circumstances, and given what was at the time some

9    uncertainty, was that the defendants have said they have

10   about two hours of testimony they want to elicit in their

11   case in chief, and that they could do it tomorrow or they

12   could do it Thursday, and under the circumstances I thought

13   the plaintiff should decide when it was most convenient for

14   them.  I'm here and I'm available.  I was blocked out for

15   trial.

16          I was going to propose that Mr. Zars tell us when

17   he would like to take that testimony, and we set that time

18   now so that everybody has some time to prepare for it,

19   whenever it is, and then we would begin Friday morning with

20   Mr. Sparks and Mr. Hoskins and we would conclude within the

21   time that we originally had scheduled.  That is still what

22   I'm inclined to do.

23          Let me say a little bit more.  I don't know how

24   this trial is going to resolve.  I don't know what the

25   Court's judgment is going to be.  I don't know what the

1    evidence and testimony concerning mitigation is going to be.

2    I know from simple math, based on the civil penalties

3    available that we begin with as a starting point I think for

4    violations of the Utah S.I.P. and the governing regulations,

5    that the numbers that we're dealing with are not small.

6            I know that the defendants have consistently

7    challenged standing in the court and the defendants have

8    lost on the main arguments and defenses they have advanced

9    in this case.  They face the possibility, if not the

10   likelihood of a significant monetary judgment.  I will just

11   tell you candidly I didn't want to undertake any efforts

12   here that would leave the defendants with the impression

13   that the Court was just predetermined to try to stick it to

14   them, including ordering them to leave a profitable

15   conference to be here to testify if there were other ways

16   around it.  I didn't have any intention of ordering him to

17   come here.  I saw as a fair middle ground, notwithstanding

18   the way that Mr. Zars has been affected personally, and I

19   will just say that I have strong feelings about this from my

20   time as a lawyer.

21           The practice of law is impossible to begin with,

22   and then when counsel or parties fail to communicate or

23   provide courtesies, including sufficient information to make

24   important decisions, then we just only impose additional

25   harm on each other.  That is something that I feel very

1    strongly about.

2         It leaves me wondering as a Judge if courts don't

3    enforce certain rules, even if they are unwritten rules of

4    professionalism and courtesy among counsel and litigants,

5    notwithstanding how everybody must feel about this case, and

6    I can only imagine how the defendants feel about this case,

7    but that is sort of beside the point.  It leaves me

8    wondering whether the Court has an affirmative obligation to

9    ensure some standards of professionalism.  I don't know what

10   to do about that.

11        We have already caused harm because we started a

12   trial when we didn't have to and we can't finish it when we

13   should have finished it.  We can't fix that, I don't think,

14   now.  I don't wish to impose any additional harm.  I think

15   if we proceed by taking the defendants' case in chief when

16   it is most convenient for the plaintiffs and we wrap on

17   Friday, that strikes me as a solution that results in the

18   least additional harm or prejudice to the parties.  That is

19   what I am proposing.

20        Mr. Zars.

21        MR. ZARS:  Thank you, Your Honor.  Our preference,

22   of course, would be slightly different.  As you know, we set

23   up the truck and then proceeded with the explanation for the

24   Court to understand the devices and the elements of design,

25   and building on that was then Mr. Sparks.  Your

1    understanding of it or at least Dr. St. Denis's explanation

2    of the downpipe and of the D.P.F. and of the sensors, this

3    is a theme and I am a lawyer and I am trained to put themes

4    together so that people can understand it.  This is

5    disruptive obviously to that theme and to I think the

6    Court's understanding.  Not to underestimate, of course,

7    Your Honor's memory and focus, but to me it is nice to stay

8    with the story and to keep our storyline together.

9             In short, it would be our preference, of course,

10   to have Mr. Sparks here tomorrow, but it is in your hands

11   and we'll do whatever is necessary.  We can handle their

12   witnesses and cross-examine them to the extent we need to.

13            THE COURT:  If I don't order his attendance

14   tomorrow morning or threaten sanctions for failure to comply

15   with your trial subpoena, your preference for taking the

16   defendants' case in chief, and Mr. Cannon said two hours in

17   total with cross-examination, and let's leave room that it

18   could be three or four hours, you would like to do that when

19   in the next two days?  When is the most convenient time to

20   take it?

21            Would you like a moment?  Would you like some

22   white noise?

23            MR. ZARS:  If you have got it.

24            (Time lapse.)

25            MR. ZARS:  Thank you, Your Honor.

1          Under this scenario -- sorry, we are not firing on

2     all cylinders here.

3          THE COURT:  None of us are.  That is all right.

4          MR. ZARS:  Under the scenario that you have

5     proposed, when would Mr. Sparks be available?

6          THE COURT:  9:00 a.m. Friday morning.

7          Would you like more time?

8          MR. ZARS:  Yes.

9          (Time lapse.)

10         THE COURT:  You have all had a visit.  Do you have

11    something different in mind?

12         MR. ZARS:  The defendants proposed to have Mr.

13    Sparks here tomorrow and so that is an alternative.  If he

14    is driving all night I'm not sure what shape our witness

15    would be in.  So we're prepared and we can accept the

16    proposal that Your Honor said, and that we would allow them

17    to put on their case tomorrow in the afternoon and then have

18    Thursday to prepare for Mr. Sparks and have him rested and

19    feeling good and earn enough money to pay the penalty in

20    this case.

21         MR. CANNON:  A couple of thoughts.  I just want to

22    make sure I was being clear.  You asked me earlier how much

23    time I needed and I said probably about two hours.  I was

24    referring to my cross-examination of Mr. Hoskins and Mr.

25    Sparks.

1        THE COURT:  I did misunderstand.

2        MR. CANNON:  I would need them to do their case in

3   chief and then also Mr. Stuart.  The only potential fourth

4   witness is Jim Anderson.  I don't want my client to be in

5   contempt of court if the subpoena is deemed valid.  I want

6   to apologize to the Court and to my esteemed colleagues here

7   that I meant no harm and I meant no games.  I hate games.

8   That was never our intention here.  I called when I knew and

9   I had a conversation and we thought -- again, I hung up

10  thinking it was all fine and I sent the e-mail and it was

11  not fine.

12        To me the best way to avoid future harm is just to

13  have Mr. Sparks here tomorrow.  I hope that given what we

14  heard from the Court about adjourning at 3:00 p.m. or 3:30,

15  and when Mr. Zars called Mr. Sparks that, you know, there is

16  no prejudice to the case because I thought we were all going

17  to be adjourned anyway.  He can fly or drive.  It is not a

18  big deal and he will be sharp and he will be ready to go and

19  he will be penitent.  He is sorry.  He just tried to do too

20  much and he apologized for that, but I think if we do Mr.

21  Sparks tomorrow we cannot have trial on Friday, which I

22  think would be really great for these out-of-towners.  I am

23  actually an out-of-towner too.  I live in Arizona so that

24  would be great for me too.  Mr. Sparks may or may not go

25  back to the conference.  I don't know.

1          THE COURT:  This is what I am going to propose

2     then.  I think this is the best resolution under the

3     circumstances.  It is a valid trial subpoena.  I have said

4     that and the motion to quash is denied.  I have sentencing

5     hearings that begin at 2:00 tomorrow afternoon so we'll have

6     to conclude a little bit earlier.  Well, I can push that

7     back to 2:30.  That would buy us an extra half an hour.  I

8     am just proposing that we start a little bit late and Mr.

9     Sparks can drive tonight, he can fly tonight, he could fly

10    in the morning and he can do whatever will be most

11    convenient for him.

12         Should we begin at 11:00 tomorrow and take an hour

13    and a half of testimony and take a very short lunch break

14    and then come back and take another hour and a half of

15    testimony and hope to get through all of his direct and

16    cross?

17          MR. ZARS:  That would be excellent, Your Honor.

18          MR. CANNON:  I asked Mr. Zars earlier how long he

19    expects he will need Mr. Sparks and he said potentially a

20    whole day, and in light of that --

21          THE COURT:  Is that right, Mr. Zars?  Am I

22    misunderstanding how much time we need with the witness?  If

23    we're going to bring him here, let's also get him back to

24    his business, if we can, the next day.

25          MR. ZARS:  Right.  11:00 to 2:00 and --

```
1                    MR. CANNON:  How about 9:00 a.m.?

2                    THE COURT:  How about 10:00 to 2:30?

3                    MR. ZARS:  We should be able to finish up with Mr.

4         Sparks on that day.

5                    MR. CANNON:  We're okay with 9:00 a.m., too.

6                    MR. ZARS:  10:00 is fine.

7                    THE COURT:  I apologize for all of the moving

8         parts here.  Here is the question.  What about Mr. Hoskins?

9         You initially said he will be here Friday.  Can he be here

10        Thursday?

11                   MR. CANNON:  Can I get three minutes to get that

12        answer?

13                   THE COURT:  Yes, of course.

14                   Let me explain why.  If we can conclude on

15        Thursday, then I can move my sentencing hearings to Friday

16        and we can have as much time as we need tomorrow.

17                   MR. CANNON:  Okay.  So you want Keaton for

18        Thursday, not Wednesday?

19                   THE COURT:  Either tomorrow afternoon late or

20        Thursday morning, it sounds like to me.

21                   MR. ZARS:  Thursday would be preferable.  If you

22        think you could finish up on Thursday as well, that would

23        give the Court Friday open.  A 10:00 start tomorrow is okay

24        for us as well.

25                   (Time lapse.)
```

1          MR. CANNON:  Thursday at 9:00 a.m. works for Mr.

2     Hoskins.

3          THE COURT:  Okay.  Let me say back what I think we

4     have just decided on.  We will resume at 10:00 a.m. tomorrow

5     with a rested Mr. Sparks in the plaintiff's case in chief.

6     Under the circumstances we'll allow the full scope of

7     cross-examination to include your direct testimony so that

8     we can finish with Mr. Sparks no later than the end of the

9     day tomorrow so he can get back to the conference and we can

10    continue with the trial Thursday morning where we will begin

11    with Mr. Hoskins at 9:00 a.m.

12         Upon finishing with Mr. Hoskins we'll take up the

13    defendants' case in chief with the firm goal of trying to

14    conclude before I begin a civil hearing at 2:30 Thursday

15    afternoon and the anticipation will be that we'll have

16    rested.

17         Let's take inventory of where we are.  If we have

18    completed the testimony I will be open-minded to the

19    question about whether counsel want to get together on

20    Friday, and on Friday sometime we can work around my

21    sentencing hearings if you think closing argument would be

22    helpful.  I mean, I am paying attention and your pretrial

23    orders have been helpful to anticipate the evidence and

24    testimony, so I will have some sense for it, but think about

25    it and talk among yourselves.  If you would like to set some

1    time for closing argument on Friday, we could probably work

2    that out.

3              Does that schedule sound like what we have agreed

4    on and it is a schedule that will work?

5              Mr. Cannon?

6              MR. CANNON:  Yes.  Thank you.

7              THE COURT:  Mr. Zars?

8              MR. ZARS:  Yes.  Thank you, Your Honor.

9              THE COURT:  I saw the expression on your face, and

10   I'm trying to be sensitive, and if everyone could get home

11   on Thursday and not be here Friday, and if leaving that

12   question open is causing some uncertainty in all of your

13   schedules we can resolve it right now.  I just wanted to

14   give you a chance to think about it.  I don't perceive that

15   closing argument will be necessary, though if you think it

16   is helpful we could schedule it, or you could submit a

17   posttrial brief.  We could do whatever you would like.  I

18   would like to accommodate your schedules.

19             Should we visit about this in the morning?

20             MR. ZARS:  Yes.  To give you an early sense of at

21   least my thinking, it would be a posttrial brief or a

22   completion of our findings of facts and conclusions of law

23   and we could propose that.  If this were a jury, I think it

24   would be a different matter.  I am not convinced -- I think

25   perhaps your time and ours might be better spent that way,

1    but that is just my initial take on closings.

2              THE COURT:  Mr. Cannon, do you have a view about

3    it?

4              MR. CANNON:  I have no opinion either way.  I am

5    happy to stay through Friday.  I will put it this way.  If

6    we get to the end of our witnesses on Thursday and your

7    civil calendar is starting, I would probably waive closing

8    arguments and say we'll do a brief.  If we have a little bit

9    of time, I would probably say give me ten minutes and I will

10   summarize what we heard.

11             THE COURT:  Fair point.  We'll plan to conclude

12   this trial by Thursday afternoon one way or the other, and

13   we'll receive posttrial briefing as you see appropriate.  We

14   can talk about timing for all of that tomorrow or Thursday.

15             Counsel, thank you for your patience coming back.

16   I appreciate it.

17             Is there anything more we need to take up while we

18   are here?

19             MR. HAYS:  Nothing more from us, Your Honor.

20             THE COURT:  Mr. Cannon?

21             MR. CANNON:  No, Your Honor.  Thank you.

22             THE COURT:  Thank you all.  Have a nice evening

23   and we'll see you in the morning at 10:00 a.m.

24             Don't wait for me, again.

25             (Proceedings adjourned.)