Cole S. Cannon (Utah Bar No. 12053)
cole@cannonlawgroup.com
Janet M. Conway (Utah Bar No. 7488)
janet@cannonlawgroup.com
CANNON LAW GROUP
53 South 600 East
Salt Lake City, Utah 84102
Telephone: (801) 363-2999

*Attorneys for Defendants*

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UTAH PHYSICIANS FOR A HEALTHY ENVIRONMENT, INC., <br><br> Plaintiff, <br><br> v. <br><br> DIESEL POWER GEAR, LLC, 4X4 ANYTHING, LLC, SPARKS MOTORS, LLC, DAVID W. SPARKS, JOSHUA STUART, AND KEATON HOSKINS, <br><br> Defendants. | **DEFENDANTS' PROPOSED POST-TRIAL FINDINGS OF FACT AND CONCLUSIONS OF LAW** <br><br> **Case No.: 2:17-CV-00032** <br><br> **Chief District Judge Robert J. Shelby** <br><br> **Magistrate Judge Dustin B. Pead** |

**TABLE OF CONTENTS**

**TABLE OF CONTENTS** …………………………………………………………....ii

**TABLE OF AUTHORITIES** ……………………………………………………… iv

**PROPOSED FINDINGS OF FACT** …………………………………………………1

**I. BACKGROUND** ……………………………………………………………...1

    **A. Nature of the Case** ………………………………………………………1

    **B. Parties** ………………………………………………………………1

    **C.  Air Pollution Along the Wasatch Front** ……………………………………2

    **D. Air Pollution from Diesel Engines Which Causes Health Problems** ……………...5

    **E. Aftermarket Emission Defeat Parts** ……………………………………7

    **F. Straight Pipes** ………………………………………………………7

**II. FACTS SUPPORTING CAA AND/OR UTAH SIP VIOLATIONS** …………………………9

    **A. B&W Auto Violations** ……………………………………………………9

    **B. Diesel Power Gear's Violations for Giveaway Trucks** ……………………………14

    **C. DPG's Violations for the Sale of Defeat Parts** ……………………………………15

    **D. Keaton Hoskins Violations for Two Personally Owned Vehicles** ……………...16

    **E.  David Sparks Liability for B&W Auto and DPG violations** ……………………17

    **F. Joshua Stuart Liability for DPG violations relating to parts sales** ……………18

**III. FACTORS FOR PENALTY PHASE CONSIDERATION** ……………………………..18

    **A. B&W Auto** ……………………………………………………………..18

B. Diesel Power Gear …………………………………………………………..20

C. David Sparks …………………………………………………………………21

D. Joshua Stuart …………………………………………………………………23

E. Keaton Hoskins ………………………………………………………………24

**PROPOSED CONCLUSIONS OF LAW** ……………………………………26

**IV. CONTROLLING STATUTES** …………………………………………………26

A. Jurisdiction ……………………………………………………………………26

B. Clean Air Act−Statutory and Regulatory Framework …………………………...26

**V.  LIABILITY** ……………………………………………………………………...28

A.  B&W Auto is Liable for violating the CAA …………………………………..28

B. Diesel Power Gear is liable for violating the CAA ……………………………29

C. Keaton Hoskins is liable for violating the CAA ……..………………………30

D.  David Sparks is personally liable for B&W Auto and DPG violations ………..31

E. Joshua Stuart is personally liable for DPG parts sales …………………………31

**VI. REMEDIES** …………………………………………………………………32

A. UPHE Standing to Pursue Remedies …………………………………………..32

B. Duplicative Remedies for violations of Utah SIP and CAA ……………………33

C. Utah SIP penalties violate "excessive fines" of Utah and U.S. Constitution …...33

D. Civil Penalty Award Should be Minimal ……………………………………...35

E. Remediation Program Must Be Proportionate to Actual Harm ………………..38

F. Injunctive Relief ………………………………………………………………40

iii

## **TABLE OF AUTHORITIES**

**Constitution**

Utah Constitution Article One Section 9 …………………………………………………..34

U.S. Constitution, Eighth Amendment ……………………………………………………34

**Cases**

*Austin v. United States*, 509 U.S. 602 (1993) ……………………………………………...34

*Bronson v. Swensen*, 500 F.3d 1099 (10th Cir. 2007) ……………………………………...32

*Cambrians for Thoughtful Dev., U.A. v. Didion Mil.,* 571 F. Supp. 2d 972 (W.D. Wis., 2008) …39

*Clappier v. Flynn*, 605 F.2d 519 (10th Cir.1979) …………………………………………..33

*Don't Waste Ariz. Inc. v. Hickman's Egg Ranch Inc*., No. CV-16-03319-PHX-GMS

    (D.Ariz. February 27, 2019) …………………………………………………………...38

*Gutierrez v. Mobil Oil Corp*., 798 F. Supp. 1280 (W.D. Tex. 1992) …………………………28

*Hawaii's Thousand Friends v. Honolulu,* 821 F.Supp. 1368 (D. Haw. 1993) …………………..36

*Kuehl v. Sellner,* 887 F.3d 845 (8th Cir. 2018) ……………………………………………38

*Mason v. Oklahoma Turnpike Auth.*, 115 F.3d 1442 (10th Cir. 1997) …………………………..33

*Natural Resources Defense Council v. Texaco*, 906 F.2d 934 (3rd Cir. 1990) …………………..40

*Oregon Env. Council v. Dept. of Env. Quality*, 775 F. Supp. 353 (D. Or. 1991) ………………...26

*Pound v. Airosol Co., Inc.*, 498 F.3d 1089 (10th Cir. 2007) …………………………………35

*Safe Air for Everyone v. EPA*, 488 F.3d 1088 (9th Cir. 2007) …………………………………...27

*Sierra Club v. Khanjee Holding (US) Inc.*, 655 F.3d 699 (7th Cir. 2011) ………………………35

*Saint John's Organic Farm*, 574 F.3d 1054 (9th Cir. 2009) ……………………………………38

*Timbs v. Indiana*, 86 U.S. ___ ,139 S. Ct. 682; 203 L. Ed. 2D11 (2019) ……………………34

*U.S. Industries, Inc. v. Touche Ross & Co.*, 854 F.2d 1223 (10th Cir.1988) ……………………33

*U.S. v. Alisal Water Corp.*, 326 F. Supp. 2d 1032 (N.D. Cal. 2004) ……………………………37

*U.S. v. Bajakajian*, 524 U.S. 321 (1998) …………………………………………………...34

*U.S. v. Cinergy Corp.*, 582 F. Supp. 2d 1055 (S.D. Ind. 2008) ……………………………………40

*U.S. v. Midwest Suspension and Brake*, 49 F.3d 1197 (6th Cir., 1995) …………………………37

*US v. Walsh*, 783 F. Supp. 546 (W.D. Wash., 1991) …………………………………………………37

*Weber v. Trinity Meadows Raceway, Inc.* 1996 WL 477049, 42 ERC 2063 (N.D. Texas) ….36, 37

*Weinberger v. Romero-Barcelo***,** 456 U.S. 305 (1982) ……………………………………………...40

## **Statutes**

28 U.S.C. § 1331 …………………………………………………………………………...26

28 U.S.C. § 1355 …………………………………………………………………………...26

28 U.S.C. §§ 1391(b) and (c) …………………………………………………………....26

42 U.S.C. §§ 7401 through 7671q …………………………………………………………...1

42 U.S.C. § 7409(b) ………………………………………………………………………26

42 U.S.C. § 7410(a)(1) ……………………………………………………………………26

42 U.S.C. § 7410(a)(3)(A) ………………………………………………………………27

42 U.S.C. § 7413(e)(1) …………………………………………………………………36

42 U.S.C. § 7502(b) ………………………………………………………………………27

42 U.S.C. § 7522 …………………………………………………………………………6, 26-30

42 U.S.C. § 7524(a) ……………………………………………………………………….35

42 U.S.C. § 7604(a) ……………………………………………………………………...26, 28

42 U.S.C. § 7604(g)(2) ……………………………………………………...28, 38

**Code Federal Regulations**

40 CFR. § 52.2320(c)(59)( Utah Admin. Code R307-201-2) ………………………...1, 26-33, 35

40 CFR § 86.1803-01 ………………………………………………………………...27

40 CFR § 1036.801 ……………………………………………………………5, 6

**Other Authorities**

66 FR 5002 (January 28, 2001) ………………………………………………………..5

EPA supplemental environmental projects …………………………………...…………………39

  (https://www.epa.gov/enforcement/supplemental-environmental-projects-seps)

Dept. of Justice, January 9, 2018, "Settlement Payments to Third Parties" ……………………39

  (https://www.justice.gov/enrd/page/file/1043726/download).

vi

<u>**PROPOSED FINDINGS OF FACT**</u>

**I.  BACKGROUND**

<u>**A. Nature of the Case**</u>

1.       This is a citizen's action for injunctive relief and civil penalties under the federal Clean Air Act ("CAA"), 42 U.S.C. §§ 7401 through 7671q.,  and Utah SIP Regulation R307-201-2, 40 C.F.R. § 52.2320(c)(59), against Defendants for removing pollution control devices from diesel vehicles, installing pollution control defeat parts onto vehicles, selling pollution control defeat parts, and selling pollution control defeat parts installed in vehicles.

<u>**B. Parties**</u>

2.       Plaintiff Utah Physicians for a Healthy Environment, Inc. ("UPHE") is a nonprofit organization that works on behalf of its members to protect and enhance the air quality in Utah, including the airshed of the Wasatch Front.  Dkt. 58 at 3.

3.       Defendant B&W Auto, LLC d/b/a Sparks Motors ("B&W Auto") is a used automobile dealership that sells and repairs trucks, with a focus on custom built diesel trucks. Dkt. 107 at 14.

4.       Defendant Diesel Power Gear ("DPG") is a "lifestyle brand company" which sells "apparel and accessories for the diesel truck lifestyle." Dkt. 107 at 43.

5.       4x4 Anything, a division of DPG, is a "drop shipment fulfillment online retailer" that sells automotive parts and accessories.  Dkt. 107 at 19.

6.       Although 4X4 Anything is named as a Defendant, the parties agree it is a d/b/a of DPG. *See* Dkt. 65 at 1 n.2; Dkt. 81 at 2 n.1.

1

7.      Defendant David Sparks ("Sparks") is owner and CEO of B&W Auto, and founder and CEO of DPG.  Dkt. 114 (Sparks Decl.) Ex. 1 at ¶ 4.  He is also the main star of Discovery Channel's television show, the "Diesel Brothers."

8.      Defendant Joshua Stuart is CFO and COO of DPG. Dkt. 107 at 22.

9.      Defendant Keaton Hoskins is one of the stars on the Diesel Brothers television show. Dkt. 107 at 23.

### C.  Air Pollution Along the Wasatch Front

10.      The Wasatch Front is a metropolitan region along the Wasatch Range in northern Utah.  About eighty percent of the State's population resides along this roughly 120 mile stretch from Brigham City to Nephi.  *Utah Physicians for a Healthy Environment v. Diesel Power Gear*, 374 F. Supp. 3d 1124, f. 10 (D. Utah 2019).

11.      The four counties along the Wasatch Front have not met air quality standards as stipulated by the Clear Air Act since the late 1970s. Trial Tr. 78: 6-11, 98: 18-20; see also Declaration of Janet M. Conway "Conway Decl.," Dkt. 65-6 and 107-2, Exh. "1," *Utah Division Of Air Quality 2009 Annual Report*, Exhibit "4," at p. 8.

12.      As of 2013, there were over 3,000,000 registered vehicles in Utah, and 1,600,000 licensed Utah drivers. *Id.*, *Table 5.1: Motor-Vehicle Registrations: 2013* and *Table 4.2: Licensed Drivers: 2013*, Exhibit "6."

13.      On-road mobile sources include all highway vehicles such as cars, light duty trucks, heavy-duty trucks and motorcycles using gasoline and diesel fuels. In 2016, on-road mobile sources produced about 36% of the annual pollution along the Wasatch Front.  *Id., Utah*

*Division of Air Quality 2016 Annual Report*, Exhibit "7", at p. 23-24. More specifically, 35% of Nox, 12% of $PM_{2.5}$, 7% of $PM_{10}$ and 2% of VOC is attributable to on-road mobile sources. *Id.* at p. 26-28.

14.     Intercontinental transport of ozone and nitrogen oxides (NOx) from Asia contributes up to 20 percent of the West's total ozone concentrations and it has been shown to be growing by 0.5–1 parts per billion (ppb) per year. *Id.*, *Pollution in Utah: Not Always the Usual Suspects*, Exhibit "8." Another major contributor is wildfires, which are on the rise in the western states. *Id.*

15.     Over 30% of <u>primary</u> $PM_{2.5}$ particle emissions in Utah came from dust; fires contributed over 15%, fuel combustion contributed 15%, and mobile sources only emitted 12.5% of the total primary $PM_{2.5}$ particles. In 2014, 67% of the <u>primary</u> $PM_{10}$ particles in Utah came from dust, largely from unpaved roads. The next highest source categories, agriculture and industrial processes, contributed approximately 17% and 5%, respectively, of the total primary $PM_{10}$ particles. *Id.*, *Air Pollution and Public Health in Utah*, Exhibit "9."

16.     The Kennecott Utah Copper Bingham Canyon Mine is a major source contributor of $PM_{10}$, $PM_{2.5}$ and NOx emissions along the Wasatch Front, having moved in excess of 1.5 million tons of material annually, resulting in thousands of tons of emissions, and that amount has increased every year since 2006. *Id.*, *Physicians v. Kennecott.* No. 2:11-CV-01181, United States District Court, D. Utah, Central Division, Memorandum Decision and Order dated June 8, 2016, Exhibit "10."

17.     As of 2014,  Kennecott had an emissions limit for the Bingham Copper Mine for the combined emissions of $PM_{10}$, SO2, and NOx (7,350 Tons Per Year) and combined emissions of $PM_{2.5}$, SO2 and NOx (6,205 Tons Per Year) encompass facility wide emissions. *Id.*, *Kennecott Utah Copper, LLC, Public Notice of Intent, dated January 13, 2014*, Exhibit "11."

18.     Another major contributor of the same emissions that are found in diesel exhaust is Pacificorp's four coal burning plants.  In 2016, Plaintiff sent the EPA formal comments, which stated:  "PacifiCorp's central Utah fleet of power plants is responsible for a substantial share of the NOx, particulates, and ozone along the Wasatch Front. . . Point sources of NOx emissions in Utah are the state's main source of NOx, and Utah's point sources consist primarily of PacifiCorp's fleet of coal-fired power plants." *Id.*, *Comments Of Utah Physicians For A Healthy Environment On The Epa's Co-Proposals For Implementing The Utah State Regional Haze State Implementation Plan*, Exhibit "13."

19.     Another major source of the same emissions that are found in diesel exhaust are the five major oil refineries along the Wasatch Front. Point sources in 2014, in Salt Lake County alone, accounted for 7,271.81 tons of NOx, 2,560.04 tons of $PM_{10}$, 1,227.34 tons of $PM_{2.5}$ and 1,610.40 tons of VOC., *Id., 2014 Inventory Compiled with Oil Gas Locomotive Aircraft NonRoad Updates*, Exhibit "16."

20.     Tesoro Oil Refinery, located along the Wasatch Front, recently settled a litigation in July, 2016, brought by the Environmental Protection Agency ("EPA") and the Department of Justice, for emitting illegal levels of the same pollutants found in diesel exhaust. *Id., Oil Refiners*

4

*to Reduce Air Pollution at Six Refineries Under Settlement with EPA and Department of Justice*,
Exhibit "17."

21.     Tesoro is currently expanding operations, resulting in increased emissions. *Id.,
Utah Physicians for a Healthy Environment v. Tesoro Marketing and Refining*, Utah Court of
Appeals, Appeal No. 20141132-CA, Opening Brief filed March 18, 2015, Exhibit "18."

**D. Air Pollution from Diesel Engines Which Causes Health Problems**

22.     Diesel exhaust contains Nox and particulate matter, both known to contribute to
poor air quality.  66 FR 5002, p. 27-28 (January 28, 2001)(which summarizes air pollution
problems relied upon by expert witness, emissions standards and emission control devices
required for new vehicles.)

23.     In 1985, the EPA started focusing on diesel vehicle exhaust and began requiring
exhaust gas recirculation on diesel vehicles to help reduce Nox in diesel exhaust.  Trial Tr. 26: 7-
11. Exhaust gas recirculation means a technology that reduces emissions by routing exhaust
gases that had been exhausted from the combustion chamber(s) back into the engine to be mixed
with incoming air before or during combustion. The use of valve timing to increase the amount
of residual exhaust gas in the combustion chamber(s) that is mixed with incoming air before or
during combustion is not considered exhaust gas recirculation.  40 C.F.R. § 1036.801.

24.     In 1995, the EPA began requiring diesel oxidation catalysts on diesel vehicles to
help reduce particulates in diesel exhaust. A Diesel Oxidation Catalyst ("DOC"), also referred to
as a catalytic converter or CAT, is a component located at the beginning of exhaust pipe. Trial Tr.
26: 7-11.

25.     In 2008, the EPA began requiring diesel particulate filters on diesel vehicles to help reduce particulate matter in diesel exhaust. A Diesel Particulate Filter ("DPF") is a filter located along exhaust pipe to filter particulate matter.   Trial Tr. 26: 18-22.

26.     In 2008, the EPA began requiring the vehicle's on-board computer diagnostics system to monitor the vehicle's emission systems for proper operation Trial Tr. 89: 14-23.

27.     In 2011, the EPA began requiring selective catalytic reduction systems on diesel vehicles to help reduce Nox in diesel exhaust.  A Selective Catalytic Reduction System ("SCR") is a device located along the vehicle's exhaust pipe which forces exhaust through 'diesel exhaust fluid' to reduce Nox. Trial Tr. 26: 18-22. Diesel exhaust fluid ("DEF") means a liquid reducing agent (other than the engine fuel) used in conjunction with selective catalytic reduction to reduce NOX emissions. Diesel exhaust fluid is generally understood to be an aqueous solution of urea. 40 C.F.R. § 1036.801.

28.     In addition to imposing these requirements on manufacturers, the CAA prohibits a person from subsequently tampering with emission control devices and specifically prohibits: a) removal of emission control devices, 2) installation of emission control defeat parts, 3) selling emission control defeat parts, and 4) selling vehicles with emission control defeat parts. 42 U.S.C. § 7522.

29.     A vehicle's certificate of conformity determines what emissions control devices are required on a specific vehicle, pursuant to the CAA. Trial Tr. 50: 13-20.

**E. Aftermarket Emission Defeat Parts**

30.     An exhaust gas recirculation ("EGR") delete kit has the principal effect of bypassing, defeating, or rendering inoperative pollution control devices on federally-certified motor vehicles. Dkt. 88, p. 14.

31.     A DPF delete kit is a straight piece of pipe roughly the same dimensions as a DPF, and usually has a bolted flange on one side and then a slip flange on the other side, the primary purpose of which is to remove the DPF from a vehicle. Trial Tr. 281: 16-23.

32.     A 'delete tune' is an aftermarket computer software program designed to disable a vehicle OBD system.  Trial Tr. 89: 7-23.

**F. Straight Pipes**

33.     The primary purpose of a vehicle's exhaust pipe, including a straight pipe, is to transport exhaust to the back of the vehicle. Trial Tr. 48-49: 24-6.

34.     The installation of the straight pipe does not change the amount of pollution that is emitted from a vehicle. Trial Tr. 49: 7-10.

35.     Only specific exhaust pipe products that are advertised as 'DPF delete' have the primary purpose to remove an emissions component.  Trial Tr. 338: 2-16.

36.     A DPF back exhaust pipe is a section of exhaust pipe that starts at the back of the DPF and goes out to the tailpipe, and does not usually affect the removal of the DPF or anything upstream of the DPF.  Trial Tr. 279: 10-19.

37.     A CAT back exhaust pipe is similar to a DPF back. It is installed at the back of the catalytic converter and ends at the tailpipe. Trial Tr. 279: 20-24.

38.     An aftermarket turbo back exhaust pipe is typically a full exhaust system replacement. There is a flange on the back of the turbo, which comes off the top of the engine, that connects to the rest of the exhaust system, and generally is installed from the firewall of the vehicle back to the tailpipe. Trial Tr. 279-80: 25-7.

39.     A downpipe back exhaust is almost identical to the turbo back except for it is about 18 inches shorter. The downpipe is essentially the specialty piece of pipe that connects to the back of the turbo. Trial Tr. 280-281: 21-5.

40.     There are variety of different reasons why a customer would purchase a turbo back kit. In most cases people want to increase the diameter of their exhaust pipe. From the factory it comes anywhere between three to four inches and aftermarket companies tend to increase that to four or five or six inches. The reason for the modification is for lower temperatures, better fuel economy, more power. In some cases the kit will have a system that allows you to bypass the DPF.  Trial Tr. 280: 8-20.

41.     Not all straight pipes are used to remove any downstream emission control device.  For instance, if a person has a working emission system in place and the DOC or  DPF is functioning, but the person wants to increase the size of the vehicle's exhaust, a person could buy a turbo back exhaust system and replace the DOC and DPF. Trial Tr. 377-378: 24-5.

42.     There are legitimate uses of a straight exhaust pipe other than tampering with emissions control systems. Sparks has personally purchased straight pipes to be able to fix exhaust systems, and to build intake systems.  It is just material. Trial Tr.  470: 13-16, 471: 2-7.

## II. FACTS SUPPORTING CAA AND/OR UTAH SIP VIOLATIONS

### A. B&W Auto Violations

43.     B&W Auto removed the DOC, DPF and SCR from a 2012 Dodge Ram 2500, 6.7L ("Truck 1" aka "Built Diesel 1") and delete tune. Dkt. 64-1, Deposition of David Sparks ("Sparks Dep."), 33:2-8, 9-12, 36:2-10, Trial Tr. 355: 13-21. The truck was driven less than 500 miles in Utah prior to being provided as a DPG giveaway sweepstakes prize to a Missouri resident in August, 2013. Trial Tr. 355: 13-21.

44.     B&W Auto removed the DOC, DPF, and SCR from a 2013 Ford F250, 6.7L ("Truck 2" aka "Built Diesel 2") and installed a delete tune. Sparks Dep. 35:12-25, 36:1-24; Trial Tr. 355: 13-21. The truck was driven less than 2,500 miles in Utah prior to being provided as a giveaway sweepstakes prize to a Maryland resident in February, 2014. Trial Tr. 355: 13-21.

45.     B&W Auto removed the DOC from a 2006 GMC 2500 LBZ Duramax 6.6L ("Truck 3" aka "Built Diesel 3, 2nd place") and installed a delete tune. Sparks Dep. 38:8-25, 39:1-20; Trial Tr. 355: 13-21. The truck was driven less than 100 miles in Utah prior to being provided as a giveaway sweepstakes prize to a California resident in June, 2014.   Trial Tr. 355: 13-21.

46.     B&W Auto removed the DOC and DPF from a 2007 GMC Kodiak C4500 LBZ, Duramax 6.6L ("Truck 4" aka "Built Diesel 6, 1st place") and installed a delete tune.  Sparks Dep. 43:13-23, 44:2-12; Trial Tr. 355: 13-21. The truck was offered for sale "as-is," after the sweepstakes winner declined it as a prize in August, 2015, but B&W Auto determined it was not suitable to sell and permanently dismantled truck. Trial Tr. 355: 13-21. This truck was driven approximately 5 miles in Utah prior to being dismantled. Id.

47.     B&W Auto removed the DOC and DPF from a 2007 GMC Silverado 2500 Duramax 6.6L ("Truck 5" aka "US Duramax") and installed a delete tune.  Sparks Dep. 60:18-22, 61:5-6, 14-16;  Trial Tr. 355: 13-21. The truck was driven approximately 50 miles in Utah prior to being provided as a giveaway sweepstakes prize to a Colorado resident in June, 2015. Trial Tr. 355: 13-21.

48.     B&W Auto removed the DOC, DPF and SCR from a 2011 Ford F350, Powerstroke 6.7L ("Truck 6" aka "Brodozer") and installed a delete tune. Sparks Dep. 67:20-25, 68:1-10, 118:11-25, 119:1-19; Trial Tr. 355: 13-21. While B&W Auto briefly offered Bro-Dozer for sale "as-is," B&W Auto removed the listing and continues to own Bro-Dozer as a concept vehicle, for display purposes. It just causes more excitement being on display than being used as a vehicle. Trial Tr. 311-12: 24-6.  The truck has been driven approximately 50 miles in Utah. Trial Tr. 361: 13-18.

49.     B&W Auto removed the DOC, DPF and SCR from a 2014 Dodge Ram 1500 Laramie 3.0L eco-diesel ("Truck No. 7" aka "Mini Megaram") and installed a delete tune.  Trial Tr. 324, 2-22; 355: 13-21. The truck was provided as a giveaway sweepstakes prize to a South Dakota resident in November, 2015. *Id.*

50.     B&W Auto removed the DPF from a 2008 Dodge 2500 single cab Cummins 6.7L (Truck No. 8" aka "Built Diesel 6 - 2nd place") and installed a delete tune. Sparks Dep. 46:2-12; Trial Tr. 355: 13-21.  The truck was driven less than 100 miles in Utah prior to being provided as a giveaway sweepstakes prize to a Florida resident in August, 2015. Trial Tr. 355: 13-21.

10

51.     B&W Auto purchased a 2012 Dodge Ram 3500  ("Truck No. 9" aka "Megaram") with the DPF removed and thereafter installed a delete tune. Sparks Dep. 64: 3-25, 65: 1-25, 66: 1-24; Trial Tr. 355: 13-21. B&W Auto continues to own this truck, and it is used primarily for non-driving promotional purposes. Trial Tr. 362: 19-23, 363: 1-16.

52.     B&W Auto purchased a 1994 Dodge Ram 3500, 12-valve Cummins 5.9 ("Truck 10" aka "Built Diesel 3, 1st place") "as-is" with the DOC removed.  Sparks Dep. 37: 1-8; Trial Tr. 355: 13-21. The truck was driven approximately 250 miles in Utah before being provided as a giveaway sweepstakes prize to an Idaho resident in June, 2014.  Trial Tr. 355: 13-21.

53.     B&W Auto purchased a 1997 Dodge Ram 3500, 12-valve Cummins 5.9L ("Truck 11" aka "Holy Grail") "as-is" with the DOC removed.  Sparks Dep. 55:9-15, 119: 23-25, 120: 1-25, 122: 1-2; Trial Tr. 355:13-21.  The truck was driven approximately 50 miles in Utah before being provided as a giveaway sweepstakes prize to a Kansas resident in November, 2015.  Trial Tr. 355: 13-21.  It was then traded back to B&W Auto, used again as a giveaway truck, and provided again as a sweepstakes prize to a Connecticut resident in July, 2018.  Trial Tr. 319: 4-14, 355: 13-21.

54.     B&W Auto purchased a 2009 Ford F250 XLT 6.4L ("Truck No. 12" aka "Mountain Ops Ultimate Hunting Rig") "as-is" with DOC removed and a delete tune installed. Sparks Dep. 56: 18-25, 57: 1-25; 58: 1-25, 59: 1-3; Trial Tr. 355: 13-21. The truck was driven approximately 50 miles in Utah prior to being provided as a giveaway sweepstakes prize to a Texas resident in April, 2015. Trial Tr. 355: 13-21.

11

55.     B&W Auto purchased a 2013 Ford F250 ("Truck No. 13" aka "UPHE Test Truck") "as is" with DOC, DPF and SCR removed, and a delete tune installed. Sparks Dep. 62-63: 24-24 and Exhibit 16 thereto; Trial Tr. 355: 13-21.. B&W Auto listed this truck for sale on ebay.com, and sold it "as-is" to a resident of St. George, Utah in October, 2014. Trial Tr. 355: 13-21. The bill of sale clearly states this truck is sold "as-is", that there may be major mechanical issues with truck, including excessive exhaust, and the purchaser may have the truck inspected by his own mechanic prior to purchase. *Id.* The truck was driven approximately 100 miles in the Wasatch Front, prior to transfer to St. George, Utah, before it left the state, and was ultimately purchased by UPHE in Colorado. *Id.*

56.     B&W Auto purchased a 2008 Ford F550 6.7L ("Truck No. 14" aka "Super Six") "as-is" with DPF removed and a delete tune installed. Sparks Dep. 70-71: 14-1 and Exhibit 21 thereto.   B&W custom built this truck for SEMA (Specialty Equipment Market Association) trade show. *Id.* The truck was driven approximately 25 miles in the Wasatch Front before being sold to Homeland Munitions, a company in Nevada. Trial Tr. 355:13-21.

57.     B&W Auto purchased a 2012 GMC 2500 ("Truck No. 15" aka "Truck Norris") "as-is" with the DPF removed and a delete tune installed. Sparks Dep. 109: 9-25, 110: 1-5, 16-18; Trial Tr. 355: 13-21. The truck was used as part of a Diesel Brothers episode with Chuck Norris, and was driven approximately 500 miles in the Wasatch Front prior to being sold in October, 2016, to Maverik Stores, a convenience store & gas station chain based in Utah, to be used as a promotional item.  Trial Tr. 355: 13-21.

58.     B&W Auto purchased a 2011 GMC Sierra 2500 HD GMC Denali ("Truck No. 16" aka "Denali") "as is" with the DPF removed and a delete tune installed. Sparks Dep. 89: 23-25, 90: 1-5,  92: 6-14, 93: 1-2; Trial Tr. 355: 13-21. The truck was driven approximately 5 miles in the Wasatch Front prior to being sold "as-is" to an Arizona resident in April, 2016. Trial Tr. 355: 13-21.

59.     B&W Auto purchased a 2011 Ford F250 6.7L Powerstroke ("Truck No. 17" aka "The Raptor") "as-is" with DPF removed and a delete tune installed. Sparks Dep. 78: 10-22; Trial Tr. 355: 13-21. This truck was used as part of a Diesel Brothers episode, and thereafter sold "as-is" to Rhinorush Energy, an energy drink company based in Idaho, to be used for promotional purposes. Trial Tr. 355: 13-21.

60.     B&W Auto purchased a 2005 Dodge Ram 2500 5.9 Cummins ("Truck No. 18" aka "Tucker Snowcat") "as is" with the DOC removed and a delete tune installed. Sparks Dep. 76: 23-25, 77: 1-11; Trial Tr. 355: 13-21. This vehicle was sold to a Coalville, Utah dog-sledding business in December, 2017, as a "heavy equipment" sale, since tires were removed and large snowcat tracks installed, converting it from a motor vehicle for use on the Utah roads to a winter service snowcat, fully tracked and designed to move only on snow. Trial Tr. 355: 13-21.

61.     B&W Auto purchased a 2008 Crew Cab LT Chevrolet Duramax ("Truck No. 19" aka "Hercules") "as-is" with extreme body/frame damage, and with the DOC removed and a delete tune installed.  Sparks Dep. 69: 16-22 and Exhibit 20 thereto. B&W Auto custom built this truck for a Diesel Brothers episode, and continues to own this truck, since it is a novelty item,

13

not capable of passing any safety inspections. The vehicle is used for non-driving promotional purposes only.  Trial Tr. 355: 13-21, 363-64: 22-14.

62.     Truck No. 20. "The Rock" 2013 Dodge Ram 5500 6.7L. This truck was purchased "as-is" with DOC, DPF and SCR removed and a delete tune installed. Trial Tr. 355: 13-21. This truck was twice offered as a giveaway sweepstakes prize option (among other trucks), but the winner chose another vehicle both times. B&W Auto thereafter entered into an agreement with I Drive Utah Trucks (an unrelated company that sells used diesel trucks) to sell this truck to a resident in North Carolina, and was sold in February, 2019.  Trial Tr. 355: 13-21, 374-75: 23-12.

63.     UPHE's expert testified the emissions testing on the UPHE Truck established that the amount of pollutants discharged from the UPHE Truck was 4.32 grams Nox per mile and 0858 grams PM per mile.  Trial Tr. 63-4: 20-5.

64.     The total combined miles driven within the entire State of Utah, by representatives for B&W Auto, for all trucks at issue in this lawsuit, is less than 4,285 miles. Trial Tr. 364-65: 20-3.

**B. Diesel Power Gear's Violations for Giveaway Trucks**

65.      DPG is a "lifestyle brand company" which sells "apparel and accessories for the diesel truck lifestyle." Dkt. 107 at 43.

66.     As a marketing strategy, DPG runs a sweepstakes giveaway program, usually offering a vehicle as a prize, to promote sales. DPG has a website with all of its products online for people to purchase, and DPG offers a chance to win a truck. A customer enters the

sweepstakes by purchasing an item on the website, say, a T-shirt that cost $20. Every $5 that is spent on the website is an entry to win the truck. Trial Tr. 190-91: 22-6.

67.     DPG acquires its giveaway trucks from B&W Auto. Trial Tr. 191: 21-23.

68.     DPG pays B&W Auto roughly the fair market value for each giveaway truck. Trial Tr. 197: 8-11.

69.     DPG does not make any decisions on the design or build of the giveaway trucks provided by B&W Auto. Trial Tr. 192: 2-5.

70.     DPG has given away approximately 50 trucks over the course of its business. Trial Tr. 192-93: 21-4.

71.     DPG transferred a total of 11 vehicles (one vehicle was given away twice), as part of its sweepstakes program, with emission defeat parts installed, identified as Truck No. 1, Truck No. 2, Truck No. 3, Truck No. 5, Truck No. 7, Truck No. 8, Truck No. 10,  Truck No. 11 (twice), Truck No. 12 and Keaton's first truck (described below). Trial Tr. 216: 3-10, 321: 17-22.

72.     All of DPG giveaway trucks were transferred to residents outside of Utah.  Trial Tr. 355: 13-21.

**C. DPG's Violations for the Sale of Defeat Parts**

73.     In summer, 2014, DPG created the 4x4 Anything product lines to sell automotive parts and accessories.  Dkt. 82-3, Deposition of Joshua Stuart ("Stuart Dep."), 10:18-25.

74.     DPG is a drop shipment fulfillment online retailer for all automotive parts, which are supplied directly to consumers by large national vendors. Stuart Dep. 17: 20-25.

75.     All parts listed on DPG's website, and information about those parts, were obtained from large third party vendor suppliers.  Trial Tr. 217-18: 18-3.

76.     On July 27, 2016, UPHE's counsel sent the Diesel Brothers a notice letter addressed to the "Diesel Brothers," identifying specific parts that asserted violated the CAA.

77.     Of the 5,000 products available for purchase, the products identified by UPHE as violating the CAA represent less than 3% of the entire product line.  Dkt.88-1, Declaration of Joshua Stuart, ¶ 8.

78.     Immediately upon receipt of the notice letter, DPG removed all products identified by UPHE that could violate the CAA from its website. Trial Tr. 222: 8-13.

79.     Between 2014 and July, 2016, DPG sold a total of 88 EGR delete kits.  Trial Tr. 321: 10-16.

80.     Between 2014 and July, 2016, DPG sold a total of 16 DPF delete kits.  Trial Tr. 321: 10-16.

81.     Of the total 104 emission defeats parts sold, only 14 were sales to Utah residents (of which nine of those sales were to B&W Auto).  Trial Tr. 235: 22-24.

**D. Keaton Hoskins Violations for Two Personally Owned Vehicles**

82.     Hoskins purchased a 2009 F250 6-door truck, known as "the Muscle's 6-Door," "as-is" with emission control devices removed and a delete tune installed.  Dkt. 108-2, Deposition of Keaton Hoskins, 8-9: 22-4.

83.     Hoskins owned the Muscle's 6-door for approximately two years, and drove it approximately 3,000-5,000 miles in Utah before selling to B&W Auto in 2013 at a financial loss, to be used as a DPG giveaway truck.  Trial Tr. 255-56: 17-6, 257: 1-5, 257: 17-19.

84.     The Muscle's 6-door was used as "Built Diesel #5" giveaway truck and awarded as a sweepstakes prize to an Alaska resident.  Sparks Dep. 30: 15-25.

85.     Hoskins thereafter purchased a 2013 Ford F350, Platinum Edition, known as the "Platinum 6x6," which Hoskins caused to have the DOC, DPF, and SCR removed and a delete tune installed in 2015.  Trial Tr. 246-47: 21-12.

86.     Hoskins owned the Platinum 6x6 for approximately one year, and drove it less than 2,000 miles along the Wasatch Front before selling it at a financial loss to a private party in Oregon. Trial Tr. 256: 7-9, 259: 7-17.

**E.  David Sparks Liability for B&W Auto and DPG violations**

87.     David Sparks had knowledge and control over B&W Auto's violations relating to the 20 trucks specifically identified in this case.

88.     David Sparks had knowledge and control over DPG's violations relating to emissions defeat parts sales.

89.     David Sparks had knowledge and control over DPG's violations relating to giveaway trucks.

90.     David Sparks has briefly operated each of the above-identified vehicles that B&W Auto owned, throughout the State of Utah.

**F. Joshua Stuart Liability for DPG violations relating to parts sales**

91.     Stuart had knowledge and control over DPG's violations relating to emissions defeat parts sales.

**III. FACTORS FOR PENALTY PHASE CONSIDERATION**

**A. B&W Auto**

92.     The economic benefit or savings resulting from the violations are difficult to quantify because a deleted truck is not worth more than a stock truck. Trial Tr. 358-59: 21-5.

93.     In a typical auction purchase from wholesale to retail, B&W Auto generally profits between $500 and $1,500 per vehicle on average. Trial Tr. 300: 18-24.

94.     B&W Auto only makes the standard profit margin of $500 to $1,500 for selling vehicles to DPG, with or without emission defeat parts.  Trial 301: 3-15, 354: 7-12.

95.     In 2016, B & W generated gross receipts of $4.3 million, and its net income was $118,358, which includes $147,247 in Sparks entertainer income, generated from his Diesel Brothers television show, brand endorsements, and other celebrity appearances. Trial Tr. 449: 2-8, Tr. Exh. 1005.

96.     In 2017, B&W Auto generated gross receipts of $3,479,410, and its net income was a loss of $101,844, despite receiving $244,650 in Sparks entertainer income. Trial Tr. 425: 12-25; 426:3-11, Tr. Exh. 1012.

97.     In 2018, B&W Auto generated gross receipts of $3.8 million, and its net income was $181,906, which includes $90,700 in Sparks entertainer income.  Trial Tr. 430: 10-25 Tr. Exh. 1016.

18

98.     B&W's average income for the last three years is $66,000 per year, with the infusion of Sparks' entertainer income. Trial Tr. 449: 9-11.

99.     B&W Auto's business is struggling. The dealership side of the business has closed. B&W Auto used to maintain 25 to 50 trucks in inventory, but only has three vehicles as of November, 2019. Sparks had to terminate his dealership manager because B&W Auto no longer has anything to sell.  Trial Tr. 450: 13-23.

100.    In 2019, the dealership revenue will be approximately a quarter of the previous years because B&W Auto is no longer selling trucks.  Trial Tr. 450: 13-23.

101.    B&W currently has between $300,000 to $500,000 in outstanding loan obligations. Trial Tr. 398:13-15.

102.    B&W Auto has difficulties paying its monthly bills.  Trial Tr. 474: 3-6.

103.    B&W has been sustained by personal loans from David Sparks, Sparks' family, and Diesel Power Gear. Trial Tr. 229: 5-11, 474: 6-11.

104.    A judgment, inclusive of civil penalty fine and attorneys' fees of even $500,000 will likely force B&W Auto into bankruptcy.  Trial Tr. 472: 18-25, 474: 17-19.

105.    UPHE counsel's rough estimate for attorneys fees they intend to seek is $1 Million.  Trial Tr. 468: 17-19

106.    The potential impact upon Defendants of a sizeable attorneys' fees award either in concert with or separate and apart from the fines that the Court imposes will be devastating.

**B. Diesel Power Gear**

107.    DPG has approximately 50 employees, including a large shipping department that is responsible for the logistics of shipping all of DPG's sold products. DPG also has a marketing team responsible for producing all of DPG's marketing material, videos, social media posts. DPG also employees staff to manage those departments. Trial Tr. 204: 11-18.

108.    The majority of hourly employees in DPG's warehouse are paid $15 per hour. Trial Tr. 204: 19-23.

109.    Over the last five years, DPG estimates it generated an increase of roughly $4,000 in additional sales revenues for each of the giveaway trucks as identified in this case. Trial Tr. 216: 14-20.

110.    DPG experienced a decrease in sales when one of the trucks identified in this lawsuit were provided as a giveaway, because the customer could not register or sell it, as opposed to an emissions compliant truck.  Trial Tr. 197: 3-7.

111.    DPG total revenue generated from the sale of EGR delete kits and DPF delete kits was approximately $12,000.  If the exhaust pipes identified by UPHE are included in the calculation, DPG's total revenue was approximately $21,735.  Trial Tr. 221: 10-17, 234: 18-22, 235: 3-5.

112.    DPG has a 10 to 15 percent profit margin on all automotive parts, resulting in a total profit of $2,000-$3,000 maximum for all parts at issue in this action.  Trial Tr. 213:14-16, 236: 11-17.

113.   Since DPG became aware that it sold emission defeat parts, it hired an employee to attempt to recall all sold parts, by offering the customer a double-refund. To date, DPG has received five parts back, and DPG destroyed those parts.  The recall effort is ongoing. Trial Tr. 225-26: 14-5.

114.   DPG's gross sales were $2,895,966 in 2014, 3,643,430 in 2015, 8.1 million in 2016, 12.8 million in 2017, and 12.4 million in 2018.  Trial Tr. 118: 22-25,.119: 2-15.

115.   DPG's net income for 2015 was $156,265. Trial Tr. 207: 10-15.

116.   DPG's net income in 2016 was $206,587.  Trial Tr. 199: 14-17; Trial Exh. 1008.

117.   DPG's net income for 2017 was $257,367. Trial Tr. 230: 12-18; Trial Exh. 1023.

118.   DPG's net income for 2018 was $271,550.  Trial Tr. 231: 5-16; Trial Exh. 1024.

119.   The financial condition of company is relatively stable, and DPG's average income for the last three years is $230,367.  Trial Tr. 232: 12-20.

120.   DPG's forecast in terms of future earnings for the next three years is approximately 10 to 15 percent growth per year.  Trial Tr. 127: 5-11, 128:2-3.

121.   A civil penalty equal to 25% of DPG's average annual net income would significantly hurt the business, but with much difficulty, DPG would survive.  Trial Tr. 209:12-20.

**C. David Sparks**

122.   Sparks lives along the Wasatch Front, and air quality is important to him.  Trial Tr. 455: 17-25.

21

123.    In the early days of the business, Sparks readily admits he did stupid things, and that he did not fully understand the impact his actions had on air quality.  Trial Tr. 455: 17-25.

124.    Sparks has since worked with the EPA to ensure compliance with the CAA, and has caused a bold disclaimer to be displayed at the beginning of every Diesel Brothers episode, to encourage its followers to not tamper with emissions control systems on their vehicles.  Trial Tr. 457-58: 14-8.

125.    The economic benefit or savings resulting from B&W Auto violations went to B&W Auto, so the only economic benefit Sparks personally gained is a minimal flow through which are reflected on Schedule C of David Sparks personal tax return. Thus, any benefit that B&W received is mirrored (though not duplicated) onto David Sparks' personal financial position. Trial Tr. 428: 12-15.

126.    The economic benefit resulting from DPG violations went to DPG, so the only economic benefit Sparks personally gained is a minimal flow through, which are reflected on the K1 of David Sparks personal tax return. Thus, any benefit that DPG received is mirrored (though not duplicated) onto David Sparks' personal financial position.  Trial Tr. 209: 4-11.

127.    In 2016, Sparks received $147,247 in entertainer income, which he nominated to go to B&W Auto. Trial Tr. 414: 2-13.

128.    In 2017, Sparks received $203,000 in entertainer income, which he nominated to B&W Auto. Trial Tr. 441: 6-13.

129.    In 2018, Sparks received $90,700 for his work as a performer on the Diesel Brothers, from Magilla Entertainment, the company that produces the Diesel Brothers.. Trial Tr. 403-04: 16-2.

130.    In addition, Sparks receives $120,000 salary from DPG.  Trial Tr. 208: 6-15.

131.    In 2016, Sparks' personal tax return taxable income is $182,407.  Trial Exh. 1026.

132.    In 2017, Sparks' personal tax return taxable income is $203,551. Trial Exh. 1014.

133.    In 2018, Sparks personal tax return taxable income is $226,864.  Trial Tr. 432: 16-21; Trial Exh. 1025.

134.    Sparks has no unencumbered assets.  Trial Tr. 438: 8-16, 477: 19-22.

135.    Sparks also has in excess of million dollars in personal outstanding debt obligations.  Trial Tr. 414: 10-13, 437: 8-14, 438: 3-7.

136.    Sparks has also lost future income opportunities as a result of the publicity stemming from this lawsuit.  Trial Tr. 451: 2-12, 454: 13-19.

**D. Joshua Stuart**

137.    Stuart was unaware that any products sold by DPG may violate the CAA, until he received notice from Plaintiff in July, 2016. As soon as Stuart received notice, he caused all offensive products to be immediately and permanently removed from the website, more than five months prior to the date this case was filed.

138.    The economic benefit resulting from DPG violations of parts sales went to DPG, so the only economic benefit Stuart personally gained is a minimal flow through, which are

23

reflected on the K1 of Stuart's personal tax return. Thus, any benefit that DPG received is mirrored (though not duplicated) onto Stuart's personal financial position. Trial Tr. 209: 4-11.

139.    Stuart believes the total approximately flow through economic benefit from the parts sales was at best a couple hundred dollars. Trial Tr. 213: 8-12.

140.    Stuart's personal tax return taxable income for 2016 was $90,736. Trial Tr. 228: 16-24; Trial Exh. 1021.

141.    Stuart's personal tax return taxable income for 2017 was $145,786.  Trial Tr. 229: 12-18l; Trial Exh. 1022.

142.    Stuart's personal tax return taxable income for 2018 was $149,369.  Trial Tr. 211: 12-19; Trial Exh. 1020.

143.    DPG pays Josh Stuart a salary of $90,000 per yer. Trial Tr. 208: 6-15.

144.    Stuart was also previously paid under a talent agreement with Magilla Entertainment for his appearances on the Diesel Brothers television show, but that arrangement ended in late 2018, and has negatively impacted Stuart's 2019 income and projected future personal income. Trial Tr. 243: 10-14.

**E. Keaton Hoskins**

145.    Hoskins' personal tax return taxable income for 2018 is $48,541.  Trial Tr. 265: 16-24; Trial Exh. 1018.

146.    Hoskins' personal financial condition is stable. The last three years, his average annual income is significantly less than $100,000 annually, but he is projected to earn $150,000 in 2019. Trial Tr. 254: 6-11.

24

147.    Other than Hoskins' home, Hoskins has no major debt, but Hoskins also has no unencumbered assets.  Trial Tr. 254: 17-20, 255: 10-12

148.    Hoskins has a $3,700 monthly mortgage on his home, and pays child support for his two young children.  Trial Tr. 255: 2-7, 260: 20-21, 261: 1-4.

## PROPOSED CONCLUSIONS OF LAW

## IV. CONTROLLING STATUTES

### A. Jurisdiction

149.    Jurisdiction of the court is invoked under 42 U.S.C. § 7604(a) (citizen suit provision of the CAA), 28 U.S.C. § 1331 (federal question statute), and 28 U.S.C. § 1355 (recovery of penalties).

150.    Jurisdiction additionally exists under 28 U.S.C. § 1331 (federal question), including 42 U.S.C. § 7522 (motor vehicle tampering and defeat device prohibitions) and 40 C.F.R. § 52.2320(c)(59), Utah Admin. Code R307-201-2 (federally-enforceable Utah motor vehicle emissions systems requirements).

151.    Venue is proper pursuant to 28 U.S.C. §§ 1391(b) and (c). Venue is in the Central Division of the District of Utah.

### B. Clean Air Act−Statutory and Regulatory Framework

152.    Pursuant to the CAA, 42 U.S.C. §§ 7401 et seq., the EPA is charged with setting primary air quality standards for certain pollutants in order to protect the public health. 42 U.S.C. § 7409(b)(1). The EPA is also charged with setting secondary air quality standards for certain pollutants in order to protect the public welfare. 42 U.S.C. § 7409(b)(2). *Oregon Env. Council v. Dept. of Env. Quality*, 775 F. Supp. 353 (D. Or. 1991).

153.    The CAA provides that states are responsible for preparing their own implementation plans for achieving and maintaining the air quality standards set by the EPA. 42 U.S.C. § 7410(a)(1). The states are required to submit their implementation plans to the EPA for

approval. *Id.* The EPA may approve an implementation plan submitted by a state only if the plan meets all of the requirements of the CAA. 42 U.S.C. §§ 7410(a)(3)(A), 7502(b). Once the EPA approves a SIP, it becomes federal law. *Safe Air for Everyone v. EPA*, 488 F.3d 1088, 1091 (9th Cir. 2007).

154. The applicable provisions of CAA Section 203(a), 42 U.S.C. § 7522(a) are set forth as follows: (a) Enumerated prohibitions. The following acts and the causing thereof are prohibited— (3)(A) . . . for any person knowingly to remove or render inoperative any [] device or element of design [installed on or in a motor vehicle or motor vehicle engine in compliance with regulations under this subchapter] after [the vehicle's] sale and delivery to the ultimate purchaser; or (3)(B) for any person to manufacture or sell, or offer to sell, or install, any part or component intended for use with, or as part of, any motor vehicle or motor vehicle engine, where a principal effect of the part or component is to bypass, defeat, or render inoperative any device or element of design installed on or in a motor vehicle or motor vehicle engine in compliance with regulations under this subchapter, and where the person knows or should know that such part or component is being offered for sale or installed for such use or put to such use.

155. Element of design means any control system (i.e., computer software, electronic control system, emission control system, computer logic), and/or control system calibrations, and/or the results of systems interaction, and/ or hardware items on a motor vehicle or motor vehicle engine. 40 CFR § 86.1803-01

156. Utah SIP regulation R307-201-2, Automobile Emission Control Devices, 40 C.F.R. § 52.2320(c)(59), provides: Any person owning or operating any motor vehicle or motor

vehicle engine registered in the State of Utah on which is installed or incorporated a system or device for the control of crankcase emissions or exhaust emissions in compliance with the Federal motor vehicle rules, shall maintain the system or device in operable condition and shall use it at all times that the motor vehicle or motor vehicle engine is operated. No person shall remove or make inoperable within the State of Utah the system or device or any part thereof, except for the purpose of installing another system or device, or part thereof, which is equally or more effective in reducing emissions from the vehicle to the atmosphere.

157.    The remedies provided by the CAA, pursuant to 42 U.S.C. § 7604, are to obtain enforcement of the standards promulgated pursuant to the Act or to have the court impose civil penalties against violators of such standards. See 42 U.S.C. § 7604(a). Any civil penalties imposed under this section do not go to the plaintiffs; instead, these penalties must either go to the United States Treasury or be deposited in a special fund for beneficial mitigation projects. See 42 U.S.C. § 7604(g). Additionally, the court cannot impose such a civil penalty in excess of $100,000 in any action under that subsection. See id. at (g)(2). *Gutierrez v. Mobil Oil Corp*., 798 F. Supp. 1280 (W.D. Tex. 1992)

**V. LIABILITY**

**A.  B&W Auto is Liable for violating the CAA.**

158.    B&W Auto violated CAA Section 203(a)(3)(A) and (B), 42 U.S.C. § 7522(a)(3) (A) and (B), and Utah SIP Regulation R307-201-2, 40 C.F.R. § 52.2320(c)(59), by removing pollution control devices from diesel vehicles, installing pollution control defeat parts onto vehicles, and selling defeat parts installed in vehicles.

159.    B&W removed 18 pollution control devices and further installed delete tunes in 8 trucks, resulting in 26 violations of the CAA  and 8 violations of Utah SIP regulation R307-201-2.

160.    B&W Auto installed a delete tune in one truck that it purchased with pollution control devices already removed, resulting in a violation of the CAA, and a violation of Utah SIP regulation R307-201-2.

161.    B&W Auto purchased eleven trucks with pollution control devices already removed, and aftermarket defeat parts installed. B&W Auto sold seven of these trucks with the aftermarket defeat parts still on the vehicles, resulting in 7 additional violations of the CAA.

162.    The Court concludes B&W Auto committed 34 total violations of the CAA, and 9 violations of Utah SIP.

163.    Additionally, B&W Auto owned and operated all 20 trucks during which time they did not have required emissions control devices installed, resulting in an additional 20 violations of Utah SIP R307-201-2.

164.    The Court concludes B&W Auto currently owns three vehicles (Megaram, Hercules, Brodozer) in violation of Utah SIP R307-201-2.

**B. Diesel Power Gear is liable for violating the CAA**

165.    DPG violated CAA Section 203(a)(3)(B), 42 U.S.C. § 7522(a)(3)(B), by selling pollution control defeat parts intended for use with, or as part of, any motor vehicle, and selling pollution control defeat parts installed in vehicles.

166.    The Court concludes DPG committed 11 violations relating to giveaway trucks with emission defeat parts.  However, none of these trucks were sold to Utah residents.

167.    DPG sold 88 EGR delete kits, which are emissions defeat parts, resulting in 88 violations of the CAA.

168.    DPG sold 16 DPF delete kits, which are emissions defeat parts, resulting in 16 violations of the CAA.

169.    The Court concludes DPG committed 104 violations of the CAA for the sale of emission defeat parts.  However, only 14 parts were sold to Utah customers.

**C. Keaton Hoskins is liable for violating the CAA**

170.    Hoskins violated CAA Section 203(a)(3)(A) and (B), 42 U.S.C. § 7522(a)(3)(A) and (B), and Utah SIP Regulation R307-201-2, 40 C.F.R. § 52.2320(c)(59), by removing pollution control devices and installing a delete tune on one diesel vehicle, and selling two vehicles with emission defeat parts.

171.    Hoskins purchased a 2009 Ford F250 truck with emissions control devices removed and defeat parts installed, and thereafter sold that vehicle with emission defeat parts. This results in one violation of the CAA.

172.    Hoskins caused three emission control devices to be removed and a delete tune to be installed on a 2013 Ford F350 truck, which he thereafter sold with emission defeat parts, resulting in five violations of the CAA and a violation of Utah SIP.

173.    Hoskins owned and operated both the 200 Ford F250 and 2013 Ford F350 while they did not have required emissions control devices installed, resulting in 2 violations of Utah SIP R307-201-2.

174.    The Court concludes Hoskins committed a total of 6 violations of the CAA and 3 violations of Utah SIP.

**D.  David Sparks is personally liable for B&W Auto and DPG violations**

175.    Sparks is personally liable for B&W Auto's violations, under the responsible corporate officer doctrine, relating to the 20 trucks.

176.    Sparks is personally liable for DPG's violations, under the responsible corporate officer doctrine, relating to the sale of emission defeat parts.

177.    Sparks is personally liable for DPG's violations, under the responsible corporate officer doctrine, relating to the 10 giveaway trucks.

**E. Joshua Stuart is personally liable for DPG parts sales**

178.    Stuart is personally liable for DPG's violations, under the responsible corporate officer doctrine, but only relating to the sale of emissions defeat parts.

179.    While DPG is liable for the giveaway trucks that violate the CAA, UPHE's Twentieth Cause of Action relating to Stuart personal liability for those violations, was dismissed by this Court on January 23, 2018. *See* Dkt No. 78, Minute Order Granting Motion to Dismiss.

31

## VI. Remedies

## A. UPHE Standing to Pursue Remedies

180.   UPHE must have standing to pursue each form of relief it seeks, and must show its members' injuries can be redressed by declaratory and injunctive relief, civil penalties, and a beneficial mitigation project.  Dkt No. 122, Memorandum Decision and Order, p. 10, *citing Bronson v. Swensen*, 500 F.3d 1099, 1106 (10th Cir. 2007) ("Each plaintiff must have standing to seek each form of relief in each claim.")

181.   The Court concludes UPHE only has standing to pursue relief for those violations that resulted in pollutants being discharged in the Wasatch Front.

182.   B&W Auto sold 7 trucks with emission defeat parts, in violation of the CAA. However, only one of these trucks was sold to a resident within the Wasatch Front.  Thus, UPHE only has standing to assert a claim for relief for one violation, relating to the sale of vehicles with aftermarket defeat parts.

183.   DPG "sold" 11 trucks with emission defeat parts, in violation of the CAA. However, all 11 sales were to residents out of Utah.  Thus, these violations resulted in zero increased pollutants along the Wasatch Front. UPHE has no standing to assert a claim for relief for these violations.

184.   DPG sold 104 emission defeat parts, in violation of the CAA.  However, since only 14 parts were to residents of Utah (which includes 9 sales to B&W Auto), UPHE only has standing to assert a claim for relief for 14 violations, since the remaining part sales resulted in zero increased pollutants discharged along the Wasatch Front.

185.     Keaton Hoskins' sale of the Platinum 6x6 to a resident of Oregon is a violation of the CAA, but UPHE has no standing to assert a claim for relief for this violation, since it resulted in zero increased pollutants discharged along the Wasatch Front.

**B. Duplicative Remedies for violations of Utah SIP and CAA**

186.     A plaintiff may not double recover damages. See, e.g., *U.S. Industries, Inc. v. Touche Ross & Co.*, 854 F.2d 1223, 1259-60 (10th Cir.1988) (compensatory damages for federal securities claim and state breach of fiduciary duty claim duplicative); *Clappier v. Flynn*, 605 F.2d 519, 530-31 (10th Cir.1979) (compensatory damages for federal civil rights claim and state civil rights claim duplicative).

187.     "Where a jury award duplicates damages, the court, either sua sponte or on motion of a party, should reduce the judgment by the amount of the duplication." *Mason v. Oklahoma Turnpike Auth.*, 115 F.3d 1442, 1459 (10th Cir. 1997)

188.     UPHE's first four causes of action are for violations of Utah SIP Regulation R307-201-2, for removing emission control devices from vehicles.  UPHE's next four causes of action are for violations of CAA Section 203(a)(3)(A), for removing emission control devices from vehicles. To award remedies for the same underlying conduct under both the CAA and Utah SIP would result in a duplicative remedy.

**C. Utah SIP penalties violate "excessive fines" of Utah and U.S. Constitution.**

189.     Utah Constitution Article One Section 9 and U.S. Constitution, Eighth Amendment bar the imposition of the per day S.I.P. fees that are assessed under Utah law.

190.    Utah Constitution, Article I, Section 9 provides:  "Excessive bail shall not be required; excessive fines shall not be imposed; nor shall cruel and unusual punishments be inflicted. Persons arrested or imprisoned shall not be treated with unnecessary rigor. "

191.    The Eighth Amendment to the U.S. Constitution provides: "Excessive bail or fines and cruel punishment prohibited. Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."

192.    The 'excessive fines' clause applies to both civil and criminal fines.  *Austin v. United States*, 509 U.S. 602 (1993).

193.    The U.S. Supreme Court has held the "amount of the forfeiture must bear some relationship to the gravity of the offense that it is designed to punish.. .We now hold that a punitive forfeiture violates the Excessive Fines Clause if it is grossly disproportional to the gravity of a defendant's offense." *United States v. Bajakajian*, 524 U.S. 321, 334 (1998) (invalidated civil fine deemed to be grossly disproportionate to the gravity of the offense it was designed to punish.)

194.    State imposed fines must "be proportioned to the wrong" and "not be so large as to deprive [an offender] of his livelihood." *Timbs v. Indiana*, 86 U.S. ___ ,139 S. Ct. 682; 203 L. Ed. 2D11 (2019)(citation omitted).  Protection against excessive punitive economic sanctions secured by the Clause is both "fundamental to our scheme of ordered liberty" and "deeply rooted in this Nation's history and tradition." *Id.* (citations omitted.)

195.    When Defendants' counsel raised the objection that the Utah SIP penalties violate Utah Constitution and parallel Eighth Amendment protections against excessive fines at the

34

conclusion of trial, this Court stated:  "Those facts are conclusively established in the case I think as a result of the answer. Just under the S.I.P., the basic math is not something that we can work with. It is $114 million. Trial Tr.: 490: 3-10

196.     Utah SIP R307-201-2 requirement of a per day penalty, resulting in a maximum $114 Million in penalties as applied, violates Defendants' state and federal constitutional rights against 'excessive fines' and must be denied.

**D. Civil Penalty Award Should be Minimal**

197.     Under CAA Section 205(a), 42 U.S.C. § 7524(a), the maximum penalty for a CAA violation prior to November 1, 2015 is $3,750 for each illegally modified vehicle and for each illegal part sold.  For violations occurring after November 1, 2015, the maximum penalty is $4,454 for each such violation.

198.     "Courts generally presume that the maximum penalty under the Clean Air Act should be imposed, and then consider the factors described in § 7413(e) to determine what degree of mitigation, if any, is proper." *Sierra Club v. Khanjee Holding (US) Inc.*, 655 F.3d 699, 707 (7th Cir. 2011);  *Pound v. Airosol Co., Inc.*, 498 F.3d 1089, 1095 (10th Cir. 2007).

199.     B&W Auto committed 34 CAA violations, most prior to November 1, 2015, resulting in a maximum penalty of $127,500, to be mitigated by the factors outlined below..

200.     DPG committed 115 CAA violations, most prior to November 1, 2015, resulting in a maximum penalty of $431,250, to be mitigated by the factors outlined below.

201.     Hoskins committed 6 CAA violations, resulting in a maximum penalty of $22,500, to be mitigated by the factors outlined below.

202.    Section 7413(e)(1) sets forth the factors that a court "shall" take into consideration in determining the penalty, if any, to be assessed for a violation of the Act, which are: a. the gravity of the violation, b. the economic benefit or savings (if any) resulting from the violation, c. the size of the violator's business, d. the violator's history of compliance with this subchapter, e. action taken to remedy the violation, f. the effect of the penalty on the violator's ability to continue in business, g. such other matters as justice may require, including whether attorneys' fee award should be balanced with penalty award.

203.    Consideration of the gravity of harm factor, mitigates against imposition of the full penalty. In determining the seriousness of the violations, "the court looks to several factors, including, but not limited to: (1) the number of violations; (2) the duration of noncompliance; (3) the significance of the violation (degree of exceedance and relative importance of the provision violated); and (4) the actual or potential harm to human health and the environment." *Hawaii's Thousand Friends*, 821 F.Supp. 1368, 1383 (D. Haw. 1993)(citing EPA, "Clean Water Act Penalty Policy," Feb. 11, 1985, at 3–5). *Weber v. Trinity Meadows Raceway, Inc.* 1996 WL 477049, 42 ERC 2063 (N.D. Texas)(Consideration must be given to lack of degree of seriousness of violation, because the nature of pollutants discharged and its lack of impact on environment.)

204.    Consideration of the economic benefit factor also mitigates against the imposition of the full penalty.  There was little, if any, economic benefit to B&W Auto resulting from the violations, including the lack of financial profit from violations.  There was marginal economic benefit to DPG resulting from the violations, and no economic benefit to Hoskins.

36

205.   Consideration of the nature of the violations, the size of the business that was in existence at the time and the present business, the ability to pay also substantially mitigates against the imposition of the full penalty. *US v. Walsh*, 783 F. Supp. 546 (W.D. Wash., 1991)

206.   "[T]he cases cited by [UPHE] are distinguishable in that they involve actual discharge of contaminants by large and wealthy corporations, while the instant case involves [minor violations] by a small family-owned operation. The Court concludes that the factors set forth under the [CAA] may be useful in determining a civil penalty here, but that a penalty of the magnitude imposed in the [CAA] cases is inappropriate because of the distinctions noted by Defendants." *U.S. v. Alisal Water Corp.*, 326 F. Supp. 2d 1032 (N.D. Cal. 2004)

207.   The Court concludes that the ability to pay "factor weighs in favor of a significant reduction in the amount of the penalty. Imposition of the full penalty will have a more drastic effect on [Defendants] than is needed to ensure future compliance. *Trinity Meadows,* at *17.

208.   The Court concludes "assessing a greater penalty would not be productive, would not be collectable and would serve no reasonable or just purpose." *US v. Walsh*, 783 F. Supp 546, 553 (W.D. Wash 1991)

209.   A civil penalty amount, reduced to no greater than 25% of net income for the defendant's most recent year, is both sufficient to deter defendants from allowing future violations and sufficient to punish Defendants for past violations. *U.S. v. Midwest Suspension and Brake*, 49 F.3d 1197 (6th Cir., 1995).

210.   The final consideration, as justice requires, relates to the anticipated attorneys' fees award to UPHE will dramatically impact Defendants' ability to pay a civil penalty.

211.    Even where a plaintiff is deemed the prevailing party and fees are appropriate, 'the nature and quality of relief may affect the amount of the fees awarded.' *Saint John's Organic Farm*, 574 F.3d 1054, 1059-60 (9th Cir. 2009).

212.    Given UPHE's knowledge about Defendants' financial condition, UPHE's attempt to seek another $1 Million in attorneys' fees will effectively bankrupt Defendants, is grounds to deny attorneys' fee request. *Kuehl v. Sellner*,  887 F.3d 845 (8th Cir. 2018)(Denial of attorneys' fees proper where Plaintiff seeks to use the award as a means to close Defendant's business.)

213.    "The astronomical civil penalty Plaintiff sought in this case, and the lack of sufficient justification for it, suggests that Plaintiff's motives would not be within the core public benefit that [the statute] is designed to provide—especially where Plaintiffs presented no evidence that [Defendant] obtained any economic benefit from [the violations]." *Don't Waste Ariz. Inc. v. Hickman's Egg Ranch Inc*. (D. Ariz. 2019) "Thus, the Court cannot say Plaintiff acted reasonably by pursuing excessive remedies under the facts of this case." *Id.*(Court substantially reduced attorneys' fee award, despite plaintiff being the prevailing party.)

214.    This Court concludes the civil penalty and attorneys' fees must be substantially mitigated to avoid B&W Auto and DPG from being devastated, especially when Defendants are 'truck people' and the 22 trucks and 104 emission defeat parts (only 14 sold to Utah customers), represent a very small minority of their businesses.

**E. Remediation Program Must Be Proportionate to Actual Harm**

215.    42 U.S.C. § 7604(g)(2) provides "the beneficial mitigation project provision is unique to the Clean Air Act..." and "the court in any action under this subsection to apply civil

penalties shall have discretion to order that such civil penalties, in lieu of being deposited [in a United States Treasury fund], be used in beneficial mitigation projects which are consistent with this chapter and enhance the public health or the environment.

216.   The provision limits expenditures to $100,000 and requires consultation with the Environmental Protection Agency. *Cambrians for Thoughtful Dev., U.A. v. Didion Mil.,* 571 F. Supp. 2d 972 (W.D. Wis., 2008)

217.   Remediation programs should not mitigate harm out of proportion with the injury that resulted from the unlawful conduct. *See* EPA's policy on supplemental environmental projects (https://www.epa.gov/enforcement/supplemental-environmental-projects-seps); DOJ's January 9, 2018, memorandum entitled, "Settlement Payments to Third Parties" (https://www.justice.gov/enrd/page/file/1043726/download).

218.   There is no way the Court can conclude that emissions from the vehicles owned by B&W Auto, based on the evidence of the minimal amount of pollutants actually discharged into the Wasatch Front as a result of the violations, has substantially harmed the Wasatch Front airshed.

219.   There is no way the Court can concludes that violations relating to DPG giveaway trucks, with all trucks being transferred out of the State of Utah, has harmed the Wasatch Front airshed.

220.   There is no way the Court can conclude that violations relating to 104 emission defeat parts sales, only 14 of those parts were sold to Utah customers (of which nine of those parts ultimately wound up in the 20 B&W Auto trucks), has had any measurable impact on the

Wasatch Front airshed. Plaintiff's requested mitigation relief of $100,000 to fund a mitigation project "would far exceed" the irreparable harm produced by past emissions. Accordingly, the "plaintiffs' mitigation proposal [did] not bear an equitable relationship to the degree and kind of harm it is intended to remedy." *United States v. Cinergy Corp.*, 582 F. Supp. 2d 1055, 1061 (S.D. Ind. 2008)

**F. Injunctive Relief**

221.     Not every violation of environmental statutes justify the issuance of an injunction. See *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 320, 102 S.Ct. 1798, 1807, 72 L.Ed.2d 91 (1982). Injunctive relief is appropriate only when the district court deems it "necessary to secure prompt compliance with the Act." *Id.* Although the district court exercises considerable discretion in making this determination, proof of irreparable injury and the inadequacy of legal remedies are prerequisites to the granting of injunctive relief in a Clean Water Act case. *Id.*, 456 U.S. at 311-13, 102 S.Ct. at 1803; *Natural Resources Defense Council v. Texaco*, 906 F.2d 934, 937-41 (3rd Cir. 1990).

222.     Injunctive relief only appropriate for ongoing violations that will result in immediate and irreparable harm.

223.     The Court concludes the terms of the preliminary injunction (Dkt No. 104) against B&W Auto should be extended for another 12 months after date of this Court's judgment.

224.     The Court concludes that Sparks is personally liable for B&W Auto's violations, under the responsible corporate officer doctrine, and the terms of the injunction against B&W Auto are extended to Sparks.

40

225.    The Court concludes that DPG poses no risk of immediate and irreparable harm to justify permanent injunction, DPG ceased selling parts that violate the CAA in July, 2016,.

226.    The Court concludes that DPG poses no risk of immediate and irreparable harm to justify permanent injunction for giveaway trucks with emission defeat parts.

227.    The Court concludes that Hoskins poses no risk of immediate and irreparable harm to justify permanent injunction, as he ceased owning any diesel trucks prior to the initiation of this lawsuit.

Respectfully submitted this 7th day of January, 2020.


                                CANNON LAW GROUP

                                /s/ Janet M. Conway
                                Janet M. Conway

                                *Attorneys for Defendants*

41