IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| UTAH PHYSICIANS FOR A HEALTHY ENVIRONMENT, | **BENCH TRIAL ORDER** |
| Plaintiffs, | Case No. 2:17-cv-00032-RJS-DBP |
| v. | |
| DIESEL POWER GEAR LLC; 4X4 ANYTHING LLC; B&W AUTO LLC, SPARKS MOTORS LLC; DAVID W. SPARKS; DAVID KILEY; JOSHUA STUART; and KEATON HOSKINS, | Chief Judge Robert J. Shelby |
| | Magistrate Judge Dustin B. Pead |
| Defendants. | |

Plaintiff Utah Physicians for a Healthy Environment (UPHE) initiated this citizen suit to enforce the Clean Air Act's (CAA or the Act) emission standards for moving sources and Utah's state implementation plan (SIP).[1] On summary judgment, UPHE demonstrated its standing and established that Defendants violated the CAA and Utah's SIP through the removal and defeat of federally-required emission control systems on diesel vehicles, the advertisement and sale of defeat devices, and the ownership or operation of tampered vehicles in Utah.[2] The court held a bench trial to determine unresolved issues of liability and to assess civil penalties. This Order details the court's findings of fact and conclusions of law concerning those issues.

---

[1] Dkt. 2 (Complaint) ¶ 1.

[2] *See Utah Physicians for a Healthy Env't v. Diesel Power Gear LLC*, 374 F. Supp. 3d 1124 (D. Utah 2019).

## PROCEDURAL BACKGROUND

On January 10, 2017, UPHE initiated this CAA citizen suit against Defendants Diesel Power Gear LLC (DPG), 4x4 Anything LLC (d/b/a DPG),[3] B&W Auto LCC (B&W Auto), Sparks Motors LLC (d/b/a B&W Auto), Dieselsellerz.com LLC, David W. Sparks, David Kiley, Joshua Stuart, and Keaton Hoskins.[4]  UPHE asserts Defendants violated the CAA by: (1) removing or rendering inoperative federally-required emission control systems in diesel trucks (tampering violation), 42 U.S.C. § 7522(a)(3)(A); (2) installing parts or components in diesel trucks that bypass, defeat, or render inoperative federally-required emission control systems (defeat part violation), 42 U.S.C. § 7522(a)(3)(B); and (3) offering to sell or selling defeat parts (defeat part marketing violation), 42 U.S.C. § 7522(a)(3)(B).[5]  UPHE further asserts Defendants violated Utah's federally-enforceable SIP by: (1) removing or making inoperable the federally-required emission control system, device, or any part thereof (Utah SIP tampering violation), 42 U.S.C. § 7413(b)(1), Utah Admin. Code r. R307-201-4; and (2) owning or operating vehicles with disabled emission-control systems (Utah SIP owning or operating violation), 42 U.S.C. § 7413(b)(1), Utah Admin. Code r. R307-201-4.[6]  UPHE requests declaratory relief, injunctive relief, assessment of civil penalties, and attorney fees.[7]

Defendants moved to dismiss UPHE's Complaint,[8] but that Motion was mooted when the court granted UPHE's Motion to Amend.[9]  UPHE subsequently filed its First Amended

---

[3] *See Id.* at 1130 n.8.

[4] *See* Dkts. 2 (Complaint), 49 (First Amended Complaint).

[5] *See* Dkt. 49 (First Amended Complaint).

[6] *Id.*

[7] *Id.*

[8] Dkt. 23.

[9] *See* Dkts. 46, 47.

Complaint.[10]  Defendants moved to dismiss UPHE's First Amended Complaint on the grounds

that UPHE lacked standing, UPHE's claims were barred by the statute of limitations, UPHE's

claims were barred by Utah's Limited Liability Company Act, and the individual Defendants

could not be held liable under the CAA for actions taken on behalf of a company.[11]  UPHE

moved for partial summary judgment on the issue of standing.[12]

     At a hearing on January 23, 2018, Defendants withdrew their statute of limitations

argument,[13] and UPHE withdrew its 20th Cause of Action against Hoskins for violating 42

U.S.C. § 7522(a)(3)(B) by selling defeat parts.[14]  The court granted without prejudice UPHE's

Motion for Partial Summary Judgment on the issue of standing,[15] and denied Defendants'

Motion to Dismiss.[16]

     UPHE moved for a preliminary injunction barring B&W Auto and Sparks from

committing additional CAA violations.[17]  At a hearing on UPHE's Motion, the parties stipulated

to a preliminary injunction.[18]  On June 8, 2018, the court enjoined B&W Auto and Sparks from

violating the CAA during the pendency of the action.[19]  The parties subsequently stipulated to

---

[10] Dkt. 49 (First Amended Complaint).  Because UPHE did not include Dieselsellerz.com LLC in its First Amended Complaint, Dieselsellerz.com LLC was terminated.

[11] Dkt. 54.

[12] Dkt. 58.

[13] Dkt. 79 (Hearing Transcript) at 17.

[14] *Id.* at 24.

[15] Dkt. 78; *see also* Dkt. 79 (Hearing Transcript) at 7–16.

[16] Dkt. 78; *see also* Dkt. 79 (Hearing Transcript) at 19–26.

[17] Dkt. 95.

[18] *See* Dkt. 105; Dkt. 104 at 1.

[19] Dkt. 104.

the dismissal of UPHE's 3rd, 7th, 15th, and 24th Causes of Action, which related to David Kiley's alleged violations of the CAA and Utah's SIP.[20]

UPHE filed numerous Motions for Summary Judgment: (1) a Motion for Summary Judgment on the liability of B&W Auto and David Sparks,[21] (2) a Motion for Summary Judgment to establish Defendants' sale of defeat parts in violation of the CAA,[22] (3) a Motion for Summary Judgment to establish the liability of Keaton Hoskins,[23] and (4) a Motion for Summary Judgment to establish DPG's shared liability for B&W Auto's illegal modification of diesel trucks.[24]  Defendants moved for summary judgment on all of UPHE's claims.[25]

The court heard oral argument on the parties' Motions for Summary Judgment[26] and, on March 12, 2019, issued an Order:[27] (1) denying Defendants' Motion,[28] (2) denying UPHE's Motion to establish the liability of DPG,[29] (3) granting in-part UPHE's Motion to establish the liability of B&W Auto and David Sparks,[30] (4) granting in-part UPHE's Motion to establish Defendants' sale of defeat parts in violation of the CAA,[31] and (5) granting UPHE's Motion to

---

[20] Dkt. 106. Because UPHE asserted these claims against David Kiley, he was dismissed from the case.

[21] Dkt. 64.

[22] Dkt. 81.

[23] Dkt. 108.

[24] Dkt. 109.

[25] Dkt. 107.

[26] Dkt. 121.

[27] *See* Dkt. 122; *Utah Physicians*, 374 F. Supp. 3d at 1130.

[28] *Utah Physicians*, 374 F. Supp. 3d at 1145.

[29] *Id.* at 1143 ("UPHE has not established DPG's liability for the modifications under its agency or joint enterprise theories.").

[30] *Id.* at 1139–40 (denying UPHE's motion as to the liability of Sparks, but granting UPHE's Motion as to the liability of B&W Auto for "(a) the removal of pollution control devices from federally-certified vehicles, (b) the installation of aftermarket emission control defeat parts in federally-certified vehicles, and (c) the sale of aftermarket emission control defeat parts as part of vehicles.").

[31] *Id.* at 1140–41 (granting UPHE's Motion as to the liability of DPG, Sparks, and Stuart for the sale of 88 defeat parts).

establish the liability of Keaton Hoskins.[32]  That Order established that:

- B&W Auto is liable under 42 U.S.C. § 7522(a)(3) for tampering violations,[33] defeat part violations,[34] and defeat part marketing violations;[35]

- B&W Auto is liable under 42 U.S.C. § 7413(b)(1), 40 C.F.R. § 52.23, and Utah Admin. Code r. R307-201-4 for Utah SIP tampering violations;[36]

- DPG, Sparks, and Stuart are liable under 42 U.S.C. § 7522(a)(3)(B) for eighty-eight (88) defeat part marketing violations;[37]

- Sparks can be held liable under 42 U.S.C. §§ 7522(a)(3) for B&W Auto's tampering, defeat part, and defeat part marketing violations "if he knew of the facts underlying the violations, had the ability to prevent or correct the violations, and failed to do so";[38]

- Hoskins is liable under 42 U.S.C. §§ 7522(a)(3) for tampering and defeat part violations;[39] and

- Hoskins is liable under 42 U.S.C. § 7413(b)(1), 40 C.F.R. § 52.23, and Utah Admin. Code r. R307-201-4 for Utah SIP owning or operating violations.[40]

Following a status conference, the court set dates for a final pretrial conference and a

---

[32] *Id.* at 1141–42 (granting UPHE's Motion as to the liability of Hoskins for "(a) the removal of pollution control devices from federally-certified vehicles, (b) the installation of aftermarket emission control defeat parts in federally-certified vehicles, and (c) owning or operating motor vehicles registered in Utah without maintaining operable pollution control systems.").

[33] *Id.* at 1139.

[34] *Id.*

[35] *Id.* at 1139–40.

[36] *Id.* at 1139.

[37] *Id.* at 1140–41.

[38] *Id.* at 1139.

[39] *Id.* at 1142.

[40] *Id.*

four-day bench trial,[41] which took place on November 5th, 6th, and 25th of 2019.[42]

## FINDINGS OF FACT

Defendants admitted many of UPHE's factual allegations in their Answer to the First Amended Complaint.[43]  These admissions are binding.[44]  The court relied on several undisputed facts as the basis for its Order resolving the parties' motions for summary judgment.  Those undisputed facts are established.  Accordingly, the court derives its factual findings from Defendants' admissions, the undisputed facts established on summary judgment, and facts found at the bench trial.[45]

### National Ambient Air Quality Standards for Ozone and Particulate Matter

1. The CAA requires the Environmental Protection Agency (EPA) "to regulate any airborne pollutant which, in the Administrator's judgment, 'may reasonably be anticipated to endanger public health or welfare.'"[46]  The pollutants within that category are called Criteria Air Pollutants, and there are currently six: (1) carbon monoxide, (2) lead, (3) nitrogen oxides, (4) ozone, (5) particulate matter, and (6) sulfur oxides.[47]  The EPA must promulgate primary and secondary national ambient air quality standards (NAAQS) for

---

[41] Dkt. 124. The final pretrial conference and trial date were rescheduled.  *See* Dkt. 129.

[42] Dkts. 149, 150, 157.

[43] Dkt. 85 (Answer).

[44] *Asarco, LLC v. Noranda Mining, Inc.*, 844 F.3d 1201, 1212 n.3 (10th Cir. 2017) (explaining judicial admissions are "binding in the entirety of the case in which they were made."); *Grynberg v. Bar S Servs., Inc.*, 527 F. Appx 736, 739 (10th Cir. 2013) (unpublished) (citing *Missouri Housing Dev. Comm'n v. Brice*, 919 F.2d 1306, 1314 (8th Cir.1990)) ("[A]dmissions in the pleadings . . . are in the nature of judicial admissions binding upon the parties, unless withdrawn or amended.").

[45] "Any finding of fact more appropriately designated as a conclusion of law shall be considered also a conclusion of law; any conclusion of law more appropriately designated as a finding of fact shall be considered also as a finding of fact." *Hawaii's Thousand Friends v. City & Cty. of Honolulu*, 821 F. Supp. 1368, 1372 n.1 (D. Haw. 1993).  Where possible, the court has provided a citation to facts established by the parties' pleadings, the motions for summary judgment, or the trial record.

[46] *Ctr. for Biological Diversity v. E.P.A.*, 749 F.3d 1079, 1083 (D.C. Cir. 2014) (quoting 42 U.S.C. § 7408(a)(1)(A)).

[47] *Id.* at 1083 n.8 (citation omitted).

regulating these Criteria Air Pollutants.[48]  "States, in turn, are required to adopt state implementation plans [ ] providing for the attainment of the NAAQS."[49]  The EPA approved Utah's SIP, which regulates all six Criteria Air Pollutants.[50]

2. When UPHE initiated this action, the air quality in seven of Utah's counties along the Wasatch Front[51] failed to meet NAAQS for ozone and particulate matter that is less than 2.5 microns in size.[52]

3. "Diesel engines emit nitrous oxides (NOx), non-methane hydrocarbons, and particulate matter [], all of which are harmful to the environment and human health."[53]  Diesel exhaust contributes to the concentration of fine particular matter and ozone in the ambient air.[54]

4. During high temperature combustion, nitrogen in the air reacts with oxygen to produce various oxides of nitrogen, or NOx, a reddish-brown gas.  One of the oxides of nitrogen, $NO_2$, is a Criteria Air Pollutant.  Oxides of nitrogen react with other air contaminants to form other Criteria Air Pollutants.  In the summer along the Wasatch Front,

---

[48] *Id.* at 1083 (citing 42 U.S.C. §§ 7409(a)(1)(A), (b)(1), (b)(2)).

[49] *Appalachian Power Co. v. E.P.A.*, 249 F.3d 1032, 1037 (D.C. Cir. 2001) (citing 42 U.S.C. § 7410).

[50] *See* 40 C.F.R. § 52.2320(a) ("This section sets forth the applicable State Implementation Plan for Utah under section 110 of the Clean Air Act, 42 U.S.C. 7410 and 40 CFR part 51 to meet national ambient air quality standards or other requirements under the Clean Air Act.").

[51] "The Wasatch Front is a metropolitan region along the Wasatch Range in northern Utah.  About eighty percent of the State's population resides along this roughly 120 mile stretch from Brigham City to Nephi."  *Utah Physicians*, 374 F. Supp. 3d at 1131 n.10 (citation omitted).

[52] Dkt. 85 (Answer) ¶ 9; *compare* Dkt. 58 at 4–6, *with* Dkt. 65 at 14.

[53] *Nat'l Petrochemical & Refiners Ass'n v. E.P.A.*, 287 F.3d 1130, 1134 (D.C. Cir. 2002); *see also United States v. Volvo Powertrain Corp.*, 758 F.3d 330, 335 (D.C. Cir. 2014) ("NOx emissions contribute to the formation of fine particulate matter, also known as PM2.5, as well as ground-level ozone, a primary component of smog.  Elevated levels of fine particulate matter have been linked to adverse human health consequences such as premature death, lung and cardiovascular disease, and asthma.") (citations and internal quotation marks omitted); EPA, *Control of Air Pollution from New Motor Vehicles*, 66 FR 5002-01, 5006–07 (January 18, 2001).  *Compare* Dkt. 58 at 14, *with* Dkt. 65 at 22.

[54] *Compare* Dkt. 58 at 3, *with* Dkt. 65 at 11–12.

photochemical reactions between $NO_2$ and Volatile Organic Compounds lead to the formation of ground-level ozone.  In the winter, $NO_2$ reacts with ammonia to form fine particulate matter.  Both of these scenarios can result in increased ozone and fine particular matter along the Wasatch Front.[55]

5. The ambient air along the Wasatch Front is frequently polluted with Criteria Air Pollutants, including NOx, ozone, and particulate matter.

6. A diesel truck with all of its federally required emission control devices removed typically emits NOx at a rate of thirty-six times its original EPA certified emissions rate and emits particulate matter at a rate of twenty-one times its original EPA certified emission rate.[56]

**The Parties**

7. UPHE is a Utah non-profit organization comprised of health care professionals and concerned citizens dedicated to educating the public about—and advocating for—clean air, healthy land, and clean water.[57]

8. UPHE's members suffer adverse health effects from elevated pollution in the ambient air along the Wasatch Front.  Some of UPHE's members are deterred from engaging in outdoor recreational activities due to their concerns about particulate matter pollution.[58]

9. DPG and B&W Auto are Utah limited liability companies doing business along the Wasatch Front.

---

[55] *Compare* Dkt. 58 at 14–15, *with* Dkt. 65 at 22.

[56] *See* Dkt. 161 (Dr. St. Denis Testimony) at 41–43.

[57] *Compare* Dkt. 58 at 3, *with* Dkt. 65 at 11.

[58] *Utah Physicians*, 374 F. Supp. 3d at 1132–33.

10. DPG is a diesel truck lifestyle brand that sells apparel and truck parts.[59]

11. B&W Auto owns and performs mechanical work on trucks, helicopters, and airplanes.[60]

12. DPG collaborates with B&W Auto to sell DPG's apparel and to offer diesel trucks as sweepstakes prizes to DPG's customers.[61]

13. David W. Sparks is the chief executive officer and owner of DPG and B&W Auto.[62]

14. Joshua Stuart is a part owner of DPG, the chief financial officer of DPG, and the chief operations officer of DPG.[63]

15. Keaton Hoskins sold vehicles to B&W Auto and drove vehicles for DPG and B&W Auto.[64]

16. The Discovery Channel has a reality television show called "Diesel Brothers" about DPG, B&W Auto, Sparks, Stuart, and Hoskins.[65]  The show is in its sixth season.[66]

17. On March 12, 2019, the court concluded UPHE had standing to pursue its CAA claims against Defendants.[67]

---

[59] Dkt. 161 (Stuart Testimony) at 116:15–17.

[60] *See* Dkt. 160 (Sparks Testimony) at 35–39, 150–51.

[61] Dkt. 159 (Stuart Testimony) at 16–17, 22.

[62] Dkt. 85 (Answer) ¶ 23.

[63] *Id.* ¶ 25.

[64] *Compare* Dkt. 108 at 6, *with* Dkt. 113 at 3 ("Hoskins does not dispute the facts set forth by Plaintiff in its motion.").

[65] Dkt. 160 (Sparks Testimony) at 107–08.

[66] *Id.* at 109:3–4.

[67] *See Utah Physicians*, 374 F. Supp. 3d at 1137.

**Removal of Federally-Required Emission Control Devices**

18. The following are emission control devices or elements of emission control design[68] that reduce the emission of particulate matter and nitrogen oxides from diesel vehicles: (1) oxidation catalysts, (2) diesel particulate filters, (3) exhaust gas recirculation systems (EGR), (4) selective catalytic reduction systems, (5) non-methane hydrocarbon catalysts, (6) NOx sensors, (7) malfunction indicator lights, (8) limp mode,[69] and (9) onboard diagnostics systems.[70]

19. Emission control devices and elements of emission control design are parts of each vehicle manufacturer's emission control system for that vehicle.[71]

20. A primary way B&W Auto generates revenue is by selling used trucks.  B&W Auto purchases trucks, modifies them, and sells them.  Before selling several trucks, B&W Auto removed emission control devices and installed defeat parts.[72]

21. Before November 2, 2015, B&W Auto knowingly caused the removal of at least thirty-seven (37) emission control devices or elements of emission control design from eight (8) trucks.  *See infra* Table 1.

---

[68] *See* 40 C.F.R. § 86.1803-01 ("Element of design means any control system (i.e., computer software, electronic control system, emission control system, computer logic), and/or control system calibrations, and/or the results of systems interaction, and/or hardware items on a motor vehicle or motor vehicle engine.").

[69] A "Limp Mode" is an electronic feature designed to prevent a vehicle's full and continued operation after an emission control device has been removed or become impaired.

[70] *See* Dkt. 85 (Answer) ¶¶ 104, 110, 178; Dkt. 161 (Dr. St. Denis Testimony, Gee Testimony, Matheson Testimony); *see also* Pl.'s Bench Trial Ex. 8 (Mitchell 1, *Emission Control Application Guide, Gasoline & Diesel* (2017)) (hereinafter, Mitchell 1 Guide) (listing federally-required emission control devices and systems for diesel vehicles); Pl.'s Bench Trial Ex. 36 (EPA, *2013 Model Year Certificate of Conformity with the Clean Air Act of 1990*) ("Vehicles covered by this certificate have demonstrated compliance with the applicable emission standards as more fully described in the manufacturer's application.  This certificate covers the above models, which are designed to meet the applicable emission standards specified in 40 CFR Parts 85, 86, 88, 1037, and 600 as applicable at both high and low altitude as applicable.").

[71] *See* Dkt. 161 (Dr. St. Denis Testimony) at 19–22, 43, 45–48, 55–58, 68–71, 73–74.

[72] *See* Dkt. 159 (Stuart Testimony) at 16–17, 22; Dkt. 160 (Sparks Testimony) at 29, 35–39, 46–48, 81–82.

a. Truck 1: In 2013, B&W Auto knowingly caused Industrial Injection Services, Inc. (Industrial Injection) to remove or render inoperable an oxidation catalyst, a diesel particulate filter, a selective catalytic reduction system, a NOx sensor, a malfunction indicator light, and limp mode from a 2012 Dodge Ram 2500 diesel truck known as "Built Diesel 1."

b. Truck 2: In 2013, B&W Auto knowingly caused the removal or incapacitation of an oxidation catalyst, a diesel particulate filter, a selective catalytic reduction system, two NOx sensors, a malfunction indicator light, and limp mode from a 2013 Ford F-250 diesel truck known as "Built Diesel 2."

c. Truck 3: In 2014, B&W Auto knowingly caused Industrial Injection to remove or render inoperable an oxidation catalyst, a malfunction indicator light, and limp mode from a 2005 GMC Silverado 2500 diesel truck known as "Built Diesel 3, Second Place."

d. Truck 4: In 2015, B&W Auto knowingly removed or rendered inoperable an oxidation catalyst, a diesel particulate filter, a malfunction indicator light, and limp mode from a 2007 GMC C4500 Kodiak diesel truck known as "Built Diesel 6, First Place."

e. Truck 5: In 2015, B&W Auto knowingly removed or rendered inoperable an oxidation catalyst, a diesel particulate filter, a malfunction indicator light, and limp mode from a 2008 Dodge Ram 2500 diesel truck known as "Built Diesel 6, Second Place."

f. Truck 6: In 2015, B&W Auto knowingly removed or rendered inoperable an oxidation catalyst, a diesel particulate filter, a malfunction indicator light, and limp mode from a 2007 GMC Silverado diesel truck known as "US Duramax."

g. Truck 7: In 2015, B&W Auto knowingly removed or rendered inoperable an oxidation catalyst, a diesel particulate filter, a selective catalytic reduction system, two NOx sensors, a malfunction indicator light, and limp mode from a 2011 Ford F-350 diesel truck known as "Brodozer."

h. Truck 19: In 2014, Sparks purchased a 2014 Dodge Ram 1500 Laramie 3.0L diesel truck known as the "Mini Megaram."  The truck was purchased new and driven by Sparks for a year.  B&W Auto later made custom modifications to the Mini Megaram for a Diesel Brothers television episode.  B&W Auto removed several emission control devices and installed several defeat parts.  The truck was offered as a sweepstakes prize in November 2015.

**Table 1: B&W Auto's Removal of Devices**

| TRUCK | DEVICES REMOVED[73] | NUMBER OF DEVICES REMOVED |
|---|---|---|
| Truck 1: Built Diesel 1 | OC, DPF, SCR, NOx Sensor, MIL, Limp Mode | 6 |
| Truck 2: Built Diesel 2 | OC, DPF, SCR, 2 NOx Sensors, MIL, Limp Mode | 7 |
| Truck 3: Built Diesel 3, Second Place | OC, MIL, Limp Mode | 3 |
| Truck 4: Built Diesel 6, First Place | OC, DPF, MIL, Limp Mode | 4 |
| Truck 5: Built Diesel 6, Second Place | OC, DPF, MIL, Limp Mode | 4 |

[73] The following abbreviations are used in this Order's tables: "OC" means oxidation catalyst, "DPF" means diesel particulate filter, "SCR" means selective catalytic reduction, "EGR" means exhaust gas recirculation system, and "MIL" means malfunction indicator light.

| Truck 6: US Duramax | OC, DPF, MIL, Limp Mode | 4 |
|---|---|---|
| Truck 7: Brodozer | OC, DPF, SCR, 2 NOx Sensors, MIL, Limp Mode | 7 |
| Truck 19: Mini Megaram[74] | Several Devices Removed | 2 |
| | **TOTAL DEVICES REMOVED:** | 37 |

22. As CEO, manager, and owner of B&W Auto, Sparks was in a position to prevent B&W Auto from removing emission control devices.[75]

23. Sparks knew that B&W Auto was removing emission control devices from trucks and failed to take any corrective or preventative action.

24. Hoskins knowingly caused the removal of ten (10) emission control devices, or elements of emission control design, from two (2) trucks.  *See infra* Table 2.

    a. Truck 21: In 2014, Hoskins caused Industrial Injection to remove or render inoperable an exhaust gas recirculation system, an oxidation catalyst, a diesel particulate filter, and a malfunction indicator light from a 2009 Ford F-250 diesel truck known as "Red 6-Door."

    b. Truck 22: In 2014, Hoskins caused the removal or incapacitation of an oxidation catalyst, a diesel particulate filter, a selective catalytic reduction system, two NOx sensors, and a malfunction indicator light from a 2013 Ford F-350 diesel truck known as "Platinum 666."

---

[74] Sparks admitted at trial that B&W Auto removed several emission control devices from the Mini Megaram. However, Sparks was unable to recall which devices were removed, and UPHE could not prove which emission control devices were removed.  The court concludes two emission control devices were removed.

[75] *Utah Physicians*, 374 F. Supp. 3d at 1139.

**Table 2: Hoskins's Removal and Installation of Devices**

| TRUCK | DEVICES REMOVED | DEVICES INSTALLED |
|---|---|---|
| Truck 21: Ford F-250 Red 6-door | EGR, OC, DPF, MIL | EGR Delete Kit, Straight Pipe, Delete Tune |
| Truck 22: Ford F-350 "Platinum 666" | OC, DPF, SCR, 2 NOx Sensors, MIL | Straight Pipe, Delete Tune |
| **TOTAL DEVICES REMOVED/INSTALLED:** | 10 | 5 |

### Installation of Defeat Parts

25. Defeat parts are parts or components intended for use with, or as a part of, any vehicle or engine, where a principal effect of the part or component is to bypass, defeat, or render inoperative any emission control device or element of design.[76]

26. The following are defeat parts that bypass, defeat, or render inoperative emission control devices or elements of emission control design: (1) straight pipes, (2) delete pipes (including turbo back exhaust pipes and downpipes-back), (3) vertical stacks, (4) delete tunes, (5) delete kits, and (6) onboard diagnostics malware.[77]

27. Straight pipes, delete pipes, and vertical stacks are defeat parts that mechanically bypass, defeat, or render inoperative emission control devices like the oxidation catalyst, the catalytic converter, the diesel particulate filter, the selective catalytic reduction system, oxygen sensors, and NOx sensors.[78]

---

[76] *See* 42 U.S.C. § 7522(a)(3)(A); 40 C.F.R. § 86.1803-01 ("Defeat device means an auxiliary emission control device (AECD) that reduces the effectiveness of the emission control system under conditions which may reasonably be expected to be encountered in normal vehicle operation and use.").

[77] *See* Dkt. 161 (Dr. St. Denis Testimony, Gee Testimony, Matheson Testimony); Dkt. 160 (Sparks Testimony) at 65–70.

[78] Dkt. 161 (Dr. St. Denis Testimony) at 72–74; Dkt. 161 (Gee Testimony) at 81–83; Dkt. 160 (Sparks Testimony) at 8–9, 12–13.

28. Delete tunes, delete kits, and onboard diagnostics malware are defeat parts that electronically bypass, defeat, or render inoperative emission control devices or systems like the diesel particulate filter, the malfunction indicator light, limp mode, and the exhaust gas recirculation system.[79]

29. B&W Auto installed twenty-four (24) parts or components in fourteen (14) diesel trucks that defeated emission control systems.  *See infra* Table 3.

   a. Between 2013 and 2015, B&W Auto installed straight pipes and delete tunes in Trucks 1-7.

   b. Truck 8: In 2014, B&W Auto installed vertical stacks in a 1994 Dodge Ram 3500 12-valve diesel truck known as "Built Diesel 3, First Place US 12-Valve."

   c. Truck 9: In 2015, B&W Auto installed a straight pipe in a 1997 Dodge Ram 2500 12-valve diesel truck known as "Holy Grail."

   d. Truck 10: In 2015, B&W Auto installed vertical stacks in a 2009 Ford F-250 diesel truck known as "Ultimate Hunt Rig."

   e. Truck 11: In 2014, B&W Auto installed vertical stacks in a 2013 Ford F-250 Powerstroke 6.7L diesel truck known as "UPHE Test Truck."

   f. Truck 12: In 2014 and 2015, B&W Auto installed a straight pipe and a delete tune in a 2012 Dodge Ram 3500 Cummins 6.7L diesel truck known as "Mega Ram Runner."

   g. Truck 13: In 2015 and 2016, B&W Auto installed a straight pipe and vertical stacks in a 2008 Ford F-550 Powerstroke 6.7L diesel truck known as "Super Six."

---

[79] *See* Dkt. 161 (Dr. St. Denis Testimony) at 70–74; Dkt. 161 (Gee Testimony) at 82–84; Dkt. 160 (Sparks Testimony) at 37:17–21.

**Table 3: B&W Auto's Installation of Defeat Parts**

| TRUCK | DEFEAT PARTS INSTALLED | NUMBER OF DEFEAT PARTS INSTALLED |
|---|---|---|
| Truck 1: Built Diesel 1 | Straight Pipe, Delete Tune | 2 |
| Truck 2: Built Diesel 2 | Straight Pipe, Delete Tune | 2 |
| Truck 3: Built Diesel 3, Second Place | Straight Pipe, Delete Tune | 2 |
| Truck 4: Built Diesel 6, First Place | Straight Pipe, Delete Tune | 2 |
| Truck 5: Built Diesel 6, Second Place | Straight Pipe, Delete Tune | 2 |
| Truck 6: US Duramax | Vertical Stacks, EFI Live Delete Tune | 2 |
| Truck 7: Brodozer | Straight Pipe, EFI Live Delete Tune | 2 |
| Truck 8: Built Diesel 3, First Place US 12-Valve | Vertical Stacks | 1 |
| Truck 9: Holy Grail | Straight Pipe | 1 |
| Truck 10: Ultimate Hunting Rig | Vertical Stacks | 1 |
| Truck 11: UPHE Test Truck | Vertical Stacks | 1 |
| Truck 12: Mega Ram Runner | Straight Pipe, ECM Delete Tune | 2 |
| Truck 13: Super Six | Straight Pipe, Vertical Stacks | 2 |
| Truck 19: Mini Megaram[80] | Several Devices Installed | 2 |
| | **TOTAL DEVICES INSTALLED** | 24 |

30. Of these trucks, the Brodozer, the UPHE Test Truck, and the Mega Ram Runner all

   remained in Utah.

31. As CEO, manager, and owner of B&W Auto, Sparks was in a position to prevent B&W

   Auto from installing defeat parts.

---

[80] Sparks admitted at trial that B&W Auto installed several defeat parts in the Mini Megaram. However, Sparks was unable to recall which defeat parts were installed. The court concludes two defeat parts were installed.

32. Sparks knew B&W Auto was installing defeat parts and did nothing to stop it.

33. Hoskins knowingly caused the installation of five (5) defeat parts in two (2) trucks. *See supra* Table 2.

    a. Truck 21: In 2014, Hoskins caused Industrial Injection to install an EGR delete kit, a straight pipe, and a delete tune in his 2009 Ford F-250 diesel truck known as "Red 6-Door."

    b. Truck 22: In 2014, Hoskins caused the installation of a straight pipe and a delete tune in his 2013 Ford F-350 diesel truck known as "Platinum 666."

34. After removing emission control systems from these vehicles and installing defeat parts, Hoskins sold the vehicles to B&W Auto.[81]

### Offering to Sell and Selling Defeat Parts[82]

35. DPG used its website, https://dieselpowergear.com, to sell diesel truck lifestyle apparel and truck parts.[83]

36. DPG did not own any of the parts it was selling. Instead, DPG offered to sell these parts by uploading another entity's online store onto dieselpowergear.com. This entity, Premier Performance, provided an online store that offered truck parts, including several defeat parts. When a customer ordered parts through dieselpowergear.com, Premier

---

[81] Dkt. 159 (Hoskins Testimony) at 80–82.

[82] The court concludes turbo back exhaust pipes and downpipes back had "a principal effect of . . . bypass[ing], defeat[ing], or render[ing] inoperable" emission control systems when installed by B&W Auto. *See* 42 U.S.C. § 7522(a)(3)(B). The court reached this conclusion because UPHE presented evidence demonstrating that B&W Auto used these pipes to bypass emission control devices. However, the court is unable to conclude that when DPG offered to sell turbo back exhaust pipes and downpipes back, a principal effect of those products was to bypass, defeat, or render inoperable emission control devices. UPHE did not present sufficient evidence for the court to conclude that the turbo back exhaust pipes and downpipes back offered for sale on DPG's website had a principal effect of bypassing emission control devices.

[83] Dkt. 159 (Stuart Testimony) at 15–16.

Performance would fulfill the order.  DPG received between 10% and 20% of the profit from each sale.[84]

37. DPG used its website and Premier Performance's online store to sell and offer to sell defeat parts.[85]

38. Through its website, DPG offered to sell eighty-eight (88) different defeat parts.  The "Exhaust" page of DPG's website offered fifty-nine (59) unique exhaust-based defeat parts.  The "EGR Deletes" page of DPG's website offered twenty-nine (29) unique delete kits designed to defeat exhaust gas recirculation systems.[86]

39. DPG offered to sell these defeat parts through its website until July 28, 2016, the day after UPHE served DPG with notice of its intent to sue under the CAA.

40. Before DPG stopped selling defeat parts, it sold 164 defeat parts.  *See infra* Table 4. DPG sold these defeat parts to customers throughout the nation.  DPG sold at least nine (9) defeat parts to customers in Utah and twenty-three (23) defeat parts to B&W Auto in Utah.

    a.  Before November 2, 2015, DPG sold sixteen (16) delete pipes.

    b.  After November 2, 2015, DPG sold fifty-four (54) delete pipes.

    c.  Before November 2, 2015, DPG sold forty-two (42) EGR delete kits.

    d.  After November 2, 2015, DPG sold fifty-two (52) EGR delete kits.

41. DPG generated approximately $21,000 from its sale of these defeat parts.

---

[84] *See Id.* at 42–46; Dkt. 160 (Sparks Testimony) at 99–100.

[85] Dkt. 85 (Answer) ¶¶ 177, 179; *see also* Dkt. 88 at 19 ("Defendants do not dispute DPG, through 4x4 Anything, sold automotive parts that violate the CAA").

[86] *See* Pl.'s Trial Exs. 1, 2.

**Table 4: Defeat Parts Sold by DPG**

|  | SOLD ON OR BEFORE 11/2/2015 | SOLD AFTER 11/2/2015 |
| --- | --- | --- |
| **DELETE PIPES** | 16 | 54 |
| **DELETE KITS** | 42 | 52 |
| **TOTAL DEFEAT PARTS SOLD:** | 58 | 106 |

42. Stuart had the ability to prevent DPG from selling defeat parts.[87]

43. Stuart knew DPG was selling defeat parts but did not prevent the sales.[88]

44. In April 2013, DPG began using a diesel truck giveaway sweepstakes as a marketing strategy to encourage customers to purchase DPG merchandise.[89]

45. DPG gave customers one raffle entry for every $5.00 spent on DPG's website.[90]

46. Before giving away the sweepstakes trucks to the winners, DPG purchased the sweepstakes trucks from B&W Auto.[91]

47. B&W Auto purchased the sweepstakes trucks and modified them. B&W Auto modified several trucks by removing emission control devices and installing defeat parts. Once the trucks were ready, B&W Auto and DPG offered them as sweepstakes prizes.[92]

48. When a sweepstakes winner was selected, DPG would pay B&W Auto for the truck. B&W Auto would then transfer the title of the truck to the winner.[93]

---

[87] *Utah Physicians*, 374 F. Supp. 3d at 1141.

[88] *Id.*

[89] Dkt. 159 (Stuart Testimony) at 15–16; Dkt. 160 (Sparks Testimony) at 25–27.

[90] Dkt. 159 (Stuart Testimony) at 15–16.

[91] *Id.* at 16–17; Dkt. 160 (Sparks Testimony) at 29:7–10, 35–36.

[92] Dkt. 160 (Sparks Testimony) at 35–36, 45–48.

[93] *Id.* at 29–30, 47–48.

49. On average, DPG made approximately $50,000 in profit for each sweepstakes truck it sold.  This profit was generated by selling apparel and parts to customers.[94]

50. On average, B&W Auto made around $1,500 in profit for each sweepstakes truck it sold to DPG.[95]

51. Since 2013, DPG and B&W Auto have sold nearly fifty (50) diesel trucks as a part of the sweepstakes marketing strategy.[96]  Many of these diesel trucks were advertised as having—and sold with—defeat parts.[97]

52. B&W Auto and DPG sold or offered to sell twenty-seven (27) defeat parts as part of fourteen (14) separate sweepstakes truck offerings.  *See infra* Table 5.  B&W Auto and DPG sold or offered to sell nineteen (19) of these defeat parts as part of nine (9) separate sweepstakes truck offerings before November 2, 2015.  B&W Auto and DPG sold or offered to sell eight (8) of these defeat parts as a part of five (5) separate sweepstakes truck offerings after November 2, 2015.

**Table 5: Sweepstakes Trucks Sold or Offered for Sale by B&W Auto and DPG**

| TRUCK | DEFEAT PARTS INCLUDED IN SWEEPSTAKES SALE | WHEN SOLD OR OFFERED FOR SALE | NUMBER OF DEFEAT PARTS INCLUDED AS A PART OF TRUCK |
|---|---|---|---|
| Truck 1: Built Diesel 1 | Straight Pipe, Delete Tune | August 2013 | 2 |
| Truck 2: Built Diesel 2 | Straight Pipe, Delete Tune | February 2014 | 2 |

---

[94] *Id.* at 26–27, 30–32.

[95] *Id.* at 28–29.

[96] Dkt. 159 (Stuart Testimony) at 17–18.

[97] Dkt. 160 (Sparks Testimony) at 35–36, 45–48.

| Truck 3: Built Diesel 3, Second Place | Straight Pipe, Delete Tune | June 2014 | 2 |
|---|---|---|---|
| Truck 4: Built Diesel 6, First Place Kodiak | Straight Pipe, Delete Tune | August 2015 | 2 |
| Truck 5: Built Diesel 6, Second Place | Straight Pipe, Delete Tune | August 2015 | 2 |
| Truck 6: US Duramax | Vertical Stacks, EFI Live Delete Tune | June 2015 | 2 |
| Truck 8: Built Diesel 3, First Place US 12-Valve | Straight Pipe | June 2014 | 1 |
| Truck 9: Holy Grail | Straight Pipe | After November 2, 2015 | 1 |
| Truck 9: Holy Grail[98] | Straight Pipe | July 2018 | 1 |
| Truck 10: Ultimate Hunting Rig | Vertical Stacks, EGR Delete Kit, Delete Tune | April 2015 | 3 |
| Truck 19: Mini Megaram | Several Defeat Parts Installed | After November 2, 2015 | 2 |
| Truck 20: The Rock | Straight Pipe, Delete Tune | 2017 | 2 |
| Truck 20: The Rock[99] | Straight Pipe, Delete Tune | 2018 | 2 |
| Truck 21: Built Diesel 5, Hoskins's Red 6-Door[100] | Straight Pipe, EGR Delete, Delete Tune | Before November 2, 2015 | 3 |
| | | **TOTAL DEFEAT PARTS INCLUDED IN SWEEPSTAKES SALES:** | 27 |

53. None of these twelve (12) sweepstakes trucks were sold to buyers in Utah.

---

[98] After the Holy Grail was given as a sweepstakes prize to a Kansas resident in November 2015, the winner traded the Holy Grail back to B&W Auto.  B&W Auto and DPG offered the Holy Grail as a sweepstakes prize again.  In July 2018, the Holy Grail was given to a Connecticut resident as a sweepstakes prize.

[99] The Rock, a 2013 Dodge Ram 5500 6.7L diesel truck, was offered twice as a sweepstakes prize.  The winner of the sweepstakes chose another vehicle both times.  B&W Auto eventually sold The Rock in February 2019.

[100] Truck 21, the Red 6-Door, is a Ford F-250 that Hoskins sold to B&W Auto.

54. Some sweepstakes winners decided not to take the sweepstakes truck.[101]

55. When the winners decided not to take a truck, B&W Auto would not sell the truck to DPG.  Instead, B&W Auto would offer to sell the truck "as-is" to its customers.[102]

56. In August 2018, B&W Auto offered to sell The Rock "as-is" after a winner decided not to take the truck.  B&W Auto offered to sell two (2) defeat parts as part of The Rock.[103]

57. B&W Auto sold or offered for sale twenty-six (26) defeat parts as part of seventeen (17) non-sweepstakes trucks.  *See infra* Table 6.  B&W Auto sold or offered to sell eleven (11) of these defeat parts as part of eight (8) non-sweepstakes trucks before November 2, 2015.  B&W Auto sold or offered to sell fifteen (15) of these defeat parts as a part of nine (9) sweepstakes trucks after November 2, 2015.

**Table 6: Non-Sweepstakes Trucks Sold or Offered for Sale by B&W Auto**

| TRUCK | DEFEAT PARTS INCLUDED IN SALE | WHEN SOLD OR OFFERED FOR SALE | NUMBER OF DEFEAT PARTS INCLUDED AS A PART OF TRUCK |
|---|---|---|---|
| Truck 7: Brodozer | Straight Pipe, H&S Delete Tune | 2014 | 2 |
| Truck 11: Ford F-250 UPHE Test Truck | Vertical Straight Pipe, Delete Tune | October 2014 | 2 |
| Truck 13: Super Six[104] | Straight Pipe, Delete Tune | 2017 | 2 |
| Truck 14: Truck Norris | Straight Pipe, Delete Tune | October 2016 | 2 |
| Truck 15: 2011 GMC Denali | Straight Pipe, Delete Tune | April 2016 | 2 |
| Truck 16: The Raptor | Straight Pipe, Delete Tune | 2017 | 2 |
| Truck 17: Tucker Sno-Cat | Straight Pipe | December 2017 | 1 |

---

[101] Dkt. 160 (Sparks Testimony) at 35–36.

[102] *Id.*

[103] *Id.* at 35–36, 102–03.

[104] B&W Auto purchased this vehicle from Hoskins.

22

| | | | |
|---|---|---|---|
| Truck 20: The Rock | Straight Pipe, Delete Tune | February 2019 | 2 |
| Truck 23: 2008 Ford F-350 Lariat | Delete Tune | October 2014 | 1 |
| Truck 24: 2009 Ford F-350 Lariat Powerstroke | Straight Pipe, Delete Tune | February 2015 | 2 |
| Truck 25: Josh's Dodge Ram 2500 | Delete Tune | March 2015 | 1 |
| Truck 26: 2011 Dodge Ram 2500 | Delete Kit | December 2015 | 1 |
| Truck 27: 2011 GMC Sierra 2500 | DPF Delete | June 2016 | 1 |
| Truck 28: 2011 Ford F-350 Powerstroke Box Truck | DPF Delete | June 2016 | 1 |
| Truck 29: 2011 Ford F-250 Powerstroke | Delete Tune | January 2015 | 1 |
| Truck 30: "White Knight" Duramax | Turbo Back Straight Pipe, Delete Tune | July 2014 | 2 |
| Truck 31: 2007 Dodge 2500 SLT | Delete Tune | July 2014 | 1 |
| | | **TOTAL DEFEAT PARTS INCLUDED IN NON-SWEEPSTAKES SALES:** | 26 |

58. The Ford F-250 UPHE Test Truck, the Truck Norris, and the Tucker Sno-Cat were sold to buyers in Utah.[105]

59. B&W Auto never sold the Brodozer and still uses it for promotional purposes.[106]

---

[105] Dkt. 160 (Sparks Testimony) at 35–36.

[106] *Id.* The court is unable to determine whether Trucks 23–31 were sold.

60. Sparks had the ability to prevent DPG and B&W Auto from selling or offering for sale defeat parts.[107]

61. Sparks knew DPG and B&W Auto were selling defeat parts as part of diesel trucks, and he did nothing to prevent or stop these sales.

### Owning and Operating Tampered Vehicles

62. Between January 12, 2012, and July 20, 2017, B&W Auto, Sparks, and Hoskins owned and operated numerous vehicles in Utah that lacked operating emission control devices or systems.[108]

63. Between January 12, 2012, and July 20, 2017, B&W Auto and Sparks owned and operated at least thirty (30) vehicles with inoperable emission control systems.[109]

64. B&W Auto currently owns three (3) vehicles with inoperable emission control systems: the Brodozer, Hercules, and the Mega Ram Runner.[110]

65. Between January 12, 2012, and July 20, 2017, Hoskins owned two (2) vehicles with inoperable emission control systems and operated seventeen (17) vehicles with inoperable emission control systems.[111]

### Economic Benefits

66. Defendants experienced many economic benefits from their removal of emission control devices, installation of defeat parts, sale of defeat parts, and ownership or operation of tampered vehicles.  These economic benefits continue extending well beyond the profits

---

[107] *Utah Physicians*, 374 F. Supp. 3d at 1139.

[108] *See* Dkt. 85 (Answer) ¶¶ 223, 238; *supra* Tables, 1, 2, 3, 5, 6.

[109] *See* Dkt. 148 at 13, 23; *supra* Tables 1, 3, 5, 6.

[110] Dkt. 160 (Sparks Testimony) at 35–36, 39–42, 91–92.

[111] *Compare* Dkt. 108 at 6, *with* Dkt. 113 at 3 ("Hoskins does not dispute the facts set forth by Plaintiff in its motion.").

from these prohibited activities to Defendants' status as television and social media celebrities, the reputation and notoriety of their brands, and the economic leverage they have used to accumulate assets and start new businesses.

67. B&W Auto, DPG, and Sparks gained popularity through social media by posting videos of diesel trucks.  Some of these videos showed tampered diesel trucks emitting large clouds of dark exhaust.[112]

68. The Discovery Channel noticed these videos and approached B&W Auto, DPG, and Sparks about filming a reality television show.[113]

69. B&W Auto, DPG, Sparks, Stuart, and Hoskins were subjects of the Discovery Channel's "Diesel Brothers" show.[114]

70. B&W Auto and DPG leveraged the notoriety from the Diesel Brothers show to expand their businesses.  Over the last four years, B&W Auto's profits and DPG's revenue significantly increased.  With the help of loans, both companies accumulated valuable assets.[115]

71. At the beginning of 2016, B&W Auto reported $661,615 in assets.[116]  At the close of 2018, B&W Auto reported $1,265,072 in assets, including a helicopter and two airplanes.[117]

---

[112] Dkt. 160 (Sparks Testimony) at 13–14, 21–23, 27–28.

[113] *Id.* at 107–08.

[114] Dkt. 159 (Stuart Testimony) at 68–69; Dkt. 160 (Sparks Testimony) at 107–08.

[115] Dkt. 159 (Stuart Testimony) at 66–67; Dkt. 160 (Sparks Testimony) at 116–18, 150–51.

[116] Defs.' Trial Ex. 1005 at 8.

[117] *See* Defs.' Trial Ex. 1016 at 4; Dkt. 160 (Sparks Testimony) at 150–51.

72. In 2016, B&W Auto reported $4,376,247 in revenue and $87,863 in profits.[118]  In 2018, B&W Auto reported $3,876,025 in revenue and $181,906 in profits.[119]

73. At the beginning of 2016, DPG reported $1,461,763 in assets.[120]  At the close of 2018, DPG reported $2,268,914 in assets.[121]

74. In 2016, DPG reported $8,253,345 in revenue and $236,287 in profits.[122] In 2018, DPG reported $12,576,067 in revenue and $271,550 in profits.[123]

75. Sparks, known as "Heavy D" on the Diesel Brothers show, has become a celebrity with millions of social media followers.[124]

76. Sparks has used his celebrity to start new businesses and make money from speaking engagements.  For example, during trial, Sparks attended a conference where he was offered $12,000 to speak.[125]

77. Over the last three years, Sparks's income significantly increased.  Sparks has reported an average annual income of over $300,000 for the last three years.[126]

78. This income came from the Discovery Channel, B&W Auto, DPG, and his other businesses.

---

[118] Defs.' Trial Ex. 1005 at 5.

[119] Defs.' Trial Ex. 1016 at 1.

[120] Defs.' Trial Ex. 1008 at 20.

[121] Defs.' Trial Ex. 1017 at 5.

[122] Defs.' Trial Ex. 1008 at 16.

[123] Defs.' Trial Ex. 1017 at 1.

[124] Dkt. 160 (Sparks Testimony) at 32:9–10.

[125] *Id.* at 7:1–4.

[126] Defs.' Trial Exs. 1011 at 7, 1014 at 11, 1025 at 1.

79. Between 2016 and 2018, Sparks earned $482,597 for his work with the Discovery Channel alone.[127]

80. Sparks has used revenue from these endeavors to purchase valuable assets and invest in new business opportunities—including gaining an ownership interest in thirteen different Utah limited liability companies.

81. Although Sparks represented to the court that he has an annual average income of around $215,000, he markets himself as a multi-millionaire.[128]

82. Stuart, known as "RedBeard" on the Diesel Brothers show, has also become a social media celebrity.

83. Over the last three years, Stuart's income significantly increased.  This income came from the Discovery Channel, DPG, and other businesses Stuart owns.

84. In 2016, Stuart reported $129,725 in adjusted gross income.[129]  In 2018, Stuart reported $202,431 in adjusted gross income.[130]

85. Hoskins, known as "The Muscle" on the Diesel Brothers show, has also become a social media celebrity.

86. For a price, Hoskins uses his social media celebrity to advertise vehicles.  Hoskins has done this for DPG and for I-Drive Utah.

87. At the peak of his social media celebrity, Hoskins made $5,000 per post to advertise a vehicle on his social media accounts.[131]

---

[127] Defs.' Trial Exs. 1011 at 11, 1025 at 3; Pl.'s Trial Ex. 125 at 11–12; Dkt. 160 (Sparks Testimony) at 137–38.

[128] *See* Dkt. 160 (Sparks Testimony) at 109:20–24, 111–13; Pl.'s Trial Ex. 104.

[129] Defs.' Trial Ex. 1021 at 4.

[130] Defs.' Trial Ex. 1020 at 11.

[131] Dkt. 159 (Hoskins Testimony) at 75–76.

88. Over the last four years, Hoskins's income has steadily increased.  Hoskins has used this income to purchase assets and to start a new business.[132]

89. In 2018, Hoskins reported $48,541 in adjusted gross income.[133]  At trial, Hoskins testified that he anticipated making $150,000 in 2019.[134]

### History of CAA Compliance and Efforts to Comply with the CAA

90. After UPHE initiated this suit, Stuart caused DPG to stop selling defeat parts.  He also hired a contractor to contact DPG customers who had previously purchased defeat parts.  The contractor was instructed to offer those customers a refund for any defeat parts they purchased.  At the time of the trial, DPG had recovered five defeat parts.[135]

91. After UPHE initiated suit, Sparks turned down two business opportunities that would have required him to promote the use of defeat parts.[136]

92. During the second season of the Discovery Channel Diesel Brothers show, Sparks caused the show to display a disclaimer at the beginning of the show.  The disclaimer indicated that the Diesel Brothers did not endorse or support the use of emission defeating equipment.[137]

93. During one episode of the Diesel Brothers show, Sparks converted a diesel truck to a natural gas vehicle and discussed the value of running a diesel vehicle on natural gas.[138]

---

[132] *Id.* at 77–80, 86:5–10.

[133] Defs.' Trial Ex. 1018 at 23.  The court did not receive any evidence concerning Hoskins's income in 2016 and 2017.

[134] Dkt. 159 (Hoskins Testimony) at 91:3–8.

[135] Dkt. 159 (Stuart Testimony) at 50–51; Dkt. 160 (Sparks Testimony) at 182–83.

[136] Dkt. 160 (Sparks Testimony) at 186–87.

[137] *Id.* at 185–86.

[138] *Id.* at 187–88.

94. During two episodes of the Diesel Brothers show, Sparks promoted the use of biodiesel as a renewable fuel.[139]

95. B&W Auto and Sparks have not restored or offered to restore any of the trucks they modified in violation of the CAA.[140]

96. B&W Auto still owns three (3) vehicles that currently violate the CAA: Brodozer, Hercules, and Mega Ram Runner.

97. After the court issued the preliminary injunction enjoining B&W Auto and Sparks from "[k]nowingly or intentionally violating 42 U.S.C. § 7522(a)(3)(B) of the [CAA] . . . [and] reselling any [tampered] vehicle,"[141] B&W Auto and Sparks sold two tampered trucks: the Holy Grail and the Rock.[142]

## CONCLUSIONS OF LAW

"Congress enacted the Clean Air [Act] . . . in response to dissatisfaction with the progress of existing air pollution programs."[143]  Through a "cooperative-federalism approach,"[144] the CAA "regulates pollution-generating emissions from both stationary sources, such as factories and powerplants, and moving sources, such as cars, trucks, and aircraft."[145]

Subchapter I of the CAA requires the EPA to "create and review [NAAQS] for certain pollutants."[146]  The NAAQS regulate Criteria Air Pollutants emitted from "mobile or stationary

---

[139] *Id.* at 185:3–13.

[140] *Id.* at 105:12–16.

[141] Dkt. 104.

[142] Dkt. 160 (Sparks Testimony) at 102–05.

[143] *Alaska Dep't of Envtl. Conservation v. E.P.A.*, 540 U.S. 461, 469 (2004) (citation and internal quotation marks omitted).

[144] *US Magnesium, LLC v. U.S. E.P.A.*, 690 F.3d 1157, 1159 (10th Cir. 2012).

[145] *Util. Air Regulatory Grp. v. E.P.A.*, 573 U.S. 302, 308 (2014).

[146] *Oklahoma v. U.S. E.P.A.*, 723 F.3d 1201, 1204 (10th Cir. 2013) (citing 42 U.S.C. §§ 7408, 7409); *see also Alaska Dep't.*, 540 U.S. at 469.

sources" that "cause or contribute to air pollution which may reasonably be anticipated to endanger public health or welfare."[147]  Once the EPA sets the NAAQS, states "have the responsibility to adopt [SIPs], which provide for implementation, maintenance, and enforcement of those [NAAQS]."[148]  "Areas meeting the NAAQS are termed attainment areas, and areas not meeting the NAAQS are termed nonattainment areas."[149]  "States create their own SIPs to bring nonattainment areas into compliance with the NAAQS and to prevent deterioration of air quality in attainment areas."[150] After reviewing each SIP, the EPA "may approve a SIP through notice-and-comment rulemaking."[151]   The EPA approved Utah's SIP,[152] which is "enforceable as federal law and may be enforced by the state, the EPA, or individuals under the CAA citizen-suit provision."[153]

Subchapter II of the CAA governs emission standards for moving sources.[154]  Under § 7521, the EPA Administrator "shall by regulation prescribe . . . standards applicable to the emission of any air pollutant from any class or classes of new motor vehicles or new motor

---

[147] 42 U.S.C. §§ 7408(a)(1)(A), (a)(1)(B).

[148] *Oklahoma*, 723 F.3d at 1204 (quoting 42 U.S.C. § 7410(a)(1)) (internal quotation marks and brackets omitted); *see also Util. Air Regulatory Grp.*, 573 U.S. at 308 ("States have primary responsibility for implementing the NAAQS by developing State implementation plans.") (citation and internal quotation marks omitted); 42 U.S.C. § 7407(a) ("Each State shall have the primary responsibility for assuring air quality within the entire geographic area comprising such State by submitting an implementation plan for such State which will specify the manner in which national primary and secondary ambient air quality standards will be achieved and maintained within each air quality control region in such State."); 42 U.S.C. § 7407(d)(4) (promulgating specific NAAQS requirements for ozone, carbon monoxide, and particulate matter).

[149] *US Magnesium*, 690 F.3d at 1159.

[150] *Id.* (citing 42 U.S.C. §§ 7407, 7410).

[151] *Id.* (citing 42 U.S.C. §§ 7410(c), (k)(3)).

[152] *See* 40 C.F.R. § 52.2320(a) ("This section sets forth the applicable State Implementation Plan for Utah under section 110 of the Clean Air Act, 42 U.S.C. 7410 and 40 CFR part 51 to meet national ambient air quality standards or other requirements under the Clean Air Act.").

[153] *US Magnesium*, 690 F.3d at 1159 (citing 42 U.S.C. §§ 7410(a)(1), 7413, 7604); *Espinosa v. Roswell Tower, Inc.*, 32 F.3d 491, 492 (10th Cir. 1994).

[154] *See* Subchapter II—Emission Standards for Moving Sources, 42 U.S.C. §§ 7521–90; *see also* Part A—Motor Vehicle Emission and Fuel Standards, 42 U.S.C. §§ 7521–54.

vehicle engines, which in his judgment cause, or contribute to, air pollution which may reasonably be anticipated to endanger public health or welfare."[155]  "Such standards shall be applicable to such vehicles and engines for their useful life . . . whether such vehicles and engines are designed as complete systems or incorporate devices to prevent or control such pollution."[156]  Under this mandate, the EPA has promulgated emission standards for the useful life of on- and off-road vehicles and motorcycles by model year, weight, and fuel type.[157]  The EPA also promulgated regulations pursuant to § 7521(m), which requires vehicles to be equipped with diagnostics systems capable of detecting problems with the vehicle's emission control systems; alert owners, repair shops, and inspection agencies to these problems; and store malfunction information electronically.[158]

 To enforce these requirements, the CAA prohibits vehicle manufacturers from selling a new motor vehicle or motor engine in the United States unless the vehicle or engine is covered by a federal certificate of conformity.[159]  The EPA issues certificates of conformity to manufacturers under § 7525(a) to certify that a particular class and model year of motor vehicles or engines has the required emission control devices or systems installed, meets the applicable

---

[155] 42 U.S.C. § 7521(a)(1); *see id.* § 7521(a)(3)(A)(i) (providing "regulations under paragraph (1) of this subsection applicable to emissions of hydrocarbons, carbon monoxide, *oxides of nitrogen, and particulate matter* from classes or categories of heavy-duty vehicles or engines manufactured during or after model year 1983 shall contain standards which reflect the greatest degree of emission reduction achievable through the application of technology which the Administrator determines will be available for the model year to which the standards apply") (emphasis added).

[156] 42 U.S.C. § 7521(a)(1).

[157] *See* 40 C.F.R. §§ 86.000-2 to 86.1930.  The EPA has also promulgated emission standards for complete heavy-duty vehicles.  *See* 40 C.F.R. §§ 86.1816-05 to -18.

[158] *See* 42 U.S.C. § 7521(m) (outlining the required capabilities of onboard diagnostics systems and providing "[t]he Administrator may, in the Administrator's discretion, promulgate regulations requiring manufacturers to install such onboard diagnostic systems on heavy-duty vehicles and engines"); 40 C.F.R. § 86.1806-05 ("[A]ll light-duty vehicles, light-duty trucks and complete heavy-duty vehicles weighing 14,000 pounds GVWR or less (including MDPVs) must be equipped with an onboard diagnostic (OBD) system capable of monitoring all emission-related powertrain systems or components during the applicable useful life of the vehicle.").

[159] 42 U.S.C. § 7522(a)(1).

emission standards, and will continue to meet such standards during the useful life of the vehicle if all emission control devices and elements of design described in the manufacturers' certificates of conformity application and installed in the vehicle remain operational.[160]  The CAA prohibits defeating these certified emission control devices or systems by making it unlawful for any person to remove or render inoperative federally-required emission control devices or elements of design from motor vehicles;[161] or sell, offer to sell, or install parts that defeat federally-required emission control devices or elements of design on motor vehicles.[162]  These prohibitions are emission standards or limitations because they "limit[] the quantity, rate, or concentration of emissions of air pollutants on a continuous basis[.]"[163]

The CAA authorizes citizens to bring civil actions "against any person . . . who is alleged to have violated . . . an emission standard or limitation."[164]  Accordingly, a citizen may bring suit to enforce: (1) a specific emission standard or limitation in the CAA,[165] or (2) a specific provision of an applicable SIP.[166]  Citizens may enforce the CAA against responsible corporate

---

[160] *See* 42 U.S.C. § 7525(a); *see also Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. E.P.A.*, 768 F.2d 385, 387 n.3 (D.C. Cir. 1985) ("'Certification' refers to the process of testing and issuance of a certificate of conformity required by section 206(a) of the Act, 42 U.S.C. § 7525(a), whereby manufacturers must demonstrate, under carefully controlled procedures, that their vehicles, or any engine or emission control system incorporated therein, conform with the applicable emissions standards prescribed in 42 U.S.C. § 7521."); 40 C.F.R. §§ 86.1848-01 to -10.

[161] 42 U.S.C. § 7522 (a)(3)(A); *see also* 40 C.F.R. § 86.1854-12(a)(3)(i).

[162] 42 U.S.C. § 7522 (a)(3)(B); *see also* 40 C.F.R. § 86.1854-12(a)(3)(ii).

[163] *Id.* § 7602(k).

[164] *Id.* § 7604(a)(1).

[165] *Id.*

[166] *See Id.* § 7413(b) (authorizing civil judicial enforcement for violation of approved SIPs); *US Magnesium*, 690 F.3d at 1159 ("Approved SIPs are enforceable as federal law and may be enforced by the state, the EPA, or individuals under the CAA citizen-suit provision.") (citing 42 U.S.C. §§ 7410(a)(1), 7413, 7604); 40 C.F.R. § 52.23 ("Failure to comply with any provisions of this part, or with any approved regulatory provision of a State implementation plan . . . shall render the person or governmental entity so failing to comply in violation of a requirement of an applicable implementation plan and subject to enforcement action under section 113 of the Clean Air Act.").

officers who had the authority to prevent or correct violations, had knowledge of the facts giving

rise to the violations, and failed to exercise their authority to prevent or correct the violations.[167]

## I.      LIABILITIES FOR VIOLATING THE CAA

UPHE brought this citizen suit under § 7604(a)(1) of the CAA to enforce § 7522(a)(3)

and Utah's SIP.[168]  The court concludes Defendants violated § 7522(a)(3) with numerous (a)

tampering violations, (b) defeat part violations, and (c) defeat part marketing violations.  The

court further concludes Defendants violated § 7413(b)(1) by committing several (d) Utah SIP

defeat part violations and (e) Utah SIP owning or operating violations.

### a.   Tampering Violations

Under § 7522(a)(3)(A) of the CAA, it is unlawful for any person to tamper with

federally-mandated emission controls.[169]  In relevant part, § 7522(a)(3)(A) prohibits any person

from removing or rendering inoperable emission control devices or systems from motor

---

[167] *See Utah Physicians*, 374 F. Supp. 3d at 1138; *United States v. Mac's Muffler Shop, Inc.*, No. CIV. A. C85-138R, 1986 WL 15443, at *10 (N.D. Ga. Nov. 4, 1986) (holding responsible corporate officer and corporation jointly and severally liable for Section 7522(a)(3) violations). *C.f. United States v. Anthony Dell'Aquilla, Enterprises & Subsidiaries*, 150 F.3d 329, 333 (3d Cir. 1998) ("The control and supervision that [Harry] Grant and Sandalwood [Construction Corporation] exercised over the project was more than sufficient to support the district court's conclusion that they were operators under the CAA.").

[168] *See* Dkt. 49 (First Amended Complaint) ¶ 49 ("Defendants' violations of the Clean Air Act's anti-tampering and anti-defeat provisions, set forth in CAA Section 203(a)(3)(A), 42 U.S.C. § 7522(a)(3)(A), and Section 203(a)(3)(B), 42 U.S.C. § 7522(a)(3)(B), respectively, and the anti-tampering and anti-defeat regulations promulgated thereunder including 40 C.F.R. § 86.1854-12(a)(3), are enforceable by citizens because these provisions are emission standards or limitations as defined by CAA Section 304(a), 42 U.S.C. § 7604(a)."); *id.* ¶ 50 ("Defendants' violations of Utah SIP Regulation R307-201-2 also are enforceable by citizens because Utah SIP Regulation R307-201-2 is an emission standard or limitation as defined by CAA Section 304(a), 42 U.S.C. § 7604(a).").  Although Defendants challenged UPHE's constitutional standing, Defendants did not challenge UPHE's statutory standing to enforce Utah's SIP or § 7522(a)(3).

[169] 42 U.S.C. § 7522(a)(3)(A) (prohibiting "any person [from] remov[ing] or render[ing] inoperable any device or element of design installed on or in a motor vehicle or motor vehicle engine in compliance with regulations under this subchapter prior to its sale and delivery to the ultimate purchaser, or for any person knowingly to remove or render inoperable any such device or element of design after such sale and delivery to the ultimate purchaser."); *see also In Re: VMP Tuning, Inc.*, No. CAA-HQ-2019-8364, 2019 WL 4745264, at *12 (E.P.A.) (Sept. 24, 2019) ("Section 203(a)(3)(A) prohibits tampering with emission controls. This includes those controls that are in the engine (e.g., fuel injection, exhaust gas recirculation), and those that are in the exhaust (e.g., filters, catalytic converters, and oxygen sensors).").

vehicles.[170]  Any violation of § 7522(a)(3)(A) "constitute[s] a separate offense *with respect to each motor vehicle* or motor vehicle engine."[171]  Violations that occurred between January 12, 2009, and November 2, 2015, carry a penalty of $3,750 per motor vehicle.[172]

B&W Auto violated § 7522(a)(3)(A) by removing or rendering inoperative thirty-seven (37) emission control devices or systems from eight (8) trucks.[173]  This constitutes eight (8) separate violations of § 7522(a)(3)(A).  Sparks is liable as a responsible corporate officer for these tampering violations because he was aware of the violations, he had the ability to prevent them, and he failed to take any preventative or corrective action.  B&W and Sparks are jointly and severally liable for these violations, which carry a combined maximum penalty of $30,000.

Hoskins violated § 7522(a)(3)(A) by causing the removal or incapacitation of ten (10) emission control devices or systems from two (2) trucks.[174]  This constitutes two (2) separate violations of § 7522(a)(3)(A).  Hoskins is liable for these violations, which carry a combined maximum penalty of $7,500.

---

[170] *See* 42 U.S.C. § 7522(a)(3)(A); *Mac's Muffler Shop, Inc.,* 1986 WL 15443, at *7 (imposing liability under the CAA for removing catalytic converters from motor vehicles).

[171] 42 U.S.C. § 7524(a) (emphasis added).

[172] *Id.* ("Any person other than a manufacturer or dealer . . . who violates section 7522(a)(3)(B) of this title shall be subject to a civil penalty"); 40 C.F.R. § 19.4, Table 1 (2019) (providing "the statutory civil penalty provisions of statutes administered by EPA, with the original statutory civil penalty levels, as enacted, and the operative statutory civil penalty levels, as adjusted for inflation, for violations that occurred on or before November 2, 2015" and listing an adjusted-for-inflation civil penalty of $3,750 for violations of 42 U.S.C. § 7524(a) that occurred between January 12, 2009, and November 2, 2015).  The court calculates Defendants' penalties at the time of trial.

[173] *See supra* ¶ 21, Table 1.

[174] *See supra* ¶ 24, Table 2.

### b.  Defeat Part Violations

Under § 7522(a)(3)(B) of the CAA, it is unlawful for any person to install parts that bypass federally-mandated emission control devices.[175]  The CAA defines these parts, known as "defeat devices," as "any part or component intended for use with, or as part of, any motor vehicle or motor vehicle engine, where a principal effect of the part or component is to bypass, defeat, or render inoperative any device or element of design installed on or in a motor vehicle or motor vehicle engine in compliance with regulations under [the CAA]."[176]  Any violation of § 7522(a)(3)(B) "constitute[s] a separate offense *with respect to each part or component*."[177] Violations that occurred between January 12, 2009, and November 2, 2015, carry a penalty of $3,750 per part or component.[178]  Where penalties are assessed on or after February 6, 2019, for violations that occurred after November 2, 2015, the penalty is $4,735 per part or component.[179]

B&W Auto violated § 7522(a)(3)(B) by installing twenty-four (24) parts or components that defeated emission control systems in fourteen (14) diesel trucks.[180]  This constitutes twenty-four (24) separate violations of § 7522(a)(3)(B).  Sparks is liable as a responsible corporate officer for these defeat part violations because he was aware of the violations, he had the ability to prevent them, and he failed to take any preventative or corrective action.  B&W Auto committed twenty-three (23) of these violations between January 12, 2009, and November 2,

---

[175] 42 U.S.C. § 7522(a)(3)(B) (prohibiting "any person [from] . . . install[ing], any part or component intended for use with, or as part of, any motor vehicle or motor vehicle engine, where a principal effect of the part or component is to bypass, defeat, or render inoperative any device or element of design installed on or in a motor vehicle or motor vehicle engine in compliance with regulations under this subchapter, and where the person knows or should know that such part or component is being offered for sale or installed for such use or put to such use").

[176] *Id.*; *see also* 40 C.F.R. § 1068.101(b).

[177] 42 U.S.C. § 7524(a) (emphasis added).

[178] *Id.*; 40 C.F.R. § 19.4, Table 1 (referencing 42 U.S.C. § 7524(a)).

[179] 40 C.F.R. § 19.4, Table 2 (referencing 42 U.S.C. § 7524(a)).

[180] *See supra* ¶ 29, Table 3.

2015, and one (1) of these violations after November 2, 2015.[181]  B&W Auto and Sparks are jointly and severally liable for these violations, which carry a combined maximum penalty of $90,985.

Hoskins violated § 7522(a)(3)(B) by causing the installation of five (5) defeat parts in two (2) vehicles.[182]  This constitutes five (5) separate violations of § 7522(a)(3)(B).  Hoskins committed these violations between January 12, 2009, and November 2, 2015.  Hoskins is liable for these violations, which carry a combined maximum penalty of $18,750.

### c. Defeat Part Marketing Violations

Under § 7522(a)(3)(B) of the CAA, it is also unlawful for any person to sell or offer to sell defeat parts.[183]  In relevant part, "[§] 7522(a)(3)(B) prohibits . . . the sale of an emissions defeat part 'as part of' a vehicle where the seller knows or should know the part is being 'put to such use.'"[184]  Any violation of § 7522(a)(3)(B) "constitute[s] a separate offense *with respect to each part or component*."[185]  Violations that occurred between January 12, 2009, and November 2, 2015, carry a penalty of $3,750 per part or component.[186]  Where penalties are assessed on or

---

[181] *Id.*

[182] *See supra* ¶ 33, Table 2.

[183] 42 U.S.C. § 7522(a)(3)(B) (prohibiting "any person [from] manufactur[ing] or sell[ing], or offer[ing] to sell, or install[ing], any part or component intended for use with, or as part of, any motor vehicle or motor vehicle engine, where a principal effect of the part or component is to bypass, defeat, or render inoperative any device or element of design installed on or in a motor vehicle or motor vehicle engine in compliance with regulations under this subchapter, and where the person knows or should know that such part or component is being offered for sale or installed for such use or put to such use"); *see also United States v. Geo-Plex Corp.*, 946 F.2d 901, 1991 WL 204941, at *1 (10th Cir. 1991) (unpublished) (affirming the district court's holding that "defendants, through their marketing and sale of a device designated the 'Itron,' caused the removal of catalytic converters on forty vehicles in violation of section 203(a)(3)(B) of the Act, 42 U.S.C. § 7522(a)(3)(B) (1988).").

[184] *Utah Physicians*, 374 F. Supp. 3d at 1140.

[185] 42 U.S.C. § 7524(a) (emphasis added).

[186] *Id.*; 40 C.F.R. § 19.4, Table 1.

after February 6, 2019, for violations that occurred after November 2, 2015, the penalty is $4,735 per part or component.[187]

B&W Auto violated § 7522(a)(3)(B) by advertising or selling twenty-six (26) defeat parts intended for use with and as a part of seventeen (17) non-sweepstakes trucks.[188]  This constitutes twenty-six (26) separate violations of § 7522(a)(3)(B).  Sparks is liable as a responsible corporate officer for these defeat part marketing violations because he was aware of the violations, he had the ability to prevent them, and he failed to take any preventative or corrective action.  Of these twenty-six (26) separate defeat part marketing violations, twelve (12) occurred before November 2, 2015, and fourteen (14) occurred after November 2, 2015.  B&W Auto and Sparks are jointly and severally liable for these violations, which carry a maximum penalty of $111,290.

B&W Auto and DPG violated § 7522(a)(3)(B) by selling twenty-seven (27) defeat parts intended for use with or as a part of trucks in fourteen (14) sweepstake offerings.[189]  This constitutes twenty-seven (27) separate violations of § 7522(a)(3)(B).  Sparks is liable for these violations as a responsible corporate officer because he knew the violations were occurring, he had the ability to prevent them, and he failed to take any preventative action.  Of these twenty-seven (27) separate violations, nineteen (19) occurred before November 2, 2015, and eight (8) occurred after November 2, 2015.  B&W Auto, DPG, and Sparks are jointly and severally liable for these violations, which carry a combined maximum penalty of $109,130.

---

[187] 40 C.F.R. § 19.4, Table 2.

[188] *See supra* ¶ 57, Table 6.

[189] *See supra* ¶ 52, Table 5.

DPG violated § 7522(a)(3)(B) by offering to sell eighty-eight (88) different defeat parts and by selling 164 defeat parts.[190]  This constitutes 252 separate violations of § 7522(a)(3)(B). Sparks and Stuart are liable as responsible corporate officers for these defeat part marketing violations because they were aware of the sales, they had the authority to prevent the sales, and they failed to prevent or correct such sales.  Of these violations, fifty-eight (58) occurred before November 2, 2015, and the remaining 194 occurred after November 2, 2015.  DPG, Sparks, and Stuart are jointly and severally liable for these violations, which carry a combined maximum penalty of $1,136,090.

### d.  Utah SIP Tampering Violations

Under § 7413(b)(1) of the CAA, it is unlawful for any person to violate "any requirement or prohibition of an applicable implementation plan."[191]  Citizens may bring suit under § 7413(b)(1) to enforce the prohibitions contained within federally-approved SIPs.[192]  Utah's SIP prohibits persons from "remov[ing] or mak[ing] inoperable the [emissions control] system or device or any part thereof, except for the purpose of installing another system or device, or part thereof, which is equally or more effective in reducing emissions from the vehicle to the atmosphere."[193]  Each emission control device or part removed constitutes a separate violation.[194]  Penalties resulting from a violation of Utah's SIP are assessed "per day for each

---

[190] *See supra* ¶¶ 38, 40, Table 4.

[191] 42 U.S.C. § 7413(b)(1).

[192] *US Magnesium,* 690 F.3d at 1159 ("Approved SIPs are enforceable as federal law and may be enforced by the state, the EPA, or individuals under the CAA citizen-suit provision.") (citing 42 U.S.C. §§ 7410(a)(1), 7413, 7604).

[193] Utah Admin. Code r. R307-201-4.

[194] *See id.* ("No person shall remove . . . the [crankcase emissions or exhaust emissions control] system *or device or any part thereof,* except for the purpose of installing another system or device, or part thereof, which is equally or more effective in reducing emissions from the vehicle to the atmosphere.") (emphasis added); *see also* 42 U.S.C. 7413(b) (permitting civil actions "to assess and recover a civil penalty [for SIP violations] of not more than $25,000 per day *for each violation*") (emphasis added).

violation."[195]  When a Utah SIP tampering violation occurs, a penalty is assessed on the first day of the violation and additional penalties are assessed for each subsequent day the violation continues.[196]  Violations that occurred between January 12, 2009, and November 2, 2015, carry a penalty of $37,500 per day of violation.[197]

Defendants object to the court penalizing them for their Utah SIP tampering violations, arguing these penalties are duplicative of the penalties imposed for their § 7522(a)(3)(A) tampering violations.[198]  Defendants raise this objection for the first time in their post-trial proposed findings of facts and conclusions of law.[199]  Neither party has briefed this question for the court, and Defendants do not cite any authority supporting their assertion that the Utah SIP tampering violations—assessed under § 7413(b)(1)—are duplicative of the tampering violations assessed under § 7522(a)(3)(A).  The court is unaware of any such authority.  Defendants instead provide authority for the proposition that a plaintiff "should be limited to recovery under only one count"[200] where "both the federal claim for relief and the state claim for relief in the case at bar arose from the same, identical, operative facts[.]"[201]  Here, UPHE is not recovering the penalties assessed and there are no state law claims—the Utah SIP tampering violations are claims asserted under federal law.[202]  Moreover, tampering violations are assessed per motor

---

[195] 42 U.S.C. § 7413(b); *id.* § 7413(e)(2) ("A penalty may be assessed for each day of violation."); *Env't Texas Citizen Lobby, Inc. v. ExxonMobil Corp.*, 824 F.3d 507, 524 (5th Cir. 2016) ("The CAA provides that in a citizen suit, '[a] penalty may be assessed for each day of violation.'") (citation omitted).

[196] *Env't Texas Citizen Lobby*, 824 F.3d at 524.

[197] 42 U.S.C. § 7413(b); 40 C.F.R. § 19.4, Table 1 (listing an adjusted-for-inflation civil penalty of $37,500 for violations of 42 U.S.C. § 7413(b) that occurred between January 12, 2009, and November 2, 2015).

[198] Dkt. 163 at 39.

[199] *Id.*

[200] *U.S. Indus., Inc. v. Touche Ross & Co.*, 854 F.2d 1223, 1259 (10th Cir. 1988).

[201] *Clappier v. Flynn*, 605 F.2d 519, 531 (10th Cir. 1979).

[202] *See* 42 U.S.C. § 74413(b)(1); *US Magnesium*, 690 F.3d at 1159 ("Approved SIPs are *enforceable as federal law* and may be enforced by the state, the EPA, or individuals under the CAA citizen-suit provision.") (emphasis added).

vehicle,[203] but Utah SIP tampering violations are assessed per day per part removed.  For these reasons, the court overrules Defendants' objection.

B&W Auto violated Utah's SIP by causing the removal of thirty-seven (37) emission control devices or elements of emission control design from eight (8) trucks.[204]  This constitutes thirty-seven (37) separate violations of Utah's SIP.  Sparks is liable as a responsible corporate officer for these Utah SIP tampering violations because he was aware of the violations, he had the ability to prevent them, and he failed to take any preventative or corrective action.  Although a penalty of $37,500 should be assessed "per day for each violation," the court is unable to make a factual finding concerning the number of days each violation occurred.  The court therefore imposes the $37,500 penalty for one day of thirty-seven (37) separate Utah SIP tampering violations.  B&W Auto and Sparks are jointly and severally liable for these Utah SIP tampering violations, which carry a combined maximum civil penalty of $1,387,500.

Hoskins violated Utah's SIP by causing the removal of ten (10) emission control devices, or elements of emission control design, from two (2) trucks.[205]  This constitutes ten (10) separate violations of Utah's SIP.  The court is unable to make a factual finding concerning the number of days each of these violations occurred.  The court therefore imposes the $37,500 penalty for one day of ten (10) separate Utah SIP tampering violations.  Hoskins is liable for these Utah SIP tampering violations, which carry a combined maximum civil penalty of $375,000.

---

[203] *See* 42 U.S.C. § 7524(a) ("Any such violation with respect to paragraph (1), (3)(A), or (4) of section 7522(a) of this title shall constitute a separate offense with respect to each motor vehicle or motor vehicle engine.").

[204] *See supra* ¶ 21, Table 1.

[205] *See supra* ¶ 24, Table 2.

### e.  Utah SIP Owning or Operating Violations

Utah's SIP prohibits persons from "*owning or operating* any motor vehicle or motor vehicle engine registered or principally operated in the State of Utah . . . [without] a system or device for the control of crankcase emissions or exhaust emissions in compliance with the federal motor vehicle rules."[206]  Penalties resulting from a Utah SIP owning or operating violation are assessed "per day for each violation."[207]  Accordingly, a civil penalty is assessed for each day the following are true: (1) a person owns or operates a motor vehicle, (2) the motor vehicle is registered or principally operated in Utah, and (3) the motor vehicle's federally-required emission control devices or systems are inoperable.[208]  Violations that occurred between January 12, 2009, and November 2, 2015, carry a penalty of $37,500 per day of violation.[209]  When penalties are assessed after February 6, 2019, for violations that occurred after November 2, 2015, the penalty is $99,681 per day of violation.[210]

B&W Auto and Hoskins each admit that between January 12, 2012, and July 20, 2017, they owned and operated motor vehicles, the motor vehicles were registered or should have been registered in Utah, and the motor vehicles' federally-required emission control devices or systems were inoperable.[211]  B&W Auto and Hoskins are thus liable for over five years of Utah SIP owning or operating violations.  If B&W Auto and Hoskins owned or operated only one (1)

---

[206] Utah Admin. Code r. R307-201-4 (emphasis added); *see also Id.* R307-201-1 ("R307-201 establishes emission standards for all areas of the state except for sources listed in section IX, Part H of the state implementation plan or located in a PM10 nonattainment or maintenance area.").

[207] 42 U.S.C. § 7413(b).

[208] *Id.*; Utah Admin. Code r. R307-201-4.

[209] 40 C.F.R. § 19.4, Table 1.

[210] 40 C.F.R. § 19.4, Table 2 (providing "the operative statutory civil penalty levels where penalties are assessed on or after February 6, 2019, for violations that occur or occurred after November 2, 2015," and listing a penalty of $99,681 for violations of 42 U.S.C. § 7413(b)).

[211] *See* Dkt. 85 (Answer) ¶¶ 223, 238.

tampered vehicle every day during this time period, they would each be liable for a maximum penalty of $114,425,625.[212]  But during this time period, B&W Auto owned and operated at least thirty (30) separate tampered vehicles, and Hoskins owned two (2) tampered vehicles and operated seventeen (17).  Moreover, B&W Auto still owns three vehicles with inoperable emission control systems: Brodozer, Hercules, and Mega Ram Runner.  B&W Auto and Hoskins are therefore liable for numerous Utah SIP owning or operating violations that continued for years.  The penalties associated with these violations are astronomical.  The court therefore begins its penalties analysis with the understanding that B&W Auto and Hoskins are each liable for their Utah SIP owning or operating violations in the amount of $114,425,625.

## II.    PENALTIES

Under § 7604(a) of the CAA, the court has the authority to "apply any appropriate civil penalties," including fines, for violations of emission standards or limitations.[213]  The court enjoys broad discretion in calculating those fines,[214] but abuses that discretion if it "fail[s] to address certain statutory factors that must be considered in a CAA penalty analysis."[215]  "Section

---

[212] There are 1,390 days between January 12, 2012, and November 2, 2015.  There are 625 days between November 3, 2015, and July 20, 2017.  Multiplying the number of days by the applicable statutory penalty and summing the two categories results in a penalty of $114,425,625.00 ((1,390 days x $37,500 = $52,125,000) + (625 days x $99,681 = $62,300,625) = $114,425,625).

[213] *Pound v. Airosol Co., Inc.*, 498 F.3d 1089, 1094 (10th Cir. 2007) (quoting 42 U.S.C. § 7604(a)); *see Env't Texas Citizen Lobby*, 824 F.3d at 523 ("Under the CAA, district courts have jurisdiction in citizen suits 'to enforce' emission standards or limitations and 'to apply any appropriate civil penalties.'") (quoting 42 U.S.C. § 7604(a)); 42 U.S.C. §§ 7413(b), 7604(g).

[214] *Pound,* 498 F.3d at 1094 ("The district court's weighing of [findings of fact in support of a CAA penalty], and its penalty determination, are reviewed for abuse of discretion.").

[215] *Id.* at 1097–98.  There is a minor ambiguity concerning which factors the court should consider when assessing penalties.  In relevant part, § 7413 provides, "[i]n determining the amount of any penalty to be assessed under this section or section 7604(a) of this title, . . . the court . . . shall take into consideration" several factors.  42 U.S.C. § 7413(e)(1).  However, § 7524 also provides, "[i]n determining the amount of any civil penalty to be assessed under this subsection, the court shall take into account" several factors.  *Id.* § 7524(b).  Because there is considerable overlap between the factors listed in § 7413(e)(1) and § 7524(b) and because this action was brought under § 7604(a), the court will use the factors listed in § 7413(e)(1).

7413(e)(1) sets forth the factors that a court 'shall' take into consideration in determining the penalty, if any, to be assessed for a violation of the Act:"

> [1] the size of the business, [2] the economic impact of the penalty on the business, [3] the violator's full compliance history and good faith efforts to comply, [4] the duration of the violation as established by any credible evidence (including evidence other than the applicable test method), [5] payment by the violator of penalties previously assessed for the same violation, [6] the economic benefit of noncompliance, and [7] the seriousness of the violation.[216]

To calculate civil penalties, the court may employ either "a 'bottom up' approach whereby the economic benefit a violator gained by noncompliance is established and then adjusted upward or downward, [or] a 'top down' approach in which the maximum possible penalty is first established, then reduced following an examination of 'mitigating' factors."[217] This court will employ the "top down" approach.[218]  Accordingly, this court will start with the maximum penalty and "then consider the factors described in 42 U.S.C. § 7413(e) to determine

---

[216] *Pound*, 498 F.3d at 1094 (quoting 42 U.S.C. § 7413(e)(1)).  At the close of trial, Defendants objected to the imposition of excessive fines in violation of the Eighth Amendment.  *See* Dkt. 160 at 217:18–22.  In particular, Defendants objected to the imposition of fines stemming from their daily Utah SIP violations.  *Id.*  Defendants did not brief the question as to whether the Eighth Amendment's Excessive Fines Clause applies to the CAA's prohibition on SIP violations, and the court is unaware of any authority addressing this issue.  Given the significant mitigation of penalties here, the court concludes this objection is inapplicable.

[217] *Pound*, 498 F.3d at 1095 (citing *United States v. Mun. Auth. of Union Twp.,* 150 F.3d 259, 265 (3d Cir.1998)).

[218] *Id.* ("In considering fines under the Act, courts generally presume that the maximum penalty should be imposed.") (quoting *United States v. B & W Inv. Properties*, 38 F.3d 362, 368 (7th Cir. 1994)).

what degree of mitigation, if any, is proper."[219]  In evaluating each factor, the court is mindful of

three general purposes of civil penalties: deterrence,[220] restitution,[221] and retribution.[222]

First, the court considers "the size of the business [and] the economic impact of the

penalty on the business."[223]  In evaluating this factor, courts have considered the business's

ability to liquidate assets,[224] the business's ability to get loans,[225] the business's earning

---

[219] *Id.* (citing *United States v. Anthony Dell'Aquila, Enterprises & Subsidiaries*, 150 F.3d 329, 339 (3d Cir. 1998)).

[220] *See Hudson v. United States*, 522 U.S. 93, 102 (1997) (recognizing "all civil penalties have some deterrent effect.").

[221] *See* 42 U.S.C. § 7604(g)(2) (providing the court with discretion "to order that such civil penalties, in lieu of being deposited in the fund . . . be used in beneficial mitigation projects which are consistent with this chapter and enhance the public health or the environment.").

[222] *See Tull v. United States*, 481 U.S. 412, 422 (1987) ("The legislative history of the [Clean Water] Act reveals that Congress wanted the district court to consider the need for retribution and deterrence, in addition to restitution, when it imposed civil penalties."); *Pound*, 498 F.3d at 1094 n.2 ("The penalty provisions of the CAA and the Clean Water Act (CWA) are virtually identical; thus, *the CWA cases are instructive in analyzing issues arising under the CAA*.") (emphasis added) (citations omitted).

[223] 42 U.S.C. § 7413(e)(1).

[224] *See Sierra Club v. El Paso Gold Mines, Inc.*, No. Civ.A.01 PC 2163 OES, 2003 WL 25265873, at *11 (D. Colo. Feb. 10, 2003).

[225] *See United States v. R.M. Packer Co., Inc.*, No. 1:16-10767-DJC, 2019 WL 4770666, at *3 (D. Mass. Sept. 30, 2019).

capacity,[226] the business's financial health,[227] and the financial condition of the business's parent company.[228]  The violator bears the burden of proving its inability to pay a civil penalty.[229]

Second, the court considers "the violator's full compliance history and good faith efforts to comply" with the CAA.[230]  In evaluating this factor, courts have considered "whether defendants have committed similar violations in the past, and the duration and nature of all such violations, including whether the violations are perpetual or sporadic."[231]  Failure to correct known violations weighs against mitigation of penalties.[232]

Third, the court considers "the duration of the violation as established by any credible evidence."[233]  In evaluating this factor, some courts consider "the overall length of the period during which the violations occurred," while other courts consider "the duration of each violation within a series of violations."[234]  This court will employ the former method.  Under this method,

---

[226] *United States v. Vista Paint Corp.*, No. EDCV 94-0127 RT, 1996 WL 477053, at *12 (C.D. Cal. Apr. 16, 1996), *aff'd*, 129 F.3d 129 (9th Cir. 1997) (unpublished) (concluding defendant's "earning capacity and borrowing capacity are such that the total civil penalties the Court adjudicates against it in this case will not undermine its financial structure and place it in jeopardy of 'going out-of-business.'").

[227] *See United States v. Oliver*, No. 3:06-cv-196 JWS, 2009 WL 10671371, at *15 (D. Alaska June 25, 2009), *aff'd*, 394 F. App'x 376 (9th Cir. 2010) (unpublished) (finding the business "poorly capitalized"); *Dell'Aquila, Enterprises & Subsidiaries*, 150 F.3d at 339 (holding "the court abused its discretion in refusing to consider appellants' financial records.").

[228] *See Mun. Auth. of Union Twp.*, 150 F.3d at 268–69.

[229] *See El Paso Gold Mines, Inc.*, 2003 WL 25265873, at *11 (citing *Pirg v. Powell Duffryn Terminals, Inc.*, 720 F. Supp. 1158, 1165–66 (D.N.J. 1989), *aff'd in part, rev'd in part sub nom.*, 913 F.2d 64 (3d Cir. 1990) ("While it is not binding on the Court, the EPA's 1986 penalty policy provides that the defendant has the principle burden of establishing that the penalty should be reduced because of the economic impact. Defendant has failed to demonstrate that assessing a severe penalty would jeopardize defendant's continued operation.")); *United States v. Gulf Park Water Co., Inc.*, 14 F. Supp. 2d 854, 868 (S.D. Miss. 1998) ("Where a violator cannot show that a penalty will have a ruinous effect, the economic impact factor under Section 309(d) [of the Clean Water Act] will not reduce the penalty.") (citations omitted).

[230] 42 U.S.C. § 7413(e)(1).

[231] *Gulf Park Water Co.*, 14 F. Supp. 2d at 864 (citation omitted).

[232] *R.M. Packer Co.*, 2019 WL 4770666, at *2; *Oliver*, 2009 WL 10671371, at *15.

[233] 42 U.S.C. § 7413(e)(1).

[234] *Env't Texas Citizen Lobby*, 824 F.3d at 531 (citations and internal quotation marks omitted).

mitigation is appropriate for a short duration of violations, but mitigation is not appropriate for a long duration of violations.

Fourth, the court considers any "payment by the violator of penalties previously assessed for the same violation."[235]  There is no evidence that Defendants paid penalties for their CAA violations.  Accordingly, this factor will not play into the court's mitigation analysis.

Fifth, the court considers "the economic benefit of noncompliance" with the CAA.[236] "[T]he goal of the economic benefit analysis is to prevent a violator from profiting from its wrongdoing."[237]  The "economic benefit" analysis "requires the district court to apply a retrospective rather than a prospective analysis, but the court has discretion in deciding how to calculate the economic benefits received from the defendant due to its noncompliance with the CAA."[238]  "Since it is difficult to prove the precise economic benefit to a polluter, a reasonable approximation of economic benefit is sufficient."[239]  To approximate this economic benefit, courts often consider the economic benefit violators obtained by delaying or avoiding "costs[] that should have been spent[] to achieve compliance" with environmental regulations.[240] Because the delayed or avoided capital expenditure inquiry is not relevant here, the court will

---

[235] 42 U.S.C. § 7413(e)(1).

[236] *Id.*

[237] *Mun. Auth. of Union Twp.*, 150 F.3d at 263; *Pound*, 498 F.3d at 1099–1100 (agreeing with plaintiff that "any profits realized through the sale, or offer of sale, of a prohibited product ought to be included when assessing the economic benefit of a CAA violation, the rationale being that one ought not to profit from one's wrongful conduct.").

[238] *Pound*, 498 F.3d at 1099.

[239] *United States v. Smithfield Foods, Inc.*, 972 F. Supp. 338, 348 (E.D. Va. 1997) (citation omitted); *Pound*, 498 F.3d at 1100 (holding the district court was "free to consider any reasonable alternative to determine Airosol's economic benefit of noncompliance—such as, the EPA's CAA Stationary Source Civil Penalty Policy and/or some degree of profits gained—as long as its analysis is not in conflict with the CAA or basic economic principles.").

[240] *Pound*, 498 F.3d at 1100; *see also U.S. ex rel. Adm'r of E.P.A. v. CITGO Petroleum Corp.*, 723 F.3d 547, 552 (5th Cir. 2013) ("Generally, courts consider the financial benefit to the offender of delaying capital expenditures and maintenance costs on pollution-control equipment.") (citations omitted).

46

consider "any profits [Defendants] realized through the sale, or offer of sale, of prohibited product[s]."[241]

Sixth, the court considers "the seriousness of the violation."[242]  In evaluating this factor, courts have considered: "(1) the number of violations; (2) the duration of noncompliance; (3) the significance of the violation (degree of exceedance and relative importance of the provision violated); and (4) the actual or potential harm to human health and the environment."[243]  In evaluating the harm to human health and the environment, the court is mindful that "the mere absence of a measurable harm to the public or the environment stemming from a particular CAA violation does not necessarily indicate that a violation is not 'serious.'"[244]  "In other words . . .  a court may still impose a penalty if it finds there is a risk or potential risk of environmental harm, even absent proof of actual deleterious effect."[245]

Finally, the court may consider "other factors as justice may require."[246]  In evaluating this factor, one court explained that "courts may either increase or decrease the penalty in light of other matters, such as bad-faith conduct of the violator, a violator's attitude toward achieving compliance, and the violator's ability to comply with the Act."[247]  It is improper for a court to mitigate penalties because a citizen (rather than the EPA) brought the suit, the plaintiff did not

---

[241] *Pound*, 498 F.3d at 1099.

[242] 42 U.S.C. § 7413(e)(1).

[243] *Gulf Park Water Co.*, 14 F. Supp. 2d at 859 (citation omitted).

[244] *Pound*, 498 F.3d at 1099.

[245] *Id.*

[246] 42 U.S.C. § 7413(e)(1).

[247] *Smithfield Foods, Inc.*, 972 F. Supp. at 353 (citation omitted).

establish that defendants intentionally violated the CAA, or the plaintiff brought the suit out of economic interests rather than environmental concerns.[248]

The penalties assessed herein against Defendants for violating the CAA are payable to the United States Treasury.[249]  These penalties are nondischargeable in bankruptcy under 11 U.S.C. § 523(a)(7) because they are payable to and for the benefit of the United States Treasury and are not compensation for actual pecuniary loss.[250]

### a. Civil Penalties for Tampering and Defeat Part Violations

B&W Auto and Sparks are liable for eight (8) tampering violations and twenty-four (24) defeat part violations.  The maximum penalty for their tampering violations is $30,000, and the maximum penalty for their defeat part violations is $90,985.  Hoskins is liable for two (2) tampering violations and five (5) defeat part violations.  The maximum penalty for his tampering violations is $7,500, and the maximum penalty for his defeat part violations is $18,750.  Before assessing penalties, the court considers the factors set forth in § 7413(e)(1) of the CAA.[251]

One of Defendants' central arguments for mitigation is that their violations are less severe because: (1) many of the parts removed and installed involved vehicles that left the state, (2) many of the defeat parts sold—either as a part of a vehicle or otherwise—were sold to buyers outside of Utah, and (3) many of the vehicles operated in violation of Utah's SIP were eventually sold to buyers outside of Utah.  But Defendants' violations are no less serious simply because

---

[248] *Pound*, 498 F.3d at 1096.

[249] *WildEarth Guardians v. Pub. Serv. Co. of Colorado*, 690 F.3d 1174, 1180 (10th Cir. 2012).

[250] *See* 11 U.S.C. § 523(a)(7); *In re Jones*, 311 B.R. 647, 656 (Bankr. M.D. Ga. 2004) ("The Court is persuaded that the civil penalty for violation of the Clean Water Act by discharging oil into a navigable water is not compensation for actual pecuniary loss. Thus, the Court is persuaded that the civil penalties under both subsections of the Clean Water Act are nondischargeable in bankruptcy.").

[251] *See Pound*, 498 F.3d at 1098–99 (explaining "the Act clearly requires that the district court consider" the § 7413(e)(1) factors in a CAA penalty analysis).

they exported their violations to other parts of the country.  The violations were numerous, occurred over a long period of time, significantly increased the toxic pollutants emitted by diesel trucks, and pose a serious risk to human health.  At bottom, the tampered trucks and the defeat parts continue to endanger human health, regardless of where they are.

Other factors also weigh against mitigation: (1) B&W Auto can afford the penalties for its tampering and defeat part violations, (2) B&W Auto produced no evidence of good faith efforts to comply with the CAA, (3) B&W Auto has not restored any of the tampered vehicles, (4) these violations were ongoing and occurred over many months, (5) B&W Auto produced no evidence suggesting its violations have ceased to cause damage to ambient air quality, and (6) the violations are serious.

Still, one factor warrants mitigating the penalty for B&W Auto's tampering and defeat part violations: the economic benefit of noncompliance.  B&W Auto did not make a significant amount of money from these violations.  In fact, B&W Auto had to spend time, money, and resources removing federally-required emission control devices and installing defeat parts.  On average, B&W Auto made only $1,500 in direct profit for each vehicle it sold via the sweepstakes.  Although B&W Auto has enjoyed significant indirect economic benefits from its violations, its direct economic benefits are small.  Because the direct economic benefits are relatively small, the court concludes some mitigation is warranted.  Accordingly, a penalty of $25,000 is appropriate for B&W Auto's eight (8) tampering violations, and a penalty of $80,000 is appropriate for B&W Auto's twenty-four (24) defeat part violations.  B&W Auto and Sparks are jointly and severally liable for a penalty of $105,000.

Likewise, a majority of the factors weigh in favor of imposing a civil fine against Hoskins: (1) Hoskins can afford the penalties for his tampering and defeat part violations, (2) Hoskins produced no evidence of any good faith efforts to comply with the CAA, (3) Hoskins produced no evidence indicating his violations ceased to cause damage to ambient air quality, and (4) Hoskins's violations are serious.  But the economic benefit factor also warrants mitigating Hoskins's tampering and defeat part violations.  Hoskins invested resources modifying the trucks, and he lost money when he sold the two (2) tampered trucks to B&W Auto.  Accordingly, the court concludes a penalty of $5,000 is appropriate for Hoskins's two (2) tampering violations, and a penalty of $15,000 is appropriate for his five (5) defeat part violations.  Hoskins is therefore liable for a penalty of $20,000.

**b.  Civil Penalties for Defeat Part Marketing Violations**

B&W Auto, DPG, and Sparks are jointly and severally liable for twenty-seven (27) defeat part marketing violations for the sale of sweepstakes trucks.  The maximum penalty for these violations is $109,130.  Having considered the § 7413(e)(1) factors, the court concludes some mitigation is warranted for these violations.

One factor, the economic benefit of noncompliance, again weighs in favor of mitigation. Although DPG made an average of $50,000 for each sweepstakes truck sold, B&W Auto and Sparks collectively made an average of $1,500 for each sweepstakes truck.  Given the relatively small direct profit B&W Auto and Sparks made for each truck, some mitigation is warranted. The remaining factors weigh in favor of assessing civil fines: (1) B&W Auto, DPG, and Sparks can each manage the economic impact of this shared penalty; (2) DPG and Sparks produced minimal evidence of good faith efforts to comply with the Act; (3) B&W Auto, DPG, and Sparks have not restored or offered to restore any of the tampered sweepstakes trucks; (4) the violations

were continuous and ongoing for years; and (5) the violations caused several diesel trucks to emit dangerous amounts of toxic pollutants.  Accordingly, the court concludes a penalty of $90,000 is appropriate for these defeat part marketing violations.  B&W Auto, DPG, and Sparks are jointly and severally liable for this penalty.

For the sale of non-sweepstakes trucks, B&W Auto and Sparks are liable for twenty-six (26) defeat part marketing violations.  The maximum penalty for these violations is $111,290.  Most factors weigh against mitigating this penalty: (1) Sparks produced minimal evidence of his good faith efforts to comply with the Act, (2) these violations were continuous and ongoing for years, (3) B&W Auto has not restored any of the tampered vehicles, (4) B&W Auto and Sparks generated significant revenue from these sales, and (5) these violations were serious because they caused diesel trucks to emit a significant amount of toxic pollutants.  However, B&W Auto and Sparks did produce limited evidence about the economic impact of a large monetary penalty on their finances.  After carefully weighing these factors, the court concludes some mitigation is warranted.  Accordingly, B&W Auto and Sparks are jointly and severally liable for a penalty of $90,000 for their defeat part marketing violations.

DPG, Sparks, and Stuart are liable for 252 defeat part marketing violations for advertising and selling defeat parts.  The maximum penalty for these violations is $1,136,090.  Several factors warrant mitigating this penalty.  First, along with the other penalties this court will assess, a $1.1 million penalty likely would have a serious economic impact on B&W Auto, Sparks, and Stuart.  Second, advertising defeat parts is not as serious a violation as actually selling defeat parts.  A defeat part injected into the stream of commerce for use on a motor vehicle obviously possesses a higher potential to cause damage to ambient air quality than a defeat part that has yet to be sold.  Third, when DPG uploaded Premier Performance's store to its

website, DPG did not know that Premier Performance's store included eighty-eight (88) different defeat parts that violated the CAA.  As soon as Stuart learned that the defeat parts violated the CAA, Stuart removed the parts from DPG's website and hired an individual to recover the 164 defeat parts DPG had sold.  To date, five (5) defeat parts have been recovered.  Fourth, DPG only made $21,000 from its sale of defeat parts.  The court therefore concludes the § 7413(e)(1) factors weigh in favor of significant mitigation.  Accordingly, DPG, Sparks, and Stuart are jointly and severally liable in the amount of $227,218 for their defeat part marketing violations.

### c.  Civil Penalties for Utah SIP Tampering Violations

B&W Auto and Sparks are liable for thirty-seven (37) Utah SIP tampering violations. The maximum penalty for these violations is $1,387,500.  Hoskins is liable for ten (10) Utah SIP tampering violations.  The maximum penalty for these violations is $375,000.  Having considered the § 7413(e)(1) factors, the court concludes mitigation is warranted in view of the economic impact of the penalties and the economic benefit of noncompliance.

First, along with the other penalties the court will assess, B&W Auto, Sparks, and Hoskins likely cannot pay the full civil penalties for their Utah SIP tampering violations. Second, the direct economic benefit B&W Auto, Sparks, and Hoskins enjoyed as a result of their Utah SIP tampering violations pales in comparison to the civil penalties for these violations. Although the remaining § 7413(e)(1) factors weigh against mitigating penalties, the court nevertheless concludes substantial mitigation is necessary.  Accordingly, B&W Auto and Sparks are jointly and severally liable for their Utah SIP tampering violations in the amount of $138,700, and Hoskins is liable for his Utah SIP tampering violations in the amount of $37,500.

### d. Civil Penalties for Utah SIP Owning or Operating Violations

B&W Auto and Hoskins are each liable for over five years of Utah SIP owing or operating violations. Even accounting for only a single violating automobile operating during that period, these violations carry a maximum penalty of $114,425,625. Having considered the § 7413(e)(1) factors, the court concludes mitigation is necessary.

Most importantly, B&W Auto and Hoskins argue mitigation is warranted because they did not operate the tampered trucks for long periods of time. The court agrees that this bears on the seriousness of their Utah SIP owning or operating violations and warrants mitigation. Mitigation is also warranted because the economic impact of a $114 million penalty would be ruinous for B&W Auto and Hoskins. Although the other § 7413(e)(1) factors heavily weigh against mitigating penalties, the court concludes a mitigation of penalties is warranted for the Utah SIP owning or operating violations. Accordingly, B&W Auto is liable in the amount of $114,426 for its Utah SIP owning and operating violations, and Hoskins is liable in the amount of $28,607 for his Utah SIP owning and operating violations.

### e. Mitigation Project

Under 42 U.S.C. § 7604(g)(2), district courts may "earmark up to $100,000 of any civil penalty they award to 'be used in beneficial mitigation projects which are consistent with this chapter and enhance the public health or the environment.'"[252] The court concludes the Davis County Tampered Diesel Truck Restoration Program is an appropriate mitigation project under § 7604(g)(2). This program is approved by the Davis County Health Department[253] and is used to

---

[252] *WildEarth Guardians*, 690 F.3d at 1188 (quoting 42 U.S.C. § 7604(g)(2)).

[253] *See* 42 U.S.C. § 7604(g)(2) ("The court shall obtain the view of the Administrator in exercising such discretion and selecting any such projects."); Pl.'s Bench Trial Ex. 70 ("Tampered Diesel Truck Restoration Program Agreement Between Utah Physicians for a Healthy Environment and Davis County Health Department").

restore tampered diesel trucks to bring them into compliance with the Act.  B&W Auto, DPG, and Sparks are therefore ordered to pay the $90,000 penalty for their defeat part marketing violations to the Davis County Tampered Diesel Truck Restoration Program.

### III.   INJUNCTIVE RELIEF

Congress enacted the CAA "to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population."[254]  "[T]o encourage citizen participation in the enforcement of standards and regulations established under th[e] Act," Congress enacted the citizen suit provision, § 7604.[255] This provision "afford[s] citizens very broad opportunities to participate in the effort to prevent and abate air pollution"[256] and entrusts this court with the power "to apply any appropriate civil penalties."[257]  One of those civil penalties is injunctive relief.[258]

UPHE seeks a permanent injunction.  To obtain a permanent injunction, UPHE must demonstrate: "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction."[259]  UPHE has satisfied each of these elements.

---

[254] 42 U.S.C. § 7401(b)(1).

[255] *Pound*, 498 F.3d at 1097 (citation omitted).

[256] *Id.* (citation omitted).

[257] 42 U.S.C. § 7604(a).

[258] *Sierra Club v. Franklin Cty. Power of Illinois, LLC*, 546 F.3d 918, 935 (7th Cir. 2008) ("Although this district court case is not binding on us, we agree that 'a plain reading of the statute' implies 'that the [injunctive remedies provision] applies to actions under [section 7604](a)(3).'") (alterations in original) (quoting *United States v. Am. Elec. Power Serv. Corp.*, 137 F. Supp. 2d 1060, 1067 (S.D. Ohio 2001)).

[259] *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006) (citations omitted).

First, UPHE demonstrated that Defendants caused irreparable injury by emitting toxic pollutants into the air UPHE's members breathe.[260]  Defendants' actions caused a dramatic increase in the NOx and particulate matter emitted by certain diesel trucks along the Wasatch Front.  This exhaust contributed to the concentration of Criteria Air Pollutants UPHE's members breathe.  And Defendants cannot disclaim responsibility for the harm they have caused by pointing to the CAA violations of others because a third party's violation does not erase or neutralize Defendants' violations.[261]  Accordingly, the court concludes UPHE suffered irreparable injury.

Second, monetary damages cannot compensate UPHE for the injuries its members suffered.  Defendants' actions caused UPHE's members to breathe toxic air pollutants and avoid outdoor recreational activities.[262]  This represents both a personal injury and an environmental injury.  The court is mindful that "[e]nvironmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.,* irreparable."[263]

Third, the balance of hardships weighs in favor of a permanent injunction.  The CAA prohibits any person from violating the Act's emission standards or limitations[264] and also prohibits any person from violating a SIP.[265]  Several Defendants willfully violated these

---

[260] *See Utah Physicians*, 374 F. Supp. 3d  at 1132–33 (concluding UPHE suffered an injury-in-fact because its members "suffer[ed] adverse health effects from elevated air pollution in the Wasatch Front or exposure to diesel exhaust," and from avoiding "outdoor recreational activities due to their concerns about fine particulate matter pollution.").

[261] *See Smithfield Foods*, 972 F. Supp. at 342 n.8 ("A violator cannot escape liability or penalties for Permit violations simply by pointing to the violations of others. Each must do its part to clean up the environment. Only then will the goals of the Clean Water Act be achieved.").

[262] *Utah Physicians*, 374 F. Supp. 3d at 1132–33.

[263] *Amoco Prod. Co. v. Vill. of Gambell, AK*, 480 U.S. 531, 545 (1987).

[264] 42 U.S.C. § 7604(a).

[265] *Id.* § 7413(b)(1).

prohibitions and injured UPHE's members.  The balance of harms weighs in favor of requiring Defendants to comply with the law.

Fourth, the public interest is served by permanently enjoining Defendants from further CAA violations because the CAA serves the public interest by protecting and enhancing the quality of the air resources along the Wasatch Front.[266]

Accordingly, Defendants are permanently enjoined from: (1) removing or rendering inoperative federally-required emission control systems in diesel trucks, 42 U.S.C. § 7522(a)(3)(A); (2) installing parts or components in diesel trucks that bypass, defeat, or render inoperative federally-required emission control systems, 42 U.S.C. § 7522(a)(3)(B); (3) offering to sell or selling defeat parts, 42 U.S.C. § 7522(a)(3)(B); (4) removing or making inoperable a federally-required emission control system, device, or any part thereof, 42 U.S.C. § 7413(b)(1), Utah Admin. Code r. R307-201-4; and (5) owning or operating vehicles with disabled emission-control systems, 42 U.S.C. § 7413(b)(1), Utah Admin. Code r. R307-201-4.

## IV.     AWARD OF COSTS AND REASONABLE ATTORNEY FEES

"The court, in issuing any final order in any action brought pursuant to [§ 7604(a)], may award costs of litigation (including reasonable attorney and expert witness fees) to any party, whenever the court determines such award is appropriate."[267]  An award is appropriate here because UPHE obtained success on the merits of its claims and did so while serving the public interest by enforcing the Act.[268]  By bringing this action against Defendants, UPHE promoted the

---

[266] *See Id.* § 7401(b)(1).

[267] *Id.* § 7604(d).

[268] *See Pound*, 498 F.3d at 1100–03.

Act's goal of reducing ambient air pollution.[269]  UPHE is accordingly entitled to an award of litigation costs, including reasonable attorney fees.

## CONCLUSION

Based on the court's findings of fact and conclusions of law, IT IS HEREBY ORDERED:

1. Hoskins is liable to the United States for violating 42 U.S.C. §§ 7413(b)(1) & 7522(a)(3) and shall pay to the United States Treasury a civil penalty in the amount of $86,107 within 120 days of the entry of final judgment in this action;

2. B&W Auto is liable to the United States for violating 42 U.S.C. § 7413(b)(1) and shall pay to the United States Treasury a civil penalty in the amount of $114,426 within 120 days of the entry of final judgment in this action;

3. B&W Auto and Sparks are jointly and severally liable to the United States for violating 42 U.S.C. §§ 7413(b)(1) & 7522(a)(3) and shall pay to the United States Treasury a civil penalty in the amount of $333,700 within 120 days of the entry of final judgment in this action;

4. B&W Auto, Sparks, and DPG are jointly and severally liable to the United States for violating 42 U.S.C. § 7522(a)(3)(B) and shall pay a civil restoration fine in the amount of $90,000 to Davis County, Utah within 120 days of the entry of final judgment in this action, for use in the Davis County Tampered Diesel Truck Restoration Program;

5. DPG, Sparks, and Stuart are jointly and severally liable to the United States for violating 42 U.S.C. § 7522(a)(3)(B) and shall pay to the United States Treasury a civil penalty in the amount of $227,218 within 120 days of the entry of final judgment in this action;

---

[269] *Id.* at 1102.

6. Defendants are permanently enjoined from: (1) removing or rendering inoperative federally-required emission control systems in diesel trucks; (2) installing parts or components in diesel trucks that bypass, defeat, or render inoperative federally-required emission control systems; (3) offering to sell or selling defeat parts; (4) removing or making inoperable the federally-required emission control system, device, or any part thereof; and (5) owning or operating vehicles with disabled emission-control systems; and

7. Plaintiff UPHE has obtained success on the merits of its CAA claims and is entitled to costs of litigation, including reasonable attorney and expert witness fees under 42 U.S.C. § 7604(d).  UPHE may submit an application for an award of costs and reasonable attorney fees under 42 U.S.C. § 7604(d) within thirty (30) days of the entry of judgment in this action.

SO ORDERED this 6th day of March 2020.

BY THE COURT:

ROBERT J. SHELBY

United States Chief District Judge