**FILED**
**United States Court of Appeals**
**Tenth Circuit**

<u>**PUBLISH**</u>

**UNITED STATES COURT OF APPEALS**

**December 28, 2021**

**FOR THE TENTH CIRCUIT**

**Christopher M. Wolpert**
**Clerk of Court**

---

UTAH PHYSICIANS FOR A HEALTHY
ENVIRONMENT,

      Plaintiff - Appellee,

v.

No. 20-4043

DIESEL POWER GEAR, LLC; B&W
AUTO, LLC d/b/a Sparks Motors, LLC;
DAVID W. SPARKS; and JOSHUA
STUART,

      Defendants - Appellants,

and

4x4 ANYTHING LLC,

      Defendants.

---

**Appeal from the United States District Court**
**for the District of Utah**
**(D.C. No. 2:17-CV-00032-RJS)**

---

Cole S. Cannon (Janet M. Conway, on the briefs), Cannon Law Group, Salt Lake City,
Utah, for Defendants-Appellants.

Reed Zars (George E. Hays, Bellevue, Washington, with him on the brief), Laramie,
Wyoming, for Plaintiff-Appellee.

---

Before **HARTZ**, **BRISCOE**, and **CARSON**, Circuit Judges.

---

**HARTZ**, Circuit Judge.

_____

Defendants' businesses focus on large diesel trucks and related parts, merchandise, and media. In 2017 Defendants were sued by Plaintiff Utah Physicians for a Healthy Environment (UPHE), a nonprofit organization that alleged, among other things, that Defendants were tampering with required emission-control devices and installing so-called "defeat devices" in violation of the Clean Air Act (CAA) and Utah's State Implementation Plan. After a bench trial the court entered judgment in favor of UPHE, finding Defendants collectively liable for hundreds of violations of the CAA and Utah's plan and assessing over $760,000 in civil penalties. On appeal Defendants challenge UPHE's Article III and statutory standing, the district court's inclusion of certain kinds of transactions in its tabulation of violations, and the court's penalty analysis. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm in part and reverse in part. Although we reject most of Defendants' arguments, we must remand to the district court for additional proceedings because (1) UPHE lacks Article III standing to complain of conduct by Defendants that has not contributed to air pollution in Utah's Wasatch Front and (2) the district court needs to reevaluate the seriousness of Defendants' violations of the Utah plan's anti-tampering provision.

## I.   STATUTORY FRAMEWORK

The CAA distributes responsibilities among the States and the federal Environmental Protection Agency (EPA) in what has been called a "cooperative-federalism approach." *US Magnesium, LLC v. EPA*, 690 F.3d 1157, 1159 (10th Cir.

2012). The EPA promulgates National Ambient Air Quality Standards (NAAQS), which set limits on maximum concentrations of various pollutants. *See Nat'l Parks Conservation Ass'n, Inc. v. TVA*, 480 F.3d 410, 412 (6th Cir. 2007); 42 U.S.C. § 7409. To date, the EPA has established NAAQS for six pollutants: carbon monoxide, lead, oxides of nitrogen, ozone, sulfur oxides, and particulate matter (with separate standards for PM10 (particles with a diameter less than 10 micrometers) and PM2.5 (particles with a diameter less than 2.5 micrometers)). *See* 40 C.F.R. §§ 50.4–12.

The States have the primary responsibility to ensure that those limits are satisfied. *See* 42 U.S.C. § 7407(a). Each State must submit to the EPA a state implementation plan (SIP) that "provides for implementation, maintenance, and enforcement of [NAAQS]." *Id.* § 7410(a)(1). The SIP is subject to approval by the EPA Administrator. *See id.* § 7410(k).

State SIP submissions must include "a list of all areas (or portions thereof) in the State, designating [them] as" (1) nonattainment (areas that fail to meet, or contribute to another area failing to meet, the NAAQS); (2) attainment (areas that meet, and do not contribute to another area not meeting, the NAAQS); or (3) unclassifiable (areas that cannot be classified on the basis of available information). *See id*. § 7407(d). The EPA may modify a State's proposed designations (including boundaries) as necessary but must first give the State an opportunity to respond. *See id.* § 7407(d)(1)(B)(ii). The consequences of being a nonattainment area are significant. The State must submit a corrective plan, *see id.*

§ 7502(c) (setting out requirements for nonattainment plan provisions); *Ukeiley v. EPA*, 896 F.3d 1158, 1161 (10th Cir. 2018), and federal assistance is unavailable for any activity that does not conform to the implementation plan, *see* 42 U.S.C. § 7506(c)(1), (5). Nonattainment areas may encompass territory in multiple states. *See id.* § 7407(d)(1)(A)(i) (defining *nonattainment area* as "any area that does not meet (*or that contributes to ambient air quality in a nearby area that does not meet*) the national primary or secondary air quality standard for the pollutant" (emphasis added)). For example, several PM2.5 nonattainment areas cross state boundaries.[1]

As a general rule, the States' principal responsibility is stationary sources like factories and power plants (governed by Title I of the CAA), while the EPA has primary responsibility over mobile sources (governed by Title II of the Act).[2] In particular, SIPs must provide for administration and enforcement of the permitting programs described in Title V of the CAA. *See id.* §§ 7410(a)(2)(C), 7661a(d). The

---

[1] *See* Air Quality Designations for the 2006 24-Hour Fine Particle (PM2.5), 74 Fed. Reg. 58688, 58696 (Nov. 13, 2009) (identifying 24-hour PM2.5 nonattainment areas in, for instance, (1) "Logan, UT-ID," (2) "New York-N. New Jersey-Long Island, NY-NJ-CT," and (3) "Philadelphia-Wilmington, PA-NJ-DE").

[2] *See Engine Mfrs. Ass'n v. EPA*, 88 F.3d 1075, 1078–79 (D.C. Cir. 1996) ("The CAA contemplated that the states would carry out their responsibility chiefly by regulating stationary sources, such as factories and power plants."); Approval and Promulgation of Implementation Plans; California; California Mobile Source Regulations, 83 Fed. Reg. 8403, 8403 (proposed Feb. 27, 2018) ("Emissions sources contributing to ambient air pollution levels can be divided into two basic categories: Stationary emissions sources and mobile emissions sources. As a general matter, the CAA assigns stationary source regulation and SIP development responsibilities to the states through title I of the Act and assigns mobile source regulation to the EPA through title II of the Act.").

4

permit programs contained in SIP proposals must cover "[a]ny major source." 40

C.F.R. § 70.3(a). "The general definition of 'major source' . . . includes any source

that emits or has the potential to emit 100 tons per year of any air pollutant. Lower

thresholds apply to emissions of hazardous air pollutants and to sources located in

certain nonattainment areas." David R. Wooley & Elizabeth M. Morss, *Clean Air Act*

*Handbook*, § 8:7 n.1 (Sept. 2021 update); *see* 42 U.S.C. § 7602(j); 40 C.F.R.

§§ 70.2, 70.3(a). "Because EPA and the states have taken steps to exclude smaller

sources from the Title V permitting program, most Title V permits are issued to

'major sources.'" Wooley & Morss, *Clean Air Act Handbook* § 8:7.

    In contrast, mobile pollution sources, such as motor vehicles, are primarily

subject to EPA regulation under Title II of the CAA. "Th[is] regulatory difference"

between stationary and mobile sources has been attributed to "the difficulty of

subjecting motor vehicles, which readily move across state boundaries, to control by

individual states," as well as Congress's concern that allowing each State to fashion

its own regulations for motor vehicles would give rise to "an anarchic patchwork of

federal and state regulatory programs, a prospect which threatened to create

nightmares for the manufacturers." *Engine Mfrs. Ass'n v. EPA*, 88 F.3d 1075, 1079

(D.C. Cir. 1996) (internal quotation marks omitted). In fact, the CAA explicitly

prohibits States and localities from "adopt[ing] or attempt[ing] to enforce any

standard relating to the control of emissions from new motor vehicles or new motor

vehicle engines subject to [Title II Motor Vehicle Emission and Fuel Standards]." 42

U.S.C. § 7543(a). The EPA has exempted only California from the prohibition

against state or local emission standards for new motor vehicles. *See Comm. for a Better Arvin v. EPA*, 786 F.3d 1169, 1174 (9th Cir. 2015); 42 U.S.C. § 7543(a), (b)(1).

Of particular relevance to this litigation, Title II has two provisions to make sure that emission-control devices required for new vehicles will be effective after retail sale. One prohibits tampering with such devices. It makes it unlawful:

> for any person to remove or render inoperative any device or element of design installed on or in a motor vehicle or motor vehicle engine in compliance with regulations under this subchapter prior to its sale and delivery to the ultimate purchaser, or for any person knowingly to remove or render inoperative any such device or element of design after such sale and delivery to the ultimate purchaser[.]

42 U.S.C. § 7522(a)(3)(A). The other prohibits "defeat devices" that prevent the original devices from performing as intended. It makes it unlawful:

> for any person to manufacture or sell, or offer to sell, or install, any part or component intended for use with, or as part of, any motor vehicle or motor vehicle engine, where a principal effect of the part or component is to bypass, defeat, or render inoperative any device or element of design installed on or in a motor vehicle or motor vehicle engine in compliance with regulations under this subchapter, and where the person knows or should know that such part or component is being offered for sale or installed for such use or put to such use[.]

*Id.* § 7522(a)(3)(B).

States may, however, "control, regulate, or restrict the use, operation, or movement of registered or licensed motor vehicles." *Id.* § 7543(d). This "preserves state and local governments' authority over *post-sale* motor vehicles." *In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prods. Liab. Litig.*, 959 F.3d 1201, 1216 (9th Cir. 2020), *cert denied sub nom. Volkswagen Grp. v. EPC of*

*Hillsborough Cnty.*, No. 20-994, 2021 WL 5284826 (U.S. Nov. 15, 2021) [hereinafter

*Counties*] (emphasis added). In some circumstances a State SIP may be required to

include regulations on post-sale motor vehicles, such as by providing for an

emission-control inspection and maintenance program in certain ozone nonattainment

areas. *See* 42 U.S.C. § 7511a. Otherwise, SIP regulation of post-sale vehicles, such as

Utah's anti-tampering provisions, is voluntary. *See Counties*, 959 F.3d at 1219–21

(counties' post-sale anti-tampering rules neither expressly nor impliedly preempted

by CAA); 42 U.S.C. § 7410 (specifying what must be included in a SIP); *id.* § 7509

(penalties for state noncompliance). As the EPA stated in disapproving the anti-

tampering provisions in Texas's SIP: "Texas' statewide tampering prohibitions are

part of the state SIP *but are not required under* [*42 U.S.C. § 7509(a)*]. . . . Since *State*

*tampering rules are not required by the* [*CAA*], this final disapproval action does not

impose sanctions for failure to meet the Act requirements." Approval &

Promulgation of Air Quality State Implementation Plans (SIP); Texas; Disapproval of

Revisions to the State Implementation Plan, 63 Fed. Reg. 6651, 6652 (Feb. 10, 1998)

(emphasis added).

   *Enforcement* of clean-air law is also a joint federal-state responsibility,

although with some assistance from private citizens. An approved SIP "has the force

and effect of federal law," and, like the CAA itself, can be enforced in federal court.

*Espinosa v. Roswell Tower, Inc.*, 32 F.3d 491, 492 (10th Cir. 1994); *see* 42 U.S.C.

§ 7413(a)–(b). The CAA empowers the EPA to seek civil and administrative

penalties, issue orders requiring compliance, seek judicial injunctive relief, and even

request the Attorney General to pursue criminal sanctions for violations of the CAA.
*See* 42 U.S.C. § 7413. The maximum civil penalty for violation of a SIP was
originally set at $25,000 per day per violation, *see id.* § 7413(b), and has since been
adjusted upward for inflation to more than $100,000.[3] (Recall that the typical SIP
violation concerns a major source, such as a factory or power plant.) But enforcement
of Title II of the CAA (which concerns mobile sources such as cars and trucks),
subject to "certain limited exceptions," is *not* covered "by the general enforcement
provisions of [42 U.S.C. § 7413]." Wooley & Morss, *Clean Air Act Handbook*,
§ 11:25. Instead, enforcement of the vehicle-related provisions in Title II is addressed
in 42 U.S.C. § 7524, which provides that "[a]ny person other than a manufacturer or
dealer who violates [42 U.S.C.] section 7522(a)(3)(A) [the CAA anti-tampering
provision] . . . or any person who violates section 7522(a)(3)(B) [the CAA defeat-
device provision] . . . shall be subject to a civil penalty of not more than $2,500 [now
about $5,000]."[4] Further, violations of the CAA anti-tampering provision

---

[3] Under the Federal Civil Penalties Inflation Adjustment Act of 1990, Pub. L.
No. 101-410, 104 Stat. 890, and the Federal Civil Penalties Inflation Adjustment Act
Improvements Act of 2015, Pub. L. No. 114-74, § 701, 129 Stat. 584, 599, the EPA
has substantially increased the CAA statutory penalty amounts. *See* Civil Monetary
Penalty Inflation Adjustment, 85 Fed. Reg. 1751 (Jan. 13, 2020). For SIP violations
that occurred after November 2, 2015 and for which the penalties are assessed on or
after December 23, 2020, the maximum allowable penalty is $102,638 per day for
each violation. *See* 40 C.F.R. § 19.4 tbl.1.

[4] 40 C.F.R. § 19.4 sets forth inflation-adjusted penalty amounts for this
section, too. For tampering or defeat-device violations that occur after November 2,
2015 and for which the penalties are assessed on or after December 23, 2020, the
maximum allowable penalty is $4,876 for each violation. *See* 40 C.F.R. § 19.4 tbl.1.

(§ 7522(a)(3)(A)) "shall constitute a separate offense with respect to each motor vehicle or motor vehicle engine" (as opposed to making each act of tampering a separate offense), while violations of the CAA defeat-device provision (§ 7522(a)(3)(B)) "shall constitute a separate offense with respect to each part or component." *Id*. § 7524(a).

Private citizens may sue for any "violation of . . . an emission standard or limitation under [the CAA]." 42 U.S.C. § 7604(a)(1). And the court may apply civil penalties. *See id*.; *US Magnesium*, 690 F.3d at 1159. A State, however, is confined to seeking only state-law remedies for violation of a SIP.[5]

Utah's SIP was officially submitted in 1972. *See* 40 C.F.R. § 52.2324. That submission and a number of proposed revisions have been approved by the EPA. *See*

---

[5] *See Espinosa*, 32 F.3d at 493 ("There is no language in the [CAA] that authorizes a state to bring a federal enforcement action."); 40 C.F.R. § 70.11 (establishing minimum requirements for state enforcement programs); *Train v. Nat. Res. Def. Council, Inc.*, 421 U.S. 60, 92 n.27 (1975) (noting availability, in addition to federal enforcement by EPA and citizens, of "whatever state [enforcement] procedures are available under the [SIP]"); W. Richard Bidstrup, Gale F. Hoffnagle, & David Patrick, Clean Air Permits: Manager's Guide to the 1990 Clean Air Act, § 915 (2011) ("Each state has its own laws authorizing civil and criminal enforcement of its air pollution control laws and regulations.").

*id*. Relevant here, Utah SIP Regulation R307-201-2[6] prohibits tampering with federally mandated emission-control devices.[7]

In addition to the substantive anti-tampering rules included in R307-201-2, Utah state law also provides for penalties of up to $5,000 per day for any violation of the State's Environmental Quality Code or the lawful orders or rules adopted thereunder. *See* Utah Code Ann. § 19-1-303.

## II.   BACKGROUND

Defendant Diesel Power Gear, LLC (DPG) is a "lifestyle brand company" that sells apparel and other accessories that cater to "the diesel truck lifestyle." Sparks affidavit, Aplt. App., Vol. 3 at 50. Defendant B&W Auto, LLC—which also goes by the trade name "Sparks Motors"—is a used-car dealership and repair shop in Bountiful, Utah, which specializes in buying and making custom modifications to large diesel trucks for resale. Defendant David Sparks is the manager and sole owner of B&W and the chief executive officer and principal owner of DPG. Defendant Joshua Stuart is a part-owner of DPG and its chief financial officer and chief

---

[6] Although the version of the rule available on the EPA's website (and incorporated by reference into Utah's SIP in 40 C.F.R. § 52.2324) is labeled R307-201-2, it appears that a slightly different version of the rule labeled R307-201-*4* has since been adopted by the State of Utah, *see* Utah Admin. Code R307-201-4. Although the differences between the two rules seem irrelevant to the issues on appeal, R307-201-4 does not appear to have been approved yet by the EPA, so we refer throughout the opinion to R307-201-2.

[7] *See Utah SIP: Table c, R307-201. Emission Standards: General Emission Standards*, EPA, https://www.epa.gov/sips-ut/utah-sip-table-c-r307-201-emission-standards-general-emission-standards (last visited Nov. 1, 2021); 40 C.F.R. § 52.2324(c)(59)(i)(A).

operating officer. Keaton Hoskins, named as a defendant in the original complaint, has performed marketing for DieselSellerz.com, an online truck-classifieds website affiliated with B&W and DPG. Original defendant 4x4 Anything is merely a d/b/a of DPG.

B&W and DPG began to grow rapidly in 2013, "quickly bec[oming] established names in the diesel truck community." *Id.* at 52. This growth was partly fueled by promotional videos posted to the internet and social-media platforms. The business was also promoted through a sweepstakes which awarded B&W custom-built trucks to the winners. In 2016 the Discovery Channel premiered "Diesel Brothers," a reality television show starring Sparks, Stuart, Hoskins, and David Kiley, another part-owner and employee of DPG. The show "feature[d] diesel trucks being custom built for off-road recreational use," Sparks affidavit II, Aplt. App., Vol. 10 at 94, and averaged over two million viewers per episode in its first season.

UPHE is a nonprofit organization of Utah healthcare professionals and concerned citizens. In July 2016 it provided written notice of its intent to sue DPG, B&W, Sparks, and Stuart under the citizen-suit provision of the CAA, 42 U.S.C. § 7604.[8] The notice alleged repeated and ongoing violations of the Act, including the removal and circumvention of emission-control systems, as well as the advertisement

---

[8] It also provided notice to and sued Kiley, DieselSellerz.com, 4x4 Anything, LLC, and Hoskins, which are not named appellants because Kiley and DieselSellerz.com were dismissed in district court; 4x4 Anything is merely a d/b/a of DPG; and, after filing a notice of appeal, Hoskins settled with UPHE and the United States and we dismissed his appeal.

and sale of so-called "aftermarket defeat parts"—parts "that have the principal effect of bypassing, defeating, or rendering inoperative emission control devices on certified diesel vehicles," Aplt. App., Vol. 1 at 76–77. UPHE also gave notice to the Administrator of the EPA and the State of Utah, as required by 42 U.S.C. § 7604(b)(1). In October 2016 UPHE sent a supplemental letter to the same persons and entities, identifying additional violations of regulations included in Utah's SIP.

In January 2017 UPHE filed suit in the United States District Court for the District of Utah. Its amended complaint asserted 25 claims under the CAA and Utah's SIP. The relevant claims can be grouped into five categories: (1) allegations that B&W and Sparks removed existing emission-control devices from at least 17 diesel vehicles; (2) allegations that DPG, Sparks, and Stuart sold or offered to sell aftermarket defeat parts; (3) allegations that B&W and Sparks installed aftermarket defeat parts; (4) allegations that B&W, DPG, Sparks, and Stuart sold or offered to sell vehicles with aftermarket defeat parts; and (5) allegations that B&W, DPG, and Sparks owned and operated Utah-registered vehicles "without maintaining all emission control systems and devices in operable condition," *id.* at 146, in violation of Utah SIP Regulation R307-201-2. UPHE alleged that these violations resulted in "the excessive emission of harmful pollutants from diesel vehicles" into the airshed of the Wasatch Front, *id.* at 29, an area in northern Utah home to more than three-fourths of the State's population. It said that these emissions "contribute to the[] adverse [health] effects" experienced by its members, including impaired vision, reduced lung capacity, sinus irritation, and coughing spells, and that they "suffer

from a reduced enjoyment of life when they are forced to avoid [recreational] activities . . ., or are unable to see with clarity the beautiful scenery that once was visible, due to high pollution levels." *Id.* at 33. UPHE sought declaratory and injunctive relief, as well as civil monetary penalties available for violations of both the CAA and Utah's SIP.

The parties filed cross-motions for full or partial summary judgment. Defendants sought summary judgment on each of UPHE's 25 claims, arguing that UPHE "lack[ed] standing to maintain this citizen suit under the [CAA]" because "Defendants' minimal contribution of increased emissions cannot be fairly traced to [UPHE's] injuries." Aplt. App., Vol. 8 at 92. Alternatively, Defendants maintained that even if UPHE did have standing, summary judgment on most of the claims would still be appropriate on the merits. The district court denied Defendants' motion. *See Utah Physicians for a Healthy Env't v. Diesel Power Gear LLC* (*UPHE I*), 374 F. Supp. 3d 1124, 1145 (D. Utah 2019). For its part, UPHE submitted summary-judgment motions on many of its claims. Some of the motions were successful, and the court then held a three-day bench trial to resolve the remaining liability issues and to assess civil penalties. *See Utah Physicians for a Healthy Env't v. Diesel Power Gear LLC* (*UPHE II*), No. 2:17-cv-00032-RJS-DBP, 2020 WL 4282148, at *1 (D. Utah Mar. 6, 2020). The court determined that it could impose statutory penalties totaling $117,290,620 against Defendants, but applying the seven factors set forth in 42 U.S.C. § 7413(e)(1), *see id.* at *20, it imposed much smaller penalties than the maximum permitted, and ultimately ordered B&W to pay

$114,426; B&W and Sparks (jointly and severally) to pay $333,700; B&W, Sparks, and DPG (jointly and severally) to pay $90,000; and DPG, Sparks, and Stuart (jointly and severally) to pay $227,218. *See id.* at *27. It also granted injunctive relief, permanently enjoining Defendants "from: (1) removing or rendering inoperative federally-required emission control systems in diesel trucks; (2) installing parts or components in diesel trucks that bypass, defeat, or render inoperative federally-required emission control systems; (3) offering to sell or selling defeat parts; (4) removing or making inoperable a federally-required emission control system, device, or any part thereof; and (5) owning or operating vehicles with disabled emission-control systems." *Id.* Finally, the district court awarded UPHE its litigation costs, including reasonable attorney fees. *See id.* at *28.

On appeal Defendants raise five challenges to the judgment. They argue (1) that UPHE lacked Article III standing to bring any of the claims; (2) that the court committed plain error in ruling that UPHE had statutory standing to pursue its claims under the CAA; (3) that Defendants were not liable for CAA violations with respect to vehicles awarded as sweepstakes prizes; (4) that Defendants were not liable for CAA violations with respect to vehicles sold "as is"; and (5) that the court made various errors in calculating the penalties.

We largely affirm the judgment of the district court. But we must remand for further factual findings on one issue. We hold that UPHE lacks standing to seek penalties for violations that did not cause the emission of pollutants in the Wasatch Front, but the record needs further development to determine what adjustment, if any,

14

must be made to the penalty assessment. Remand is also required because we hold that the district court abused its discretion in weighing one of the penalty-assessment criteria (namely, seriousness of the violation) in imposing penalties for tampering under the SIP penalty provision.

## III.   DISCUSSION

### A.   Article III Standing

Article III of the Constitution limits the jurisdiction of the federal courts to "Cases" and "Controversies." U.S. Const. art. III, § 2, cl. 1. An essential component of a Case or Controversy is that the party bringing the action have standing. *See Habecker v. Town of Estes Park*, 518 F.3d 1217, 1223 (10th Cir. 2008). Because Defendants have raised serious questions about UPHE's Article III standing to pursue the claims against them, we address the matter at some length. We review de novo the district court's determination at summary judgment that UPHE has Article III standing to pursue all its claims under the CAA and Utah's SIP. *See id.*

In general, a plaintiff has standing when "(1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000). "We refer to these three familiar requirements as injury in fact, causation, and redressability." *Habecker*, 518 F.3d at 1224. Additional requirements must be satisfied when the plaintiff is an organization

suing on behalf of its members, such as UPHE in this case. The organization has standing only "[1] when its members would otherwise have standing to sue in their own right, [2] the interests at stake are germane to the organization's purpose, and [3] neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Laidlaw*, 528 U.S. at 181. Because the second and third conditions are unquestionably satisfied here (protecting the environment is a core purpose of UPHE and the relief it seeks does not require the participation of individual members, *cf. Warth v. Seldin*, 422 U.S. 490, 515–16 (1975) (homebuilders association lacked standing to seek damages on behalf of its members when injuries were "peculiar to the individual member[s] concerned, and both the fact and extent of injury would require individualized proof")), we focus solely on whether members of UPHE would have standing in their own right.[9]

As for the standing of the individual members of UPHE, the first and third requirements are not in serious doubt. Defendants do not dispute (nor do we see a basis for them to do so) the district court's determination that UPHE members suffered injury in fact because of "adverse health effects from elevated air pollution in the Wasatch Front or exposure to diesel exhaust" and reduced participation "in outdoor recreational activities due [to] their concerns about fine particulate matter

---

[9] The Supreme Court in *United Food & Commercial Workers Union Local 751 v. Brown Group, Inc.*, 517 U.S. 544, 554–56 (1996), concluded that the first two prongs of the organizational-standing test have an Article III element, although the third does not and is solely a matter of prudential standing.

pollution." *UPHE I*, 374 F. Supp. 3d at 1132. Also, the members' injuries are redressable through both injunctive relief and the imposition of penalties on wrongdoers whose violations were ongoing at the time UPHE filed suit. *See Laidlaw*, 528 U.S. at 186 (Environmental group had standing to seek not only injunctive relief, but also civil penalties because by "encourag[ing] defendants to discontinue current violations [of the Clean Water Act (CWA)] and deter[ring] them from committing future ones, [civil penalties] afford redress to citizen plaintiffs who are injured or threatened with injury as a consequence of ongoing unlawful conduct."); *Benham v. Ozark Materials River Rock, LLC*, 885 F.3d 1267, 1273 (10th Cir. 2018) ("redressability element . . . handily met" in CWA citizen suit, since "the injunctive relief and civil penalties sought by [the plaintiff] and ordered by the district court w[ould] restore the unlawfully filled wetlands and deter future violations").

There remains the question of causation: Are the injuries of the UPHE members "fairly traceable to the challenged action[s]" of Defendants? *Laidlaw*, 528 U.S. at 180. Although "Article III does at least require proof of a substantial likelihood that the defendant's conduct caused plaintiff's injury in fact," it "demands something less than the concept of proximate cause" found in tort law. *Nova Health Sys. v. Gandy*, 416 F.3d 1149, 1156 (10th Cir. 2005) (internal quotation marks omitted); *see Pub. Int. Rsch. Grp. of N.J., Inc. v. Powell Duffryn Terminals Inc.*, 913 F.2d 64, 72 (3d Cir. 1990) ("A plaintiff need not prove causation with absolute scientific rigor to defeat a motion for summary judgment. The 'fairly traceable' requirement . . . is not equivalent to a requirement of tort causation.").

17

Defendants' attack on UPHE's standing has a factual component and a legal component. Factually, they contend that their contribution to pollution in the Wasatch Front is a negligible fraction of the total pollution that comes from a myriad of sources. They assert: "The undisputed evidence at trial established the total combined miles driven within the State of Utah for all B&W trucks is less than 4,285 miles. The maximum total excess emissions as a result of all B&W violations over five years is less than .02 tons of NOx and .0004 tons of PM, compared to the millions of tons of the same pollutants from other sources." Aplt. Br. at 8–9 (citation omitted); *see also UPHE I*, 374 F. Supp. 3d at 1134 ("[M]any sources contribut[e] to air pollution in the Wasatch Front, including on-road mobile sources, wildfires, and oil refineries."). Legally, they claim that the fairly-traceable test for causation in the standing context has been replaced by the meaningful-contribution test in the context of air pollution. We begin with the legal component of Defendants' argument.

The term *meaningful contribution* in the standing context first appeared in the Supreme Court decision in *Massachusetts v. EPA*, 549 U.S. 497 (2007). The Court determined that the Commonwealth of Massachusetts had standing to challenge the EPA's rejection of a petition for rulemaking to regulate greenhouse-gas emissions from new motor vehicles. *See id.* at 510–11, 517, 526. In the course of the discussion the Court observed that "[j]udged by any standard, U.S. motor-vehicle emissions make a *meaningful contribution* to greenhouse gas concentrations and hence, according to petitioners, to global warming." *Id.* at 525 (emphasis added). But it is far from clear how, if at all, the "meaningful contribution" language should affect our

18

analysis here because *Massachusetts* arose in a context much different from that of the present litigation. The alleged injury to Massachusetts was the loss of coastal property. *See id.* at 522–23. The loss would be caused by rising sea levels (resulting from the melting of ice and snow on land) that in turn resulted from a warming climate. *See id.* at 521. The climate change would result from an increased concentration of carbon dioxide in the world's atmosphere. *See id.* at 523. The United States transportation sector "account[ed] for more than 6% of worldwide carbon dioxide emissions." *Id.* at 524. The regulation sought by Massachusetts would apply only to new vehicles, and the Court did not dispute that "predicted increases in greenhouse gas emissions from developing nations, particularly China and India, are likely to offset any marginal domestic decrease." *Id.* at 523–24. But in light of the significant percentage of worldwide carbon dioxide emissions arising from this country's transportation sector (a "*meaningful contribution* to greenhouse gas concentrations"), the Court said that "reducing domestic automobile emissions is hardly a tentative step." *Id.* at 524–25 (emphasis added). It appears to us that the Court's use of the term *meaningful contribution* was to emphasize that despite the length of the causal chain from regulation of new motor vehicles to the loss of coastal property, the causal connection was a substantial one, not mere speculation. We doubt that the Court was instituting a general meaningful-contribution requirement that would apply even when the causal link is merely between the emission of noxious gases and harm to those who breathe the air into which the gases are emitted.

In addition, to adopt Defendants' requirement that standing be granted only for claims against the largest polluters would amount to major surgery on the CAA's citizen-suit provision. The purpose of citizen-suit provisions is to increase enforcement of public law when the government lacks the resources or will to handle the entire task. Without such provisions only the worst offenders are likely to fear sanctions. Uncommon would be the case in which mobile sources of air pollution, particularly a few motor vehicles, would be the target. This is an appropriate circumstance in which to heed the admonition that "[c]ourts must afford due respect to Congress's decision to impose a statutory prohibition or obligation on a defendant, and to grant a plaintiff a cause of action to sue over the defendant's violation of that statutory prohibition or obligation." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2204 (2021); *cf. id.* at 2204–05 ("Congress may elevate to the status of legally cognizable injuries concrete, *de facto* injuries that were previously inadequate in law.").[10]

---

[10] This admonition has particular force when the plaintiff's claim is similar to a common-law cause of action but does not satisfy the requirements for that cause of action because of considerations that do not apply to the statutory claim. *See TransUnion*, 141 S. Ct. at 2204 (observing that "history and tradition offer a meaningful guide to the types of cases that Article III empowers federal courts to consider" and stating that "with respect to the concrete-harm requirement in particular, . . . courts should assess whether the alleged injury to the plaintiff has a 'close relationship' to a harm 'traditionally' recognized as providing a basis for a lawsuit in American courts," though "an exact duplicate" is not required (internal quotation marks omitted)). For example, when, as here, there are multiple sufficient sets of causes of an injury, the injured person has a claim against any negligent actor responsible for one of the causes *unless that actor's "negligent conduct constitutes only a trivial contribution to a causal set."* Restatement (Third) of Torts: Phys. & Emot. Harm § 36 (2010) (emphasis added); *see June v. Union Carbide Corp.*, 577

Our view finds support, perhaps even a precedential mandate, in a decision of this court handed down after the district court entered judgment. In *Sierra Club v. EPA*, 964 F.3d 882, 887–88 (10th Cir. 2020), the plaintiff sued the EPA to compel it to object to a CAA permit issued by Utah for an industrial plant referred to as the "Hunter Plant." For standing, the Sierra Club "allege[d] that its members experience[d] air pollution because they live and work near the Hunter Plant" and suffered from "health risks and diminished visibility of nearby national parks and wilderness areas." *Id.* at 888. In support of the proposition that the Hunter Plant contributed to the pollution, the panel noted that the EPA had stated that air emissions from the plant "cause or contribute to visibility impairment in nearby national parks." *Id.* (internal quotation marks omitted). The plant owner argued that the Sierra Club could not establish causation because, among other reasons, "other

---

F.3d 1234, 1239–44 (10th Cir. 2009). But that common-law limitation on the cause of action "has developed as a matter of fairness, equitable-loss distribution, and administrative cost." Restatement (Third) of Torts § 36 cmt. b. Those (non-causal) considerations do not apply to the claims against Defendants since they have violated federal law (so that sanctions would be unfair) and the only remedies sought are an injunction and civil penalties. *See also* Restatement (Second) of Torts § 840E cmt. b (1979) ("Situations may arise in which each of several persons contributes to a nuisance to a relatively slight extent, so that his contribution taken by itself would not be an unreasonable one and so would not subject him to liability; but the aggregate nuisance resulting from the contributions of all is a substantial interference, which becomes an unreasonable one. In these cases the liability of each contributor may depend upon whether he is aware of what the others are doing, so that his own conduct becomes negligent or otherwise unreasonable in the light of that knowledge. It may, for example, be unreasonable to pollute a stream to only a slight extent, harmless in itself, when the defendant knows that pollution by others is approaching or has reached the point where it causes or threatens serious interference with the rights of those who use the water.").

sources contributed to the pollution." *Id.* at 889. We rejected the argument, declaring

that "the existence of other contributors wouldn't affect the Sierra Club's standing."

*Id.* Following a Fifth Circuit opinion under the Clean Water Act, *Sierra Club, Lone*

*Star Chapter v. Cedar Point Oil Co.*, 73 F.3d 546, 558 (5th Cir. 1996), we said that

"[e]ven with other contributors, standing would still turn on whether the Sierra Club

had adequately attributed the pollution at least partly to the [EPA's failure to object

to the permit for the Hunter Plant]." *Sierra Club*, 964 F.3d at 889.

Our view also appears to be in keeping with the view of courts in other circuits

that, except in one circumstance,[11] a person injured by air or water pollution has

---

[11] Plaintiffs claiming injury from climate change caused by greenhouse gases
have been denied standing to sue nearby emitters of greenhouse gases because the
causal link is too attenuated: a nearby source has no greater impact on the plaintiff
than a source on the other side of the earth. *See, e.g.*, *Wash. Env't Council v. Bellon*,
732 F.3d 1131, 1141–43 (9th Cir. 2013) ("the chain of causality between"
Defendants' failure to limit greenhouse-gas emissions from Washington's five oil
refineries and the plaintiffs' climate-change related injuries, including reduced
recreational opportunities in the state's mountains and property damage caused by
increased flooding along the state's rivers, was "too attenuated" to support standing);
*Ctr. for Biological Diversity v. U.S. Dep't of Interior*, 563 F.3d 466, 476, 478–79
(D.C. Cir. 2009) (rejecting plaintiffs' substantive theory of standing, which was
based on the reasoning that the Department of the Interior's "approval of [a program
allowing for leasing of offshore lands for oil and gas drilling would] bring[] about
climate change, which in turn [would] adversely affect[] the species and ecosystems
of those . . . areas, thereby threatening [the plaintiffs'] enjoyment of [those] areas and
their inhabitants"); *WildEarth Guardians v. Salazar*, 880 F. Supp. 2d 77, 83–86
(D.D.C. 2012) (although plaintiffs claimed "recreational, aesthetic, and economic
interests in the areas adjacent to" tracts of land on which Bureau of Land
Management (BLM) had authorized leasing for coal mines, plaintiffs' injuries, to the
extent based on impacts from climate change, were not fairly traceable to BLM
action); *Amigos Bravos v. U.S. Bureau of Land Mgmt.*, 816 F. Supp. 2d 1118, 1135–
36 (D.N.M. 2011) (plaintiffs' alleged climate-change injuries were not fairly
traceable to BLM's approval of in-state oil-and-gas leases; "[w]ith [greenhouse
gases], every inhabitant of our planet is within the 'zone of discharge'; consequently,

standing under the CAA or the Clean Water Act to seek a remedy from a defendant that emits the injurious pollutant in the geographic vicinity of where the person is injured. *See Env't Tex. Citizen Lobby, Inc. v. ExxonMobil Corp.*, 968 F.3d 357, 370 (5th Cir. 2020) (no need for specific evidence of air pollution's "geographic range when plaintiffs sit squarely in the discharge zone of a polluting facility such that their proximity speaks for itself" (brackets and internal quotation marks omitted)); *Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs*, 781 F.3d 1271, 1276–77, 1280 (11th Cir. 2015) (members' recreational and aesthetic injuries from visible pollution were fairly traceable to coal-mining operations located upstream within the same watershed); *Sierra Club v. TVA*, 430 F.3d 1337, 1339–40, 1345 (11th Cir. 2005) (recreational and aesthetic harms suffered by members in "the natural areas around the [defendant's coal-fired electric power] plant" were fairly traceable to plant's violations of opacity standard included in Alabama SIP); *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 204 F.3d 149, 158–61 (4th Cir. 2000) (injury to member's waterfront property from water pollution was fairly traceable to smelting facility four miles upstream when evidence indicated that discharge from the facility could "impact the receiving waterway for a good distance downstream—well past

---

the issue of geographical proximity to the source of pollution may not be a proper measure of the likelihood of one's injury having been caused by a particular polluter."). The reasoning in these cases is consistent with the Supreme Court's reference to "meaningful contribution" in *Massachusetts*, 549 U.S. at 525, as discussed above. But this appeal does not involve climate-change-related harms from greenhouse gases, so the reasoning in these cases is inapplicable.

[the member's] property"); *Cedar Point*, 73 F.3d at 558 & n.24 (member's injury was fairly traceable to oil-and-gas well's discharge of "produced water" into particular area of Galveston Bay where member canoed and participated in other outdoor activities); *Powell Duffryn*, 913 F.2d at 72–73 (plaintiff affidavits said that they suffered aesthetic injury from oily or greasy sheen on water which was fairly traceable to defendant's discharge of oil and grease two miles upstream); *WildEarth Guardians*, 880 F. Supp. 2d at 83, 86–87 (plaintiffs had standing to challenge BLM's approval of mining operations that would "lead to haze, smog, and dust clouds in areas immediately adjacent to [the land to be mined]," where plaintiffs "ha[d] recreational, aesthetic, and economic interests"); *Concerned Citizens Around Murphy v. Murphy Oil USA, Inc.*, 686 F. Supp. 2d 663, 669, 672–73 (E.D. La. 2010) (CAA plaintiffs' recreational and aesthetic injuries were fairly traceable to emissions from oil refinery located blocks away). By showing a close geographical connection, the plaintiff has "adequately attributed the pollution" to the source, *Sierra Club*, 964 F.3d at 889, and the injury is "fairly traceable" to the polluter, *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (brackets, ellipsis, and internal quotation marks omitted).

Defendants suggest that causation is lacking because this is a case "'[w]here the causal chain involves numerous third parties whose independent decisions collectively have a significant effect on plaintiffs' injuries.'" Aplt. Br. at 23 (quoting *Wash. Env't Council v. Bellon*, 732 F.3d 1131, 1142 (9th Cir. 2013)). But there is no such chain of causation here. The proposition relied on by Defendants can be traced

to Supreme Court decisions denying standing to those challenging the grant of

government tax exemptions on the ground that entities receiving the exemptions

would halt their discriminatory practices if denied the exemptions. *See, e.g.*, *Allen v.

Wright*, 468 U.S. 737, 756–61 (1984). The discrimination was not "fairly traceable"

to the grant of a tax exemption because the response to the denial of an exemption

was too speculative. *Id.* at 758. In this case, there is no speculation that Defendants'

unlawful conduct would cause the emission into the atmosphere of harmful

pollutants. The only relevant decisions to be made by independent third parties would

be to drive the vehicles improperly modified by Defendants, and the decisions to do

so were virtually inevitable.

We therefore hold that UPHE has standing to challenge Defendants' violations

that contributed to the unhealthy air in the Wasatch Front. The EPA has determined

that the Salt Lake City area, which includes where Defendants conduct business, is a

nonattainment area for 24-hour levels of fine particulate matter (PM2.5).[12] *See* 40

C.F.R. § 81.345. Those who reside in that area can fairly trace injuries they suffer

from the polluted air to any contributor of prohibited emissions in the area.

---

[12] Fine particulate matter is one of the two main pollutants (the other being
nitrogen oxides) that UPHE alleges contribute to its members' injuries. *See UPHE I*,
374 F. Supp. 3d at 1132 ("Some members are deterred from engaging in outdoor
recreational activities due [to] their concerns about fine particulate matter
pollution."); *see also UPHE II*, 2020 WL 4282148, at *4 (finding that "[a] diesel
truck with all of its federally required emission control devices removed typically
emits . . . particulate matter at a rate of twenty-one times its original EPA certified
emission rate").

But what about CAA violations that did not cause the emission of pollutants in the Salt Lake City nonattainment area? The appellate courts have recognized that a plaintiff may lack standing to challenge actions by a too-distant polluter. In *Friends of the Earth, Inc. v. Crown Center Petroleum Corp.*, 95 F.3d 358 (5th Cir. 1996), for instance, the Fifth Circuit held that a lake "located three tributaries and 18 miles downstream from [the defendant's] refinery" was too far away for one to infer a causal link between the defendant's discharge and the alleged injuries to the plaintiff's members' use of the lake. *Id.* at 361. Deprived of this inference and having failed to offer any "competent evidence that [the defendant's] discharges ha[d] made their way to . . . or would otherwise affect" the lake, the court concluded that the plaintiff could not satisfy Article III's causation requirement. *Id.*; *see also Ctr. for Biological Diversity v. EPA*, 937 F.3d 533, 538–39 (5th Cir. 2019) (plaintiffs failed to show sufficient "geographic proximity between [their] interests and the discharges"; "[a] geographic area as big as the 'Western and Central portions of the Gulf [of Mexico]' cannot support Article III standing.").

The Seventh Circuit reached a similar conclusion in *Texas Independent Producers & Royalty Owners Ass'n v. EPA* (*TIPROA*), 410 F.3d 964 (7th Cir. 2005). In that case an environmental group sought to challenge an EPA General Permit prescribing limits on storm-water discharge from construction sites. *See id.* at 969–70. Attempting to establish standing, the group argued, among other things, that its members used various bodies of polluted water affected by the discharges allowed under the permit. *See id.* at 972. It pointed to notices filed by construction companies

indicating their intent to "discharge under the General Permit in the bodies of water used by [three of the group's] affiants." *Id.* at 973. The court rejected this argument, pointing out that "the water bodies at issue span, in some cases, hundreds of miles," and concluding that, absent evidence of injury to "the portion of the river[s] used by the [members]," the group had failed to establish fairly-traceable causation. *Id.*

Likewise in *Delaware Department of Natural Resources & Environmental Control v. EPA*, 785 F.3d 1 (D.C. Cir. 2015), the D.C. Circuit held that Delaware lacked standing to challenge a portion of an EPA rule exempting generators "located in remote areas" of the country from national emission standards, as "Delaware [had] offer[ed] no evidence that backup generators in the remote-area subcategory are located near enough to Delaware to pose a threat to the state's air quality." *Id.* at 8, 10; *see id*. at 10 (the "only examples" Delaware provided "of these remote locations are references to the Powder River Basin of Wyoming and fields of generators visibly evident across Wyoming and Colorado, and throughout Nebraska and California" (ellipsis and internal quotation marks omitted)).

The need for geographic limitations as part of the traceability inquiry was persuasively discussed in the Fifth Circuit's *Cedar Point* decision, which limited the reach of the Third Circuit's expression in *Powell Duffryn* that the plaintiffs in that case had standing because the defendant had discharged an excessive amount of pollutant into a waterway in which the plaintiffs had an interest that could be adversely affected by the pollutant, *see Powell Duffryn*, 913 F.2d at 72:

Douglas was the only affiant who expressed an interest in that *part* of Galveston Bay where Cedar Point's discharge is located. It is true that a strict application of the *Powell Duffryn* test does not demand that sort of specificity, because the plaintiff need only show an interest in the "waterway" into which the defendant is discharging a pollutant; nevertheless, such a literal reading of *Powell Duffryn* may produce results incongruous with our usual understanding of the Article III standing requirements. *For example, some "waterways" covered by the CWA may be so large that plaintiffs should rightfully demonstrate a more specific geographic or other causative nexus in order to satisfy the "fairly traceable" element of standing*. Therefore, while we find the *Powell Duffryn* test useful for analyzing whether Douglas's affidavit meets the "fairly traceable" requirement, we recognize that it may not be an appropriate standard in other CWA cases.

*Cedar Point*, 73 F.3d at 558 n.24 (emphasis added) (citations omitted); *see also*

*Gaston Copper*, 204 F.3d at 161 ("Rather than pinpointing the origins of particular

molecules, a plaintiff must merely show that a defendant discharges a pollutant that

causes or contributes to the kinds of injuries alleged *in the specific geographic area

of concern*." (emphasis added) (internal quotation marks omitted)); *Black Warrior

Riverkeeper*, 781 F.3d at 1280 (adopting the view of *Gaston Copper*); *ExxonMobil*,

968 F.3d at 370 ("Plaintiffs must demonstrate the existence of a specific geographic

or other causative nexus such that the [CAA] violation could have affected their

members." (internal quotation marks omitted)); *cf. Lujan*, 504 U.S. at 558, 567 n.3

(petitioners had failed to demonstrate that they would suffer an injury in fact as a

result of a Secretary of the Interior interpretation of the Endangered Species Act

limiting its application to the "United States or the high seas"; "[t]he dissent may be

correct that the geographic remoteness of those members (here in the United States)

from Sri Lanka and Aswan does not 'necessarily' prevent [a finding of injury]—but it

28

assuredly does so when no further facts have been brought forward (and respondents have produced none) showing that the impact upon animals in those distant places will in some fashion be reflected here"). Of course, specific scientific data may establish a causal connection even to some distant sources. *See ExxonMobil*, 968 F.3d at 370; *Crown Ctr.*, 95 F.3d at 361; *cf. Lujan*, 504 U.S. at 567 n.3.

Defendants contend that the district court erred by finding that UPHE had standing to pursue "violations that did not result in pollutants being discharged into the Wasatch Front." Aplt. Br. at 27. (Although this passage speaks of discharge into the Wasatch Front, the line drawn by Defendants in much of its argument is between vehicles driven in Utah and those that were not. We take it that Defendants are in essence conceding that we can assume that a relevant vehicle driven in Utah was driven within the Wasatch Front.) Defendant's contention is not barred by our holding that UPHE has standing to bring a number of its claims. "[S]tanding is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek (for example, injunctive relief and damages)." *TransUnion*, 141 S. Ct. at 2208; *see Colo. Outfitters Ass'n v. Hickenlooper*, 823 F.3d 537, 551 (10th Cir. 2016) ("[A] plaintiff must demonstrate standing for each claim he or she seeks to press." (original brackets and internal quotation marks omitted)). UPHE must demonstrate that *each* of Defendants' violations "cause[d] or contribute[d] to the kinds of injuries alleged," *Piney Run Pres. Ass'n v. Cnty. Comm'rs of Carroll Cnty.*, 268 F.3d 255, 264 (4th Cir. 2001) (internal quotation marks omitted), or, as the district court put it, "show [that]

Defendants' violations contribute[d] nitrous oxides (NOx) and particulate matter (PM) to air in the Wasatch Front," *UPHE I*, 374 F. Supp. 3d at 1135; *see ExxonMobil*, 968 F.3d at 365–66 ("[O]ne injury does not entitle a litigant to right other wrongs that did not injure it. . . . [A CAA] plaintiff needs standing for each violation for which it seeks a penalty."). We therefore examine Defendants' causation objections to UPHE's standing with respect to specific civil penalties.

Defendants point to violations related to vehicles eventually sold out-of-state or to parts sold out-of-state or merely marketed and never sold. For vehicles eventually sold or transferred to customers out-of-state, Defendants argue that "there is simply no way to conclude that emissions from [these vehicles], which were only briefly operated in Utah, . . . has [sic] harmed the Wasatch Front airshed." Aplt. Br. at 27–28.

We agree with the underlying principle stated by Defendants. Although molecules of a nitrogen oxide produced in Oregon may certainly drift over to Utah, greater geographical proximity is required to satisfy by itself the "fairly traceable" test. But in one respect, we reject their argument. If the vehicle was driven, however little, in the Salt Lake City area, UPHE has established that its members' injuries from excessive pollution can be fairly traced to the CAA violation; so standing can be predicated on pollution from that vehicle.

But if the vehicle was never driven in Utah, or the defeat part was sold to someone out-of-state, UPHE has not established standing. It has presented no evidence of actual or imminent injury to its members caused by the emission of

pollutants outside of Utah. Such evidence might be available if pollutants in, say, southern Wyoming were contributing to the failure of the Salt Lake City area to meet EPA air-quality standards and the EPA designated that part of Wyoming as included in the Salt Lake City nonattainment area. *See* 42 U.S.C. § 7407(d)(1)(A)(i) (defining *nonattainment area* as "any area that does not meet (*or that contributes to ambient air quality in a nearby area that does not meet*) the national primary or secondary air quality standard for the pollutant" (emphasis added)); Air Quality Designations for the 2006 24-Hour Fine Particle (PM2.5), 74 Fed. Reg. 58688, 58696 (Nov. 13, 2009) (identifying 24-hour PM2.5 nonattainment areas that included parts of more than one State, for instance, "Logan, UT-ID," "New York-N. New Jersey-Long Island, NY-NJ-CT," and "Philadelphia-Wilmington, PA-NJ-DE"). When the EPA has determined that the plaintiff and the pollution emission are in the same nonattainment area, the plaintiff could rely on that determination as adequate evidence (subject, of course, to rebuttal by contrary evidence) that the emission is a cause of the harm to the plaintiff from air pollution and therefore the plaintiff would have standing to seek sanctions against the out-of-state polluter. *Cf. Sierra Club*, 964 F.3d at 889–90 (noting, in support of its determination that the plaintiff had standing, that the EPA had stated that air emissions from the polluter caused or contributed to impairment of visibility at parks visited by plaintiff's members).

But that is not the circumstance here. Because the nonattainment area including the Wasatch Front does not extend into any other State, we do not presume that pollutants emitted in another State contribute to injuries suffered by UPHE's

members. Nor has UPHE produced any other type of scientific evidence that pollution outside of Utah contributes to unhealthful air in the Wasatch Front. We conclude that UPHE does not have standing to bring its claims based on vehicles never driven in Utah or defeat devices sold to persons outside Utah.

We also conclude, though for slightly different reasons, that UPHE lacks standing to pursue claims for civil penalties related to defeat parts marketed but not actually sold. UPHE cannot claim to have been actually injured by Defendants' marketing (which plainly did not itself result in the emission of excess nitrogen oxides or particulate matter into the Wasatch Front) and any threatened harm—such as "the threat that consumers in Utah may be influenced by Defendants' advertisements to buy and install the parts, resulting in an increase in emissions," Aplee. Br. at 22—is too "conjectural or hypothetical" to satisfy the injury-in-fact requirement, particularly since Defendants apparently ceased marketing the defeat parts after receiving UPHE's notice of its intent to sue. *See UPHE II*, 2020 WL 4282148, at *9. It is not enough that there was a statutory violation. The claims based on unsold defeat parts are similar to the claims brought by plaintiffs against a credit reporting agency that allegedly failed to use reasonable procedures to ensure the accuracy of their credit files but that never disclosed the allegedly false information to third parties. *See TransUnion*, 141 S. Ct. at 2200. The Supreme Court held that those plaintiffs lacked standing to sue for actual or statutory damages. *See id.* at 2209–13. Because the only claims at issue on this appeal are those for civil penalties,

we need not address whether UPHE had standing to sue for injunctive relief relating to unsold defeat devices.

To enable the district court to determine precisely which claims can be pursued by UPHE, we must remand for further proceedings.

### B.    Statutory Standing

Defendants argue that UPHE lacks statutory standing under the CAA's citizen-suit provision to pursue its claims under either the CAA or Utah's SIP because they seek enforcement of "general statutory prohibitions . . . not defined under the CAA as standards or limitations." Aplt. Br. at 31. Because statutory standing is not jurisdictional and Defendants failed to raise this issue below, we review only for plain error. *See Niemi v. Lasshofer*, 728 F.3d 1252, 1262 (10th Cir. 2013) (issue of statutory standing, if forfeited, would be reviewed for plain error). "Plain error is (i) error, (ii) that is plain, which (iii) affects substantial rights, and which (iv) seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Id.* (internal quotation marks omitted). As we proceed to explain, the district court likely did not err, and certainly did not *plainly* err, in ruling Defendants' various tampering and defeat-device violations actionable under the CAA and Utah's SIP. Accordingly, we need not continue to the third and fourth elements of plain error.

The CAA's citizen-suit provision, 42 U.S.C. § 7604, provides in relevant part:

[A]ny person may commence a civil action on his own behalf—

(1) against any person (including (i) the United States, and (ii) any other governmental instrumentality or agency to the extent permitted by the Eleventh Amendment to the Constitution) who is alleged to have violated (if there is evidence that the alleged violation has been repeated) or to be in violation of (A) an emission standard or limitation under this chapter or (B) an order issued by the [EPA] Administrator or a State with respect to such a standard or limitation[.]

42 U.S.C. § 7604(a). This provision permits a plaintiff to sue only when there has been a violation of "an emission standard or limitation under this chapter [that is, the CAA]" or an order "with respect to such a standard or limitation." *Id.* § 7604(a)(1). Defendants contend that UPHE's underlying claims, brought under 42 U.S.C. § 7522(a) and Utah SIP Regulation R307-201-2, do not implicate any "emission standard or limitation" because both § 7522(a) and R-307-201-2 merely prohibit various acts related to emission-control and defeat devices, rather than imposing numerical limits on emissions. Defendants suggest that these prohibitions should not be regarded as emission standards or limitations but as "enforcement mechanisms" enforceable only by the government and not by private citizens. Aplt. Reply Br. at 13.

Definitions within the CAA itself, however, refute this argument. The CAA's citizen-suit provision defines *emission standard or limitation under this chapter* to include, among other things, an "emission limitation, standard of performance or emission standard," and "any other standard [or] limitation . . . established . . . under any applicable State implementation plan approved by the [EPA] Administrator." 42 U.S.C. § 7604(f). Section 7602 in turn defines *emission limitation* and *emission standard* to mean "a requirement established by the State or the [EPA] Administrator

34

which limits the quantity, rate, or concentration of emissions of air pollutants on a

continuous basis, *including any requirement relating to the operation or maintenance*

*of a source to assure continuous emission reduction, and any design, equipment,*

*work practice or operational standard promulgated under this chapter [the CAA]*."

*Id.* § 7602(k) (emphasis added). And § 7602 defines *standard of performance* as "a

requirement of continuous emission reduction, including any requirement relating to

the operation or maintenance of a source to assure continuous emission reduction."

*Id.* § 7602(*l*). Thus, § 7604 authorizes citizen suits against violations of any

"requirement established by the State or the [EPA] Administrator . . . relating to the

operation or maintenance of a source to assure continuous emission reduction, and

any design, equipment, work practice or operational standard promulgated under [the

CAA]," and of any "requirement relating to the operation or maintenance of a source

to assure continuous emission reduction."

UPHE argues that "[a]n anti-tampering requirement prohibiting the removal or

defeat of an emission control device, such as a catalytic converter, that is designed to

reduce emissions on a continuous basis, is plainly a requirement that ensures the

reduction of emissions on a continuous basis," and therefore satisfies the statutory

definition of an emission standard or limitation. Aplee. Br. at 28–29. This argument

has considerable force.

The Supreme Court has adopted essentially the same view, albeit when

interpreting a provision of the CAA to which the above statutory definitions did not

apply. In *Engine Manufacturers Ass'n v. South Coast Air Quality Management*

35

*District*, 541 U.S. 246 (2004), the Court considered whether a provision of the CAA

preempting state or local adoption or enforcement of "'*any standard relating to the*

*control of emissions* from new motor vehicles or new motion vehicle engines'"

extended to local rules barring fleet operators from purchasing or leasing vehicles not

in compliance with certain emission requirements. *Id.* at 248–49, 252 (emphasis

added) (quoting 42 U.S.C. § 7543(a)). The district and circuit courts had found no

preemption, interpreting the statutory language to "include only regulations that

compel manufacturers to meet specified emission limits." *Id.* at 252. The Court

reversed, adopting a more expansive view:

> "[S]tandard" is defined as that which "is established by authority,
> custom, or general consent, as a model or example; criterion; test."
> Webster's Second New International Dictionary 2455 (1945). The
> criteria referred to in [42 U.S.C. § 7543(a)] relate to the emission
> characteristics of a vehicle or engine. To meet them the vehicle or
> engine must not emit more than a certain amount of a given pollutant,
> *must be equipped with a certain type of pollution-control device*, or
> must have some other design feature related to the control of emissions.
> This interpretation is consistent with the use of "standard" throughout
> Title II of the CAA (which governs emissions from moving sources) to
> denote requirements such as numerical emission levels with which
> vehicles or engines must comply, *e.g.*, 42 U.S.C. § 7521(a)(3)(B)(ii), *or
> emission-control technology with which they must be equipped*, *e.g.*,
> § 7521(a)(6).

*Id*. at 252–53 (emphasis added); *see Counties*, 959 F.3d at 1218 (applying *South

Coast* to hold that the county anti-tampering regulations at issue were "'emissions

standards' for purposes of [§ 7543(a)]"). The language interpreted by the Supreme

Court is not identical to the language at issue here; but if an anti-tampering

requirement has been interpreted as a standard "relating to the control of emissions,"

36

42 U.S.C. § 7543(a), one would think that it would also be a "requirement relating to the operation or maintenance of a source to assure continuous emission reduction," *id.* § 7602(*l*).

Defendants rely on a Ninth Circuit decision that analyzed the term "emission standard or limitation" in the context of the CAA's citizen-suit provision and reasoned that it did not extend to "the generic statutory prohibitions in § 7522," such as those at issue here. *In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prods. Liab. Litig.*, 894 F.3d 1030, 1041 (9th Cir. 2018) [hereinafter *Fleshman*]. Respectfully, we question the following analysis in *Fleshman* of the scope of the citizen-suit provision:

> For an example of an "emission standard," consider 40 C.F.R. § 86.1811-04. That regulation establishes permissible emission levels of nitrogen oxide (NOx) for "light-duty vehicles" like the vehicles at issue in this case. *See id.* § 81.1811-04(c) ("Exhaust emissions from Tier 2 vehicles must not exceed the standards in Table S04-1 of this section at full useful life ."). Unlike the statutory prohibitions in § 7522, which were enacted by Congress, the regulation is "a requirement established by the Administrator which limits the quantity, rate, or concentration of emissions of air pollutants on a continuous basis." § 7602(k).

*Id.* at 1041–42 (ellipses omitted). This narrow reading appears to overlook that *emission standard* and *standard of performance* are both defined to encompass "any requirement relating to the operation or maintenance of a source to assure continuous emission reduction." 42 U.S.C. § 7602(k), (*l*). By removing or defeating emission-control devices like oxidation catalysts or diesel particulate filters, a person is violating a specific requirement to maintain the diesel truck to assure continuous emission reductions.

37

*Fleshman* also seems to suggest that the anti-tampering provision of the CAA was not a requisite standard because the § 7522 prohibitions were enacted by Congress and therefore were not "requirement[s] established by the State or the [EPA] Administrator," *id.* § 7602(k), as would be necessary to come within the definition of *emission standard. See* 894 F.3d at 1041–42. But we note that *standard of performance* is defined so that it need not be a requirement established by the State or the EPA Administrator. *See id.* § 7602(*l*). In addition, UPHE, unlike the plaintiff in *Fleshman*, based its tampering and defeat-device claims not only on the statutory provision, *id.* § 7522(a)(3), but also on the EPA regulations, *see* 40 C.F.R. § 86.1854-12(a)(3)(i), (ii), imposing the same requirements.

In any event, we need not definitively resolve the question because if indeed there was error, it was not plain. *See Niemi*, 728 F.3d at 1262. "An error is plain if it is clear or obvious under current, well-settled law." *United States v. Faulkner*, 950 F.3d 670, 678 (10th Cir. 2019) (internal quotation marks omitted). Because the district court's interpretation of the CAA's citizen-suit provision was reasonable, and a contrary result was not dictated by well-settled law, we reject Defendants' plain-error challenge to UPHE's statutory standing.

## C.   Sweepstakes Giveaways

Defendants argue that the district court improperly imposed penalties with respect to trucks awarded through sweepstakes. They state: "The District Court's interpretation that giveaway sweepstakes trucks are a 'sale' is contrary to Utah law, and disregards the fact that a third to half of the sweepstakes entries are from free

mail-in requests. The CAA requires a 'sale' of an emissions tampered vehicle to violate this section." Aplt. Br. at 40.[13] We reject the argument.

The tampering provision, 42 U.S.C. § 7522(a)(3)(A), makes it unlawful:

> for any person to remove or render inoperative any device or element of design installed on or in a motor vehicle or motor vehicle engine in compliance with regulations under this subchapter prior to its sale and delivery to the ultimate purchaser, or for any person knowingly to remove or render inoperative any such device or element of design after such sale and delivery to the ultimate purchaser[.]

For purposes of this provision, *ultimate purchaser* "means, with respect to any new motor vehicle or new motor vehicle engine, the first person who in good faith purchases such new motor vehicle or new engine for purposes other than resale." 42 U.S.C. § 7550(5).

The district court rejected Defendants' argument on the ground that the sweepstakes awards were sales, reasoning that "DPG asked for and received valuable consideration in exchange for the conveyance of the trucks, in the form of direct monetary benefits (increased sales) and indirect benefits (promotion of its brand)." *UPHE I*, 374 F. Supp. 3d at 1144–45 (footnote omitted); *see id.* at 1145 ("The fact that each particular winner contributed only a portion of the total consideration

---

[13] The discussion of this issue in Defendants' opening brief never quotes, or even identifies, statutory language on which it is basing this argument. But since the opening brief speaks of "an emissions tampered vehicle," we conclude that Defendants are referring to 42 U.S.C. § 7522(a)(3)(A) and not the defeat-device language in § 7522(a)(3)(B). We note that earlier in the brief, Defendants distinguished between tampering violations and defeat-device violations. *See* Aplt. Br. at 33 (referring to "violations of the CAA's tampering and defeat device provisions"); *id.* at 37 (arguing that "only the government can enforce the CAA's tampering and defeat device provisions").

received by DPG does not preclude the existence of a sale."). We review matters of statutory interpretation de novo. *See Pound v. Airosol Co., Inc.*, 498 F.3d 1089, 1094 (10th Cir. 2007).

We have reservations about the district court's analysis. One may question whether a lottery winner who paid nothing to obtain a lottery ticket (either by paying cash or making a purchase of goods) has provided any consideration. *See Albertson's, Inc. v. Hansen*, 600 P.2d 982, 985–86 (Utah 1979). But we may reach the same result with a somewhat different analysis. *See Orner v. Shalala*, 30 F.3d 1307, 1310 (10th Cir. 1994) ("[W]e may affirm challenged decisions of the district court on alternative grounds, so long as the record is sufficient to permit conclusions of law.").

We affirm because, as we read the statute, there is no requirement that a violator sell the vehicle. The provision can be violated by someone who removes or renders inoperative a control device "prior to its sale and delivery to the ultimate purchaser" or by someone who knowingly removes or renders inoperative such a device after "sale and delivery to the ultimate purchaser." 42 U.S.C. § 7522(a)(3)(A). The only relevance of the sale to the ultimate purchaser is that if the tampering occurs after such a sale, the tampering must be performed "knowingly." But since there is no question that Defendants' actions were done knowingly, they are liable regardless of when the sale to the ultimate purchaser has taken place or will take place.

In short, we reject Defendants' argument that vehicles awarded as part of the sweepstakes should have been excluded from the district court's tabulation of violations.

### D.    Sale of "As-Is" Vehicles

Under 42 U.S.C. § 7522(a)(3)(B) it is unlawful:

> for any person to manufacture or *sell*, or offer to sell, or install, *any part or component* intended for use with, or *as part of, any motor vehicle* or motor vehicle engine, *where a principal effect of the part or component is to bypass, defeat, or render inoperative any device or element of design installed on or in a motor vehicle or motor vehicle engine in compliance with regulations under this subchapter*, and where the person knows or should know that such part or component is being offered for sale or installed for such use or put to such use[.]

Defendants argue that the district court erred by including "pass-through sales of 'as-is' trucks" in its tabulation of their CAA violations. Aplt. Br. at 43. They contend that the provision "cannot be read as prohibiting the re-sale of a used vehicle containing a defeat part that was installed by the previous owner." *Id.* at 44. Defendants point to other state and federal laws that exempt the sale of "as-is" vehicles, *see, e.g.*, Utah Code Ann. § 13-20-6(2) (limiting motor-vehicle-dealer liability to written express warranties made apart from manufacturer warranties); 16 C.F.R. § 455.2(b)(1) (Federal Trade Commission regulation recognizing sales of "vehicle[s] without any implied warranty, i.e., 'as is,'"), and suggest that extending § 7522 to as-is sales would conflict with these other provisions.

Defendants' argument is a nonstarter. The statute certainly does not explicitly provide an exception for as-is sales. Nor does anything in the CAA provide a

rationale for such an exception. On the contrary, the as-is nature of a sale concerns only the relationship between the seller and the buyer, whereas the CAA's concern is the relationship between the user of the vehicle and the public that must suffer from that vehicle's emissions. Defendants offer no rationale for excusing injury to the public just because the buyer is willing to accept the vehicle without warranties (presumably for a lower price).

We recognize that the provision contains a scienter requirement—liability does not attach unless the manufacturer or seller "*knows or should know* that such part or component is being offered for sale or installed for such use or put to such use." 42 U.S.C. § 7522(a)(3)(B) (emphasis added). There may be occasions in which an as-is seller could reasonably claim that it had no reason to know that the vehicle contained an illegal defeat device, and thus escape liability under § 7522(a)(3)(B). But an ignorance defense is independent of whether the vehicle is sold with any warranties; and in any event, Defendants have not claimed such ignorance. We affirm the district court's refusal to recognize an as-is defense for Defendants.

### E.   Penalties

Defendants raise several challenges to the penalties imposed by the district court. We review for clear error "a district court's findings of fact in support of a CAA penalty." *Pound*, 498 F.3d at 1094. "The district court's weighing of those facts, and its penalty determination, are reviewed for abuse of discretion." *Id.* And "we review de novo the statutory interpretation behind the district court's decision." *Id.* (internal quotation marks omitted).

Before addressing the specific challenges, however, we summarize the

penalties imposed upon Defendants and the statutory bases for those penalties.

- The district court found that Defendants removed a total of 37 emission-control devices from eight trucks, giving rise to eight separate violations of the CAA's anti-tampering provision, 42 U.S.C. § 7522(a)(3)(A), *see UPHE II*, 2020 WL 4282148, at *15–16; under § 7524(a) and 40 C.F.R. § 19.4, it assessed Defendants' maximum liability as $30,000 ($3,750 per violation), *see id.*, but ultimately imposed a penalty of only $25,000, *see id.* at *24.

- It found that Defendants installed a total of 24 defeat parts in 14 trucks, giving rise to 24 separate violations of the CAA's defeat-device provision, 42 U.S.C. § 7522(a)(3)(B), *see id.* at *16; under § 7524(a) and 40 C.F.R. § 19.4, it assessed Defendants' maximum liability as $90,985 (between $3,750 and $4,735 per violation, depending on the date), *see id.*, but ultimately imposed a penalty of only $80,000, *see id.* at *24.

- It found that Defendants advertised, sold, or offered to sell a total of 305 defeat parts, giving rise to 305 additional separate violations of the CAA's defeat-device provision, 42 U.S.C. § 7522(a)(3)(B), *see id.* at *17; under § 7524(a) and 40 C.F.R. § 19.4, it assessed Defendants' maximum liability as $1,356,510 (between $3,750 and $4,735 per violation, depending on the date), *see id.*, but ultimately imposed a penalty of only $407,218, *see id.* at *24–25.

- It found that Defendants removed a total of 37 emission-control devices from eight trucks, giving rise to 37 separate violations of the Utah SIP's emission-control provision, R307-201-2, *see id.* at *19; under § 7413(b) and 40 C.F.R. § 19.4, it assessed Defendants' maximum liability as $1,387,500 ($37,500 per violation), *see id.*, but ultimately imposed a penalty of only $138,700, *see id.* at *25.

- It found that Defendants owned and operated multiple emissions-tampered vehicles between January 12, 2012, and July 20, 2017, giving rise to "numerous" additional violations of the Utah SIP's emission-control provision, R307-201-2, *id.* at *19; under § 7413(b) and 40 C.F.R. § 19.4, it assessed Defendants' maximum liability as $114,425,625 (between $37,500 and $99,681 per violation per day, depending on the date), *see id.*, but ultimately imposed a penalty of only $114,426, *see id.* at *25.

Broken out by defendant, the district court ordered B&W to pay $114,426; B&W and Sparks (jointly and severally) to pay $333,700; B&W, Sparks, and DPG (jointly and severally) to pay $90,000; and DPG, Sparks, and Stuart (jointly and severally) to pay $227,218. *See UPHE II*, 2020 WL 4282148, at *27.

The district court arrived at these amounts via the "top down" approach to penalty analysis, first calculating Defendants' maximum possible liability for violations of the CAA and Utah's SIP and then "determin[ing] what degree of mitigation, if any is proper" according to the penalty-assessment criteria set forth in 42 U.S.C. § 7413(e). *UPHE II*, 2020 WL 4282148, at *20. Section 7413(e) directs courts to consider, "in addition to such other factors as justice may require":

> the size of the business, the economic impact of the penalty on the business, the violator's full compliance history and good faith efforts to comply, the duration of the violation as established by any credible evidence (including evidence other than the applicable test method), payment by the violator of penalties previously assessed for the same violation, the economic benefit of noncompliance, and the seriousness of the violation.

Weighing these factors separately for each category of violations, the court reduced the total penalty amount by more than 99%, from $117,290,620 to $765,344. *See UPHE II*, 2020 WL 4282148, at *23–25. By far the largest penalty reductions were made with respect to Defendants' SIP violations (the owning-and-operating violations, in particular). Even so, the penalties imposed for violations of the Utah SIP's anti-tampering provision, R307-210-2, ($138,700, *see UPHE II*, 2020 WL 4282148, at *25) far exceeded those imposed for violations of the anti-tampering provision contained in the CAA itself, 42 U.S.C. § 7522(a)(3)(A), ($25,000, *see*

44

*UPHE II*, 2020 WL 4282148, at *24), despite the fact that both sets of violations arose from the same conduct.

Defendants raise several challenges to the penalties imposed by the district court. Some apply to all the penalties. Others concern only the penalties for tampering imposed as violations of the Utah SIP. We begin with the challenges to the tampering penalties imposed as violations of the SIP.

        1.  Penalties for tampering

As repeatedly noted above, the CAA has a specific penalty provision for a violation of the anti-tampering provision, § 7522(a)(3)(A). Under § 7524(a) the penalty for persons "other than a manufacturer or dealer" (which includes all Defendants) is $2,500 (substantially increased for inflation) per vehicle and not per day or per component tampered with. The Utah SIP, in contrast, treats as a separate violation every component tampered with in a single vehicle. And the CAA penalty for violation of a SIP is $25,000 (again increased for inflation) per day of violation. *See* 42 U.S.C. § 7413(d)(1)(A).

Defendants present several theories for challenging the tampering penalty imposed under the SIP, all of which derive from the observation that the CAA itself imposes its own penalty for tampering with emission devices. First, Defendants argue "that imposing civil penalties for violations under the CAA and Utah SIP for the same statutory prohibited activity constitutes a double penalty." Aplt. Br. at 45. They rely on two opinions by this court stating that "'double recovery is precluded when alternative theories seeking the same relief are pled and tried together.'" *Id.* at 46

(quoting *Clappier v. Flynn*, 605 F.2d 519, 530 (10th Cir. 1979), and *Mason v. Okla. Tpk. Auth.*, 115 F.3d 1442, 1459 (10th Cir. 1997), *overruled on other grounds by TW Telecom Holdings, Inc. v. Carolina Internet Ltd.*, 661 F.3d 495, 497 & n.2 (10th Cir. 2011)). *Clappier* can be distinguished because it concerned only compensatory damages and was merely recognizing that a plaintiff should not be permitted to recover more in compensatory damages than the loss incurred. Civil penalties, however, are not imposed to compensate a party but to penalize the defendant.

More in point is *Mason*, which considered the imposition of punitive damages, a remedy that is also not designed to compensate the victim but to penalize the defendant. We wrote:

> Although the rule against double recovery arises most often in the context of compensatory damages, it applies to punitive damages as well. For instance, courts have held frequently that a plaintiff may not recover both punitive damages under a state tort law claim and treble damages under a federal statutory claim, where the state and federal claims arise from the same operative facts and merely represent alternative theories of recovery.

*Mason*, 115 F.3d at 1459 (footnote omitted);[14] *see also New York v. United Parcel Serv., Inc.*, 942 F.3d 554, 600 (2d Cir. 2019) ("Penalties cascading on a defendant

---

[14] *Mason* limited its double-recovery principle to circumstances in which both theories of recovery were "pled and tried together." 115 F.3d at 1459. On that ground one could distinguish "double recoveries" from recoveries in multiple suits filed by distinct plaintiffs. *See Counties*, 959 F.3d at 1223–24 (rejecting Volkswagen's argument that prior settlement agreement reached with federal government for violations of § 7522(a)(3)(A) and (B) precluded further liability for the same conduct in subsequent civil suit brought by counties for violations of overlapping state and local prohibitions).

from several statutory regimes must be applied with great care when they result from one underlying set of bad actions."). *But cf. Morse Diesel Int'l, Inc. v. United States*, 79 Fed. Cl. 116, 121–22 (2007) ("The court disagrees with the view that imposing civil penalties under the Anti-Kickback Act, and separate civil penalties and treble damages under the False Claims Act for the same acts, is either duplicative or prohibited.").[15]

Defendants' second theory is, in essence, that the penalties authorized for violations of a state SIP must yield to the specific penalties set forth in § 7524(a) for tampering with vehicle emissions controls. This theory may be in keeping with the function of SIPs within the CAA framework. Their chief purpose is to regulate stationary sources of pollution to attain air-quality standards established by the EPA. They play only a limited role with respect to Title II of the CAA, which focuses on mobile sources of pollution. Title II imposes just a few requirements on SIPs.[16] To be sure, a SIP may, as Utah's does, establish further requirements on motor vehicles (although only after sale to the ultimate purchaser), but the CAA does not generally require them to. (Thus, when Texas adopted a SIP that, in the view of the EPA,

---

[15] The government, by the way, had not sought double recovery in *Morse*, stating that if it received the penalties and treble damages under the False Claims Act, it would not pursue further penalties under the Anti-Kickback Act. *See* 79 Fed. Cl. at 121.

[16] *See, e.g.*, 42 U.S.C. § 7545(m)(1)(A) (mandating oxygenated-gasoline requirements in SIPs for certain carbon monoxide nonattainment areas); *id.* § 7586(a)(1) (requiring SIPs to have clean-fuel vehicle programs for fleets in certain nonattainment areas).

contradicted federal law governing tampering with motor-vehicle emission devices, the EPA disapproved of the SIP but assessed no penalty on Texas because it had no duty to address tampering in its SIP.[17]) One might infer that when Congress set the penalty for violation of a SIP, it was contemplating violations by power plants and factories, not motor vehicles. In particular, Defendants' apparent view is that a proper understanding of the CAA requires interpreting the SIP penalty provision as not permitting imposition of a penalty for violation of a SIP provision that duplicates the CAA's anti-tampering provision.[18] *Cf. Loving v. IRS*, 742 F.3d 1013, 1020 (D.C. Cir. 2014) (Kavanaugh, J.) (rejecting interpretation of a general statutory penalty provision as conveying to the IRS a "heretofore undiscovered carte blanche grant of authority . . . to impose an array of penalties" on tax-return preparers for conduct already specifically targeted by a comprehensive penalty scheme in the Tax Code).[19]

---

[17] *See* Approval & Promulgation of Air Quality State Implementation Plans (SIP); Texas; Disapproval of Revisions to the State Implementation Plan, 63 Fed. Reg. 6651 (Feb. 10, 1998).

[18] As best we can tell, there is only one other circumstance in which a violation of a SIP could also be a violation of a provision in Title II for which there is a specific penalty in Title II. Penalties for violations of certain fuel regulations are provided by 42 U.S.C. § 7545(d)(1). And a SIP may include a fuel regulation if the EPA finds that the regulation is necessary to achieve NAAQS. *See id.* § 7545(c)(4)(C)(i).

[19] Even if this argument of Defendants is correct, it would not necessarily foreclose States from setting their own penalty provisions for violation of their SIPs. For instance, the Ninth Circuit's decision in *Counties* suggests that defendants may properly face liability under federal law for violation of anti-tampering provisions included in the CAA and under state law for violation of the relevant State's SIP. *See* 959 F.3d at 1223–25.

48

Neither of Defendants' arguments is frivolous. But we need not resolve them at this time. That is because another of their arguments—that the district court did not properly apply the statutory factors in evaluating the size of the penalty—is persuasive with respect to the SIP anti-tampering violations, so we must reverse and remand for reconsideration of those penalties. The analysis is straightforward.

The CAA provides assessment criteria to be used in judicial and administrative proceedings when imposing penalties. It states:

> *In determining the amount of any penalty to be assessed under this section* or section 7604(a) of this title, the Administrator or *the court*, as appropriate, *shall take into consideration* (in addition to such other factors as justice may require) the size of the business, the economic impact of the penalty on the business, the violator's full compliance history and good faith efforts to comply, the duration of the violation as established by any credible evidence (including evidence other than the applicable test method), payment by the violator of penalties previously assessed for the same violation, the economic benefit of noncompliance, and *the seriousness of the violation*.

42 U.S.C. § 7413(e)(1) (emphasis added).

We focus here on "the seriousness of the violation." The district court noted that in evaluating the seriousness-of-the-violation factor, courts have considered "(1) the number of violations; (2) the duration of noncompliance; (3) the significance of the violation (degree of exceedance and relative importance of the provision violated); and (4) the actual or potential harm to human health and the environment." *UPHE II*, 2020 WL 4282148, at *22 (internal quotation marks omitted). The court determined that the seriousness of the violation "weigh[ed] *against* mitigating penalties." *Id.* at *25 (emphasis added). But in so doing, the district court did not

49

give proper weight, if it gave any weight at all, to the judgment of Congress regarding the severity of the tampering violations. We seek "objective indications of the seriousness with which society regards the offense." *Frank v. United States*, 395 U.S. 147, 148 (1969) (holding that a "petty" offense, for which jury trial is not required, is one for which the maximum sentence is no greater than six months). And when considering the seriousness of an offense for purposes of federal law, there could be no better objective indication than the penalty authorized by Congress for the specific conduct. *See United States v. 817 N.E. 29th Drive*, 175 F.3d 1304, 1309 (11th Cir. 1999) ("Because Congress is a representative body, its pronouncements regarding the appropriate range of fines for a crime represent the collective opinion of the American people as to what is and is not excessive."). For example, when assessing the propriety of a punitive-damages award, courts may compare the award to the civil penalties that could be imposed for comparable misconduct to "accord substantial deference to legislative judgments concerning appropriate sanctions for the conduct at issue." *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 583 (1996) (internal quotation marks omitted). In this case we need look no further than the CAA itself. *See Arizona v. ASARCO LLC*, 773 F.3d 1050, 1058 (9th Cir. 2014) (en banc) ("Here, Congress has made a reasoned judgment not simply as to analogous criminal or civil penalties, but as to punitive damages awarded in cases like the one at hand. We need not search outside the statutory scheme Congress enacted for legislative guidance in other contexts.").

50

For persons other than manufacturers or dealers, the maximum penalty for tampering with a motor vehicle, no matter what the aggravating factors, was set by Congress at $2,500. *See* 42 U.S.C. § 7524(a). Such a clear signpost cannot be ignored. True, violations of requirements in SIPs are subject to a higher penalty cap. *See id.* § 7413(b) ("not more than $25,000 per day for each violation"). But the fact that a factory or an industrial plant contaminating the atmosphere (and it cannot be gainsaid that such stationary polluters are the bread-and-butter of a SIP) may merit a much higher penalty is hardly ground for imposition of similar penalties for tampering with an automobile emission system. The very fact that one of the statutory assessment criteria is "seriousness of the violation" testifies to the need for an individualized assessment of each violation.

We therefore must hold that the district court abused its discretion in weighing the seriousness-of-the-violation factor against Defendants in calculating penalties for violations of the Utah SIP's anti-tampering provision. We vacate the penalties associated with those violations and remand for the district court's reconsideration.

## 2.   Other challenges to the penalties

Our remand for reconsideration of the SIP anti-tampering penalties, however, represents the only respect in which we agree with Defendants' arguments regarding the penalties assessed against them.

To begin with, we see no other abuse of discretion in assessing the statutory factors for imposition of penalties. In all other respects, the district court's careful evaluation of the factors evinced the essence of judicial discretion. We do note,

however, that after judgment was entered Defendants presented some evidence of financial reverses that led to a district-court order conditionally granting a motion staying execution of the judgment. Reconsideration of the penalties in light of any such developments is authorized on remand.

Finally, Defendants argue that the penalties imposed on them for violations of Utah's SIP are "excessive and disproportionate to the gravity of the violations," and therefore unconstitutional under the Eighth Amendment. Aplt. Br. at 47. They attack what they call the "outrageously excessive" $114 million starting point calculated by the district court for owning-and-operating violations by B&W. *Id.* But that is not the penalty the court imposed. Although employing the top-down approach that starts with the statutory maximum, the court lowered the owning-and-operating penalties by more than 99.8%, to $114,426 for B&W. *See UPHE II*, 2020 WL 4282148, at *19, *25. The test for whether a fine is excessive under the Eighth Amendment is whether "it is grossly disproportional to the gravity of a defendant's offense." *United States v. Bajakajian*, 524 U.S. 321, 334 (1998). In light of the flagrant misconduct by Defendants, we see no gross disproportion. They have brought to our attention no comparable case in which a civil penalty was held to violate the Eighth Amendment.

## IV.   CONCLUSION

The judgment of the district court is **AFFIRMED IN PART** and **REVERSED IN PART**. On remand, the court shall make findings regarding which, if any, of the vehicles sold or awarded to out-of-state customers were driven or operated in Utah before sale. The following categories of violations shall then be excluded from the

52

total liability: (a) violations based on vehicles sold or awarded to out-of-state customers without first being driven or operated in Utah; (b) violations based on defeat parts sold to out-of-state customers; and (c) violations based on marketing (but not sale) of defeat parts. Finally, the court will need to reassess appropriate penalties under the CAA and Utah's SIP in a manner consistent with this opinion, taking into account the same factors as before, as well as any additional information the court deems relevant.

UNITED STATES COURT OF APPEALS FOR THE TENTH CIRCUIT
Byron White United States Courthouse
1823 Stout Street
Denver, Colorado 80257
(303) 844-3157
Clerk@ca10.uscourts.gov

Christopher M. Wolpert                                                  Jane K. Castro
Clerk of Court                                                  Chief Deputy Clerk

December 28, 2021

Mr. Cole S. Cannon
Mr. Janet M Conway
Cannon Law Group
124 South 600 East
Salt Lake City, UT 84102

Mr. George E. Hays
George Hays, Attorney at Law
P.O. Box 843
#110
Bellevue, WA 98009

Mr. Reed Zars
Law Office of Reed Zars
910 Kearney Street
Laramie, WY 82070-3911

**RE:    20-4043, Utah Physic. for Healthy Env't v. Diesel Power Gear, et al**
**Dist/Ag docket: 2:17-CV-00032-RJS**

Dear Counsel:

Enclosed is a copy of the opinion of the court issued today in this matter. The court has
entered judgment on the docket pursuant to Fed. R. App. P. Rule 36.

Pursuant to Fed. R. App. P. 40(a)(1), any petition for rehearing must be filed within 14
days after entry of judgment. Please note, however, that if the appeal is a civil case in
which the United States or its officer or agency is a party, any petition for rehearing must
be filed within 45 days after entry of judgment. Parties should consult both the Federal
Rules and local rules of this court with regard to applicable standards and requirements.
In particular, petitions for rehearing may not exceed 3900 words or 15 pages in length,
and no answer is permitted unless the court enters an order requiring a response. *See* Fed.
R. App. P. Rules 35 and 40, and 10th Cir. R. 35 and 40 for further information governing
petitions for rehearing.

Please contact this office if you have questions.

Sincerely,

Christopher M. Wolpert
Clerk of Court

CMW/klp